# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| *In re*: Application Pursuant to 28 U.S.C.§ 1782 of<br>FARHAD AZIMA<br>5921 Ward Parkway<br>Kansas City, Missouri 64113<br><br>　　　　　Petitioner,<br><br>　　　　　v.<br><br>AMIR HANDJANI<br>290 West Street, Apartment 6A<br>New York, NY, 10013<br><br>　　　　　Respondent. | No. 21 mc- |

## DECLARATION OF DOMINIC HOLDEN

**I, DOMINIC HOLDEN**, do hereby declare under penalty of perjury pursuant to 28 U.S.C.§1746 the following.

**Introduction**

1. I am admitted to practice law, as a solicitor, before the Courts of England and Wales and I am a partner of the London-based law firm located in the United Kingdom (**"UK"**), Burlingtons Legal LLP (**"Burlingtons"**). Burlingtons acts for Mr. Farhad Azima, the Defendant and Counterclaimant in civil proceedings pending in the High Court of Justice of England and Wales, Business and Property List captioned: RAKIA -v- Mr Farhad Azima (Claim no.: HC-2016-002798) (**"the UK Proceedings"**).

2. I respectfully submit this Declaration in support of Mr. Azima's application for an order under 28 U.S.C. § 1782 directing that Amir Handjani produce discovery for use in the UK Proceedings, including documents and a deposition.

3. Nothing in this statement is intended, and I am not authorized, to waive any legal privilege on behalf of Mr. Azima. I am authorized by Mr. Azima to make this Declaration on his behalf.

4. As detailed below, the UK Proceedings include a counterclaim alleging hacking brought against RAKIA by Mr. Azima. On 11 June 2021, Mr. Azima applied to join four other Defendants to his counterclaim, namely: Mr Jamie Buchanan, Mr. Stuart Page, Dechert LLP, and Mr. Neil Gerrard (**"the Additional UK Defendants"**). The hearing to consider Mr. Azima's application to join the Additional UK Defendants to the UK Proceedings is pending. However, pending the hearing, Mr. Azima issued a claim against the Additional UK Defendants (Claim No. BL-2021-000666) (**"the Claim against the Additional UK Defendants"**).

5. Reference to the "UK Proceedings" in this application should be treated as including the UK Proceedings and the Claim Against the Additional UK Defendants (until such time as this claim has been withdrawn or determined) given that the information and material sought from Mr. Handjani will be relevant to both sets of proceedings in the UK.

**The UK Proceedings**

6. In the UK Proceedings, Defendant to the Counterclaim (**'RAKIA'**) is the state investment entity of the Emirate of Ras Al Khaimah (**'RAK'**). Mr. Azima is a U.S. citizen and a businessman with whom RAKIA had engaged in several commercial ventures.

7. On 30 September 2016, RAKIA sued Mr. Azima regarding two of those ventures. RAKIA's claim relied on a substantial quantity of Mr. Azima's hacked and stolen private and personal data. RAKIA admitted that the materials were stolen but claimed to have obtained them innocently from sources on the internet. In addition to resisting the merits, Mr. Azima alleged that RAKIA was responsible for the hacking and for the publication of the hacked material on the internet (such that RAKIA's claim to have discovered the materials on the internet was a sham). Mr. Azima brought a counterclaim against RAKIA for the hacking and related wrongs, seeking injunctive relief and damages. He also raised a defence of set-off to the sums claimed by RAKIA.

8. The trial of RAKIA's claims took place in January and February 2020 (the '**First Trial**') before Mr. Andrew Lenon QC, sitting as a Deputy Judge of the High Court (the '**Deputy Judge**'). Judgment was given on 22 May 2020 ('**HC Judgment**').

9. The Deputy Judge found that RAKIA's account of having discovered the hacked materials on the internet was not true but found overall that RAKIA's responsibility for

the hacking had not been proven. The Deputy Judge therefore dismissed the counterclaim on the basis that RAKIA's responsibility for the hacking had not been proven.

10. Mr. Azima was granted leave to appeal the Deputy Judge's findings on the hacking among other findings. In support of his appeal, Mr. Azima also sought to rely on new evidence indicating RAKIA's responsibility for the hacking. Following a hearing from 2-4 March 2021, the Court of Appeal gave judgment on 12 March 2021 (the '**CA Judgment**'). The Court of Appeal, among other things, overturned the dismissal of the hacking counterclaim and remitted the counterclaim for a further trial before a new Judge and admitted the new evidence relating to the hacking.

11. The Court of Appeal also noted that the findings of the Deputy Judge on the hacking issue will not be binding in the new trial.

12. Following the CA Judgment Mr. Azima applied to the English High Court to amend his Counterclaim by adding additional parties as defendants, namely, Mr. Neil Gerrard, Dechert LLP, Mr. James Buchanan, and Mr. Stuart Page. Mr. Azima's draft, amended Counterclaim is at (**Exhibit A**) (**"the Draft Counterclaim"**).

## Mr Amir Handjani

13. Mr. Amir Handjani is a U.S. Citizen and a lawyer in two U.S. jurisdictions. He was and may still be a close advisor to Sheikh Saud bin Saqr Al Qasimi (the Ruler of Ras Al Khaimah) (**"the Ruler"**), who is implicated in the hacking. Mr. Handjani is a member of the board of RAK Petroleum and a senior adviser to Karv Communications, a firm engaged by RAKIA in connection with RAKIA's investigation of Mr. Azima and others. As explained below, Mr. Handjani was involved with other agents acting for RAKIA in relation to this dispute and has made a witness statement in the UK Proceedings on RAKIA's behalf (**Exhibit B**) in which he has confirmed (§13-22) that he became involved in RAKIA's dispute with Mr. Azima in March 2015.

## Summary of the factual case against RAKIA and the Additional Defendants

14. The draft hacking Counterclaim sets out the case against RAKIA and the Additional Defendants. Rather than repeating the contents of that pleading in detail in this Declaration, I respectfully refer the Court to the draft hacking Counterclaim and set out below a summary of the key elements of the case and indicate the main sources of evidence supporting it. For reasons of economy, I do not address every part of the case.

A summary of the case against RAKIA and each of the Additional Defendants is set out at § 100-110 of the draft Counterclaim (which draw on the more detailed particulars given earlier in the document).

15. There is no dispute that Mr. Azima was the victim of hacking, or that RAKIA has had possession of the hacked materials:

   a. In August and September 2016, links to around 30 GB of Mr. Azima's personal and private data spanning more than 10 years, including a substantial number of privileged communications, appeared online. The links to anonymous peer-to-peer platforms known as BitTorrents appeared on websites that disparaged Mr. Azima. At the First Trial, it was common ground that this material had been obtained without Mr. Azima's authority by hacking his electronic devices and/or email accounts.

   b. On 23 September 2016, RAKIA sent a pre-action letter to Mr. Azima, making allegations based on documents included within the hacked materials. A claim was issued shortly afterwards, on 30 September 2016, relying very heavily on the hacked material.

   c. No other party has sought to rely on the hacked material in any proceedings in any jurisdiction.

16. Before and after the time that the materials appeared on the internet and RAKIA brought its claim, RAKIA had been in a dispute with its former CEO, Dr. Khater Massaad (**"Dr. Massaad"**). In 2015 and 2016, Mr. Azima assisted the parties (RAKIA and Dr. Massaad) in seeking to broker a settlement between RAKIA and Dr. Massaad.

**Mr. Page and the "Project Update" Identifying Mr. Azima as an Enemy**

17. In around March 2015, RAKIA believed that Mr. Azima was working with Dr. Massaad, and was managing a "*team*" in the U.S. working to draw attention to allegations of human rights abuses in RAK. The evidence for this is set out in a document created by RAK's advisors and called "RAK Project Update Report" (the '**Project Update**'). The Project Update makes clear that RAKIA viewed Mr. Azima as an enemy of RAK and proposed that action be taken against Mr. Azima and his team, including steps to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans*" (**Exhibit C**).

18. Evidence presented at the First Trial established that the Project Update was authored by RAKIA's agent Mr. Stuart Page (**"Mr. Page"**) and provided to RAKIA and its other agents by Mr. Page. RAKIA admits that it had engaged Mr. Page to provide investigative services in relation to its dispute with Dr. Massaad, and that Mr. Gerrard (RAKIA's English lawyer at the time) and Mr. Buchanan (RAKIA's authorised representative at the time) provided instructions to him.

**The Ruler's Instructions to Mr. Handjani and Others to Go After Mr. Azima**

19. Shortly after the Project Update was distributed, the Ruler instructed Mr. Handjani, Mr Buchanan, and Mr. Nasser Bustami to "*target*" and "*go after*" Mr. Azima, as recorded in emails between Mr. Buchanan and others (**Exhibit D**). Mr. Handjani received and responded to these emails.

**Spear-phishing emails**

20. Between March 2015 through August 2016, more than 150[1] malicious 'spear-phishing' emails were received by Mr. Azima and others associated with him. Common features of these emails point to a single 'spear-phishing' campaign targeting Mr. Azima and associated persons.

**The 'View from the Window' Document Authored by a Company Affiliated with Mr. Handjani**

21. In late December 2015, Karv Communications provided a document entitled the 'View from the Window' to RAKIA and its agents accusing Mr. Azima of taking actions against RAK. The report stated that "*through a series of investigations*" it had been "*exposed as fact*" that, "*FA* [Mr. Azima]*, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities*" (**Exhibit E**). Karv Communications, the company at which Mr. Handjani serves as a senior advisor, provided this document to RAKIA and its agents.

22. Karv Communications is a PR firm based in New York City and is one of RAKIA agents. Mr. Handjani is closely associated with the company and featured on its

---

[1] It is likely that significantly more such emails were received than those that have been identified. A substantial number of emails are likely to have been caught by spam or virus filters and/or deleted by the time the emails were identified (which for the vast majority was in mid-2020).

5

website. In 2019, Mr. Handjani filed a Foreign Agent Registration Act form listing Karv Communications for his business (**Exhibit F**).

**The July 2016 meeting**

23. Evidence at the First Trial established that in July 2016, Mr. Gerrard pressured Mr. Azima to assist RAKIA in its dispute with Dr. Massaad. Mr. Gerrard told Mr. Azima that if he did not do so, and if Dr. Massaad did not agree to a settlement of his dispute, Mr. Azima would be "*collateral damage*" in the ensuing conflict that would then occur between RAKIA and Dr. Massaad. At the time of this threat, Mr. Azima was unaware that he had already been hacked.

**The Torrent sites**

24. The dispute was not settled. As set out above, within weeks of this meeting, blog sites were created that disparaged Mr. Azima and contained links to over 30GB of Mr. Azima's confidential and/or private data on torrent sites (the '**Torrents**'). Though Mr. Azima was never able to access the data, RAKIA was, and has disclosed to Mr Azima a copy of the data that it claimed was on the Torrents. The stolen data included:
    a. Emails taken from 10 email accounts belonging to Mr. Azima and Mr. Adams (the Chief Financial Officer of Heavylift, one of Mr. Azima's companies);
    b. Mr. Azima's appointments, call history, photos, recordings, SMS messages, Viber messages, videos, voicemails, WhatsApps, contacts and notes; around: (i) 161,702 emails; (ii) 13,736 photographs or other images; and (iii) 840 voice recordings; material of a personal nature about Mr. Azima and his family.

25. In 2018 and 2019, additional links to Mr. Azima's stolen data were added to the blog sites disparaging Mr. Azima.

**The emails 'breaking the news' that the hacked data was online**

26. On 15 and 16 August 2016, Mr. Buchanan and Mr. Gerrard each sent emails purporting to "break the news" of the discovery of the websites containing Mr. Azima's stolen data (**Exhibit G**). Mr. Handjani and Mr. Frank received the email of 16 August 2016. As set out in the draft pleading at §§ 67-70, the expressions of surprise in those emails (and the suggestion that RAKIA had learned of them only on around 14 August 2016) cannot be reconciled with other evidence, including emails from RAKIA's side showing that the websites were being downloaded by RAKIA's IT consultants (which, on RAKIA's

6

case, was done on Mr. Gerrard's and Mr. Buchanan's instructions) several days prior to that point. Mr. Azima's case is that it is to be inferred that the emails were intentionally written to confect a documentary trail purporting to evidence the 'innocent discovery' of the Torrents.

**CyberRoot and Mr. Nicholas Del Rosso and Gravitas**

27. In February 2021, bank statements of an Indian cyber security firm, CyberRoot Risk Advisory Private Limited ('**CyberRoot**') were publicly filed in U.S. legal proceedings. An ex-employee of CyberRoot (supported by other evidence) has confirmed that CyberRoot is a 'hack for hire' firm, that CyberRoot uses the infrastructure of another Indian hack for hire firm, BellTroX Info Tech Services, and that other hacking firms had been approached to target Mr Azima as early as October 2014.

28. The bank statements show that over $1 million had been paid to CyberRoot between 2015 and 2017 by a company located in North Carolina known as Vital Management Services, Inc. which is controlled by Nicholas Del Rosso. RAKIA and Mr. Del Rosso now admit that these payments were made.[2]

29. Mr. Del Rosso testified at the First Trial that he arranged for the hacked material to be downloaded from the Torrents in August and September 2016 by Northern Technology Inc., on RAKIA's behalf. RAKIA has admitted that Mr. Del Rosso is their agent, and Mr. Gerrard and Mr. Del Rosso have admitted that Mr. Del Rosso received instructions from Mr. Gerrard. Mr. Del Rosso made no mention in either his written or oral evidence at the First Trial of his involvement with CyberRoot on RAKIA's behalf.

30. Mr. Azima also understands (from correspondence in other proceedings) that the bank statements show that substantial payments were made to CyberRoot by Gravitas International LLC ('**Gravitas**'), an enterprise owned and controlled by Mr. Buchanan and located in the UAE. Mr. Buchanan made no mention in either his written or oral evidence at the First Trial of his involvement with CyberRoot.

---

[2] Mr. Azima has separately sued Mr Del Rosso and Vital in North Carolina. *See Azima v. Del Rosso et al*, No. 1:20-cv-00954-WO-JLW, (M.D.N.C. Oct. 15, 2020).

7

**Discovery Sought**

31. Prior to the First Trial, both Mr Azima and RAKIA undertook an extensive disclosure/discovery exercise. However, documents within the possession and/or control of Mr. Handjani were not included in the search undertaken by RAKIA.

32. Karv Communications, to which Mr. Handjani is a senior adviser, was included in the search.

33. It is clear from the "Breaking the News" communications (referred to at ¶ 25 above), and the emails in respect of The Ruler's Instructions to "target" and "go after" Mr. Azima (referred to at ¶ 19 above), that Mr. Handjani used his personal Gmail account, and likely other personal devices and accounts to communicate with representatives of RAKIA, Mr. Page, Mr. Buchanan, Mr. Gerrard/Dechert, Mr. Bustami, Mr. Halabi, and the Ruler in respect of issues relevant to the UK Proceedings.

34. Further, given his close connection with Karv Communications and the Ruler, Mr. Handjani will likely have emails and/or other documents relating to the creation of the "View From the Window" document (referred to at ¶ 21 above).

35. Accordingly, on information and belief, Mr. Handjani has information, documents, and material which would provide evidence which is directly relevant to the issues in the UK Proceedings, and which have not yet been disclosed in the UK Proceedings to date, which relate to the period from September 2014 to date.

36. Moreover, given Mr. Handjani's close involvement with the events described in the Amended Counterclaim, from the start of the decision to "target" Mr. Azima through the emails purporting to "break the news" of the discovery of Mr. Azima's stolen data, a deposition of Mr. Handjani is necessary to obtain evidence relevant to the allegations.

37. For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

38. Pursuant to 27 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Dated: 29 June 2021

*Dominic Holden*

_____
**Dominic Holden**