# Exhibit B

Claimant<br>
Amir Ali Handjani<br>
First<br>
5 September 2019

**IN THE HIGH COURT OF JUSTICE**                               Claim No: HC-2016-002798

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**

**BETWEEN:**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

<u>Claimant</u>

-and-

**FARHAD AZIMA**

<u>Defendant</u>

---

**WITNESS STATEMENT OF**
**AMIR ALI HANDJANI**

---

I, **AMIR ALI HANDJANI**, of RAK Petroleum plc, PO Box 1223, Ras Al Khaimah, UAE **WILL SAY** as follows:

1. I am a company director and currently sit on the board of a number of companies, including RAK Petroleum plc. I make this statement on behalf of the Claimant, Ras Al Khaimah Investment Authority ("**RAKIA**") to address certain matters involving the Defendant, Farhad Azima ("**Mr Azima**").

2. Save insofar as is stated otherwise, the facts and matters set out below are within my own knowledge or are derived from other sources or documents that I have seen and which in all cases I believe to be true.

3. Documents to which I refer in this witness statement are identified by reference to their disclosure ID number (contained in curly brackets { }).

**Background**

4. I am a US citizen and qualified lawyer in two US jurisdictions. I practised law in the US, including working for the Department of Justice, until around 2004, when I moved to the UAE to set up and work for an e-commerce company.

1

5. Not long after I moved to the UAE, I was introduced by a family friend to His Highness Sheikh Saud bin Saqr al Qasimi ("**His Highness**"), who was then Crown Prince and is now the Ruler of Ras Al Khaimah ("**RAK**").  At some point around this time, His Highness became interested in the company I was working for and became a joint venture partner in the business.  I had intended to return to the US when the business was up and running, however, before I did so, His Highness informed me that he intended to establish and develop an oil company in RAK and that he wanted me to help him do so.  In 2006 I therefore agreed to become the Vice-President of Legal Affairs of RAK Petroleum PCL.

6. I stayed in the UAE working for companies within the RAK Petroleum group for the next decade or so, during which time my role changed to that of General Counsel. I was involved in various aspects of the business, including assisting in matters related to the appointment of senior management.  I often worked closely with His Highness in my role and over time got to know him well.

7. On occasions, His Highness asked me to assist him or RAK in various matters. For example, in around 2009, His Highness asked me to be involved in a project related to the America's Cup being held in RAK.  In that context, His Highness introduced me to Andrew Frank ("**Mr Frank**") who I understood would be helping with the public relations aspects of the project.

8. Since 2009, I have got to know Mr Frank well.  When Mr Frank set up his public relations company, Karv Communications, he appointed me as a senior adviser although I do not have day to day involvement with the company.

9. RAK Petroleum PCL was restructured between 2014 and 2015 with the assets, liabilities and business being transferred to a new vehicle which was ultimately listed, being RAK Petroleum plc. Since then, whilst I have held (and continue to hold) a position on RAK Petroleum plc's board, I have been less involved with the company's operations and have held various positions outside of RAK.  I was based in the UAE until around 18 months ago, at which time I relocated back to the US.

**Dr Khater Massaad and Mr Azima**

10. Prior to 2012, Dr Khater Massaad ("**Dr Massaad**") was a very prominent individual in RAK.  As a result of my role within RAK Petroleum PCL, I met Dr Massaad

2

several times.  We were quite well known to each other and were on good terms.

11. I also met Mr Azima during my time in RAK.  I believe the first occasion was in or around 2008, when His Highness invited me to a dinner at which both Dr Massaad and Mr Azima were present.  I recollect that Mr Zalmay Khalilzad (who was then the US Ambassador to the United Nations) was also present at that dinner.  To the best of my recollection, my understanding at the time was that Mr Azima was involved in one or more commercial transactions in RAK, but I was not aware of any details.  I did not understand him to be a friend of His Highness or to know him particularly well.

12. In the decade or so since I met Mr Azima, I have occasionally bumped into him at social events in RAK and the US.  We move in some of the same expatriate circles in the US given that we are both Iranian Americans and I understand that he has a mutual friend with my father.  He is therefore someone with whom I have had exchanges from time to time.  Before the events described below, those interactions were generally limited to the exchange of pleasantries, when our paths happened to cross.  On occasions, Mr Azima had also reached out to me when seeking to contact His Highness, for example in relation to His Highness' invitation to the Clinton Global Initiative in 2011 **{RAK0000525}**.  As far as I recall, until I was brought into Mr Azima's dispute with RAKIA (and/or other RAK entities) as I describe below, I did not have any dealings with Mr Azima in any business or professional capacity.

**My involvement in the dispute(s)**

13. In the spring of 2015, I received a telephone call out of the blue from Mr Azima.  I believe this was in March 2015 as I was staying with family in Iran for Iranian New Year, which is celebrated on 21 March.  I was surprised to receive the call from Mr Azima as I was not involved in any matters related to him at the time and I did not know (and still do not know) how he knew I was in Iran at the time or how he got the telephone number on which he reached me.

14. My recollection of the call is that Mr Azima wished me happy New Year and then proceeded to tell me that there was a big problem between him and His Highness and that he needed me to help resolve it.  Mr Azima said that he was owed $8m by RAK.  I cannot recall on what basis he said he was owed this money or in how much detail we discussed the matter on this call.  However, whilst the tone of the call was friendly, I do recall Mr Azima saying that if things were not resolved, it

3

could "get ugly" for everyone.  As far as I can recall, Mr Azima did not mention Dr Massaad on this call or any other matters aside from the $8m he said he was owed.

15. Around the same time, I also received an unexpected call from Dr Massaad.  I am less certain of the exact date of this call, but I believe it was shortly after the call I received from Mr Azima.   I do not believe that we had been in contact for a few years prior to this.  On the call, Dr Massaad said that he knew I was close to His Highness and he asked me to talk to His Highness and get him to stop investigating him.  I believe Dr Massaad also mentioned Mr Azima during the call.  I told Dr Massaad that I would relay what he had said to His Highness, but I did not anticipate being able to stop anything.

16. I informed His Highness about both calls.  His Highness put me in touch with Jamie Buchanan ("**Mr Buchanan**") and Naser Bustami ("**Mr Bustami**"), to discuss matters further.  I believe I met with Mr Buchanan and Mr Bustami in late March or early April 2015 and it was around this time that I began to learn more about the ongoing investigations in respect of Dr Massaad and learned that Mr Azima may also have been involved in related matters.  His Highness asked me to ensure that there remained an open channel of communication between me and Mr Azima and (separately) Dr Massaad.

17. I have been shown several email exchanges that I had with Mr Buchanan and Mr Bustami over the period of 4 – 6 April 2015 (e.g. **{RAK0001059}**, **{RAK0001062}**). I can see that there are various references to His Highness wanting Mr Azima to be targeted and charges brought against him.  I believe I understood these references to reflect His Highness' view that we should consider whether criminal or civil charges could be brought against Mr Azima.  I do not recall discussing the basis for any such potential charges with His Highness. This recollection is confirmed by my emails on 4 April **{RAK0001059}**. I do recall thinking that I knew of no basis on which to bring charges against Mr Azima and that the better course was for RAK first to investigate the issue of the money that Mr Azima said was owed and seek to negotiate a resolution with Mr Azima as appropriate. I recall advising His Highness against bringing any lawsuits against Mr Azima until any investigations or negotiations had run their course. This is reflected in my email on 6 April 2015 to Mr Bustami **{RAK0001062}**.

4

18. I do not recall what the reference to "another channel" meant in the email of Mr Bustami to me on 4 April 2015 to which I responded on 6 April 2015 also referring to "other channels" **{RAK0001062}**. It may have been a reference to me talking to Mr Azima or Dr Massaad directly.

19. Over the next few months, at His Highness' request, I continued to act as a channel of communication for discussions regarding the money Mr Azima said he was owed. I believe at some point Mr Azima's focus changed from there being a specific $8m debt to a claim in relation to a failed joint venture he had entered with RAK Airways in relation to a training academy and he appeared to drop the former request. My role was primarily limited to passing messages back and forth between Mr Azima and representatives of RAK (that is Mr Buchanan and Mr Bustami). I believe that at one stage I expressed the view that I considered Mr Buchanan was much better placed than I was to progress the negotiations with Mr Azima (not least as I was not regularly in RAK at this point in time) and I note that on 14 June 2015, I introduced Mr Buchanan to Mr Azima by email for this purpose **{RAK0001105}**.

20. Over the rest of 2015 and into 2016, I continued to be involved from time to time in discussions with Mr Buchanan and Mr Bustami regarding both the money that Mr Azima said was owed to him and matters involving Dr Massaad. However, my involvement was intermittent, and I was not party to all the details of the ongoing investigations and negotiations which were increasingly being led by Mr Buchanan. Throughout my involvement I encouraged negotiations towards settlement.

21. I have been shown an email from 19 July 2015 in which Mr Buchanan told me that His Highness wanted *"to go after FA – subject to guidance from AF"* **{RAK0001158}**. I understood this to be a similar request to that in April, that is to consider the possibility of bringing criminal or civil charges against Mr Azima. At around the same time Mr Azima had emailed me because he did not feel that discussions with RAK were progressing in relation to his training academy claim **{HL_00000238}**, **{RAK0001157}**. In my response to Mr Buchanan's email of 19 July 2015 I said "*Talking to the boss now. He wants me to respond to the little guy in an email and to coordinate with you.*" I believe that was a reference to responding to Mr Azima's email about the training academy claim. I have seen

5

that on 28 July 2015 I sent a response to Mr Azima explaining that there was nothing I could do beyond putting him in touch with Mr Buchanan {HL_00000253}.

22. As far as I am aware no civil or criminal charges were brought against Mr Azima in 2015 and Mr Buchanan proceeded to negotiate a settlement with Mr Azima.

**Mr Azima's data**

23. I have no knowledge of who was responsible for the hacking of Mr Azima and/or the publication of his data. I understand that it has been suggested that the references in the emails I have mentioned to "targeting", or "going after" Mr Azima, and "using other channels" were somehow coded references to a plan to hack his emails. This is nonsense. I have already explained my understanding of these emails. No plan to hack Mr Azima's emails or data was ever mentioned to me by anyone in RAK, or anywhere else, and I was never party to any such plan. The first time that I became aware that there was data relating to Mr Azima available on the internet was when I received an email from Mr Buchanan – addressed to me and Mr Frank – on 16 August 2016 {RAK0001954}.

**Statement of Truth**

I believe that the facts stated in this witness statement are true.

**AMIR ALI HANDJANI**

DATE: 9/5/19

6