# EXHIBIT 5



Ras Al Khaimah Investment Authority v Farhad Azima

Day 8

January 31, 2020

Opus 2 International - Official Court Reporters

Phone: +44 (0)20 3008 5900
Email: transcripts@opus2.com
Website: https://www.opus2.com

**Page 1**

                Friday, 31 January 2020
(10.30 am)
            MR AMIR HANDJANI (continued)
        Cross-examination by MR LORD (continued)
MR LORD: May it please your Lordship, Mr Handjani, please
    could you be shown yesterday's transcript, {Day7/212:1}.
A.  I'm just waiting for it to come up.
Q.  That's all right.
A.  Yes, I have it up, my Lord.
Q.  Thank you Mr Handjani. Could you see the question that
    I asked at line 10 and your answer, please, at line 14.
    (Pause)
A.  I do, my Lord.
Q.  So I asked you whether:
        "... apart from a sort of general sort of advocacy
    for a settlement with Azima, you weren't involved in any
    of the analysis on the RAKIA side of things as to
    whether that was a good idea and, if so, on what terms?"
        You said:
        "That's a fair statement ..."
A.  "... counsel", yes, I did.
Q.  "counsel", yes. It's right, isn't it, that analysis on
    RAKIA's side of the fence as to HeavyLift's claims was
    effectively left to the Ruler, Mr Buchanan and possibly
    Mr Gerrard?

**Page 2**

A.  My Lord, my understanding at the time was it was left to
    Mr Buchanan who was in direct negotiation with Mr Azima,
    and of course Mr Buchanan, my Lord, is not a lawyer and
    I believe outside counsel was provided by Dechert
    through Mr Gerrard.
Q.  If we go to your second witness statement, please, at
    {D/16/2} and to paragraph 4.
A.  Yes, it's up now. I have it, my Lord.
Q.  Where you see you say this in paragraph 4:
        "Mr Azima asserts that I played a key role (with
    others) in the negotiation of the settlement agreement
    that he entered into with RAKIA in March 2016 (the
    'Settlement Agreement'). That is not correct. Whilst
    I was aware of the negotiations taking place with
    Mr Azima and Mr Azima would occasionally contact me to
    ask if I could assist in moving the negotiations
    forward, I played no role in the negotiation of the
    Settlement Agreement."
        Can his Lordship take it that that is an accurate
    reflection of your involvement in the settlement
    agreement?
A.  I believe so, my Lord.
Q.  You've seen, haven't you, Mr Handjani, I think, that
    the Ruler's approval was sought in February 2016 to
    enter into this settlement agreement with Mr Azima by

**Page 3**

    Mr Buchanan and Mr Bustami, haven't you?
A.  That's correct, my Lord.
Q.  And can his Lordship take it that you yourself do not
    know what the Ruler's reasons were in the event for
    approving the entry into by RAKIA of the settlement
    agreement?
A.  That's not correct, my Lord. I spoke to the Ruler about
    the settlement agreement when it was almost finalised.
    He asked my views on it, and I said I think it's full,
    I think it's fair, and at the time I thought that
    Mr Buchanan and Mr Azima had developed a pretty good
    working relationship. My understanding at that time was
    that Mr Azima was also assisting in negotiations with
    Mr Massaad. I saw no reason, and didn't have the
    details, other than perhaps a phone call from Mr Azima
    from time to time or information from Mr Buchanan from
    time to time, and I thought that was a good path
    forward.
Q.  But you didn't discuss, did you, what the wider
    objectives were?
A.  I actually did discuss with the Ruler, my Lord, what the
    wider objectives were at the time. The wider objectives
    were to settle the matter with Mr Azima. He seemed
    enthusiastic to do so, and also Mr Azima was helping
    with the settlement negotiations with Dr Massaad, and my

**Page 4**

    understanding was that was the wider objective, was to
    settle the matters with Mr Azima and settle the matters
    with Dr Massaad.
Q.  So at least one of the wider objectives of entering into
    the settlement agreement with Mr Azima was to continue
    with his co-operation or assistance in relation to the
    negotiations with Dr Massaad?
A.  I can't say if that was a key objective, but that was
    taking place, I was aware that was taking place,
    Mr Azima was being helpful, and I think both sides were
    treating each other with congeniality and fairness.
Q.  And what did you understand the purpose behind the
    good faith clause in the agreement, if in fact you knew
    about it?
A.  I did not know about the good faith clause, my Lord.
    I never read the settlement agreement, my Lord, until in
    court. I knew the quantum of the settlement agreement,
    my Lord.
Q.  So you can't give any evidence to his Lordship as to
    what lay behind, on RAKIA's side of the fence, seeking
    a good faith clause from Mr Azima in that contract?
A.  I cannot, my Lord.
Q.  Thank you.
A.  As a lawyer myself, my Lord --
Q.  Don't speculate. If you don't know about what happened,

**Page 5**

1  then just deal -- don't speculate; just deal with what
2  you knew about this particular contract.
3  A. Well, counsel, I was just going to say that as
4  a commercial lawyer, it's pretty normal to have
5  good faith clauses in contracts.
6  Q. Did you -- but you had no involvement with what lay
7  behind RAKIA seeking the good faith clause in this
8  particular settlement agreement?
9  A. I do not, my Lord.
10 Q. Thank you, Mr Handjani.
11     Could I ask you, please, now, to consider some of
12  the evidence you gave yesterday about Mr Azima and
13  HeavyLift's claims for compensation, please.
14 A. Of course.
15 Q. Would you go to {Day7/202:1} which is your evidence
16  yesterday Mr Handjani.
17 A. Yes, it's up.
18 Q. And could you please go to line -- if you go, please, to
19  line 14.
20 A. Yes.
21 Q. And read on down to about line 19, you were being asked
22  by me -- or you were giving evidence as to the emergence
23  of Mr Azima's claim for compensation, all right?
24 A. Yes.
25 Q. You said this at line 14, Mr Handjani:

**Page 6**

1     "The entire -- at this time, my Lord, the entire
2  thrust of what I believe was going on in my involvement
3  was to substantiate the validity of Mr Azima's monetary
4  claim. It came out of the sky. It came to me first.
5  I relayed that to the Ruler. In subsequent
6  conversations the quantum went down very quickly."
7     And so it runs on. Can you see that?
8  A. I can, my Lord. Would you like me to finish reading it?
9  Q. If you would like to, yes. (Pause)
10 A. Thank you, my Lord.
11 Q. If you would like to read, perhaps, the -- right through
12  to the end of page {Day7/202:1}, and if you could please
13  go then to read down to line 14 on page 203?
14 A. So I'm finished with 202?
15 Q. Yes, and then, Mr Handjani, if you would be kind enough
16  to read page 203 from line 1 to line 14 inclusive.
17 A. Yes. {Day7/203:1-14}.
18     I have read it, my Lord.
19 Q. Have you reviewed the transcript of your evidence from
20  yesterday overnight?
21 A. I have not, my Lord.
22 Q. Having now had a chance to review what you said to
23  his Lordship on oath yesterday in these passages,
24  Mr Handjani, are there any aspects of those -- of that
25  evidence of yours which you would like to revise?

**Page 7**

1  A. I do not, my Lord.
2  Q. So your evidence is that the HeavyLift claim had come
3  out of the sky; is that right?
4  A. My Lord, I didn't say the HeavyLift claim. I said he
5  didn't mention to me in that phone call, the first phone
6  call we had what -- there's three claims from what
7  I understand now, which I didn't understand at the time.
8  There's a HeavyLift claim, there's a training academy
9  claim, there's a simulator in one of those two, I'm not
10  sure which one that is, and then there's a Boeing claim.
11  When he discussed -- when Mr Azima called me in the
12  spring of 2015, he didn't discuss those claims
13  individually or collectively. He discussed the quantum
14  that he believed that was owed to him, my Lord, and that
15  was the quantum.
16 Q. So when, in {Day7/202:16-17}, you said of Mr Azima's
17  monetary claim "it came out of the sky", you're there,
18  aren't you, Mr Handjani, giving evidence on oath in
19  relation to Mr Azima's monetary claim?
20 A. As I heard it and put to me in that conversation that
21  I had with Mr Azima, that's correct.
22 Q. And "out of the sky", you mean out of the blue,
23  don't you, really, in other words it came from nowhere;
24  that's what you're trying to convey there, Mr Handjani,
25  isn't it?

**Page 8**

1  A. That is a fair interpretation.
2  Q. Could you please be shown {H7/79/1}, Mr Handjani.
3  A. Yes, it's up, my Lord.
4  Q. Have you seen this document before, Mr Handjani?
5  A. I just saw it in court for the first time, my Lord, last
6  week or this week, I can't recall.
7  Q. His Lordship can take it you had seen this document
8  before you gave the evidence you gave yesterday to
9  his Lordship?
10 A. I did, yes.
11 Q. Did you when you heard reference to this document, did
12  you consider the implications of this document?
13 A. I think we want to be careful, counsel. You asked me at
14  the time when I got the phone call in the spring of 2015
15  when I said that came out of the sky, I had not read
16  this document or knew anything about Mr Azima's claim in
17  the spring of 2015.
18     If you're asking me today about where those numbers
19  came from, yes, I've seen this in court. But that's
20  only been the last week, counsel.
21 Q. So should his Lordship understand when you said "it came
22  out of the sky", ie Mr Azima's monetary claim, what you
23  should really have said, or perhaps what you meant to
24  say, was, "As far as I, Mr Handjani knew of things, this
25  was the first time I knew of Mr Azima's claim for

**Page 9**

1    compensation". Is that what you meant?
2  A. I think we're quibbling over semantics, counsel.
3     I stand behind my statement, my Lord. I was very clear.
4     If my Lord would like me to further elucidate for him,
5     I would be happy to.
6  JUDGE LENON: Well, I think you can answer that question.
7  A. It's correct, as far as I was aware, at the time.
8  MR LORD: Because you can see there's a difference between
9     saying to his Lordship, "Mr Azima's claim came out of
10    the sky as far as anybody at RAKIA was concerned" --
11 A. I was speaking for myself, counsel, not anyone from
12    RAKIA, I'm speaking for myself.
13 Q. So --
14 A. Mr Azima called me in my personal capacity, not as an
15    executive of RAKIA. I have never been an executive of
16    RAKIA, my Lord.
17 Q. So his Lordship can take it, can he, Mr Handjani, that
18    before March 2015, you had no awareness at all of any
19    claims by Mr Azima for any compensation at all?
20 A. None that I can recall, my Lord.
21 Q. If you look at {H7/79/1}, Mr Handjani, you can see that
22    it's -- there's a letter on HeavyLift letterhead, can
23    you see that?
24 A. I can, my Lord.
25 Q. Dated 2 September 2013. And it's addressed to

**Page 10**

1     Jim Stewart who was at that time CEO of RAKIA. Can you
2     see that?
3  A. I can, my Lord.
4  Q. And in this claim, in this letter, sorry, entitled
5     "HeavyLift Windup", HeavyLift made a claim for
6     compensation in relation to the training academy at RAK
7     Airport. Can you see that?
8  A. I can, my Lord.
9  Q. And if you -- you can see what was said in this letter
10    by HeavyLift:
11       "A substantial investment was undertaken by
12    HeavyLift on behalf of the joint venture. That
13    investment includes, among other things ..."
14       Can you see number 1:
15       "Cash, training materials, and equipment of
16    approximately $2,260,000 USD."
17       Can you see that?
18 A. I can, my Lord.
19 Q. Then 2:
20       "Staff and management time and related costs ..."
21       Can you see that?
22 A. I can, my Lord.
23 Q. Then:
24       "RAK Airways was to provide to the joint venture,
25    among other things ..."

**Page 11**

1     And there's reference to various property-related
2     things, can you see that?
3  A. I can, my Lord.
4  Q. If you go over the page, please, Mr Handjani, to
5     {H7/79/2}, you can see in the third paragraph it says
6     this:
7        "We estimate the value of the land and the building
8     to be approximately US$5 million, of which HeavyLift
9     would be entitled to its 50% share on dissolution."
10       Can you see that?
11 A. I can, my Lord.
12 Q. It's right, isn't it, that on a fair reading of this
13    letter, HeavyLift was asking for, on the face of it,
14    US$2.26 million for its input and half of the
15    $5 million, so altogether roughly US$4.75 million?
16 A. I have no basis to challenge you, counsel, on that.
17 Q. Thank you. It wasn't a claim, was it, Mr Handjani, on
18    its face for US$8 million?
19 A. I am not giving testimony to the validity or the quantum
20    of the HeavyLift claim. My testimony was very clear,
21    counsel. When Mr Azima called me, the number he put to
22    me was $8 million.
23 Q. Can I take up that last answer, please, Mr Handjani.
24 A. Please.
25 Q. Would you be kind enough, please, to go to paragraph 13

**Page 12**

1     of your first witness statement which you'll find at
2     {D/15/3}.
3  A. I have it up now.
4  Q. You say in that paragraph 13 that in around March 2015
5     when you got this call, that you describe, you were in
6     Iran at the time with your family.
7  A. I was, my Lord.
8  Q. And you say you got a phone call.
9  A. I did, my Lord. It was a pleasant call, wishing me
10    first a happy Persian New Year, and I wished that back
11    to him. I was a bit surprised that Mr Azima had my
12    number, and then he went on to discuss the matters which
13    I lay out in my witness statement.
14 Q. Then if you look at paragraph 14 of your witness
15    statement {D/15/3}, you claim that your recollection of
16    the call is that Mr Azima said he was owed $8 million by
17    RAK.
18 A. That is correct, my Lord.
19 Q. And you say in paragraph 14:
20       "I cannot recall on what basis he said he was owed
21    this money ..."
22 A. That's correct, my Lord.
23 Q. Has your recollection improved of these matters,
24    Mr Handjani, since you gave this written statement on
25    9 May 2019, would you say?

**Page 13**

1  A.  It has not, my Lord.  I stand by my witness statement
2      and my testimony yesterday, my Lord.
3  Q.  So can his Lordship take it that you don't have any
4      recollection of the basis on which you say Mr Azima made
5      a claim for $8 million in that call to you?
6  A.  Counsel, at that time I did not.
7  Q.  And his Lordship can take it, can't he, that your
8      recollection of those matters won't have improved in the
9      last -- in the intervening time since June -- May last
10     year?
11 A.  Well, I know more today than I did in March 2015,
12     counsel.  So there's -- I'm more informed as to the
13     numbers behind the quantum.
14 Q.  I'm not asking you about your recollection improvement
15     since March 2015, Mr Handjani, as you well know.  I'm
16     asking you about the position as between May 2019 when
17     you gave this witness statement, which was already over
18     four years since the phone call --
19 A.  Yes.
20 Q.  -- and today, Mr Handjani.
21 A.  Yes, it's not that my recollection has improved.  My
22     knowledge has improved, I think is the more precise
23     language.
24 Q.  And how has that been improved, Mr Handjani?
25 A.  Well, I've been sitting in court and I've been seeing

**Page 14**

1      the evidence presented, counsel.
2  Q.  So you've been able to reconstruct events, have you, as
3      a result of sitting in court during the trial?
4  A.  No, that's not a correct statement.  It's not that
5      I have been able to reconstruct events.  I've become
6      more informed as to the nature of his claim since we've
7      come to court.
8  Q.  But none of what you've heard in court would have given
9      you a better basis to recollect more of this telephone
10     call in March 2015, would it?
11 A.  No, it would not, my Lord.  I don't remember a phone
12     call from -- the exact details of a phone call from five
13     years ago.  What I do remember was the headline number
14     of 8 million.  As I said, it was a very pleasant phone
15     call, he wished me a Happy New Year, we've always had
16     a -- pleasant exchanges.
17 Q.  Could you be shown {Day2/125:1}, please.
18 A.  Yes.
19 Q.  Which was evidence given by Mr Buchanan to his Lordship.
20 A.  Yes.
21 Q.  And, Mr Handjani, if you would please go to
22     {Day2/125:1}.
23 A.  Yes, it's in front of me, counsel.
24 Q.  Can you see at {Day2/125:7}, Mr Buchanan said this:
25     "I also subsequently understood that Mr Azima had

**Page 15**

1      raised with Mr Handjani the claim for the $8 million in
2      respect of the Boeing matter."
3  A.  Yes, I see that.
4  Q.  Then it runs on.
5  A.  Yes.
6  Q.  Can you see that?
7  A.  Would you like me to read the page?
8  Q.  Yes, if you don't mind, that would be very helpful,
9      thank you, Mr Handjani.
10 A.  Yes, of course.  (Pause)  I have read it, counsel.
11 Q.  So what Mr Buchanan was telling his Lordship in this
12     part of Mr Buchanan's evidence was that as far as
13     Mr Buchanan understood it, there were two prompts for
14     the Ruler's instruction to target Mr Azima as recorded
15     in those April emails which I took you to yesterday.
16     One, according to Mr Buchanan, was an unwarranted claim
17     for $8 million by Mr Azima, and the other, according to
18     Mr Buchanan, was the apparent involvement of Mr Azima in
19     wrongdoing vis-a-vis Dr Massaad.  Can you see that?
20 A.  I see that's Mr Buchanan's testimony, yes.
21 Q.  That's what Mr Buchanan was saying.  Mr Buchanan in his
22     evidence suggests that the $8 million claim was in
23     relation to Boeing aircraft purchase, can you see that?
24 A.  I can, my Lord.
25 Q.  Do you have any knowledge of that, of the nature of the

**Page 16**

1      $8 million claim as you allege it?
2  A.  I'd like you to please, counsel, be precise.  As of now
3      today or then in 2015?
4  Q.  Then.
5  A.  No, I did not at the time, no.
6  Q.  It's right, isn't it, Mr Handjani, that Mr Azima did not
7      make a claim for $8 million for either the Boeing
8      aircraft or the training academy?
9  A.  I'm sorry, you're asking me if I'm lying under oath?
10 Q.  I'm suggesting to you that Mr Azima did not make a claim
11     for $8 million.
12 A.  He called me, my Lord.  He said he was owed this sum of
13     money and he'd asked my assistance.  I gave him my
14     assistance by putting him in touch with Mr Buchanan, and
15     that is the nature of my involvement at this time with
16     his claim.
17         Now, whether it related to Boeing aircraft or the
18     training academy, my Lord, or all other dealings he has,
19     I was not aware of at the time, nor did I care at the
20     time.  It was not my job to substantiate the validity of
21     Mr Azima's claim.
22 Q.  Mr Handjani, have you ever seen any document in which
23     Mr Azima or anybody acting for him makes a claim for
24     $8 million?
25 A.  I'm not aware, my Lord.

**Page 17**

1  Q.  It's likely, isn't it, Mr Handjani, that if there were
2      such a document, that would have been brought to your
3      attention for the purposes of this trial?
4  A.  Not necessarily, my Lord.
5  Q.  But you have not seen any such document, have you,
6      Mr Handjani?
7  A.  None that I'm aware of, my Lord.
8  Q.  So is it your evidence that Mr Azima made his claim for
9      $8 million simply orally; is that your evidence?
10 A.  That is correct, my Lord, and it went down quite quickly
11     from 8 to 5 to 3, and I believe that was because of the
12     negotiation that was taking place between Mr Buchanan
13     and Mr Azima, and, as I said, I believe that negotiation
14     was congenial and they had developed a good rapport with
15     each other; and from time to time, my Lord, Mr Azima
16     would call me and I would take his call, and from time
17     to time I would check in to see how that negotiation was
18     going, and I was in favour of a commercial settlement
19     with Mr Azima.
20 Q.  It's right, isn't it, Mr Handjani, that what Mr Azima in
21     fact led you to understand in that telephone call was
22     that Mr Azima was claiming he'd actually saved the Ruler
23     $8 million?
24 A.  That's not my recollection, my Lord.
25 Q.  Could you go, please, to {Day7/200:1}. And you'll see

**Page 18**

1      there --
2  A.  I'm still waiting for it. (Pause) It's up now. Where
3      would you like me to go to, counsel?
4  Q.  Can you see that at page {Day7/200:1}, I was asking you
5      some questions about the July email between Mr Buchanan
6      and you?
7  A.  I can, my Lord.
8  Q.  Where Mr Buchanan made reference to what Mr Bustami had
9      allegedly relayed from the Ruler, can you see that?
10 A.  I can. Where would you like me to read to?
11 Q.  The relevant background or context is the instruction
12     from the Ruler to go after FA, all right?
13 A.  If you just let me finish the …
14 Q.  That's all right. (Pause)
15 A.  Yes, I can.
16 Q.  Then, Mr Handjani, please could you be shown page
17     {Day7/203:1} of the transcript which I've already taken
18     you to this morning, which you've kindly already read, I
19     think once.
20 A.  Yes.
21 Q.  Can you see, picking it up now at the top of the page,
22     at {Day7/203:3}, I was asking you:
23         "So what do you understand by the Ruler wanting to
24     go after Mr Azima at this time? What was prompting
25     the Ruler to want to go after Mr Azima?"

**Page 19**

1      Can you see that?
2  A.  I can, my Lord.
3  Q.  Then Mr Handjani you said this -- you see what you say
4      at {Day7/203:6}:
5         "I think he wanted to -- as I said, my Lord, he
6      wanted to understand if Mr Azima was connected to the
7      frauds of Dr Massaad because he came to know the Ruler
8      through Dr Massaad, and it was around the same time that
9      the frauds of Dr Massaad had come up and Mr Azima called
10     and asked for $8 million and said that, if this matter
11     wasn't settled, that there would be blitzkrieg campaign
12     against Ras Al Khaimah. I think that would be
13     unsettling for anyone to hear, my Lord."
14         Can you see that?
15 A.  I can, my Lord.
16 Q.  So your evidence yesterday to his Lordship was that, as
17     I understand it, around this time Mr Azima --
18     in July 2015, Mr Azima had made a claim for $8 million.
19     That was your evidence here, wasn't it?
20 A.  I don't know if it was -- counsel, I'd like to be
21     precise, please. I don't know if it was July or April
22     or May. The first time he raised it with me was March
23     of 2015, was the first time that quantum came to mind.
24     When it was raised again, what happened after that is
25     a different matter, but if you're asking me when was the

**Page 20**

1      first time I heard that quantum, it was March of 2015.
2  Q.  So as far as you were concerned, that was the first time
3      that you heard the figure $8 million?
4  A.  That is my testimony under oath, my Lord.
5  Q.  Can we go, please, to {H7/273/1}, please. Can you keep
6      your answers there in mind, please, Mr Handjani.
7      {H7/273/1}, please.
8  A.  This is the email between Mr Bustami and myself, cc'd
9      Mr Buchanan.
10 Q.  That's the one.
11 A.  Yes, I have it in front of me.
12 Q.  Just let's get the chronology very clear as you're now
13     attesting to, please, Mr Handjani.
14 A.  Of course, counsel.
15 Q.  You're saying to his Lordship that in March 2015, you
16     learnt for the first time that Mr Azima was making
17     a claim for $8 million. That's your evidence, isn't it?
18 A.  That is correct.
19 Q.  You're giving evidence to his Lordship, or you gave
20     evidence yesterday and you've confirmed it now again on
21     oath today, I think, that in -- that when the Ruler
22     in July 2015 instructed the going after of Mr Azima,
23     your evidence is that that could be attributed at least
24     in part to Mr Azima making a claim for $8 million.
25 A.  I think, counsel, I want to be precise again. If you

**Page 21**

1  look at the previous -- our previous colloquy of
2  yesterday, I said that it related to Mr Azima coming
3  from -- Mr Azima's relationship with the Ruler, my Lord,
4  came from Dr Massaad. It was around this time that
5  Dr Massaad's alleged frauds were being uncovered, and
6  because Mr Azima claimed that he was owed a sum of
7  money, I believe his joint venture partner at the time
8  in Ras Al Khaimah was entities controlled by Dr Massaad,
9  entities that Dr Massaad had a fiduciary relationship
10 to, my Lord, that he was very sceptical of his claims.
11 Q. So what was the answer to my question?
12 A. Could you please repeat your question?
13 Q. In giving evidence to his Lordship yesterday, you said
14    that when the Ruler in July 2015 instructed the going
15    after of Mr Azima, you thought that could be attributed
16    at least in part to Mr Azima making a claim for
17    $8 million.
18 A. Yes.
19 Q. Is that your understanding of what was --
20 A. I think I said partly. I gave a more fuller explanation
21    than your summary just now.
22 Q. Right. And this is a claim that you were first apprised
23    of in March 2015.
24 A. That is correct, my Lord.
25 Q. And I think you think the telephone call was 21 March,

**Page 22**

1     don't you?
2  A. My Lord, the Persian New Year is March 21, the first day
3     of spring, so it was at or around that time. It's
4     customary for people who celebrate the Persian New Year
5     to call each other and wish each other a Happy New Year
6     at around that time.
7  Q. Yes, well, let's assume that you're right about that;
8     then if you go, please, to {H7/273/1}, can you see the
9     date, please, Mr Handjani?
10 A. I can, my Lord.
11 Q. Can you read it out for the transcript, please,
12    Mr Handjani?
13 A. 4/4/2015, so it would be, I assume, April 4, 2015.
14 Q. So by my calculation that would be two weeks after, on
15    your evidence, Mr Azima first makes this claim for
16    $8 million.
17 A. I think that's a fair assessment, my Lord.
18 Q. If we see what Mr Bustami says in this email to you and
19    Mr Buchanan, only two weeks after your telephone call on
20    21 March with Mr Azima, he says this:
21        "I have had few discussions with boss about FA and
22    he is adamant that we bring charges against him. He was
23    very happy that you told him that FA is no longer asking
24    for the $8 m."
25 A. That's correct.

**Page 23**

1  Q. Now, you see, Mr Handjani, the documents here suggest
2     that certainly by 4 April 2015, any suggestion that
3     Mr Azima was asking for $8 million had in fact -- it
4     looks as if by that date, Mr Azima, whatever had
5     happened before, was no longer making such a claim. Do
6     you agree?
7  A. Yes, and I can tell you why, if you permit me.
8  Q. Go on, then.
9  A. Yes. After that first phone call, I came back to the
10    Emirates, I had a subsequent phone call with Mr Azima,
11    and what I recall in that subsequent phone call with
12    Mr Azima is that he somehow said -- and it was very,
13    very casually -- that the claim, you know -- that's the
14    number that he believes he is owed, but he would be
15    happy taking less, and I relayed that to the Ruler.
16 Q. There's no reference in your witness evidence, is there,
17    Mr Handjani, to any subsequent telephone call with
18    Mr Azima between 21 March and 4 April?
19 A. I think, my Lord, I say in my witness statement that
20    Mr Azima and I had been in touch from time to time.
21 Q. What's the answer to my question, Mr Handjani? Do you
22    give any evidence in your witness statements that after
23    the 21 March call with Mr Azima, where you allege he
24    asked for $8 million, you had a further call with him
25    where you and he discussed the same claim?

**Page 24**

1  A. We didn't discuss the claim, we discussed the quantum.
2  Q. Right. Do you give any evidence of that in your witness
3     statement, Mr Handjani?
4  A. I don't believe so. I was discussing the first time
5     this claim came to mind. These events, counsel,
6     happened five years ago.
7  Q. Your evidence I think now, your evidence now,
8     Mr Handjani, seems to be that after Mr Azima made the
9     claim for $8 million on 21 March, he adjusted his claim
10    between then and 4 April. Is that right, Mr Handjani?
11 A. I think the word "claim" is misleading. It's the
12    quantum he was owed, he said he was owed. He didn't
13    tell me the -- all that was involved in him coming up
14    with that quantum, but what he did tell me subsequently
15    that in a commercial settlement he would take less, and
16    I simply relayed that back to the Ruler.
17 Q. You see, Mr Handjani, doesn't the fact that in this
18    email, the references to no longer asking for the
19    $8 million, "the $8 million" suggests a reference to
20    a particular claim, doesn't it? "The", not -- if it was
21    he is no longer claiming $8 million but he's asking for
22    5 or 4, it's odd to put "the $8 million", isn't it? Do
23    you see what I mean?
24 A. I'm sorry, I do not. Could you please elucidate that
25    for me?

**Page 25**

1  Q. Can you tell his Lordship what you think Mr Azima and
2     you did discuss about the revision of the
3     $8 million figure?
4  A. Your Lord, I can't recall. The first phone call, it was
5     the Persian New Year, I was with my family, I came back
6     to the Emirates a few days or a week later, and we had
7     a subsequent call, and because I called him and I said,
8     "I'm back and I'm going to relay your message"; and
9     I think in that phone call I said, you know, "So you're
10    owed 8 million", or words to that effect, and he said,
11    you know, something to the effect of, "But, you know,
12    that's what I'm owed, but I would take less", and,
13    you know, "I'd like you to relay that to the Ruler and
14    I'd like you to help me make" -- you know, "to get my
15    money back", that he thought he was owed.
16 Q. You see, Mr Handjani, by this date -- say March
17    or April 2015 -- nobody working for RAKIA -- including
18    you -- had any basis to think or allege that Mr Azima
19    was making fraudulent claims.
20 A. Absolutely not. I did not think his claim was
21    fraudulent when he called me.
22 Q. So you'd have no basis to tell the Ruler that as far as
23    you were concerned, Mr Azima's claims were unwarranted,
24    would you?
25 A. And I had not, and I have not at the time.

**Page 26**

1  Q. Did you tell the Ruler between 21 March and 4 April that
2     Mr Azima's claim, however made and in whatever quantum,
3     was unwarranted?
4  A. No.
5  Q. Did you discuss the matter of Mr Azima's claim, however
6     described and in whatever quantum, with the Ruler over
7     that two-week period, Mr Handjani?
8  A. I believe I did, my Lord.
9  Q. And it's likely, isn't it, Mr Handjani, therefore that
10    you would have given the Ruler no cause to think that
11    Mr Azima was making an unwarranted claim at that stage
12    upon RAK or RAKIA or the Ruler?
13 A. That's a fair statement, my Lord.
14 Q. So can you explain to his Lordship whether you continue
15    to give evidence that you think that one of the
16    motivations for the Ruler's instruction to go after
17    Mr Azima in April 2015 was the Ruler's belief that
18    Mr Azima was making unwarranted claims for compensation?
19 A. My Lord, the Ruler's belief is the Ruler's belief. He
20    has many other sources to inform his beliefs, but for
21    me, I was simply an inbox and then an outbox relaying
22    a message; and in fact at the time I do recall that
23    Mr Azima, when I called him and told him I was in the
24    Emirates and I was going to be passing along his
25    message, and it was -- that he was owed $8 million, he

**Page 27**

1     never described to me all the things that came into that
2     quantum. He said to me but he would be -- he would take
3     less than that to settle this matter, and I simply
4     relayed that to the Ruler.
5       These matters occurred five years ago, my Lord.
6     I can't recall every little bit of the conversation that
7     I had, but I do recall that those were the conversations
8     that took place, and that's what I relayed.
9  Q. You see, Mr Handjani, I think you see the point now.
10 A. I don't see the point, no.
11 Q. Oh well, I'll have to --
12 A. Please.
13 Q. -- go through it again with you, Mr Handjani. I think
14    we've established now on oath, the evidence on oath,
15    that the right analysis is that whatever Mr Azima may
16    have discussed with you on 21 March 2015 in relation to
17    any claim of his, that you had no basis to think it was
18    unwarranted or fraudulent, did you?
19 A. I had none.
20 Q. And that you discussed that matter with the Ruler, you
21    think, in the next couple of weeks?
22 A. I believe that's correct, my Lord, yes.
23 Q. And that you would have no cause to lead the Ruler to
24    think that Mr Azima was making any unwarranted, still
25    less fraudulent claim upon the Ruler?

**Page 28**

1  A. No, that is correct, my Lord.
2  Q. So unless someone else has caused the Ruler to think
3     that, or the Ruler has his own basis for thinking that,
4     nothing that you have put to the Ruler could have made
5     that one of the Ruler's thoughts at the time?
6  A. My Lord --
7  Q. From your point of view.
8  A. From my point of view, I gave the Ruler no cause for
9     concern.
10 Q. No. So when the Ruler --
11 A. Although I should be more complete with that answer,
12    counsel. I did inform the Ruler what Mr Azima said to
13    me, that if these matters were not resolved in the
14    appropriate fashion, you know, it would be not good for
15    the Emirates and not good for the Ruler.
16 Q. I'm going to come back to that, Mr Azima. Are you
17    sure --
18 A. Mr Handjani.
19 Q. Sorry, Mr Handjani. Are you sure you want to confirm
20    that evidence, Mr Handjani, because I'm going to ask you
21    about it in a minute?
22 A. Yes, I do confirm that because that is something he said
23    to me a number of times and throughout 2015 to 2016. In
24    fact, my Lord, that was the basis for me not wanting to
25    be the postman, if you will, my Lord, in between this,

**Page 29**

1  and actually advocating for a commercial settlement with
2  Mr Azima because I didn't want both sides to be
3  adversarial with each other.
4      And my emails would speak to that, my Lord.
5  Q. So what's your -- these emails in early April 2015 catch
6     you discussing with Mr Bustami and Mr Buchanan
7     the Ruler's apparent instruction to target Mr Azima, so
8     if as far as you were concerned that couldn't be
9     explained on the basis of Mr Azima making baseless
10    claims for compensation, what do you think you
11    understood at that time to have been the Ruler's
12    motivation for instructing the targeting of Mr Azima?
13 A. My Lord, I've given testimony to this yesterday, and
14    I'll be happy to repeat it.
15 Q. What's the answer, Mr Handjani?
16 A. The answer is that because at the time Dr Massaad's
17    frauds were coming to light -- alleged frauds coming to
18    light, my Lord, and the fact that Mr Azima's essentially
19    joint venture partner in the Emirates were entities
20    controlled by Dr Massaad, he came through Dr Massaad,
21    it's my understanding, to meet His Highness.
22    His Highness was very sceptical of Mr Azima's claim.
23    Now, I also would like to elucidate to counsel, my
24    Lord, that Mr Bustami and Mr Buchanan were investigating
25    the alleged frauds of Dr Massaad; I was not. So

**Page 30**

1  I wouldn't know the information that they knew at the
2  time, and I had no basis of knowing that information,
3  my Lord.
4  Q. Could you go, please, to {Day7/203:1}, Mr Handjani, to
5     which you've taken you to this morning I think already?
6  A. Yes, my Lord.
7  Q. Where you use the word "blitzkrieg", can you see that?
8  A. I do, my Lord.
9  Q. And what you say for the transcript at page
10    {Day7/203:6-14}, you give evidence that Mr Azima I think
11    said to you that if the matter wasn't settled, there
12    would be a blitzkrieg campaign against Ras Al Khaimah,
13    can you see that?
14 A. I can, my Lord.
15 Q. And I think you're giving evidence here, aren't you,
16    Mr Handjani, about events happening as you claim in
17    around about April, March/April 2015?
18 A. That is correct, my Lord., that is my recollection.
19 Q. Do you think your recollection might be faulty,
20    Mr Handjani?
21 A. As anyone who is remembering things of five years ago,
22    was five years older, would be, but --
23 Q. Do you think maybe you've got the date wrong when there
24    was first any reference to any sort of blitzkrieg or
25    offensive concerning Mr Azima or at Mr Azima's behest?

**Page 31**

1  A. I don't think so, my Lord.
2  Q. You don't think maybe that was in 2016 rather than 2015?
3  A. I don't believe so, my Lord, but I cannot recall,
4     you know, with 100% accuracy, my Lord. These are
5     matters that occurred four and five years ago, my Lord.
6  Q. When you gave your witness statement in September 2019
7     where you gave evidence on these matters, did you see
8     any document which prompted your recollection of
9     Mr Azima allegedly threatening some sort of blitzkrieg
10    against RAK around about March or April 2015?
11 A. Absolutely not, my Lord.
12 Q. Did you have any private note or diary entry that would
13    have confirmed that piece of evidence of yours?
14 A. I do not, my Lord. I don't keep a diary, my Lord.
15 Q. No. So by my calculation, your witness statement was
16    given some four and a half years after the relevant
17    time, wasn't it?
18 A. That is correct, my Lord.
19 Q. And was that the first time that you'd been asked to
20    give evidence about what you may have experienced in
21    relation to the matters in dispute back in March
22    and April 2015?
23 A. Yes, because I'm giving evidence -- these are the
24    proceedings. I don't believe there are any other
25    proceedings I am involved with, so, yes.

**Page 32**

1  Q. So you hadn't been asked to turn your mind
2     to March/April 2015 in relation to Mr Azima
3     before September 2019 when you gave your witness
4     statement; is that right?
5  A. I think we -- my Lord, around about this time, I had
6     discussions with Mr Buchanan, Mr Bustami and
7     His Highness.
8  Q. Which time are you talking about?
9  A. March and April 2015, counsel.
10 Q. Yes.
11 A. And those -- because my discussions with Mr Azima went
12    through March 2015, my Lord, until -- through 2016,
13    I was sort of peripherally involved in this matter,
14    these discussions came up.
15    I had multiple discussions with Mr Azima
16    from March 2015 through -- it may even have been the
17    fall of 2016 or the December of 2016 when things started
18    deteriorating between RAK and Mr Azima. He would
19    mention this campaign to me that would get very --
20    you know, very bad for everyone involved, and that is my
21    recollection, my Lord.
22 Q. I'm sure it's my fault, Mr Handjani, but the question
23    I was asking you was whether you'd had course to
24    recollect matters in March and April 2015 before you
25    came to give your witness statement around about the

**Page 33**

1  autumn of last year?
2  A. No. I would say, my Lord, after 2016 I have not been
3     asked to recall these matters.
4  Q. And what was the basis for your putting in your witness
5     statement that you thought Mr Azima had threatened some
6     sort of campaign against RAK around March or April 2015?
7     What is your basis for saying that, Mr Handjani?
8  A. My direct conversation with Mr Azima.
9  Q. Which you recollected, did you, some four and a half
10    years later?
11 A. Correct. It's not the type of thing someone would
12    forget.
13 Q. Did you -- something like that would presumably be
14    a concern. If you'd heard Mr Azima threatening some
15    sort of blitzkrieg against RAK, that would have been
16    a matter of concern to you, wouldn't it, Mr Handjani?
17 A. It would, my Lord.
18 Q. And you are likely, aren't you, to have relayed that to
19    other people who might have an equal concern on the RAK
20    or RAKIA side of things?
21 A. That is correct, my Lord. And I did.
22 Q. And who did you relay it to?
23 A. I relayed it to the Ruler who at the -- around about
24    this time, I first met Mr Buchanan. He had me meet
25    Mr Buchanan. Mr Bustami. And later I met, maybe a few

**Page 34**

1  months later, Mr Gerrard.
2  Q. And do you think that this threatened campaign by
3     Mr Azima, that was relayed to you in the March 2015
4     telephone call? I think that's your evidence, isn't it?
5  A. I'm sorry, could you repeat, counsel?
6  Q. I think your evidence is that you first learned of
7     Mr Azima's threat to launch some sort of blitzkrieg, if
8     things didn't work out on the money side, in
9     the March 2015 telephone conversation with you,
10    Mr Handjani. That's right, isn't it?
11 A. That's correct.
12 Q. That's your evidence?
13 A. That's correct.
14 Q. And you've agreed, I think, only a moment ago that if
15    you'd heard that from Mr Azima, that would have been
16    a source of real concern to you, wouldn't it?
17 A. That is correct, my Lord.
18 Q. And it's right, isn't it, Mr Handjani, that you would
19    have thought that that was a basis for the Ruler of
20    Ras Al Khaimah to be concerned himself about Mr Azima at
21    that time, wouldn't you, Mr Handjani?
22 A. I think that's a fair statement, my Lord.
23 Q. And that would be potentially a basis, wouldn't it, on
24    which the Ruler may want to target Mr Azima around that
25    time, wouldn't it, Mr Handjani?

**Page 35**

1  A. I think that's a fair statement, my Lord.
2  Q. And there would be no reason, would there, Mr Handjani,
3     when you were corresponding with people like Mr Bustami
4     and Mr Buchanan around that time, for you to conceal or
5     keep quiet about this alleged concern you had about
6     a threatened blitzkrieg from Mr Azima?
7  A. I relayed the message as it was relayed to me, my Lord.
8  Q. What's the answer to my question, Mr Handjani? Would
9     there be any reason for you to -- for you not to share?
10 A. No, there would be no reason, my Lord.
11 Q. And actually every reason for you to convey that concern
12    to Mr Buchanan and Mr Bustami. Do you agree,
13    Mr Handjani?
14 A. I would agree with that, my Lord.
15 Q. Shall we look at the April emails again in the light of
16    that evidence, Mr Handjani. Would you like to go back
17    to {H7/267/1}, please.
18 A. Yes.
19 Q. And we'll take it slowly now, because now we know that
20    by April 2015, on your evidence on oath to his Lordship
21    yesterday --
22 A. Yes.
23 Q. -- and confirmed again today --
24 A. Yes.
25 Q. -- you have a recollection of Mr Azima threatening

**Page 36**

1  a blitzkrieg against RAK around about March 2015.
2  A. That is correct.
3  Q. So let's, with that sort of in our -- ringing in our
4     ears, can we please look at what you did say at the
5     time.
6  A. Yes.
7  Q. At {H7/267/1}, Mr Buchanan emailed you:
8        "Good afternoon. HHSS had wanted us to target FA --
9     on what basis would we do this? Thanks."
10       "I'm not sure that's possible at the moment.
11    I don't know what basis you would target him.
12    Thoughts?"
13 A. Yes.
14 Q. Can you see that?
15 A. I can, my Lord.
16 Q. So should his Lordship understand it that -- why did you
17    not -- in the context of these exchanges that we see you
18    have, why did you not at least advert to this alleged
19    threat of a blitzkrieg?
20 A. My Lord, I'm a very anodyne emailer. I don't like to
21    spend a lot of time writing long emails. Mr Buchanan
22    used the word "target". I'm a former prosecutor. The
23    word "target" has a specific meaning to me. I saw no
24    basis to target Mr Azima for any sort of criminal
25    action. It didn't make any sense to me, what he was

**Page 37**

1. saying, and in fact Mr Azima had relayed to me that he
2. was wanting to settle his claim commercially and to
3. prove his claim commercially.
4.    I saw no reason; that's why I answered the way I did
5. to Mr Buchanan.
6. Q. You see, Mr Handjani, I suggest to you that even if what
7.    you'd understood from Mr Azima, what you claim Mr Azima
8.    said to you, did not qualify for any sort of prosecution
9.    of Mr Azima, I do put it to you, Mr Handjani, that you
10.    would have raised that matter in the course of these
11.    email exchanges with Mr Buchanan and Mr Bustami so at
12.    least they were fully apprised of the Azima position as
13.    at this time.
14. A. Not necessarily, my Lord. I wouldn't raise every matter
15.    in my mind on an email. I had met with Mr Bustami and
16.    Mr Buchanan, and I'd orally conveyed my concerns and my
17.    thoughts. It doesn't necessarily mean that on every
18.    email I would convey every thought and every concern.
19. Q. And I suggest to you, Mr Handjani, that you have
20.    invented the suggestion that Mr Azima made some threats
21.    of a blitzkrieg against RAKIA in 2015.
22. A. I think, my Lord, counsel has run out of things to say
23.    to me and is therefore accusing me of perjuring myself
24.    which I find offensive. I'm telling you under oath, my
25.    Lord, as an officer of the court everything that

**Page 38**

1. I recall of that time.
2. Q. His Lordship has your evidence, Mr Handjani. Can you
3.    go, please, to {D/9/31} and to paragraph 87 of
4.    Mr Buchanan's first witness statement. Can you see
5.    that, Mr Handjani?
6. A. I can, my Lord.
7. Q. And I think you said yesterday that you had read some
8.    other witness statements before trial; is that right?
9. A. That is correct, my Lord.
10. Q. Had you read Mr Buchanan's first witness statement?
11. A. I cannot recall. I read -- he's given multiple witness
12.    statements, so I read maybe one or two of them.
13. Q. What, the short ones but not the main one, is that
14.    likely?
15. A. Probably, probably.
16. Q. Probably?
17. A. Probably.
18. Q. What, not the main one?
19. A. Not in the last ten days, two weeks.
20. Q. What about the last month or two months?
21. A. Maybe I have, yes.
22. Q. Good. It's likely, isn't it?
23. A. Yes, it is.
24. Q. Yes, it is. So in paragraph 87, you can see that
25.    Mr Buchanan's evidence is that it was after

**Page 39**

1. a January 2016 lunch with Mr Azima that he first -- that
2. the concern about some campaign and blitzkrieg emerged.
3. Have you seen that?
4. A. I can. I can't speak to Mr Buchanan's testimony,
5.    my Lord.
6. Q. And would it be fair to say that Mr Buchanan was more
7.    closely involved with these matters for RAKIA back in
8.    2015 than you, Mr Handjani?
9. A. That is a fair statement, my Lord.
10. Q. Thank you, Mr Handjani. Now, can I ask you, please,
11.    finally about the discovery by RAKIA of the hacked data,
12.    if I may, please, Mr Handjani.
13. A. Please.
14. Q. Mr Buchanan gave evidence that he -- that you and
15.    Mr Azima were -- sorry, that Mr Buchanan and Mr Azima
16.    were on friendly terms before the discovery, I think, of
17.    the hacked data?
18. A. I'm sorry, I didn't catch your last word. On what
19.    terms?
20. Q. Mr Buchanan gave evidence that he, Mr Buchanan and
21.    Mr Azima, were on good terms --
22. A. Yes.
23. Q. -- until the emergence of the hacked data which caused
24.    Mr Buchanan to recalibrate his view of Mr Azima?
25. A. That is my recollection, my Lord, yes.

**Page 40**

1. Q. And that's your understanding?
2. A. Yes, it is, my Lord.
3. Q. And I think you said yesterday that you were also on
4.    friendly terms with Mr Azima until -- at least until the
5.    emergence of the hacked data and I think you said
6.    thereafter?
7. A. We've never been on unfriendly terms, my Lord.
8. Q. And it's fair to say, isn't it, that you found Mr Azima
9.    quite an engaging person?
10. A. He is a very charming person, he's always been very
11.    polite to me, my Lord.
12. Q. Yes.
13. A. And I to him.
14. Q. And you quite liked him, didn't you, Mr Handjani?
15. A. I -- well, yes, there was no reason not to like him.
16.    He's never been anything but respectful and -- to me and
17.    I've never been anything but respectful to him.
18. Q. And at least --
19. A. And that's been borne out by my email exchanges. I was
20.    trying to make sure that they would have a commercial
21.    settlement so that both parties would walk away
22.    satisfied.
23. Q. Yes, I think your evidence is that the Ruler had asked
24.    you to keep open the channel of communication with
25.    Mr Azima, hadn't he?

**Page 41**

1  A. That is correct, my Lord.
2  Q. And the basis for that, as you understood it, was that
3     you actually had quite a good relationship with
4     Mr Azima?
5  A. Yes, we had a friendly relationship, my Lord.
6  Q. Could you go, please, to {H10/262}.
7  A. Yes, I have it.
8  Q. Thank you Mr Handjani. You'll see there that's an email
9     of 16 August 2016 from Mr Buchanan to Mr Frank of
10    Karv Communications and to you, Mr Handjani?
11 A. That is correct, my Lord.
12 Q. Thank you, copied to Mr Neil Gerrard, can you see that?
13 A. Yes, yes, I can, my Lord.
14 Q. You deal with the discovery of Mr Azima's stolen data in
15    your witness statement at paragraph 23 at {D/15/6},
16    which -- I wonder if that could be brought up on the
17    screen.
18 A. Yes. The last paragraph of my September 5 witness
19    statement.
20 Q. That's it, Mr Handjani. Can you see?
21 A. I can, my Lord.
22 Q. And you say -- in the last sort of six or seven lines,
23    you say that it's nonsense to suggest that the targeting
24    or going after emails were reference to a plan to hack
25    his emails, you say that's nonsense. Then you say this

**Page 42**

1     in the last five lines:
2        "No plan to hack Mr Azima's emails or data was ever
3     mentioned to me by anyone in RAK, or anywhere else, and
4     I was never party to any such plan. The first time that
5     I became aware that there was data relating to Mr Azima
6     available on the internet was when I received an email
7     from Mr Buchanan -- addressed to me and Mr Frank -- on
8     16 August 2016 …"
9        Can you see that?
10 A. That is my testimony under oath, my Lord.
11 Q. Right. So that's your testimony on oath and we can put
12    that away. Now we can look, if we may, at the email at
13    {H10/262/1} with that testimony in mind.
14 A. I have it, counsel.
15 Q. Thank you, Mr Handjani. You see what Mr Buchanan told
16    you on 16 August 2016.
17 A. That is correct, my Lord.
18 Q. He said:
19        "Subject: FA".
20        All right?
21 A. Yes.
22 Q. Now, by this point, on your evidence, you were on
23    friendly or good terms with Mr Azima, weren't you?
24 A. Yes. I recall in the summer of 2016, my Lord, some
25    article came out about me in one of these rags, if you

**Page 43**

1     will, and somewhere around this time Mr Azima called me
2     and informed me of it. It was maybe a rag called
3     Intelligence Online, or something -- a publication that
4     I'd never seen before. And after that, I sort of
5     withdrew from discussions with Mr Azima because I could
6     see that things were getting a little bit more, shall we
7     say complex, counsel, with him, and I didn't want to,
8     you know, have much communication.
9  Q. Is that the very first time, Mr Handjani, just now, that
10    you've given any evidence that you were withdrawing from
11    your dealings with Mr Azima around this time?
12 A. Yes.
13 Q. Is that the first time?
14 A. Yes.
15 Q. And is that because you know I'm going to ask you about
16    this email?
17 A. No, I'm happy to discuss this email with you, counsel.
18 Q. Well, I suggest, Mr Handjani, that that is why you've
19    given the evidence that you've just given because you're
20    trying to prepare for the questions that you know are
21    coming in relation to this email.
22 A. I have no idea what you're going to ask me, counsel, but
23    I would be happy to answer them.
24 Q. Very well. Coming back to the email, please,
25    Mr Handjani, of 16 August {H10/262/1}:

**Page 44**

1        "Subject: FA".
2  A. Yes. I read the email.
3  Q. From that last answer, can his Lordship take it, then,
4     that you sensed -- that you were getting a bit more
5     uneasy about Mr Azima prior to the -- prior to August
6     2016, there had been a sort of slight change, had there,
7     in your perception of -- just wait for the question,
8     please, Mr Handjani. Had there been a change in your
9     perception of Mr Azima by the beginning of August
10    2015 -- 2016?
11 A. I would -- my Lordship, I was more cautious in my
12    dealings with Mr Azima because, as it was relayed to me,
13    the ceasefires -- there were a number of ceasefires that
14    had taken place that had been -- those deadlines had
15    passed. Also I started seeing my name in the press
16    appear in things that were not -- that were unrelated to
17    me, and he would tell me about those things.
18       One publication I recall in exactly around this
19    time, or maybe a month or two before, we could dig that
20    up if you'd like, counsel, I'd be happy to dig that up,
21    the publication, and I got a very strong sense that that
22    blitzkrieg campaign he was talking about was taking
23    place.
24 Q. And -- but why didn't you think that Mr Azima was just
25    tipping you off to something that he thought you ought

**Page 45**

1    to be aware of?
2  A. Well, counsel, Mr Azima deals in a world that is
3    unfamiliar to me. It is the intelligence world and the
4    world of security services, he's done it for some time.
5    I make no judgments about that world, but this
6    publication was called Intelligence Online, so, although
7    I'm not of very high intelligence, I put two and two
8    together and thought: you know what, it's best that
9    I withdraw.
10 Q. By the end of July 2016, RAKIA itself had launched its
11   own offensive against Dr Massaad, hadn't it?
12 A. Date again, counsel?
13 Q. By the end of July 2016, RAKIA had either launched or
14   was about to launch its own online campaign against
15   Dr Massaad, wasn't it?
16 A. I'm not sure if that's correct. If you say so. I have
17   no knowledge of that.
18 Q. So his Lordship can take it that you had no knowledge of
19   RAKIA's -- of the launching by RAKIA of its campaign or
20   its online work around about -- just wait for the
21   question -- around about the end of July and going
22   into August 2016. Is that your evidence, Mr Handjani?
23 A. My Lord, I can't recall what date that was. I'll take
24   at face value what counsel says. I can't recall the
25   date.

**Page 46**

1  Q. That wasn't quite the question, Mr Handjani. We know in
2    this case that on 31 July 2016, there's evidence that
3    Digitalis were asked to action certain -- a couple of
4    websites in order to begin some sort of campaign against
5    Dr Massaad on behalf of RAK or RAKIA, all right?
6  A. Yes, my Lord.
7  Q. And that those websites were then, I think, actioned and
8    put into effect at some point shortly thereafter, and
9    they were up for about a month or so, all right?
10 A. Correct, my Lord.
11 Q. And that's the evidence?
12 A. And if that's the date that the evidence stacks up, then
13   I accept that, counsel.
14 Q. So let's assume that by the first week, or within the
15   first week of August 2016, RAK or RAKIA is in fact in
16   the process of launching this online offensive against
17   Dr Massaad, all right? Assume that. Have you got that,
18   Mr Handjani?
19 A. We're dealing in hypotheticals, so, yes, I do.
20 Q. Well, no, the evidence is that that was what was
21   happening, all right?
22 A. Okay.
23 Q. Is your evidence that you were aware at the time that
24   that was RAK -- that that was what RAK or RAKIA was
25   doing?

**Page 47**

1  A. My Lordship, I can't recall when I became aware of it,
2    if it was 2016 or 2017. I just can't recall.
3  Q. I'm asking you now, Mr Handjani, of when you first
4    became aware that RAK or RAKIA -- ie if you like the
5    other side from Dr Massaad -- that they were in fact
6    initiating some sort of online offensive. When did you
7    first become aware of that, Mr Handjani?
8  A. And, counsel, it's my testimony that I really can't
9    recall, my Lordship. It could have been some time in
10   2016, it could have been in 2016, I really can't recall.
11   I was not a key member of the RAKIA team launching that
12   offensive, my Lord.
13 Q. If you go to {H10/262/1}, you can see that Mr Buchanan
14   said this:
15     "Good morning. I have been informed by Stuart last
16   night that there is an internet site that is carrying
17   a huge amount of material relating to FA -- I will get
18   you the link later."
19     Do you see that?
20 A. I can, my Lord.
21 Q. And so it runs on. Now, Mr Handjani, your evidence,
22   I think you gave yesterday on a couple of occasions, was
23   that you didn't know who Stuart Page was until this
24   trial.
25 A. That is correct, my Lord.

**Page 48**

1  Q. Mr Buchanan is writing, isn't he -- I know it's
2    Mr Buchanan's words --
3  A. Yes, my Lord.
4  Q. -- but he's writing, isn't he, by reference to Mr Page
5    in a way that looks as if he thinks that his audience
6    will know whom he's talking about. Do you agree with
7    that?
8  A. I do not, my Lord.
9  Q. Because he says, "I have been informed by Stuart", can
10   you see that?
11 A. Oh I can, my Lord.
12 Q. So he just uses the first name of Mr Page, doesn't he?
13 A. I think your analysis is incorrect, counsel. When
14   I read "Stuart", I thought of Stuart Leach at Digitalis,
15   not Stuart Page. I didn't know who Stuart Page was.
16 Q. You thought it was a reference to Stuart Leach, did you?
17 A. I did, my Lord. Digitalis.
18 Q. Mr Buchanan is writing this email, isn't he?
19 A. Yes, he is.
20 Q. And I know you're not Mr Buchanan, I'm not going to ask
21   you what Mr Buchanan was thinking, but I just want you
22   to finish this line. We know that Mr Buchanan himself
23   was referring to Stuart Page, not Stuart Leach, all
24   right?
25 A. We know that now. I didn't know that then, my Lord.

**Page 49**

1   Q.  No.
2   A.  And I knew Stuart Leach was working for Digitalis,
3       my Lord. And so when I saw "Stuart", muscle memory was
4       Stuart Leach, not Stuart Page. I never met Stuart Page,
5       so I wouldn't know that he would be referring to someone
6       that I'd never met.
7   Q.  No. But can you see that looking at it sort of
8       objectively for a minute, looking objectively,
9       Mr Buchanan has only referred to Mr Page by his first
10      name in this email, hasn't he?
11  A.  My Lord, my testimony is when I saw this email,
12      I thought it was Stuart Leach. I don't want to deal in
13      counsel's hypotheticals. I don't know what Mr Buchanan
14      was referring to at the time. So I'd like to stick with
15      my own testimony. Not what was in Mr Buchanan's mind.
16  Q.  You see, I suggest to you -- well, we'll go on to what
17      this said. You see that Mr Buchanan is here informing
18      you and Mr Frank of something which, on the face of it,
19      might be potentially significant news. Do you agree?
20  A.  My Lord, until this email was put to me, I had no
21      recollection of it, I didn't become aware -- this was
22      four years ago now, or four and a half years ago now.
23      Significant? Maybe. I can't recall what I thought of
24      it at the time. It was the summer of 2016. I was on
25      holiday at that time, in Bermuda, I believe. I didn't

**Page 50**

1       think much of this.
2   Q.  There's no evidence, Mr Handjani, of Mr Buchanan's
3       sending emails out to you on any other occasion that
4       we've seen to alert you to some possible internet
5       information or information of any sort, really, about
6       Mr Azima except this email of 16 August 2016.
7   A.  That's correct, my Lord.
8   Q.  So his Lordship can take it, can't he, that this is the
9       first and only time that you received an email from
10      Mr Buchanan conveying -- allegedly conveying this sort
11      of information?
12  A.  I believe so, my Lord, yes.
13  Q.  When you got this email, tell his Lordship how you
14      received it, what you thought?
15  A.  I -- my Lord, I was on holiday when I got this email.
16  Q.  You could still think, couldn't you, on holiday?
17  A.  I could, I can't remember what I was thinking on
18      holiday, counsel, four years ago, when I received this
19      email. I really can't. I don't think I responded to
20      it. In fact I'm sure I didn't. I didn't know what he
21      was talking about. I was enjoying my holiday.
22  Q.  You see, Mr Handjani, we've seen that when Mr Buchanan
23      emails you in April 2015, you respond to him quite
24      promptly, don't you?
25  A.  Yes -- I don't remember the timeline, but, yes, I think

**Page 51**

1       within a day or two.
2   Q.  And in July 2015, when we see Mr Buchanan emailing you
3       again, you also reply quite promptly, don't you,
4       Mr Handjani?
5   A.  At times I reply promptly, my Lord, at times I don't.
6   Q.  And on the face of it, I suggest, Mr Handjani, if this
7       was the first time that you had been made aware that
8       there was some potentially significant data relating to
9       Mr Azima, important enough for Mr Buchanan for the first
10      time to apprise you of those matters and to go into this
11      sort of detail about it, you would have been likely to
12      respond to his email.
13  A.  My Lord, I'm very careful how I respond to emails, and,
14      no, I would not respond necessarily to every email
15      Mr Buchanan wrote, or every email that others write to
16      me. I had nothing to say on this email. It didn't
17      involve me and doesn't concern me.
18  Q.  You see, Mr Handjani, I suggest that if you had not
19      already by 16 August 2016 learnt of this data of
20      Mr Azima's on the internet, you would have responded,
21      even shortly, to Mr Buchanan at the time.
22  A.  Well, that is incorrect, my Lord. In this email he
23      says, "We will speak later". My recollection was we did
24      speak later.
25  Q.  So although you're on holiday, you spoke to him, did

**Page 52**

1       you -- you interrupted your holiday to speak about this?
2   A.  I do recall Mr Buchanan calling me and telling me about
3       this matter. He told -- I said, "Well, I'm on holiday",
4       and he said, "When you come back, please let me know".
5   Q.  So when his Lordship goes back to your witness
6       statement, Mr Handjani -- just have it up. Do you
7       remember that paragraph 23 we looked at at {D/15/6},
8       paragraph 23, could you look at it, Mr Handjani?
9   A.  Yes.
10  Q.  Do you see any account by you there of some telephone
11      call you had with Mr Buchanan in relation to this email?
12  A.  No, that is not what this witness statement's about.
13      This witness statement is about hacking, and if I had
14      any knowledge of who hacked Mr Azima, or if there was
15      a plan to hack Mr Azima's emails, and the answer to that
16      is absolutely not. It doesn't refer to me finding out
17      from Mr Buchanan about -- information about Mr Azima on
18      the internet. That's not what my statement was about.
19  Q.  So what did Mr Buchanan tell you in this telephone call
20      which --
21  A.  I --
22  Q.  Sorry, Mr Handjani, I really must put the question for
23      the transcript, for the potential record, with which you
24      will be very familiar; if you don't mind my finishing
25      the question, and then it will be there for the record.

1  A. Not at all, counsel. Please.
2  Q. That's very kind. I'll just go back because I'm afraid
3     I've lost my train of thought thanks to that
4     interruption. (Pause)
5        Yes, when you allegedly had this phone call with
6     Mr Buchanan, did he call you or did you call him?
7  A. I believe he called me, my Lord. I believe. I can't --
8     four years ago, I can't recall who called who, but I do
9     remember having that phone call with him.
10 Q. Do you? And it was important enough, was it, this piece
11    of information, for Mr Buchanan to interrupt your
12    holiday, was it, Mr Handjani?
13 A. I believe so, I believe we spoke.
14 Q. And what did he tell you, do you think, on this
15    telephone call?
16 A. He told me that there was data of Mr Azima that had
17    appeared online and that he -- I can't recall exactly
18    what he said but that there were going to be people
19    brought in to look at it, and he wanted to make me aware
20    of it. And --
21 Q. Why? Why would he want to make you aware of it, do you
22    think, or why did he lead you to believe that it was
23    important enough for you to know about it, Mr Handjani?
24 A. You'd have to ask him that, counsel, but I think because
25    I had been involved in the matter with Mr Azima since

                              53

1     the spring of 2015, and he knew that Mr Azima was
2     someone that was known to me, and I think that's why.
3     But you'd have to ask him.
4  Q. But on your evidence, on your evidence, you've today
5     said you withdrew a bit from Mr Azima at this time, so
6     you now claim.
7  A. Yes.
8  Q. And you're not sure when you learnt of the RAKIA
9     campaign against Mr Azima. So I'm just wondering, why
10    in that context did you think at the time that
11    Mr Buchanan was calling you on holiday with this piece
12    of news?
13 A. My Lord, you'd have to ask Mr Buchanan that.
14 Q. You see, I suggest to you -- well, can you see in the
15    second line {H10/262}:
16       "... I will get you the link later."
17 A. Yes, I have looked at --
18 Q. Sorry, Mr Handjani, can I ask the question? The first
19    thing is I want to point you to that, but then there
20    will be a question. I know you've got an answer that
21    you've prepared, but it would work better if I show you
22    the bit of the email, and then ask my question, if
23    that's all right? Even if you can foresee and you know
24    that this is the time to give the answer you want to
25    give. Would that be all right?

                              54

1  A. Please proceed.
2  Q. "I will get you the link later", can you see that,
3     Mr Handjani?
4  A. I can, my Lord.
5  Q. What did you understand Mr Buchanan was offering to get
6     you when you got this email, Mr Handjani?
7  A. My Lord, I did not receive any link from Mr Buchanan.
8     I have never clicked on any link. He never came back to
9     me. We spoke, I told him I was on holiday, he told me
10    what had been discovered and they were going to analyse
11    it, and that was that, no link was provided to me, and
12    I moved on enjoying my holiday.
13 Q. Did you not pursue, did you not follow up on the fact
14    that you hadn't been supplied with the link?
15 A. No, no, my Lord.
16 Q. Really?
17 A. I wouldn't care enough. It didn't concern me where
18    Mr Azima's information came up. I was on holiday.
19 Q. You see, Mr Handjani, I suggest that you've made up this
20    account of a telephone call with Mr Buchanan on that
21    date.
22 A. My Lord, that's incorrect. Counsel has run out of
23    things to ask me.
24 Q. And that the reason you didn't respond to Mr Buchanan's
25    email is because by this time, you already knew about

                              55

1     the existence of the online material.
2  A. That's a preposterous assertion, my Lord. I deny it.
3     It's wrong.
4  Q. And I suggest that you also knew by this stage that that
5     material that Mr Buchanan is describing there had been
6     illegally procured from within Mr --
7  A. Absolutely not, my Lord. Absolutely not.
8  Q. Sorry, had been illegally -- sorry, I put it to you,
9     Mr Handjani, that by this time you knew that this
10    material had been illegally procured from within
11    Mr Azima's confidential email archives.
12 A. My Lord, as an officer of the court, I sit here under
13    oath, with a penalty of perjury, I had no knowledge of
14    Mr Azima's material being hacked, who hacked it or of it
15    appearing online.
16 Q. And I'm not suggesting, Mr Handjani, at all that you
17    played any part in the hacking, to be clear, I'm not
18    suggesting that for one moment, but I am suggesting that
19    by the time of this email, you did know or suspect that
20    persons working for or on behalf of RAK or RAKIA were
21    behind the illegal procurement of this internet
22    material?
23 A. My Lord, that's false, and counsel's -- there's no
24    evidence to suggest that I ever knew that RAKIA was
25    pursuing any such campaign on Mr Azima.

                              56

1  Q. You seem to have had a very successful career in RAK,
2     would you agree?
3  A. Depends how you measure success, my Lord.
4  Q. You moved back to the US around the end of 2017, the
5     start of 2018, that is correct, isn't it?
6  A. That is right, my Lord.
7  Q. Is that because you were disturbed by what you had seen
8     in 2015 and 2016?
9  A. No, my Lord. I was getting married, and my wife was an
10    American. She wanted to live in the US, in New York,
11    close to her family.
12 Q. And did you have a concern at continuing to be
13    associated with a regime like that of
14    Sheikh Saud bin Saqr Al Qasimi?
15 A. That is not the reason I moved back, my Lord.
16 Q. And that you felt uneasy about what you had seen go on
17    within Ras Al Khaimah and you wanted to move to the US?
18 A. That's absolutely untrue, my Lord.
19 MR LORD: Thank you Mr Handjani.
20 MR TOMLINSON: I think your Lordship should take the
21    transcriber break. I won't be long, but it's five
22    minutes over.
23 A. My Lord, am I still under oath?
24 JUDGE LENON: You can get down, but you mustn't speak to
25    anyone.

57

1  (11.51 am)
2              (A short break)
3  (11.58 am)
4  A. My Lord, if I may, in my colloquy with counsel, I said
5     there was an Intelligence Online article with my name on
6     it that Mr Azima brought to my attention in the summer
7     of 2016. I have found the article. It came up, my
8     Lord, in June of 2016.
9           Re-examination by MR TOMLINSON
10 MR TOMLINSON: Mr Handjani, I want to ask you about two
11    matters.
12        The first is it was repeatedly put to you by Mr Lord
13    that the Ruler had given an instruction to target or go
14    after Mr Azima in 2015. Did the Ruler ever give you an
15    instruction to target or go after Mr Azima?
16 A. Never, my Lord.
17 Q. As far as you're aware, did the Ruler -- did anybody
18    else that you discussed these matters with say the Ruler
19    had given them an instruction to go after or target
20    Mr Azima?
21 A. None, my Lord, in person. When we spoke that was never
22    a charge.
23 Q. Thank you. Now, finally, it was suggested to you that
24    somehow you'd fled RAK to go to the United States
25    because you'd been shocked and appalled by the illegal

58

1     activity that you'd seen there in 2016. Do you still
2     have connections with RAK and RAKIA, Mr Handjani?
3  A. None with RAKIA, my Lord, but with Ras Al Khaimah I do,
4     my Lord.
5  Q. Do you still visit there and have business connections?
6  A. I was there two months ago, my Lord. I go there
7     regularly, my Lord.
8  MR TOMLINSON: Thank you, Mr Handjani. Does your Lordship
9     have any questions?
10 JUDGE LENON: I don't have any questions. Thank you,
11    Mr Handjani.
12 MR TOMLINSON: My Lord, that's the case for the claimant.
13 MR LORD: My Lord, I'm going to call Mr Azima. Before I do,
14    my Lord, I have raised with my learned friend,
15    Mr Azima's -- English is his third language, my Lord.
16    He speaks English reasonably well, but he doesn't read
17    nor write in English very well at all, and I've said to
18    my learned friend -- I've asked him in fairness to
19    Mr Azima, to bear that in mind in his questioning and
20    that certainly if significant documents are going to be
21    put to Mr Azima or passages thereof, in fairness to
22    Mr Azima, it would be much easier for him to understand
23    the matter if that could be read to him rather than his
24    being asked to read it. Certainly in any significant
25    quantity. My learned friend very helpfully agreed that

59

1     he would of course bear that in mind during his
2     questioning. But I thought I should just apprise
3     your Lordship of that.
4  JUDGE LENON: Thank you.
5  MR LORD: Thank you, my Lord. May I please call Mr Azima.
6              MR FARHAD AZIMA (affirmed)
7            Examination-in-chief by MR LORD
8  MR LORD: Mr Azima, could you please give his Lordship your
9     full name and address?
10 A. Your Lordship, my name is Farhad Azima, that is
11    A-Z-I-M-A.
12 Q. And your address?
13 A. 5921 Ward Parkway, Kansas City, Missouri 64113.
14 Q. Mr Azima, please could you be shown bundle E and
15    divider 3, and {E/3/1} should be the first page of
16    a witness statement given by you, can you see that?
17 A. Yes, I see that.
18 Q. And if you could turn, please, Mr Azima, to page
19    {E/3/36}, you'll see that you've signed that statement
20    on 28 August 2019. Can you see that?
21 A. Yes, my Lord, I have.
22 Q. And have you reviewed the contents of that witness
23    statement recently?
24 A. Yes, my Lord, I have.
25 Q. Then, Mr Azima, could you please turn to {E/4/1}, which

60