# Exhibit 1

IN THE SUPREME COURT OF THE UNITED KINGDOM

UKSC Ref No: 2021/0084

BETWEEN:

**FARHAD AZIMA**

**Proposed Appellant**

-and-

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Proposed Respondent**

---

**GROUNDS OF THE PROPOSED APPELLANT'S APPLICATION TO RELY ON NEW EVIDENCE**

---

**Overview**

1. The Proposed Appellant, Mr Azima, lodged an application for permission to appeal dated 8 April 2021 against the judgment and order of the Court of Appeal in *Azima v Ras Al Khaimah Investment Authority* [2021] EWCA Civ 349. The application for permission to appeal has not yet (it is understood) been determined.

2. Mr Azima makes this application pursuant to Rule 30 of the Supreme Court Rules 2009 and paragraph 7.1 of Practice Direction 7 to place new evidence before the Supreme Court. The new evidence is an affidavit from Mr Stuart Page (together with its supporting documents exhibited thereto), an investigator who was one of the key figures in the camp of the respondent ('**RAKIA**'), and who acted on RAKIA's behalf.

3. Mr Page's affidavit provides direct evidence of RAKIA, its witnesses and its lawyers conspiring to provide false testimony at trial regarding the hacking of Mr Azima, and procuring a judgment by fraud. Mr Page makes admissions of serious wrongdoing, including the following:

1

    a. That Mr Gerrard, Mr Buchanan and the Ruler of Ras Al Khaimah solicited and willingly received (from an investigator engaged through Mr Page) hacked emails; and

    b. That Mr Page conspired with other key figures on RAKIA's side to give false evidence at the trial. Those figures included the executive managing its affairs (Mr James Buchanan), and two of its solicitors: Mr Neil Gerrard, formerly a partner in Dechert LLP ('**Dechert**'), and Mr David Hughes, formerly a partner of Dechert and then of Stewarts Law (RAKIA's current solicitors).

4. This evidence, it is submitted, is highly material to the application for permission to appeal, and to the merits of the appeal. The new evidence provides a compelling basis for granting permission and for allowing the appeal.

**The key issues in the appeal to this Court**

5. The application for permission to appeal explains the background and the reasoning of the trial judge and the Court of Appeal (the '**CA**'). The Court is respectfully referred to that application: see particularly PTA Application, §§1-15. The key points addressed here are certain matters at issue under the proposed grounds of appeal.

6. In a nutshell, Mr Azima's case is that RAKIA illegally obtained his confidential emails, trade secrets and data, and that RAKIA and its witnesses have lied about the way in which RAKIA came into possession of the hacked materials. This case was rejected on the facts at trial, but Mr Azima appealed and the CA directed that Mr Azima's hacking counterclaim was to be remitted for a retrial. Following the CA's judgment, the issue of hacking will therefore be investigated and determined at a further trial.

7. Aside from remitting the counterclaim, the CA otherwise: (i) rejected Mr Azima's case that RAKIA's claims should be struck out as an abuse of process (and/or the stolen evidence excluded) even if RAKIA is ultimately shown to have procured the hacking; (ii) dismissed Mr Azima's defence of equitable set-off; and (iii) otherwise rejected Mr Azima's appeals on RAKIA's claims.

2

8. As set out in the grounds of appeal (see PTA Application, §§45-68), Mr Azima's case before this Court is essentially that the CA erred in its ruling on the potential consequences of RAKIA ultimately being found to have procured the hacking and to have presented a false case.

9. The grounds of appeal encompass the following points, to which the fresh evidence is relevant, as explained further below.

10. **Ground One, §§47-57:** By holding now, before the retrial of the hacking issue takes place, that RAKIA's claim should not be struck out or the stolen evidence excluded, the CA has wrongly pre-empted the investigation of the hacking issue.

    a. The scale of RAKIA's and its witnesses' wrongdoing and fraud on the Court – and the extent and gravity of its abuse of the Court's process – would only become apparent after a trial of the factual issues, as the judgment in *Summers v Fairclough Homes* [2012] 1 WLR 2004 makes clear.

    b. It is wrong in law to rule <u>before</u> the factual investigation is completed that certain remedies may not be available. *Hunter v Chief Constable of the West Midlands Police* [1982] AC 529 states that it is unwise to confine the exercise of the power to strike out a case to particular categories.

11. The CA also proceeded on the assumption that the counterclaim may show "at least some" of RAKIA's evidence – by which it appears to have meant Mr Page and one of his associates, Mr Majdi Halabi – to have given false evidence. This was the wrong approach. Mr Azima's case is that the hacking conspiracy and the conspiracy to present false evidence was much wider than those two individuals, and that it also included RAKIA's solicitor (Mr Gerrard) and the executive managing its affairs (Mr Buchanan), among others.

12. **Ground Two, §§58-63:** The CA held that it would be wrong to strike out a claim if the claim showed that a defendant had acted dishonestly. But this was the wrong approach. The Court must be entitled to take into account the seriousness of the abuse of process in pursuing the claim, the unfairness this creates, and the extent to which allowing a dishonestly advanced claim to be upheld would bring the administration of justice into disrepute.

3

13. **Ground Three, §§64-66**: It was wrong for the CA to dismiss the defence of set-off. That defence calls for evaluating and weighing in the balance the extent of the claimant's unlawful and dishonest conduct and its abuse of the Court's process.

14. **Ground Four, §§67-68**: The CA wrongly dismissed Mr Azima's challenge to the finding that RAKIA had relied on his representations. If it were shown that RAKIA's key decision-makers (including in particular Mr Buchanan and the Ruler) had lied in their evidence, that they had been targeting Mr Azima, and that they were using hacking, the claim of reliance would be nonsensical.

**The progress of the counterclaim**

15. As noted, the CA directed that Mr Azima's counterclaim complaining of hacking was to be remitted for a retrial. Since the CA's judgment, the counterclaim has been advancing in the High Court. Mr Azima applied to amend his counterclaim and to add new defendants: Mr Page, Mr Buchanan, Mr Gerrard, and Dechert. Those applications met with opposition but were allowed in full by the designated judge, Mr Justice Michael Green at a CMC in July 2021.

16. Defences were then filed by RAKIA, Mr Buchanan, Mr Gerrard and Dechert, and Replies have been served. A CMC is to take place on 16-17 March 2022.

17. After being added as a defendant to the counterclaim, Mr Page has recently entered into a settlement with Mr Azima and the claim against him has been discontinued. The affidavit and supporting documents now relied on in this application were provided by Mr Page following that settlement. In light of the admissions and new evidence that Mr Page has provided as to RAKIA's activities, Mr Azima anticipates amending his counterclaim shortly. It bears emphasis that a concerted effort was made to cover up the hacking and that the full factual picture continues to be investigated.

**Legal principles: fresh evidence on appeal**

18. Practice Direction 6.3.3 contemplates that fresh evidence may be admitted for the hearing of an appeal, upon an application being made. The Supreme Court Rules and the Practice Directions do not themselves specify the circumstances in which

fresh evidence not available to the Courts below may be admitted. The principles governing the admission of fresh evidence on appeals before the High Court and the Court of Appeal may therefore be instructive.

19. The Court of Appeal may admit new evidence pursuant to CPR 52.21(2). It exercises its power to do so by reference to the principles in *Ladd v Marshall* [1954] 1 WLR 1489 (CA) (at 1491, Lord Denning MR):

> "In order to justify the reception of fresh evidence or a new trial, three conditions mast be fulfilled: first, it must be shown that the evidence could not have been obtained with reasonable diligence for use at the trial: second, the evidence most be such that, if given, it would probably have an important influence on the result of the case, though it need not be decisive: thirdly, the evidence must be such as is presumably to be believed, or in other words, it must be apparently credible, though it need not be incontrovertible."

20. It should also be noted that where new evidence shows that an earlier judgment had been obtained by fraud, this would provide a basis for a fresh action to set aside that judgment, or the appellate court may direct that trial of the fraud issue is remitted: see *Noble v Owens* [2010] 1 WLR 2491 (CA). In *Dale v Banga* [2021] EWCA Civ 240, Asplin LJ explained the threshold standard to be met, as follows (para 42):

> "It seems to me that it is necessary to decide whether the new evidence is capable of showing that the judge was deliberately misled by the Respondents and that the judgment may have been obtained by fraud. It must be sufficient to justify pleading a case of fraud. It must be capable of showing that there was conscious and deliberate dishonesty which was causative of the judgment being obtained in the terms it was. The conscious and deliberate dishonesty must be that of a party to the action, or was at least suborned by or knowingly relied upon by a party."

21. If that threshold is met, the Court would then decide whether a fresh action or a remittal is appropriate: *Dale v Banga*, para 43.

**The new evidence: Mr Page's affidavit and the supporting exhibit**

22. The Court is respectfully invited to review Mr Page's affidavit. The key points it makes are, in summary, as follows.

23. First, Mr Page states that he provided key individuals at RAKIA with regular reports (including reports that concerned Mr Azima) that included extracts from hacked emails. Mr Page explains that it was obvious that these materials were confidential emails that could only have been obtained through illicit means. Mr Page explains that the reports were prepared by an Israeli entity, Insight, which engaged in hacking (referred to in the investigations business as "SIGINT", or signals intelligence): affidavit, §§9-16.

24. Mr Page provided the reports to (affidavit, §§14, 22-25):

    a. Mr Buchanan, who managed RAKIA's affairs and who was responsible for the conduct of this litigation until shortly before the trial in January 2020;

    b. Mr Gerrard, who was RAKIA's solicitor;

    c. The Ruler of Ras Al Khaimah.

25. All of these individuals provided witness statements for the first trial, and Mr Page, Mr Buchanan and Mr Gerrard were cross-examined. They all denied any involvement in or knowledge of hacking.

26. Second, Mr Page gives evidence that he and others on RAKIA's side concocted the account by which RAKIA supposedly 'discovered' the Torrents containing Mr Azima's data.

27. At trial, RAKIA's case was that Mr Buchanan had asked Mr Page to "keep an ear out" for anything notable regarding Mr Azima, RAKIA, or associated individuals. It was said that Mr Page in turn asked Mr Halabi to look out for such information. Mr Halabi's evidence for RAKIA was that he periodically conducted web searches for information about Mr Azima, and that those web searches led Mr Halabi to find publicly available internet sources (known as Torrents) that contained Mr Azima's data. RAKIA's evidence and pleaded case was that Mr Halabi was the source of

6

-16-

the information as to the Torrents: he was said to have provided the link or links to those Torrents to Mr Page, who in turn passed this information to Mr Gerrard and/or Mr Buchanan.

28. Mr Page's evidence in his affidavit is that this was a false cover story created by RAKIA, its lawyers and its witnesses to conceal the truth. It was actually an individual at Insight, Amit, who provided Mr Page with the links. However, Mr Buchanan and Mr Gerrard did not wish to identify Amit or Insight in the narrative of 'discovery'. Identifying Amit and Insight as the source would have caused serious problems for RAKIA's case on the hacking since it would have entailed an admission that RAKIA had hired an Israeli hacker for its investigation. Mr Buchanan, Mr Gerrard, and Mr Hughes agreed with Mr Page and Amit to advance a different, false account, and so a cover story involving discovery through Mr Halabi and his web searches was fabricated (affidavit, §§35-38).

29. Importantly, this cover story was worked out between not just Mr Page and Mr Halabi, but also Mr Gerrard, Mr Buchanan, and Mr Hughes (affidavit, §§36-39). This cover story was crystallised at a meeting in Cyprus on around 21 November 2018.[1]

30. Mr Page then met with another partner at Stewarts Law, Lucy Ward, and two Dechert partners (Caroline Black and Dorothy Cory-Wright), to prepare his witness statement (affidavit, §40).

31. Mr Page explains that after this false account was set out in witness statements, he and Mr Halabi attended a "mock trial" session in Switzerland shortly before the trial in which Mr Gerrard played the role of judge, conducting a practice cross-examination on their false evidence (affidavit, §§46-53, particularly §52). During the meeting in Switzerland, Mr Page recalls Mr Gerrard saying to him, "*if they ever*

---

[1] Shortly before this meeting, RAKIA had provided a response to a Request for Information under CPR Part 18 indicating that the Torrent links had been provided to Mr Page by a person who was not identified by that response. That response (signed by Mr Hughes on 6 November 2018) stated that the links had been discovered by *"Mr Page acting on behalf of RAKIA"* who *"learned of the existence of the links from a person who was not engaged or acting on behalf of RAKIA"* (response to request 2(d)). Shortly after the meeting on 21 November 2018, RAKIA served a Voluntary Further Information (dated 11 December 2018, signed by Mr Hughes) stating that this "person" was Mr Halabi. Copies of those pleadings are enclosed with these submissions.

7

*believe or prove that we are behind the hacking, then this thing is going to drag on for years*" (affidavit, §53). On its face, this is an admission by Mr Gerrard to Mr Page that RAKIA (with Mr Gerrard's involvement) had hacked Mr Azima.

32. Mr Page's affidavit therefore shows RAKIA's case and the evidence of its witnesses to be a dishonest sham, constructed by Mr Gerrard and others to conceal the true position and deceive the Court.

**Submissions**

33. It is submitted that the fresh evidence should be admitted.

34. The fresh evidence is highly material both to the issues before the courts below and to the issues raised on this appeal.

   a. The evidence shows that RAKIA – through its agents – obtained and made use of hacked emails, and that this was known to and self-evidently approved of by Mr Buchanan, Mr Gerrard, and the Ruler.

   b. It also shows that there was a conspiracy between a large number of key RAKIA witnesses to present a false case and perjured evidence: Mr Page, Mr Halabi, Mr Buchanan, Mr Gerrard, and the Ruler (with the knowledge of Mr Hughes, who was not a witness in the proceedings, but who is a solicitor who also acted for RAKIA).

35. Had the true position been known, this would clearly have had a bearing on the defences raised by Mr Azima. These facts also provide further support for Mr Azima's appeal:

   a. The fact that knowledge and approval of hacking was widespread within the highest level at RAKIA, and that there was a wide-ranging conspiracy to present a false case and perjured evidence (involving two solicitors, Mr Gerrard and Mr. Hughes) shows that the CA was wrong to proceed on the assumption that false evidence may have been given by Mr Page and Mr Halabi (but not others).

   b. These facts otherwise provide graphic confirmation of Mr Azima's contention that RAKIA's activities involving wrongdoing of a very serious nature and an

8

-18-

egregious abuse of the court's process. This is highly material to the assessment of Mr Azima's arguments that the claims should be struck out and/or the evidence otherwise excluded.

c. The gravity of RAKIA's wrongdoing and deceit is also highly relevant to the defence of equitable set-off.

d. The evidence shows that Mr Buchanan, Mr Gerrard and the Ruler were fully aware of hacking and involved in the cover-up. It was Mr Buchanan and the Ruler who were said by RAKIA to have relied in good faith on Mr Azima's representations, and it was Mr Gerrard who drafted the agreement at the centre of RAKIA's misrepresentation claims. That contention of reliance is squarely contradicted by this new evidence. Indeed, any evidence given by these RAKIA witnesses on RAKIA's claims against Mr Azima should be rejected as unreliable (unless independently corroborated).

36. The evidence is also 'apparently credible'. Mr Page was a key figure in events and has hereto been presented as a witness by RAKIA, and who RAKIA has admitted acted on its behalf. He has obviously not provided this affidavit lightly and he has provided first hand evidence of his participation with others in a broader scheme of wrongdoing. Mr Page would have had good reason to continue covering up this wrongdoing and so the fact that he has admitted to his role in it should be regarded as credible.

37. If the Court is minded to admit this evidence, for the reasons set out above it is submitted that permission to appeal should also be granted on the strength of this new material.

**TIM LORD QC**
**THOMAS PLEWMAN QC**
**HUGO LEITH**
**SOPHIE BIRD**

*Brick Court Chambers*

10 January 2022