# Exhibit 2

Appellant
S. Page
First Affidavit
Exhibit: "SRP-1"
7 January 2022

**IN THE SUPREME COURT OF THE UNITED KINGDOM
ON APPEAL FROM THE COURT OF APPEAL
(ENGLAND)**

**UKSC 2021/0084
ON APPEAL FROM
CA No. A3/2020/1271
[2021] EWCA Civ 349**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE**, of 14 Montpellier Road, London, W5 2QP, **STATE ON OATH** as follows:

1       I make this affidavit at the request of Farhad Azima ("**Mr Azima**"), the Appellant, who I understand has a pending application for permission to appeal to the Supreme Court, and that the evidence I give in this affidavit may be relevant to that application.

2       I have prepared this affidavit in a fairly limited time period as I understand that Mr Azima's application may be decided imminently, and so I have not had the opportunity to review the full range of potentially relevant documents that are available to me.  I am therefore preparing this affidavit largely from memory and with limited assistance from documents. Subject to this point, and except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

3      In this affidavit I refer to documents which together comprise exhibit "**SRP-1**". References to page numbers in bold in squared brackets in this affidavit are references to that exhibit.

4      As a result of previous work I carried out on behalf of the Ruler of Ras Al Khaimah ("**RAK**") (the "**Ruler**"), I gave evidence for the Ras Al Khaimah Investment Authority ("**RAKIA**"), the Respondent, in these proceedings during the trial which took place in January and February 2020 before Deputy Judge Lenon QC (the "**First Trial**"). As such, I provided a witness statement dated 20 June 2019 [**SRP-1/1-7**] (my "**Witness Statement**") and gave evidence at the First Trial on 29 January 2020. A transcript of my oral evidence is at [**SRP-1/8-35**].

5      I make this affidavit to supplement the evidence which I gave at the First Trial in the present proceedings. I also want take this opportunity to correct part of that evidence, as set out below.

**My role in the investigation of Khater Massaad**

6      I was engaged by the Ruler to investigate Khater Massaad ("**Khater**") in January 2015, in relation to the misappropriation of a large amount of government funds. Khater had previously been the main advisor to the Ruler and a close confidante and friend, and he sat on the board of a number of RAK entities.

7      The Ruler initially asked me to meet with Mr Jamie Buchanan ("**Jamie**"), to whom I reported during the course of my mandate, until Jamie left RAK in the summer of 2019. In the course of my mandate, I also worked alongside Mr Neil Gerrard ("**Neil**") of Dechert LLP ("**Dechert**"), although I was never instructed by him in relation to the investigation into Khater.

8      In addition to the general mandate described above, Jamie provided more detailed instructions and requested that my investigation looked into:

8.1      Khater's alleged connection with Hezbollah, a prescribed terrorist organisation, in Lebanon, and alleged assistance in relation to their funding;

8.2      Khater's assets and business interests, particularly in Saudi Arabia;

8.3      A concern that Khater was allegedly working with other members of the Ruler's family to overthrow the Ruler;

8.4      Khater's connections with Iran, and in particular an alleged connection to Iran's Islamic Revolutionary Guard Corps (the "**IRGC**"); and

8.5      Khater's business associates, in particular his association with Viktor Bout (to whom I refer in my Witness Statement).

9        Soon after meeting with Jamie in 2015, I instructed Amit (of Insight – the company which I identified during my oral testimony at the First Trial as having assisted me with the preparation of the reports I presented to the Ruler, Jamie and Neil) to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defence Force. Consequently, Amit and his team had extensive knowledge of the methods used by Iran and the IRGC to move money in support of terrorist organisations. They also had multiple language skills (in particular Arabic and Farsi), and so were a natural choice for this project.

10       This project was given the codename "Project Beech" which was used between me, Amit and his team.

11       The investigation work was undertaken using three main sources of intelligence, namely:

11.1     HUMINT – human intelligence, which constituted cultivating individuals to provide information;

11.2     Open Source – research into corporate and other publicly available records; and

11.3     SIGINT – signal intelligence, which is intelligence-gathering by the interception of communications.

12       SIGINT is a term that originates from intercepting radio signals and tapping a target's phone, and continues to be used in the intelligence world (including the commercial investigations industry) to include the hacking of confidential emails and unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

13       My main point of contact was Amit, but I know that Amit used a number of analysts to assist with the project by analysing the raw data. I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose.

14       In addition to undertaking some of the investigative work for the project, my role also included ensuring that the reports Amit and Insight prepared were shared with the Ruler, Jamie and, later on, Neil as securely as possible (given the sensitivity of the reports and what they contained).

15      Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. One of the reports entitled "Project Update" (dated 26 March 2015) which I have seen (in redacted form) in the context of the First Trial [**SRP-1/36-52**] was the second of these reports. The reports would generally include an executive summary, some raw data that had been obtained as a result of the investigation (usually contained within an appendix to the report), some analysis of this data, and recommendations and action points.

16      I recall that some of these reports also featured extracts from confidential documents (with the document itself then appended to or embedded in the report) which I concluded must have been obtained as part of Amit's and Insight's SIGINT work. It was obvious to me (and it would have been obvious to anyone else reading the reports) that such documents were obtained as a result of unauthorised access to computers.

17      I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

18      Given the nature of the people and organisations we were investigating (including those set out above), we adopted secure communications protocols for handling Amit's reports and sharing them with Jamie, Neil and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

19      An email account was created that only Amit and I (and my personal assistant, Caroline Timberlake ("**Caroline**")) could access, and to which we knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to my company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

20      Amit (or one of his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to me (or occasionally Caroline) to indicate that there was something to be reviewed. These messages would then be deleted.

21      To discuss matters relating to Project Beech, other members of the team, including Jamie and Neil also used Confide (originally) and then moved to Signal later on. I also recall that Andrew Frank (who was part of RAKIA's strategy team – see below) routinely used Whatsapp.

22      Once the reports had been downloaded and printed in hard copy, Caroline was instructed to delete the electronic copy. The reports were hand-delivered to Jamie for his review, or would be left for him at his hotel in London with the concierge. I would also deliver the report in person to the Ruler in RAK as part of our regular private audiences.

23      At Jamie's request, I would also arrange for a copy of some of the reports (but not all of the reports) to be sent to Neil, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Caroline) to Neil (or Neil's secretary) at Dechert's office in London. However, on one occasion, a report was opened by someone other than Neil or his secretary at Dechert. Given the obvious make-up of the report (as set out above), this caused Neil real concern, as he asked me to send future reports to his home in Nutley, East Sussex. Courier receipts and emails relating to the delivery of reports to Neil at Decherts and at his home are exhibited at [**SRP-1/53-73**].

24      The Ruler instructed me that I was not to send anything to him via electronic means or by courier: if I had something to give to him or something to report, I was to meet with him in person in RAK. Accordingly, for the duration of Project Beech, I met with the Ruler approximately every three to four weeks to provide an update on our investigation. I would usually meet Jamie beforehand and discuss the report in detail, and he would indicate any part of the report that he thought I needed to highlight to the Ruler. Normally Jamie would then also be present at those meetings with the Ruler, and very occasionally Neil would be in attendance as well.

25      A typical meeting with the Ruler would last about 45 minutes, of which the first fifteen minutes would be spent discussing world affairs, of which the Ruler is very knowledgeable. In my experience in the Arab world, Middle Eastern clients are unlikely to read lengthy documents, so frequently the Ruler asked me to give him an overview of where we were in the investigation, and occasionally would read the executive summary at the front of the report, but not the whole document. I would leave the copy of the report with the Ruler before I left.

26      At this point I wish to correct and clarify my evidence given at the First Trial, as I realise that I was unintentionally misleading when I said that my reports to clients, including the Ruler, were "invariably oral". What I meant was that my reports to the Ruler were invariably face to face, in the manner described above.

27      Every few months, Jamie returned to me the hard copies of the reports he held, on the understanding that I would then arrange for the reports to be destroyed (which I then did).

28      I also arranged meetings with Amit, Jamie, Neil and me between 2015 and 2019 in order to obtain guidance from Jamie and Neil as to the direction of the investigation. They were specifically interested in my investigation into the role played by Khater in RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of my investigation were on the US sanctions list). I recall that Jamie told me that Mr Azima had introduced the three buyers to the transaction and asked me to look into the sale of the hotel as part of my investigation. To the best of my recollection, the reports produced by Amit and his team in connection with this part of the investigation contained information derived from SIGINT material.

29      Starting in 2016, multiple meetings took place at Dechert's office in London. Dechert required visitors to sign in and show some form of identification. To the best of my knowledge and belief, towards the end of 2016 or the beginning of 2017, Neil became increasingly concerned about meeting at Dechert's office as he did not want a written record indicating that Amit (or any other member of Amit's team) had visited him. It was after this that when we met in London, we gathered at Jamie's suite in the Churchill Hotel or in Amit's suite at the Metropolitan Hotel.

30  .   Jamie told me that he also attended strategy meetings in New York every four to six weeks with Andrew Frank (of Karv Communications) Amir Handjani ("**Amir**") (a close advisor to the Ruler) and Neil to discuss the investigation and RAK's litigation.

**Discovery of the hacked data**

31      As set out paragraphs 14 to 15 of my Witness Statement, Jamie told me that he understood that a negative publicity campaign had been threatened by Khater against the government of RAK and the Ruler, and asked me to keep my eye and ears open for anything about such a campaign that might be damaging for RAK.

32      I wish to correct the evidence I gave both in my Witness Statement and during my oral testimony at the First Trial as to the circumstances in which Mr Azima's confidential information came to be discovered.

33      The fact of the matter is that Majdi Halabi ("**Majdi**") had no role in the discovery of Mr Azima's confidential information. I provided incorrect testimony, claiming that (i) I had approached in him in relation to the threatened negative publicity campaign, and (ii) he had discovered the data. In fact, I approached Amit (and not Majdi) and asked him

to monitor the internet and dark web for such information, and it was Amit who told me about the data.

34    In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima.

35    During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In November 2018, my name was disclosed by RAKIA to Mr Azima in the context of these proceedings as being the person who informed them of the existence of the tranches of data. However, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit was in turn the person who had told me about the data, and Amit told me that he did not want his name disclosed in proceedings, for fear that, by inference, Insight would be accused of being responsible for hacking. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK. At this time there were no diplomatic relations between the State of Israel and the UAE.

**Meeting in Cyprus**

36    Consequently, there were a series of meetings between (variously) Amit, Jamie, Neil and me to discuss how to respond to Mr Azima's enquiries in these proceedings regarding how his data had been discovered by RAKIA.

37    Amit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Majdi, who I knew as one of Amit's subcontractors. I subsequently met with Majdi and Amit and we discussed the idea of Majdi being used as a cover for Amit's discovery of Mr Azima's data. I then discussed the idea of Majdi being used as a cover story with Jamie and Neil, and it was subsequently agreed that we would all meet to work out the plan. Initially Jamie, Neil and I discussed seeing the 'Israeli boys' (i.e. Amit and his team) in Israel as the safest option, but we later agreed to meet in Cyprus to sign off on the use of Majdi as a cover story.

38     We met in Cyprus on or around 21 November 2018. The meeting was attended by David Hughes (a partner, formerly with Neil at Dechert but, by this time, at Stewarts Law ("**David**")), Neil, Jamie, Majdi, Amit and me. It was agreed at this meeting that we would proceed with the cover story that Majdi (and not Amit) had discovered and passed the link to Mr Azima's confidential data to me, and that, if necessary, Majdi and I would be willing to provide witness testimony to this effect.

39     During this meeting, David raised his objection to the cover story, saying it was "*not credible*" and that it would not work, but Neil made it clear that this was going to be the best way forward, and that David needed to fall in line.

40     I subsequently met with Caroline Black and Dorothy Cory-Wright of Dechert and Lucy Ward of Stewarts Law to prepare my Witness Statement, which I signed on 20 June 2019.

41     I apologise unreservedly for the part I played in misleading the Court during the First Trial, and wish to state that the remainder of my evidence was true.

**Meeting with the FBI**

42     In mid-February 2019, Jamie advised me that the Ruler wished for me to attend a meeting with the FBI. On or around 21 February 2019, I therefore attended a meeting in New York at Dechert's office in order to meet with an FBI agent. My understanding was that the purpose of the meeting was to try to persuade the US authorities to open an investigation into Mr Azima. This is based on my understanding that for some while, RAK had been attempting to persuade the Department of Justice and the FBI to open up such an investigation.

43     When I arrived, I met with Jamie, Neil and a Mr Chris Swecker ("**Chris**") who I understand is a lawyer and an ex-FBI agent. However, after we waited for a considerable time in the meeting for the FBI agent to arrive, I was told that the meeting needed to be cancelled due to a scheduling miscommunication. I returned to the UK and awaited further instructions.

44     In early to mid-March 2019, Jamie then advised me that the Ruler wished for me to return to the US for a further meeting, this time to Houston. I had not been briefed on what the meeting related to, but I was told that my expenses would be covered and that I should just make sure that I made myself available. On or around 17 March 2019, I met with Jamie, Neil, Chris and an FBI agent called Paul Zukas ("**Paul**") at the Hyatt Centric The Woodlands hotel in Houston.

45     In the course of my career, I have had numerous interactions with federal law enforcement agencies and the district attorney's office in New York. Those meetings always took place at the offices of the relevant organisation. I therefore found it

strange that the meeting with the FBI in Houston was held at a hotel and not at the field office. At that meeting, Chris told me that I was being considered as a potential witness for a grand jury and that the purpose of the meeting was to assess my credibility. Following the meeting, Jamie, Neil, Chris and I went for dinner with the assistant special agent in charge ("**ASAC**") of the Houston field office, whose name I do not now recall. In the course of that dinner it became apparent that Chris and the ASAC were friends.

**Meeting in Switzerland**

46      As the trial of the proceedings (i.e. the First Trial) approached (due to commence in January 2020), I was asked by Amit (who had in turn been instructed by Neil) to organise and attend a meeting with him, Jamie, Neil, and Majdi to rehearse our testimony for the First Trial. We settled on Switzerland as the location for the meeting.

47      This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Having reviewed my travel records [**SRP-1/74-90**], I arrived at the hotel on the evening of 1 December 2019 and I left on 4 December 2019.

48      Shortly before the meeting, I was told by Neil that the Ruler had instructed him to tell Jamie that the meeting was no longer going ahead. As far as I am aware, the Ruler had terminated Jamie's employment in the summer of 2019. I was told by Neil that the Ruler therefore had concerns about whether he could be trusted to attend a meeting which required total secrecy.

49      Amit and some of his team also attended the meeting and provided extensive security for the meeting.

50      I had arranged for a special protocol to be in place to ensure maximum security and secrecy. I told Neil to leave his mobile phone at home or to switch it off so that his location could not be tracked. Neil, Caroline and I used burner phones for communication purposes, and I left my mobile phone at home.

51      To avoid detection, I did not fly direct to Switzerland. On 1 December, I took a series of trains from London to Paris Gare du Nord, then I transferred to Gare de l'Est. From Paris, I then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, I was collected by a member of Amit's security team and driven to the hotel.

52      At the hotel, we went through a mock trial, with Neil acting as both the judge and the cross-examining counsel. An effort was made to perfect the narrative that we were to tell the English court about how I had discovered the hacked data through Majdi.

53      We made use of the hotel's private chef and their wine from the hotel's cellar. The day was a mixture of eating, drinking and sections of cross-examination by Neil to drill into our story. During one of the sessions, Neil said something to the effect of "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*".

**Termination of my engagement**

54      Following the First Trial, my work for RAK continued until 1 June 2020 when my engagement was terminated. I believe that the last report I prepared was for May 2020. I set out below the circumstances leading up to the termination of my engagement.

55      In March 2020, I received a call from Amir who told me that I should have no further contact with Neil. By this time, Amir had become one of my points of contact for the investigation after Jamie's role had been terminated.

56      I assumed at this point that it was Neil who was being pushed out of the picture by the Ruler. I agreed to have no further contact with Neil.

57      It seemed that I was wrong in my assumption when, on 28 May 2020, I received a letter from the Investment & Development Office of the Government of RAK saying that my engagement had been terminated. The language seemed odd to me given that I had never had a formal written agreement with any particular RAK entity that could be terminated.

58      This came as a shock to me as I had frequently been told by Jamie that the Ruler was grateful for the work I had done for him.

59      I therefore telephoned Amir shortly after receiving the letter to ask what was going on. He told me that he knew nothing about this but that he would check the position with the Ruler. He then called me back along the lines that I should not worry, that it was all connected to internal politics and that I should be re-instated in a few months. However, that never happened, and I received a subsequent letter from the Investment & Development Office on 14 June 2020 confirming payment of my final

invoice.

**SWORN** by Stuart Robert Page

Signed: _____

Date: 7 January 2022

Before me: _____

Name: _____ CRAMPTON _____

Occupation: _____ SOLICITOR _____

Address:       Ashfords LLP
               1 New Fetter Lane
               London
               EC4A 1AN

**CA No. A3/2020/1271**
**[2021] EWCA Civ 349**

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL (ENGLAND)**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

**Burlingtons Legal LLP**
**5 Stratford Place**
**London**
**W1C 1AX**

**DX 82986 MAYFAIR**

**DH/AZI0003.2**

**Tel:      0207 529 5420**

**Solicitors for the Appellant**

Appellant
S. Page
First Affidavit
Exhibit: "SRP-1"
7 January 2022

**IN THE SUPREME COURT OF THE UNITED KINGDOM**

**ON APPEAL FROM THE COURT OF APPEAL (ENGLAND)**

**UKSC 2021/0084**
**ON APPEAL FROM**
**CA No. A3/2020/1271**
**[2021] EWCA Civ 349**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**EXHIBIT "SRP-1"**

---

This is the Exhibit "SRP-1" to the First Affidavit of Stuart Robert Page

**Stuart Robert Page**

Before me:

Name:   C KRAMPTON

Occupation:   SOLICITOR

Address:

Ashfords LLP
1 New Fetter Lane
London
EC4A 1AN

| Tab | Document | Date | Pages |
|---|---|---|---|
| 1. | Witness Statement of Mr Stuart Page | 20 June 2019 | 1 - 7 |
| 2. | Transcript of the Evidence of Mr Stuart Page at Trial | 29 January 2020 | 8 - 35 |
| 3. | Project Update Report | 26 March 2015 | 36 - 52 |
| 4. | Courier receipts and emails relating to the delivery of reports to Neil Gerrard | Various | 53 - 73 |
| 5. | Travel records relating to meeting in Switzerland | Various | 74 - 90 |

Claimant
Stuart Robert Page
First
2o June 2019

**IN THE HIGH COURT OF JUSTICE**          **Claim No. HC-2016-002798**

**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**

**BUSINESS LIST (ChD)**

**BETWEEN:**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

Claimant

**-and-**

**FARHAD AZIMA**

Defendant

---

**WITNESS STATEMENT OF STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE**, of 5-8 The Sanctuary, Ground Floor East, London, SW1P 3JS, **WILL SAY** as follows:

1. I am the Chairman and majority shareholder of Page Group Limited ("**Page Group**"), a holding company based in Hong Kong but operating from London. Page Group has various subsidiaries including Page Corporate Investigations Ltd and Page Protective Services Ltd based in England and Page Group ME FSZ based in Dubai. I make this witness statement on behalf of the Claimant, Ras Al Khaimah Investment Authority ("**RAKIA**").

2. Save insofar as is stated otherwise, the facts set out below are within my own knowledge or are derived from other sources or documents that I have seen and which in all cases, I believe to be true. Where any facts are not within my knowledge, the source of those facts is stated.

435

1

**Background**

3. I began my career in the police force (1970-1979), first in Sussex and subsequently in the Metropolitan police. Towards the end of my time in the police I was seconded to Scotland Yard's Anti-Terrorist Squad and Special Branch during the period of the Troubles in Northern Ireland.

4. I left the police in 1979 in order to take a career break and went to work in Saudi Arabia as a security and investigations adviser in the construction and oil industry. I returned to the UK in around 1983 and worked as a subcontractor for companies such as Argen, Kroll and Control Risks. I began working for myself in around 1985-1986 and have run my own businesses ever since. Due to my early experience in the Middle East I have always had a focus on work in the Middle East and am known as a specialist in the area.

5. The Page Group was formed in July 2009. Its subsidiaries, Page Protective Services Ltd and Page Corporate Investigations Ltd focus respectively on: 1) providing security services to diplomats in hostile environments; and 2) undertaking investigations and due diligence. The security services side of the business is the largest. Until recently we were the largest supplier to institutions of the European Union and in 2016 there were more than 200 people working for Page Protective Services Ltd around the world. We provide either armed or unarmed protection for diplomatic staff in areas of conflict such as Afghanistan and Haiti and have worked for the Department for International Development (DFID), the Norwegian government, the Belgian government, the French government and the British Embassy in Tel Aviv.

6. On the investigations side of the business we work for high net worth individuals, government bodies and large corporates. Our services include asset tracing, specialist research and due diligence, and can involve using covert human intelligence sources. Our reputation is critical to us as we rely on our network of contacts both for information and the referral of work. We do not generally work directly for law firms. We do not undertake cyber security investigation work because this is not one of our areas of expertise.

2

436

2

7.  I should say that my recollection of precise dates and events regarding this matter is not entirely clear. Generally, I travel a lot and have a busy schedule. Furthermore, at the time of the events in question, I was dealing with some extraordinarily difficult family issues and therefore my primary focus was not on work matters and I do not remember much about what happened at work during this period. I don't keep contemporaneous documents and my briefings to clients are invariably oral, especially in the Middle East where this is very normal.

**Initial engagement in Ras Al Khaimah**

8.  In 2008 I was approached by Khater Massaad who was an adviser to His Highness Sheikh Saud bin Saqr Al Qasimi (then the Crown Prince of Ras Al Khaimah ("**RAK**")) and CEO of RAK Ceramics. I believe I was approached due to my reputation in the area and my previous work for Mashreq Bank. The sister of the owner of Mashreq Bank was Sheikh Saud's wife. At this time I was engaged, through Khater Massaad acting on behalf of the Government of RAK, to undertake investigation services on a confidential matter unrelated to RAKIA or to any of the issues which arise in this case. I reported to Khater Massaad and had no direct involvement with Sheikh Saud.

9.  In October 2010 Sheikh Saud's father passed away and Sheik Saud became the Emir of RAK. My engagement came to an end because the confidential investigation I had been working on was no longer necessary.

10. In 2014 I saw in the press that an investigation was taking place into financial irregularities in RAK Airways. I contacted someone in RAK that I had known through my work for Khater Massaad to see if I could pitch for investigation work. I had one meeting with Sheikh Saud but nothing came of it.

11. My next involvement with RAK was in January 2015 when a meeting was set up between me and Jamie Buchanan. I cannot now recall who arranged this meeting, Jamie himself or a personal assistant. I understood that Jamie was an adviser to Sheikh Saud and this was simply a "get to know you meeting". We had breakfast in a hotel in Dubai and Jamie asked me about my background and the work I did. No specific work for RAK was discussed.

3

12. About a couple of months later Jamie and I had another meeting in Dubai and at that point we discussed a specific mandate. Jamie said that he was involved in investigating wrongdoing by Khater Massaad and the misappropriation of assets. He wanted my assistance in tracing assets, investigating Khater Massaad's involvement with Iran, his links to Hezbollah and Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking). I understood my engagement to be for the government generally but I did not know which specific government entity. There was no letter of engagement specifying a particular RAK entity. In my experience, this is common practice in the Arab world.  It is highly unusual to have any formal letter of engagement. Business relationships are commonly based on trust and a handshake. I was to report directly to Jamie. In the course of this mandate, I received instructions from Jamie and reported directly to him, sometimes in the presence of Sheikh Saud and on the odd occasion Neil Gerrard of Dechert as well. I did not interact with any other consultant engaged by RAK or Dechert to investigate Khater Massaad.

**Knowledge of Farhad Azima**

13. During this period in 2015 when I was undertaking the investigations described above in relation to Khater Massaad, I did not come across the name Farhad Azima. The first time I recall hearing his name was in early 2016 at one of my regular catch ups with Jamie. Jamie mentioned that he was discussing a commercial enterprise with Farhad Azima relating to high tech equipment for the RAK Government and he asked me if I had ever come across Major General John Holmes. He thought I might have done because Major General Holmes was involved in providing resettlement training to people leaving the armed forces and many of those became bodyguards.

14. At another of my regular meetings with Jamie (I do not recall exactly when) Jamie mentioned that Farhad Azima had threatened him, although I cannot now recall the details.  I do recall that Jamie also mentioned (possibly at this meeting or a subsequent one) that he understood that a negative publicity campaign had been threatened by Khater Massaad against the Government

4

438

4

of RAK, His Highness Sheikh Saud and his advisers at Dechert. I do not remember how Jamie said this threat had been conveyed to him.

15. During that conversation, Jamie asked me to keep my ears and eyes open for anything I heard about a negative publicity campaign that might be damaging for RAK. I understood that he had made this request on the basis that I have sources and contacts around the world, especially in the Middle East and I might be able to find out if someone was running a black PR campaign. There was no formal instruction to me about this and I understood it was not money earning work, simply a casual request as a favour to let him know if I heard anything on the grapevine.

16. Following this conversation with Jamie, I spoke to a few contacts I use occasionally in the investigations business, journalism and PR industry and asked them to keep their ear to the ground. It is a very small world and we share information. If someone does me a favour, they might ask a favour from me in return. I cannot now remember who I spoke to about this but I said something to the effect that I was interested in any whispers they might hear about a possible negative press campaign against RAK. I would have mentioned the names of the parties I understood were involved including Khater Massaad (who I had been investigating) and Farhad Azima (because I knew he had threatened Jamie) but I do not recall specifically what I said.

**Communications with Majdi Halabi – first cache of data**

17. Since 2005 my company, Page Protective Services Limited (which is now part of the Page Group) has provided physical security for an EU aid mission to Palestine in Jerusalem. I therefore spent a lot of time going in and out of Jerusalem. I met Majdi Halabi at a roundtable lunch in 2012, I believe. Majdi Halabi is an Israeli journalist who specialises in Middle Eastern affairs. We formed a friendly relationship because we both operate on both sides of the Palestinian/Israeli border.

18. Majdi Halabi must have been one of the contacts that I spoke to after my conversation with Jamie about the threatened negative publicity campaign. I do not recall speaking to him specifically but as he is very knowledgeable in

Middle Eastern affairs he was likely to have occurred to me as someone who might hear something. No Page Group companies have ever formally engaged Majdi. We have more of a friendship than a professional relationship. We have a useful mutual relationship. He might ask me, for example, if I could run a name check for him in Dubai. There has never been a commercial arrangement between us.

19. At some point later that year, I do not recall specifically when, Majdi called me and told me that he had come across something interesting on the internet about Farhad Azima. He did not tell me how he had come across this information. He told me that he didn't want to open the site because it might have harmful viruses and he suggested I shouldn't either. As far as I can remember, he sent me the website address where the material could be found in a WhatsApp message. I cannot check because I regularly delete my WhatsApp messages for security reasons. He also told me that he believed the information came from the UAE. I did not ask why he thought this.

20. When I received this information from Majdi, I would have picked up the phone to Jamie although I do not specifically remember doing so. I was speaking to Jamie frequently during the period in relation to my investigations relating to Khater Massaad and there would have been no reason to delay in passing on this information. I believe I spoke to Jamie first because he was my client and that he asked me then to contact Neil Gerrard at Dechert and let him know what I had heard but it may have been the other way round. I think I may have spoken to them more than once in this period. I do not recall how I provided them the links that Majdi had given to me.

21. I do not know what Jamie and Neil did with the information about what Majdi had found. I have a recollection that I was told that they intended to get a specialist firm to download it but I was not involved in this. I was never instructed to investigate Farhad Azima, so I was not told at that time what information they had found in the downloaded material. I never downloaded the material myself.

6

440

6

**Second cache of data**

22. A few weeks later, I recall that I learned that a second set of data relating to Mr Azima had been put onto the internet. I cannot recall when or how exactly I learned of this. As I had not discussed the first set with any of my sources other than Majdi Halabi, I believe it may have been him that told me about the second set but it is possible that I was told by one of my other sources. I do not recall being told anything about how or when the second set had been discovered. I believe that I would have called Jamie or Neil immediately. I made no attempt to download the data.

**Mr Azima's allegations**

23. I am now aware that Mr Azima alleges that RAKIA was responsible for the hacking and dissemination of his data. I have never been asked to hack or otherwise access Mr Azima's emails or data by RAKIA or anyone else. I do not know who hacked Mr Azima's computers or placed his data online.  My involvement in this matter was limited to passing on of information provided by sources to RAKIA as I have already mentioned.

**STATEMENT OF TRUTH**

I believe that the facts stated in this Witness Statement are true.

Signed...................................................

**STUART ROBERT PAGE**

Date: 20\6\19

7

441

7

1    nothing in Hebrew about this matter.

2    MR TOMLINSON: Thank you. May this witness be released?

3    JUDGE LENON: Yes. Thank you, Mr Halabi.

4    A.  Thank you, my Lord.

5    MR TOMLINSON: My Lord, before calling the next witness,

6        I want to make sure how we're doing in timetabling terms

7        because we've put Mr del Rosso off until tomorrow. The

8        position is that Mr King can only do tomorrow morning,

9        Mr Leach can't do tomorrow morning and --

10   MR LORD: Sorry, my Lord, I'm eight minutes ahead of time or

11       ten minutes which is unusual, so I've made a little bit

12       of time. I would anticipate that I won't need more

13       than -- I don't think I will need more than an hour with

14       Mr Leach and I would estimate roughly half a day -- it

15       might be longer -- with Mr Page. So I'm trying to

16       finish both Mr Leach and Mr Page today. I hope to be

17       able to do that. But if my learned friend wants to call

18       Mr Leach first to be sure that he can get away today,

19       because Mr Page could come back tomorrow if required,

20       then that would be fine as far as we're concerned. But

21       I'm in your Lordship's hands and those of my learned

22       friend, of course, whose evidence he is calling .

23   MR TOMLINSON: Unfortunately I don't have Mr Leach here at

24       the moment.

25       My Lord, the possibilities are I think that Mr Leach

49

1    is interposed in Mr Page's evidence at, say, 3.00, if my

2    friend thinks -- or 3.30 if my friend thinks he will be

3    an hour or that we put Mr Leach off till -- I think he

4    can do tomorrow afternoon.

5    MR LORD: My Lord, I was expecting to deal with -- I spoke

6       to my learned friend about this yesterday -- I was

7       expecting to deal with Mr Page and Mr Leach today, so

8       I would prefer to start with Mr Page, as planned, and

9       interpose Mr Leach if necessary, but if I think Mr Page

10      in time, with an hour to go, then we can just go on in

11      the normal way and he will be away this afternoon.

12   JUDGE LENON: Let's carry on on that basis.

13   MR TOMLINSON: If we revisit at the break in the afternoon.

14      I'm certainly going to call Mr Page next. I just wanted

15      to ensure what we were going to do about Mr Leach.

16   JUDGE LENON: That's very helpful. Thank you.

17   MR TOMLINSON: So, my Lord, I call Mr Page.

18           MR STUART ROBERT PAGE (sworn)

19         Examination-in-chief by MR TOMLINSON

20   MR TOMLINSON: Could you give the court your address,

21      Mr Page?

22    A.  Number 14 -- sorry, my business address, your Honour, or

23      my home address?

24    Q.  I think your home address is on the witness statement.

25    A.  Right, number 14 --

50

1    Q.  No, perhaps that's your business address. I apologise.

2      The business address.

3    A.  It's The Sanctuary and it's -- shall I give the full

4      address? It's The Sanctuary, Westminster, SW1.

5    Q.  Could you look -- there should be a bundle there in

6      front of you labelled "D", and then if you go to tab 3.

7      {D/3/1} --

8    A.  Correct, yes, I have it, yes.

9    Q.  -- that should be a document that says "Witness

10      statement of Stuart Robert Page" on the first page.

11    A.  Yes.

12    Q.  Then if you turn to page {D/3/7}, is that your

13      signature?

14    A.  That is my signature, my Lord.

15    Q.  Are there any matters in that statement that you wish to

16      correct or clarify , Mr Page?

17    A.  Yes, there are.

18    Q.  Do you want to indicate what they are?

19    A.  In reference to my police service, which is on

20      "Background" at 3, the date I left the police was 1978,

21      not 1979 {D/3/2}.

22    Q.  Thank you.

23    A.  And there is a reference, my Lord, to the name of my

24      company in Dubai. It's actually called "Page Group

25      Middle East FZE". I think it's in the statement as

51

1    "SZE".

2      The other part of my statement, my Lord, is where

3      I talk about reference to reviewing documents, but then

4      I mention in my statement, my Lord, that I did not --

5      I'm not familiar with the name of Farhad Azima.

6    Q.  And what did you want to correct in relation to that,

7      Mr Page?

8    A.  Having been shown a report which was prepared by my

9      firm, I now aware that I was -- should have been

10      familiar with that name.

11    Q.  What report is that?

12    A.  It's a report which I was shown by the -- by

13      Stewarts Law.

14    Q.  I'm sorry, Mr Page?

15    A.  Sorry, my Lord, I was asked to look at a document by

16      Stewarts Law and asked to confirm whether that was my

17      report or not.

18    Q.  Can you be shown {H7/298} please? It is {H7/299}, the

19      next page. Sorry. Is that the document you are

20      referring to?

21    A.  That is the document, my Lord.

22    Q.  And sorry, Mr Page, what's your evidence about that

23      document?

24    A.  Well, I was not -- when I prepared my witness statement,

25      my Lord, I was not -- did not recall that we submitted

52

1      this report to the client in which Farhad Azima's name
2      is quite clearly given.
3   Q. Thank you. Is there anything else that you wish to
4      clarify or correct in your statement, Mr Page?
5   A. No, my Lord.
6   MR TOMLINSON: Thank you, Mr Page. If you wait there, there
7      will be some questions.
8   JUDGE LENON: Can I just be clear what part of the statement
9      you want to correct?
10  A. Sorry, my Lord, it was the reference to my police
11     service.
12  JUDGE LENON: You've done that. In relation to Mr Azima, is
13     it paragraph 13?
14  A. Yes, paragraph 13. Yes, my Lord. {D/3/4}.
15  JUDGE LENON: So what do you want to say instead of that?
16  A. Well actually what I'm saying, my Lord, is of course
17     I should have remembered the name, but at the time
18     I prepared my statement in June of 2019 I could not
19     recall Farhad Azima's name.
20  MR TOMLINSON: And that was the result of having been shown
21     that document, the RAK project update?
22  A. That is correct, my Lord.
23  MR TOMLINSON: Thank you, Mr Page. If you wait there, there
24     will be some questions.
25  MR LORD: My Lord, I've raised this with my learned friend,

                                    53

1      but in view of the matters I am going to be putting to
2      Mr Page, I thought I should raise with him whether it
3      may become appropriate for him to be given any sort of
4      warning about the privilege against self-incrimination.
5      I'm not saying that I advocate that, but I just wanted
6      to make sure that that was something that I had at least
7      broached in case your Lordship or my learned friend or
8      somebody thought that at some point in my questioning,
9      if at all, that was an appropriate warning that should
10     be given to this witness. I didn't want it to be said
11     that I had crashed on in my forensic eagerness and had
12     not allowed that to be considered. So I'm not
13     suggesting it or advocating it. I just thought I ought,
14     as a matter of sort of good order, really, to flag that,
15     my Lord.
16  JUDGE LENON: Thank you.
17              Cross-examination by MR LORD
18  MR LORD: Mr Page, I'm going to ask you first about the
19     nature of your relevant businesses, if I may.
20         Have you got your witness statement there, Mr Page?
21  A. Yes, I do, my Lord.
22  Q. In paragraph 1 and paragraph 5 you set out the
23     businesses which you say are relevant to the matters in
24     this dispute, don't you {D/3/1-2}?
25  A. Yes, my Lord.

                                    54

1   Q. And it looks from paragraphs 1 and 5 as if the
2      businesses are Page Corporate Investigations Limited --
3      is that right?
4   A. That is correct, my Lord, yes.
5   Q. -- and Page Protective Services Limited?
6   A. That is correct, my Lord.
7   Q. And those are both English companies -- well, English
8      and Welsh companies, are they?
9   A. Well, there is a Page Protective Services in Cyprus and
10     there is a Page Protective Services in Hong Kong.
11  Q. So when you say "based in England", what do you mean by
12     that in paragraph 1?
13  A. Well, the company that was performing the contract for
14     the European Commission in -- well, sorry, the company
15     that was performing the contracts for the European Union
16     was Page Protective Services UK.
17  Q. What about the company which did the work in this case?
18  A. Page Group Middle East.
19  Q. That's a Dubai company, is it?
20  A. It's a Dubai -- what they call a "DMCC company".
21  Q. Apart from the matters that you refer to in your witness
22     statement, do you or any of your companies or firms --
23     do they do any other work for any RAK-related entity?
24  A. I'm sorry, my Lord, I don't understand the question.
25  Q. Well, apart from the work that you've explained in your

                                    55

1      witness statement in paragraphs 1 and 5 {D/3/1-2} and
2      then the work that you described starting at
3      paragraph 13 {D/3/4} -- 12 and 13 -- have you or any of
4      your businesses done any other work for RAK, the Ruler,
5      any RAK entity?
6   A. Yes, prior to this project, yes.
7   Q. Are any of the companies that you identify in this
8      statement of yours -- are any of those licensed or
9      regulated in any way?
10  A. Well, there is no regulation in the United Kingdom
11     regarding security companies providing security in
12     hostile environments. We are signatories to the code of
13     conduct, which is part of the UN Charter on how you
14     operate in conflict zones. There is no requirement to
15     be a licensed investigation company in this country. In
16     Israel, where I operate, I do have a security licence
17     issued by the Government of Israel, as I do in
18     Palestine.
19  Q. If we go to paragraph 5 of your witness statement
20     {D/3/2}, where you're explaining the Page Group, and you
21     set out some companies there. Can you see -- you say
22     "Page Protective Services Limited". It looks as if that
23     does security and Page Corporate Investigations Limited
24     does the investigation work; is that right?
25  A. That is partially correct, yes.

                                    56

1  Q.  Because you say there they focus respectively on (1)
2      providing security services and (2) undertaking
3      investigations and due diligence.
4  A.  That would be correct, my Lord, yes.
5  Q.  And would it be right to say that the investigative work
6      that you did in this case in 2015 and 2016 in relation
7      to RAK or RAKIA, that was carried out through
8      Page Corporate Investigations Limited?
9  A.  No, that is not correct, my Lord.
10 Q.  Through which Page entity did you carry that work out?
11 A.  Page Group Middle East Limited, which is a wholly owned
12     subsidiary of Page Group Hong Kong.
13 Q.  And you've said in paragraph 6 of your witness statement
14     at page [D/3/2] -- you're explaining the investigation
15     side of your business, aren't you?
16 A.  That is correct, my Lord.
17 Q.  And you say about six lines down:
18         "We do not generally work directly for law firms."
19     Can you see that?
20 A.  Yes, that is correct, my Lord.
21 Q.  Is that because, Mr Page, law firms would generally not
22     be comfortable with your methods of investigation?
23 A.  That is not correct, my Lord.
24 Q.  So why would it be that you don't generally work
25     directly for law firms?

57

1  A.  Because I -- getting instructed, it is the norm that
2      I get instructed with a client that has a problem, an
3      issue, and he would ask me to work alongside his legal
4      team in gathering information for their -- in support of
5      their litigation.
6  Q.  If you go, please, to paragraph 3 of your witness
7      statement, Mr Page, at [D/3/2], you explain how you
8      began your career in the police force, 1970 to 1979,
9      first in Sussex and subsequently the
10     Metropolitan Police. Can you see that?
11 A.  Correct, yes. That's correct.
12 Q.  And you say:
13         "Towards the end of my time in the police I was
14     seconded to Scotland Yard's Anti-Terrorist Squad and
15     Special Branch during the period of the Troubles in
16     Northern Ireland."
17         To what rank did you rise, Mr Page, when you were in
18     the police?
19 A.  Police constable.
20 Q.  So you were police constable throughout your time in the
21     force, were you?
22 A.  I was a police constable, yes.
23 Q.  You were never in fact promoted, were you, then?
24 A.  I never sought to be promoted.
25 Q.  And you were in the force for nearly ten years; is that

58

1      right?
2  A.  No, I was in the force for eight years, my Lord.
3  Q.  Then you said in paragraph 4:
4         "I left the police in [1978] in order to take
5      a career break and went to work in Saudi Arabia as
6      a security and investigations adviser in the
7      construction and oil industry. I returned to the UK in
8      around 1983 ..."
9         Can you see that?
10 A.  Yes.
11 Q.  What prompted you to take a career break from the police
12     force in 1978?
13 A.  My Lord, in 1978, as a young detective, I was working in
14     the region of 60 to 70 hours a week. The opportunity
15     came to go and work in the Middle East with a tax-free
16     salary which was twice that which I was earning in the
17     police service, and the rule at that time within the
18     police service is that you could take a career break, if
19     you rejoined the service within five years, you
20     maintained all your pension contributions and you could
21     rejoin without the need to be retrained. And it was
22     always my intention, my Lord, to rejoin the police
23     service when I finished working in Saudi Arabia.
24 Q.  But in the event you did not rejoin the police force?
25 A.  I did not.

59

1  Q.  No. Could you please go to paragraph 8 of your witness
2      statement at [D/3/3]?
3  A.  Yes, I have that.
4  Q.  You can see in paragraphs 8 to 9 you give some evidence
5      about your initial engagement in Ras Al Khaimah. Can
6      you see that, Mr Page?
7  A.  I can see that, my Lord.
8  Q.  Have you read your statement recently, your witness
9      statement?
10 A.  I have been reading it fairly consistently, my Lord,
11     yes.
12 Q.  Since when have you been reading it consistently?
13 A.  In preparation for this trial, my Lord.
14 Q.  And when do you think you first started reading it by
15     way of preparation for the trial? How far ago, how long
16     ago?
17 A.  Well, my Lord, I just recently returned from a trip to
18     the Far East and I took it with me to read so I could
19     refresh my memory on the testimony that I will be giving
20     for your court.
21 Q.  So what's the answer to my question? Approximately
22     when -- how long ago did you first re-read this
23     statement of yours that you've given in the middle of
24     last year? Two weeks? Three weeks?
25 A.  Well, I left for Hong Kong a week ago last Monday.

60

January 29, 2020      Ras Al Khaimah Investment Authority v Farhad Azima      Day 6

1        I took it with me then. I would have been shown it by
2        the solicitors for the client because of the mistake
3        I made regarding the report on -- when -- Mr Azima's
4        name. So it's not a very long statement, my Lord.
5        I would have refreshed my memory as and when.
6  Q.  And when did you first appreciate that there were
7        matters in the statement that you ought to correct?
8  A.  When -- well, first of all when I read that I got the
9        date of leaving the police service wrong; more recently
10       when I became aware that I got the name of my company or
11       the designation of the company in Dubai wrong; and of
12       course, when I was shown this report on the screen here,
13       where obviously I should have been aware of
14       Farhad Azima's name.
15  Q.  So the first time you thought you ought to revise this
16       statement was when Stewarts Law showed you a copy of the
17       project update that you've referred to this morning?
18  A.  That is correct, my Lord.
19  Q.  And had that not been shown to you, it's unlikely you
20       would have sought to revise your evidence in that
21       regard, isn't it, Mr Page?
22  A.  My Lord, I would like to, if I may, put into context
23       what was going on in my life in June of 2019 when
24       I prepared this report.
25        In August of 2019 I was diagnosed with clinical

61

1        depression, which takes me back to June of 2019, where
2        my psychiatrist is clear that I would have been
3        suffering from depression at that point. Therefore, my
4        Lord, with respect, my recollection of events that
5        occurred some four years previously was slightly shaded.
6  Q.  Could you please look at paragraphs 8 to 9 of your
7       witness statement {D/3/3}?
8  A.  Yes.
9  Q.  You're referring there, aren't you, to some work that
10       you did from 2008 to 2010 for the current Ruler of
11       Ras Al Khaimah?
12  A.  It was on behalf of the current Ruler of Ras Al Khaimah,
13       yes.
14  Q.  Yes, when he was the Crown Prince?
15  A.  That is correct, my Lord.
16  Q.  And it's right, isn't it, that there was something of
17       a struggle for power within Ras Al Khaimah around that
18       time?
19  A.  I would not, my Lord, describe it as a "struggle for
20       power".
21  Q.  So what was the work that you did at that time in terms
22       of investigation services?
23  A.  So, my Lord, His Highness Sheikh Saud had been appointed
24       Crown Prince after his half-brother had been removed
25       from that position on instructions of the late

62

1        Sheikh Zayed of Abu Dhabi.
2        So my instructions were that the information that
3        I -- or the brief that I received was to ascertain
4        whether Sheikh Khalid was intending to try and -- not
5        de-throne, but to reappoint himself as a Crown Prince.
6  Q.  So there was potentially going to be a challenge to the
7       current Ruler and you helped him in that regard?
8  A.  Well, there was a challenge to the current Ruler.
9  Q.  And you were retained by or on behalf of the then
10       current Ruler?
11  A.  No, I was retained by Khater Massaad in his position as
12       chairman of RAK Ceramics, who in turn was reporting to
13       His Highness Sheikh Saud.
14  Q.  Could you be shown, please, {Day2/85:1}? Mr Page,
15       you'll see starting at paragraph 9 -- on Day 2,
16       page 85 --
17  A.  Yes, I can see it, my Lord.
18  Q.  -- Mr Buchanan was asked about certain matters
19       pertaining to you. And he said at line 9:
20        "Answer: Mr Page had worked for the RAK Government
21  previously."
22        And I asked him.
23        "Question: Doing what?"
24        And he said:
25        "Answer: I believe it was during the time of --

63

1        there was certain dissent taking place over the
2        leadership at RAK, and I believe it was at that time
3        that Mr Page worked for His Highness who was then
4        Crown Prince."
5        And I said.
6        "Question: ... So Mr Page worked for the
7        Crown Prince before he took over as Ruler of RAK?"
8        And Mr Buchanan said:
9        "Answer: That is speculation on my part because
10       I was not involved at the time."
11        Was Mr Buchanan right to be giving evidence that you
12       were involved in relation to certain dissent within
13       Ras Al Khaimah at around that time?
14  A.  I'm sorry, my Lord, I didn't quite understand the
15       question. Again?
16  Q.  What were you doing, Mr Page? What were doing at that
17       time? What was the remit? What were you doing?
18  A.  Okay, so the remit was to try and ascertain what plans
19       Sheikh Khalid had to try and destabilise His Highness'
20       position as the Crown Prince of Ras Al Khaimah.
21  Q.  And what did you do in terms of investigating or
22       ascertaining what those plans were or might be?
23  A.  We conducted surveillance in London. My Lord, I'm not
24       quite sure that it's appropriate to talk about what is
25       a confidential matter between myself and His Highness

64

1  unrelated to Khater Massaad, but if you instruct me to
2  do so, I will do so.
3  JUDGE LENON: Will you answer the question, please?
4  A.  Okay. So we were undertaking intelligence-gathering,
5     trying to understand what his plans were, who he was
6     meeting with, how he was being supported, what his PR
7     campaign was, and things along those lines.
8  MR LORD: You did that for how long? Over what period?
9  A.  To the best of my knowledge and my belief, my Lord --
10    well, it was at least two -- I presume two years prior
11    to the death of the Ruler.
12 Q.  And what form did the surveillance and monitoring that
13    you're describing -- what form did that take? How did
14    you actually carry it out?
15 A.  Well, at that time, Sheikh Khalid was living -- or still
16    does, I believe -- living in Kensington, so we were
17    physically putting him under surveillance.
18 Q.  You had people following him?
19 A.  That is correct, my Lord.
20 Q.  And were there any other forms of intelligence-gathering
21    that you used?
22 A.  No, the purpose was -- is to understand who his advisers
23    were. So the purpose of physical surveillance was to
24    see who he met, where he went and nothing else, my Lord.
25 Q.  Mr Page, just seeing where the Sheikh went and who he

65

1     spoke to, who he met, that wouldn't tell you, would it,
2     what he was talking about, what his plans were? That
3     would just tell you his physical movements, wouldn't it,
4     Mr Page?
5  A.  My Lord, with respect, if you conduct surveillance in
6     a proper manner, you are able to determine what someone
7     is meeting with because the whole purpose of
8     surveillance -- and it was a very large surveillance
9     operation -- is you would have multiple teams, and the
10    architect of a multiple team is if Sheikh Khalid met
11    Mr A and we didn't know who Mr A was, we would then
12    follow off -- a part of the team would follow off Mr A
13    to ascertain who he was.
14       So from memory -- and it's a long time ago, my
15    Lord -- he had a lawyer representing him, so we needed
16    to find out -- we identified who that lawyer was. He
17    had a PR company representing him. We found out who
18    that was. And we at one point -- I think, my Lord, from
19    memory, we followed him to the Israeli Embassy.
20 Q.  So, so far you've got the Sheikh, you've got the PR
21    company, the lawyer and the Israeli Embassy. That's
22    four bits of information. That doesn't allow you,
23    Mr Page, does it, to ascertain what the plans are? How
24    do you know what the plans are? They may be just having
25    a lunch at the Israeli Embassy.

66

1  A.  My Lord, His Highness Sheikh Saud has his own sources of
2     information. I was just one of those sources of
3     information, carrying out the instructions given to me
4     by Khater Massaad to try and understand -- for example,
5     my Lord, we followed Sheikh Saud [sic] to Geneva because
6     we believed that he was going to attend an important
7     meeting in Geneva. That is a very complicated and very
8     expensive operation and it was successful.
9        We followed him to the United States for the
10    inauguration -- where he went to the inauguration of
11    President Obama. He also met Hillary Clinton, so we
12    were understanding how he was trying to elicit support
13    from the United States for his potential attempt to
14    regain power or -- correct -- to regain his position in
15    Ras Al Khaimah as the Crown Prince.
16 Q.  Sorry, Mr Page, when you said that the Sheikh had his
17    own sources of information, what were you there
18    referring to?
19 A.  I presume, my Lord, coming from sources within --
20    sources within Ras Al Khaimah.
21 Q.  Mr Page --
22 A.  But, my Lord, I never met His Highness during the whole
23    engagement on this issue. In fact, the first time I met
24    His Highness is when he instructed me in relation to the
25    issue before the court now -- correction, the matter of

67

1     Khater Massaad.
2  Q.  Mr Page, you would have wanted, wouldn't you, to obtain
3     what was likely confidential information at that time in
4     order to be able to tell -- to inform the Sheikh --
5     sorry, the Ruler -- about the Sheikh's plans?
6  A.  By "confidential information", what are you referring
7     to?
8  Q.  You'd want information from people who were on the
9     inside, as you would see it, of the Sheikh's gang,
10    wouldn't you? That's what you'd want, isn't it,
11    Mr Page?
12 A.  That is correct.
13 Q.  You'd want some inside information, wouldn't you,
14    Mr Page?
15 A.  That is correct, my Lord.
16 Q.  And are you telling his Lordship that over the period of
17    two years, all you did was physically tail these people
18    and you didn't actually obtain any inside information at
19    all?
20 A.  Not at all, my Lord. In fact we developed intelligence
21    that Sheikh Saud [sic] and/or his wife were involved in
22    a number of industrial tribunal cases before the courts
23    in England, involving members of his entourage who had
24    sued him for unfair dismissal. We then cultivated those
25    people as what we call a "confidential source" to know

68

1    what they knew about his plans in respect of
2    Ras Al Khaimah. So they were former employees of
3    Sheikh Khalid who may or may not have been privy to
4    information concerning his plans to regain his position
5    as the Crown Prince.
6  Q.  You're talking about Sheikh Khalid there, aren't you?
7      The Ruler was Sheikh Saud and Sheikh Khalid was the
8      person --
9  A.  Yes, I beg your pardon.
10  Q.  That's all right. I think it's clear.
11       So you were getting information from ex-employees at
12     that time?
13  A.  We were seeking to get information from ex-employees,
14     yes.
15  Q.  I suggest that you succeeded, didn't you, Mr Page, in
16     all likelihood?
17  A.  I cannot recall whether we -- we have a number of ways,
18     my Lord, of cultivating sources, and I can't, after all
19     these years, remember whether we succeeded or didn't
20     succeed. I seem to recall that his former security
21     adviser was one of those people that we managed to talk
22     to and he provided information because he was a very
23     aggrieved ex-employee of His Highness -- sorry, of --
24     well, he's still His Highness -- Sheikh Khalid and he
25     wished to vent his anger by sharing information. That's

69

1    how we operate in this business.
2  Q.  In other words, this aggrieved employee would have told
3      you confidential things that he'd learnt when he was
4      working as a security officer for Sheikh Khalid?
5  A.  Yes, and it's not for me to question whether he was in
6      breach of any of his employment obligations.
7  Q.  Or for you to question whether he was breaching any duty
8      of confidentiality presumably, Mr Page?
9  A.  It's -- that was not for me to consider.
10       My Lord, he was what we call in this industry --
11     it's called "HUMIT", which stands for "human
12     intelligence ", but in everyday speak, it's
13     a confidential source. And that confidential source may
14     well be, my Lord, a journalist that Sheikh Khalid is
15     seeking to get him to write some positive PR spin.
16     I have a number of -- then and to this day -- a number
17     of journalist sources who would let me know if
18     they're -- in fact, my Lord, it was all out there on the
19     internet that Sheikh Khalid -- what his plans were. He
20     was spinning his story on the internet as to how he
21     should be the Ruler of -- sorry, he should be the
22     Crown Prince of Ras Al Khaimah, not Sheikh Saud, which
23     included a disinformation programme, including
24     publishing a report which is known as the "Rogue
25     Report", claiming that Sheikh Saud and the Emirate of

70

1    Ras Al Khaimah had illegal, unsavoury relationships with
2    Iran.
3      So it was out there on the internet, my Lord.
4    I didn't have to find it -- sorry, I did not have to get
5    it from a source. Sheikh Khalid was employing a company
6    called Californian Strategies to lead his PR campaign
7    against His Highness Sheikh Saud.
8  Q.  I think from that answer you've just given, Mr Page, it
9      wouldn't concern you when gathering intelligence if the
10     source disclosed confidential information to you
11     because, as far as you were concerned, that was their
12     responsibility, whether it was confidential or not;
13     would that be fair?
14  A.  That would be fair, my Lord, yes.
15  Q.  Who did you deal with -- when you were working around
16     about 2008 to 2010 for the current Ruler, as you've
17     described, I think you said that you were engaged
18     through Dr Massaad; is that right?
19  A.  That is correct, my Lord.
20  Q.  And who else did you come across at RAK or the Palace or
21     part of the Ruler's group in the widest sense during
22     that engagement of yours over that two-year period?
23  A.  Okay, my Lord, so how this came about is I was in
24     Brussels meeting the European Union in relation to one
25     of my contracts. I received a phone call from someone

71

1    called Wahid Attalla, an Egyptian gentleman, who I'd
2    known since my engagement with the Government of Dubai
3    in relation to other matters which were before the --
4    other matters.
5      Wahid Attalla said basically, my Lord, "Where are
6    you? Can you make it to Geneva?", and I said, "If it's
7    important, I can make it to Geneva". So I flew to
8    Geneva, I then met Dr Massaad and I was then taken on
9    his private jet and I was flown to Lebanon to be briefed
10   on this issue of Sheikh Khalid.
11  Q.  Do you want to answer the question, please, Mr Page?
12  A.  Only Dr Massaad and Wahid Attalla and no one else.
13  Q.  And so when you reported back on the fruits of your
14     information-gathering and monitoring at that time, to
15     whom did you report?
16  A.  Dr Massaad.
17  Q.  Did you ever report directly to the Ruler?
18  A.  Absolutely not.
19  Q.  And why was that?
20  A.  Because this is the way that Dr Massaad wanted the case
21     to be run. I didn't question his instructions .
22  Q.  And how often did you report back in that engagement?
23  A.  We used to have regular updates, but I would say six,
24     eight, ten weeks; for example, if Dr Massaad was
25     travelling in Europe, I would meet him. Such meetings

72

1      I had in Nice with him, I met him in Germany, I met him
2      in Switzerland, occasionally I met him in Ras Al Khaimah
3      or in Dubai, because I've been a frequent traveller, my
4      Lord, to Dubai since -- as long as I can remember, but
5      certainly since 1995.
6   Q.  It's right, isn't it, that that was really how you
7      became a trusted adviser as far as the current Ruler of
8      Ras Al Khaimah is concerned? That's how you gained his
9      trust, through this engagement, wasn't it, Mr Page?
10  A.  I would not say that, my Lord, no.
11  Q.  How else do you think that you managed to gain the trust
12     of the Ras Al Khaimah Ruler or government bodies?
13  A.  My Lord, without sounding big-headed, I'm a known entity
14     in the UAE. I have worked for the Government of Dubai
15     since 1995. I continue to work for the Government of
16     Dubai until this date. My reputation in the UAE -- they
17     respect my knowledge, they respect my ability and
18     His Highness' wife is married to someone called
19     Abdul Aziz Al Ghurair. Abdul Aziz Al Ghurair is the
20     sister -- I beg your pardon, Abdul Aziz Al Ghurair is
21     the chairman of Mashreq Bank. I was worked for
22     Mashreq Bank, so therefore in looking for an adviser --
23     or -- correction -- looking for someone to service his
24     needs, it would be not too difficult for His Highness to
25     check into my bona fides.

73

1   Q.  Did you do any work for the Ruler or for RAK, any
2      RAK-based entity, after 2010 but before the end of 2014?
3   A.  I did not.
4   Q.  Can we come on to your work in 2015 in RAK, please,
5      Mr Page? Would you go to paragraph 12 of your witness
6      statement at {D/3/4}? You see you say this:
7          "About a couple of months later ..."
8      So I think we should probably look at paragraph 11,
9      where you say that you went to see Mr Buchanan in
10     January 2015 -- can you see that?
11  A.  Yes, I do, yes.
12  Q.  -- and you say you cannot recall who arranged the
13     meeting.
14  A.  Well, it's more than likely it was His Highness'
15     personal secretary.
16  Q.  But who instigated it? Was it you or Mr Buchanan who
17     initiated it? Who called who first?
18  A.  So from recollection I received a call from
19     His Highness' secretary saying she wished me to meet
20     someone -- sorry, on instructions of `His Highness, I was
21     to meet one of his advisers, and then it's possible, but
22     I cannot recall exactly, my Lord, that Mr Buchanan
23     phoned me and said, "When can we meet?" I don't think
24     Mr Buchanan even knew I was in the UAE at that point.
25  Q.  In paragraph 12 you say this:

74

1          "About a couple of months later Jamie and I had
2      another meeting in Dubai and at that point we discussed
3      a specific mandate."
4      That's around about March 2015, isn't it, Mr Page?
5   A.  Yes, but Mr Buchanan's evidence is wrong.
6   Q.  In what respect?
7   A.  So in the chronology of the events, my Lord, which is
8      referred to in my statement, I saw information in the
9      local media regarding an investigation or issues to do
10     with RAK Airways. I am very knowledgeable about how
11     they report things in the Gulf papers, and when they say
12     "issues", there is an underlying issue. So I reached
13     out for Wahid Attalla, the gentleman I referred to who
14     introduced me to Khater Massaad, and asked him if he
15     would effect me an introduction to His Highness, who I'd
16     never met before.
17     So I went to the Palace with Wahid Italia, I met
18     His Highness, we had a get-to-know-you conversation. It
19     was then, some months later, that His Highness summoned
20     me back to the Palace, after I had met Jamie Buchanan.
21     My Lord, it's important to understand that
22     His Highness has a habit of compartmentalising things.
23     He would ask me to do certain things, but not involve
24     Jamie Buchanan. So, therefore, I had this Chinese wall
25     between what His Highness wishes me to undertake and

75

1      what he wishes Mr Buchanan to understand.
2   Q.  In your witness statement, Mr Page, at paragraph 10
3      {D/3/3}, you set out I think some evidence about what
4      you've just said. Is that what you're talking about?
5      You had one meeting with Sheikh Saud?
6   A.  Sorry, paragraph which are we looking --
7   Q.  10 of your witness statement at {D/3/3}.
8   A.  Paragraph 10 of my witness statement? That talks about
9      RAK Airways. Is that what you're referring to? I'm
10     sorry, my Lord, I --
11  Q.  You've just explained how you basically contacted --
12     well, read paragraph 10. I assumed that paragraph 10
13     was a summary form of what you have just said, Mr Page.
14  A.  Yes, I'm sorry, my Lord. That is correct, yes.
15  Q.  Well, it's your statement. You must know what you meant
16     by it, Mr Page.
17  A.  I think, my Lord, I have actually reported how it
18     actually -- sorry, presented to you how it occurred.
19  Q.  It wasn't a trick there. I was just trying to help you.
20  A.  Oh, I'm sorry. Thank you.
21  Q.  So then we can pick the story up in paragraph 11
22     {D/3/3}. You've now helpfully explained that you did
23     have a meeting with Sheikh Saud in 2014 and the next
24     involvement you had with RAK in January 2015 was
25     likely -- it sounds as if it was initiated by the Sheikh

76

1    who, through his personal assistant, invited you to come
2    to meet Mr Buchanan.
3  A.  Well, no, I think -- yes, he asked me to meet
4    Mr Buchanan, but there was a subsequent meeting at
5    the Palace with His Highness.
6  Q.  And when was that?
7  A.  Some time -- right, so, if I put it into context --
8  Q.  No, sorry, Mr Page --
9  A.  No, this is important.  In December 2014 through to
10    early -- to the middle of January 2015, I was in the
11    UAE -- I was in the UAE on an assignment for another
12    member of a royal family.
13      So, yes, there was the initial meeting with
14    Jamie Buchanan, but that was a get-together meeting and
15    nothing else at the Park Hyatt Hotel in Dubai.
16  Q.  Mr Page, I was just asking you when did you have this
17    meeting with His Highness.
18  A.  It could have been three days later, it could have been
19    four days later.  I honestly can't remember.  Certainly
20    before I left the UAE, somewhere around mid-January.
21  Q.  So some time in the first half of January --
22  A.  Correct.
23  Q.  -- 2015?
24  A.  No, not the first half of January because I left Dubai
25    on or around 10 January.

77

1  Q.  So some time in the first half of January 2015?
2  A.  Well, I wouldn't -- okay, semantics, my Lord, but
3    I would agree with you, yes.
4  Q.  And what did you discuss with the Ruler on that
5    occasion?
6  A.  My Lord, I am in some difficulty here because it was
7    a confidential discussion and instructions from
8    His Highness in relation to a personal matter which
9    I don't believe relates to the matter before the court
10    today.  I am happy to disclose it to you, my Lord, but
11    I don't think it's appropriate, when we have members of
12    the press in the back of the court, for me to disclose
13    what is a confidential discussion between myself and
14    His Highness because, my Lord, to do so would destroy my
15    reputation as someone who deals in confidential matters.
16  JUDGE LENON:  At the moment I don't see why it's necessary
17    to go into any detail as to the nature of the personal
18    matter, if that's the evidence.
19  MR LORD:  No, I'm happy with that, my Lord, but
20    your Lordship will see I am anxious to get to the
21    bottom --
22  A.  My Lord, I am prepared to share a piece of information
23    if you feel, but it's very limited as to what I'm
24    prepared to say in open court.
25  Q.  It may become relevant, my Lord, this point, but we'll

78

1    move on because all I want to establish, as
2    your Lordship will appreciate, is the relevant remit for
3    this gentleman.  So it looks like this is part of the
4    run-in.  That's all.  That's why I ask the question.
5      Can I ask a different question, then?
6      Mr Page, in paragraph 12 of your witness statement
7    {D/3/4}, you say this:
8      "About a couple of months later, Jamie and I had
9    another meeting in Dubai and at that point we discussed
10    a specific mandate."
11      You're not here talking about this confidential
12    personal matter, are you?
13  A.  No, I'm not.
14  Q.  You're talking about something different, aren't you,
15    Mr Page?
16  A.  I am, my Lord, yes.
17  Q.  So is your evidence right there that around about
18    March 2015 you had this meeting with Mr Buchanan when
19    you discussed a specific mandate?
20  A.  Yes, my Lord, because the reason this is now -- when
21    I've corrected my witness statement is the report that
22    is before -- that has now been disclosed and I have
23    shown is dated March 2015 and it refers in this report
24    to a previous report, so it is inconceivable that
25    in March 2015 I was receiving an instruction from

79

1    Jamie Buchanan in relation to -- well, I received
2    a mandate, but I was obviously mandated before this
3    report, and that's the matter that I said is before
4    His Highness which I don't think I can disclose any more
5    at this point.
6  Q.  Sorry, so are you saying that the report we --
7  A.  My Lord, the timeline doesn't work because you're
8    talking of a report dated 26 March 2015 and in
9    Mr Buchanan's evidence he talks about briefing me in --
10    sorry, in -- at the same period.  It doesn't work.
11    There was a previous engagement, which is the one I'm
12    referring to, with His Highness, who I don't think I can
13    disclose in open court.
14  Q.  Well, I'm sorry about that -- I'm sorry, my Lord, I'm
15    troubled by that answer.  If you go to {H7/299/3} -- get
16    that page up first, Mr Page.
17  A.  Yes.
18  Q.  This is an extract from the report that you or your firm
19    did -- and we'll come back to it in more detail today --
20  A.  Correct.
21  Q.  -- on 26 March 2015.  It's your firm's report, isn't it?
22  A.  Yes, it is my firm's report, yes.
23  Q.  Can you see at the top it says:
24      "KM efforts against the client."
25  A.  Yes.

80

1   Q.   "FA and the US Advisory Team."

2   A.   That is correct, my Lord.

3   Q.   "FA" refers to Mr Azima, doesn't it, Mr Page?

4   A.   It does, my Lord.

5   Q.   And it says -- this is the words of your firm's report:

6         "In continuation to our previous report, we were

7         informed by several new sources that FA is managing KM's

8         efforts in the US and perhaps even paying their bills ."

9         Now, Mr Page, it looks, doesn't it, on the face of

10        this report of yours in March, that there is a link

11        between this report, in this part of it anyway, and

12        a previous report.  Is that right?

13  A.   That is correct, my Lord.

14  Q.   So what is the link between what we see here and what

15        you covered in your previous report?

16  A.   My Lord, this is where I'm in some difficulty because,

17        as I tried to explain, the meeting with His Highness

18        in January of 2015 gave me a specific mandate of which

19        this is just part of that mandate. But again, my Lord,

20        I'm happy to disclose it, but I don't think I would be

21        happy to disclose it in the presence of the media.

22  Q.   But it says:

23        "In continuation to our …"

24        It's under the heading "FA and the US Advisory

25        Team".

81

1   A.   My Lord, it's impossible to put this report into context

2        if you don't understand the mandate that I received from

3        His Highness based on the information that he had

4        received.

5        My Lord, I really am in some difficulty here because

6        you're asking me to breach a confidence and I don't feel

7        comfortable.

8   MR TOMLINSON: My Lord, it's not something that I know

9        anything about, but obviously this witness is concerned

10       about it and, my Lord, there are two ways of dealing

11       with it.

12       The first is that Mr Page can write something down

13       on a note to be shown to your Lordship and my friend,

14       indicating the general nature of the matter, or the

15       second is that the court can go into private for this

16       evidence to be explored.

17       It's probably sensible that the first option be

18       explored first because then we may get some clearer idea

19       of what the ambit of it is.  But obviously it's

20       appropriate for -- if this is a -- your Lordship will

21       appreciate the Ruler isn't my client and I don't know

22       anything about this matter that's been talked about, but

23       obviously this witness is in some discomfort about

24       disclosing what he regards as confidential professional

25       matters and it wouldn't be right, if it's not relevant

82

1        to any issue in this case, for confidential professional

2        matters to be disclosed in open court of an irrelevant

3        nature.

4   MR LORD: My Lord, the difficulty with that is that this

5        problem has arisen because of the way in which the

6        claimant has gone about explaining Mr Page's role

7        because it's clear from these answers that there is

8        potentially a relevant connection between the previous

9        report and mandate and matters that I am allowed to ask

10       him about because clearly they relate to Mr Azima and

11       this case.

12       So if there is some overarching concern or some

13       ability to pass the earlier report and the earlier

14       mandate, that's something that should have been dealt

15       with before if in fact -- through RAKIA factoring in

16       that this report was that of Mr Page and not adducing

17       evidence, as it has done, of a sort that your Lordship

18       has seen that disguises Mr Page's role because -- I am

19       anxious that we go into private and we don't have the

20       rigour of open court when I'm asking this witness

21       questions because it would be my submission that he has

22       told lies on oath, and I'll tell your Lordship that

23       Mr Page has lied on oath in relation to the written

24       reports and in relation to his coming across Mr Azima,

25       and in those circumstances, in my submission,

83

1        your Lordship should think very long and hard before we

2        abandon the usual approach of staying in open court.

3        I can ask questions -- I'll try and ask my questions

4        more slowly to establish the link to Mr Azima. I'm

5        happy to do that.  But I am anxious that we should keep

6        the public forum here to make sure that we get

7        a truthful answer, if your Lordship understands what I'm

8        saying.

9   JUDGE LENON: I'm certainly at this stage not going to go

10       into any sort of closed session.  What do you say to the

11       proposal that Mr Page should write down on a piece of

12       paper the nature of the issue that he's uncomfortable

13       about?

14  A.   My Lord, it is quite -- I beg your pardon.

15  MR LORD: Well, we can try that, my Lord.  I'm very happy to

16       try that, but I am going to have to ask about the

17       connection with the -- this witness has said that there

18       is a connection so I am going to have to ask him about

19       that.

20  JUDGE LENON: I see that and I see that's on the face of it

21       plainly relevant.

22  A.   My Lord, it is quite -- with respect to everybody, it's

23       quite difficult for me to put this in succinct format in

24       two or three lines.  I will repeat.  I am happy to

25       breach the confidence.  There are representatives of

84

1  His Highness here who would have no knowledge of the
2  mandate I was given because this is a personal
3  conversation between a sovereign ruler and myself, but
4  I am happy to disclose it to the court, but not in the
5  presence of the media.
6  MR LORD: My Lord, this is likely to be relevant because
7  a private conversation between Mr Page and the Ruler
8  that establishes some direct line of communication
9  between those two gentlemen is obviously relevant to
10  this case. It's relevant. The subject matter may not
11  be relevant, but the fact of the communication is
12  relevant, and I repeat that the problem has arisen
13  because of the way in which -- the evidence that RAKIA
14  has disclosed about Mr Page and his previous work in and
15  about relevant matters.
16  MR TOMLINSON: With great respect to my friend, these are
17  wholly bad points. The position is that this RAK
18  project update which he talks about a lot, doesn't
19  feature in his pleaded case and it's a matter that
20  hasn't been dealt with in evidence because it didn't
21  appear to be part of the issues before the court at all.
22  He can't criticise me now for not addressing a case
23  which only first appears in his note of opening and not
24  addressed in my evidence. But, my Lord --
25  MR LORD: Sorry, no, I'm going to correct that because that

85

1  is flatly wrong because Mr Azima referred to the project
2  update in his evidence. My learned friend successfully
3  had those bits, I think, maybe struck out. I can't
4  remember now. But the Ruler of Ras Al Khaimah deals
5  with this document in his evidence, and your Lordship
6  should go to that because my learned friend's case is
7  that this is really the first time that it's really
8  arising in this case and that's --
9  MR TOMLINSON: No, it's not my case it's the first time it
10  arises, but you can't criticise me for not dealing with
11  something in evidence when it's not part of the pleaded
12  case. The fact that it's referred to in witness
13  statements subsequently -- my friend actually amended
14  his pleadings to deal with certain matters that were
15  dealt with in disclosure, and if he wanted to deal with
16  this, he could have amended his pleadings to deal with
17  it. He choses not to.
18  JUDGE LENON: Yes, but presumably that's partly because he
19  didn't know who wrote it.
20  MR TOMLINSON: Well, my Lord, if this was relied on as
21  a document, he doesn't actually have a pleaded case
22  about Mr Page's role either. The position is if this
23  is -- this is a document which we know refers to
24  Mr Azima. He could have had a pleaded case that this
25  was -- some inferences could therefore be drawn from

86

1  this as to the role of Mr Azima in the thinking of
2  RAKIA. He didn't plead that case. So I'm not objecting
3  to him now putting all these points to my witness in
4  cross-examination, but I am objecting to him complaining
5  that somehow I've suppressed reference to these in
6  evidence when they're not part of the case.
7  But, my Lord, what we've got to deal with here is --
8  my friend says, "Well, it's relevant that Mr Page was in
9  communication with the Ruler". That may be relevant,
10  but that's not in dispute. That's clear on the face of
11  the evidence. It's been -- it's mentioned in Mr Page's
12  witness statement. He's mentioned it again in evidence
13  today.
14  If he wants to go further into private, confidential
15  conversations between the Ruler and Mr Page, then that
16  is not an appropriate matter to be dealt with in open
17  court because one simply doesn't know where that goes
18  and how that relates to the Ruler's private affairs. It
19  doesn't matter whether it's the Ruler. It would be the
20  same if it was anybody whose private affairs were
21  discussed with a confidential agent. The idea that then
22  they could be explored in open court to see whether
23  something relevant comes out, my Lord, can't possibly be
24  right. The court has -- as your Lordship knows, the
25  court has a duty to protect people's rights to privacy

87

1  under Article 8. The court is a public authority and
2  it's important that those rights are protected.
3  One simply doesn't know exactly what's being
4  adverted to here. I'm perfectly happy for it to be
5  explored and if it turns out to be relevant to some
6  issue in the case, of course it must be dealt with. But
7  as a general piece of exploration, it's not right just
8  to go into it on the off-chance it might be.
9  JUDGE LENON: No, but you would presumably accept that the
10  nature of any mandate that the Ruler gave to Mr Page is
11  of relevance?
12  MR TOMLINSON: The nature of any mandate, my Lord, yes, but
13  what concerns me is that the question then goes into the
14  details of the mandate and what the Ruler said and,
15  you know, what information he provided and so on.
16  Certainly the general nature of the mandate I think must
17  be -- I accept that, and I think Mr Page was actually
18  about to volunteer it at one point.
19  A. My Lord --
20  MR LORD: I'm in your Lordship's hands. I am going to want
21  to pursue the dealings that Mr Page had with the Ruler
22  and obviously matters that relate to this project report
23  that we've had which appear to refer back to earlier
24  work and engagements concerning Mr Azima, which is what
25  this case is about.

88

1  A. My Lord, I am prepared to answer certain questions, but
2     they will be vague and I think that's the best I can
3     help the learned counsel here -- and I'm happy to answer
4     a question, but without going into too many specifics.
5  MR LORD: My Lord, my concern is I'm not going to be held to
6     be giving Mr Page any licence to give anything other
7     than exactly truthful answers, so I'm not going to agree
8     to that. If in fact there's a staging post here which
9     we can go through in writing or otherwise that's
10    sufficient, then I'm more than happy for that approach
11    to happen. I'm not happy with Mr Page having, if you
12    like, licence, editorial licence, as to how he puts
13    things under the guise of this alleged confidentiality
14    that can't be looked behind.
15  JUDGE LENON: I am going to invite you, Mr Page, to write
16    down on a piece of paper what it is that you are
17    concerned about and to do it in as succinct a way as you
18    can.
19  A. My Lord, may I request I do that in the break for lunch
20    because first of all I need to write it and it would be
21    much better, if you accepted, my Lord, for me to sit
22    with the lawyers for the Government and I will write it.
23  MR LORD: I'm sorry, my Lord, but obviously --
24  JUDGE LENON: That's not going to be possible.
25  A. My Lord, then I'm prepared to say certain things which

1    I think will be helpful to counsel here. If he wishes
2    to expand on them, then I may have to revert to that.
3      I think what I will tell him, my Lord, will be
4    useful to him and I think it answers the concerns he may
5    have.
6  MR LORD: My Lord, would it be better to go into private for
7    this initial exploration and then to see whether
8    your Lordship feels, in the light of that, we should
9    continue in private, go into public or desist with that
10    line of questioning at all? I wonder if that would be
11    a safer way of doing it. It's just an offer.
12  JUDGE LENON: Yes, if that's going to be a way through this.
13  MR TOMLINSON: My Lord, I'm happy to deal with it in that
14    way if everybody thinks that's appropriate. It may be
15    that there's an earlier stage that Mr Page is offering
16    a general explanation, if he gives that general
17    explanation and it becomes clear that there's no need to
18    go any further, then we don't need to go into private.
19    If he gives that general explanation and my friend wants
20    to explore further, then we may need to.
21  JUDGE LENON: Let's try that. I'm anxious not to delay
22    matters too much with this. Let's see if we can get by
23    without --
24  MR LORD: Very well, my Lord. Very well.
25      Mr Page, you were going to explain the sensitivity.

1  A. Yes, my Lord. His Highness' instructions were --
2    His Highness' information was that a member of his
3    family was working with Khater Massaad in gathering
4    information from the Palace and my instructions were to
5    ascertain whether that was in fact correct, that they
6    were working in collusion. But, my Lord, before I'm
7    asked a question, I can say on oath I was never asked --
8    I never heard the name of Farhad Azima.
9  Q. So, Mr Page, you were asked by the Ruler to carry out
10    some sort of surveillance or investigation into what
11    the Ruler thought was some leak within the Palace?
12  A. No, that's not correct. The request was could
13    I establish, because he'd heard a rumour, that
14    Khater Massaad was working with a member of his family
15    to the detriment of His Highness and the Government of
16    Ras Al Khaimah.
17  Q. And so -- we'll come back to what you did in that
18    regard, please, but is that something that -- that was
19    an engagement that was set up simply between you and
20    the Ruler; is that right?
21  A. That is correct, my Lord.
22  Q. And is your evidence that nobody else knew about that?
23  A. No one else was present at the meeting and no one else
24    knew my mandate.
25  Q. And how long did that mandate last for?

1  A. It's --
2  Q. Still going on?
3  A. No -- correction -- it's not still going on. It was
4    dealt with in the first report, which is obviously
5    not -- we do not have -- and it was dealt with partly in
6    the second report, the one -- the redacted report we
7    have here. Again I'm happy to share, my Lord, that
8    there was no information to suggest that His Highness'
9    belief was correct --
10  Q. Right.
11  A. -- ie that he was working with a member of his family.
12  Q. And what sort of investigation work did you do in order
13    to establish the true position?
14  A. Well, it was to review the previous investigation into
15    Sheikh -- His Highness, both his family members --
16    I nearly gave it away then. I beg your pardon -- and to
17    see what was going on and to try to ascertain whether
18    there was a connection, and this report is partly
19    prepared in relation to that. And I can take you
20    through chapter and verse, my Lord, if you want, but it
21    is the fact that we knew from previous intelligence
22    people who had worked for Sheikh Khalid in relation to
23    the bad -- the negative PR campaign that he launched
24    against His Highness when he was the Crown Prince and
25    therefore we explored that evidence as a possibility of

```
 1     the -- where we might find a link  through
 2     His Highness -- sorry, that Khater Massaad was working
 3     with parties against the Ruler.
 4  Q. Sorry, was the concern of the Ruler that somebody in
 5     the -- somebody within his family was working with
 6     Dr Massaad or was it the fact of Dr Massaad's alleged
 7     campaign? I'm not sure what the concern was.
 8  A. It was that they were working, my Lord, together for
 9     whatever reason -- I have no reason why -- that they
10     were working together for the purposes of destabilising
11     or causing harm to His Highness.
12  Q. And as part of that engagement you looked at Mr Azima?
13  A. That is not correct.
14  Q. So at [H7/299] of your report, you say:
15     "FA and the US Advisory Team.
16     "In continuation to our previous report, we were
17     informed by several new sources that FA is managing KM's
18     efforts in the US and perhaps even paying their bills ."
19  A. That is correct, but I was never mandated by
20     His Highness to investigate then, subsequently,
21     Farhad Azima.
22  Q. Can I ask you, please, about the scope of the retainer?
23     Go back to paragraph 12 of your witness statement,
24     please.  [D/3/4].
25  A. Yes.
```

93

```
 1  Q. Can you see what you say in paragraph 12 about the scope
 2     of your retainer pursuant to this specific mandate?
 3  A. I do, my Lord.
 4  Q. "Jamie said that he was involved in investigating
 5     wrongdoing by Khater Massaad and the misappropriation of
 6     assets.  He wanted my assistance in tracing assets,
 7     investigating Khater Massaad's involvement with Iran,
 8     his links to Hezbollah and Lebanon and his relationship
 9     with Viktor Bout ...  I understood my engagement to be
10     for the government generally but I did not know which
11     specific government entity.  There was no letter of
12     engagement ..."
13     Can you see that?
14  A. Yes, I can, my Lord.
15  Q. Then, "Knowledge of Farhad Azima", paragraph 13:
16     "During this period in 2015 when I was undertaking
17     the investigations described above in relation to
18     Khater Massaad, I did not come across the name
19     Farhad Azima.  The first time I recall hearing his name
20     was in early 2016 at one of my regular catch ups with
21     Jamie."
22     Now, Mr Page, you knew when you gave this witness
23     statement that it was in relation to a dispute between
24     RAKIA and Mr Azima about whether -- amongst other
25     things, about whether RAKIA had been involved in the
```

94

```
 1     illegal access of Mr Azima's data, didn't you?
 2  A. I do.
 3  Q. And you're here giving evidence in a written statement
 4     about the extent of your engagement by RAK or RAKIA,
 5     aren't you?
 6  A. I am, yes.
 7  Q. And if you put together paragraph 12 and paragraph 13,
 8     you are claiming, aren't you, that you did not come
 9     across the name Farhad Azima until early 2016?
10  A. That is correct, my Lord.
11  Q. If we go to the one surviving project update at
12     [H7/299], you can see at pages [H7/299/2-4] that there
13     are three pages of this report -- it looks like it's
14     17 pages.  So three of the 17 pages concern matters
15     involving Mr Azima, don't they?
16  A. That is correct.
17  Q. So, Mr Page, can you explain to his Lordship why you put
18     in a witness statement and signed it and verified it to
19     be true back in June 2019 where you said this:
20     "During this period in 2015 when I was undertaking
21     the investigations described above in relation to
22     Khater Massaad, I did not come across the name
23     Farhad Azima.  The first time I recall hearing his name
24     was in early 2016 at one of my regular catch ups with
25     Jamie."
```

95

```
 1  A. That is correct, my Lord.
 2  Q. Can you tell his Lordship why, when we've seen that in
 3     March 2015 you have prepared a report which discusses
 4     Mr Azima's alleged management of Dr Massaad's US team in
 5     the context of a concern about Dr Massaad's strategy
 6     that leads on to discussion of intelligence -gathering
 7     and monitoring activities and containing and ruining
 8     plans -- how could you possibly put in evidence what you
 9     said in paragraph 13? What's the explanation for it,
10     Mr Page?
11  A. It's very simple, my Lord.  Farhad Azima was just -- was
12     a side issue in this report.  There were matters I was
13     investigating across the globe, including, as I have
14     said, Lebanon, Iran, Hezbollah, arms trafficking, people
15     trafficking, and his name at the time I wrote that
16     statement no more than perhaps some of the other 20, 30,
17     40 names that we came across in the course of this
18     investigation rang a bell to me, and, my Lord, that is
19     my evidence. Plus, my Lord, as I explained, in June of
20     2019 there were certain things going on in my personal
21     life which affected my ability to remember events that
22     occurred as far back as -- sorry -- as 2015, four years,
23     and if my Lord wishes me to expand on what those issues
24     were, I'm more than happy to do so.
25  Q. No, thank you, Mr Page.  Could you go, please, to
```

96

```
 1     paragraph 7 at {D/3/3}?
 2  A. Are you talking about my statement or --
 3  Q. Yes, please, Mr Page. I want to just finish this
 4     matter, if you don't mind. I'm aware of the time.
 5     Thank you.
 6        In paragraph 7 of your witness statement you say
 7     this in the last sentence:
 8        "I don't keep contemporaneous documents and my
 9     briefings to clients are invariably oral, especially in
10     the Middle East where this is very normal."
11        Now, Mr Page, I wasn't sure this morning whether you
12     were clarifying this bit of your witness statement as
13     well. What's the answer?
14  A. I'm sorry, my Lord, I still don't understand that
15     question.
16  Q. Where you say in this paragraph 7 that your briefings to
17     clients are invariably oral, that means that your client
18     briefings are always oral, doesn't it?
19  A. No, not always oral, my Lord. My Lord, the one thing
20     I learnt, having worked in Saudi Arabia for three years,
21     was a knowledge of the Middle Eastern culture and, with
22     the greatest of respect to counsel, it is a quite unique
23     learning experience. Even to this day, my Lord, I will
24     go before a client from the Middle East who will read
25     more -- less than one page. So, therefore -- you're
```

97

```
 1     saying "Verbal briefings?" My Lord, the answer to that
 2     question is "Yes, verbal briefings".
 3  Q. Mr Page, you're not answering the question. What you
 4     were telling the court in this witness statement at
 5     paragraph 7 was that you always briefed clients
 6     especially in the Middle East.
 7  A. Well --
 8  Q. Sorry, Mr Page. Sorry, Mr Page. The word "invariably"
 9     means "without exception".
10  A. Well --
11  Q. You shrug. Sorry, Mr Page --
12  A. No, I beg your pardon. Sorry.
13  Q. Did you know what "invariably" means?
14  A. Well, I think I do, but perhaps that was a misleading
15     line in my statement.
16  Q. So what do you think it means? It means always, except
17     for the 27 written reports in this case that you made?
18     Is that what you meant to say?
19  A. My Lord, I would go before His Highness and I would have
20     an audience of perhaps 30 minutes. The first 15 minutes
21     of that audience, because His Highness is extremely
22     knowledgeable about world affairs, will be discussing
23     with me -- who he thinks I'm also quite knowledgeable
24     about issues in the Middle East -- affairs of the
25     Middle East.
```

98

```
 1     I would then present him with a verbal briefing and
 2     he would not even look sometimes at the reports, but
 3     sometimes he would read an executive summary, and I mean
 4     an executive summary, because it is the custom, my Lord,
 5     that in the Middle East you are very lucky, no matter
 6     what it relates to, if they will read more than one
 7     page.
 8        What His Highness did subsequently with the verbal
 9     briefings and if I'd given him a written report I cannot
10     comment on, but I know until this day that the culture
11     is a verbal briefing. They prefer it because they like
12     to hear what you're saying. And I'm sorry, my Lord, if
13     it goes against protocol that people understand, but
14     that is an experience I have learned since 1995. So I'm
15     a -- long standing practitioner in the Middle East.
16  MR LORD: Would that be a convenient point, my Lord?
17  MR TOMLINSON: Mr Page, you're in the middle of your
18     evidence so you know you mustn't talk to anybody about
19     your evidence until you have concluded?
20  A. I understand.
21  (1.04 pm)
22                  (The luncheon adjournment)
23  (2.00 pm)
24  MR LORD: May it please your Lordship, Mr Page, I was asking
25     you about your witness statement in which you said that
```

99

```
 1     you invariably briefed clients orally. Do you remember?
 2  A. That is correct.
 3  Q. And I was putting to you that that was untruthful
 4     because we know at least in this case that you provided
 5     many written project updates, didn't you?
 6  A. Yes, that is correct, in addition to verbal updates.
 7  Q. In addition to your oral updates, yes. And Mr Buchanan
 8     gave evidence that you updated about every month; would
 9     that be right?
10  A. Every month, six weeks, depending on when His Highness
11     wanted to see me.
12  Q. Yes. And Mr Buchanan estimated that probably roughly at
13     least half of the time there would be a written update
14     from you.
15  A. That is correct, my Lord.
16  Q. It's right, isn't it, that you still work for RAK or
17     RAKIA?
18  A. That is correct, my Lord.
19  Q. And so, since the beginning of 2015, you'd have provided
20     probably something in the region of 30 written project
21     updates, wouldn't you?
22  A. I think that the number has diminished over the last
23     12 months, but you may be right, my Lord. It may be 30.
24     I cannot recall exactly.
25  Q. By it's going to be in the order of around 25 to
```

100

1      30 reports in writing?
2  A.  That is possible.  I can't -- you know, I can't remember
3      exactly how many I did.
4  Q.  Mr Buchanan gave evidence that all the reports were in
5      the same format; that's right, isn't it?
6  A.  Yes.
7  Q.  And how were the reports prepared?  Did you type them
8      all up yourself or were others involved?
9  A.  No, others involved.
10 Q.  Who was involved?
11 A.  The agent that I employed to assist me in this complex
12     investigation .
13 Q.  And who's that?
14 A.  It's a company in the State of Israel .
15 Q.  Pardon?
16 A.  A company in the state of Israel .
17 Q.  What's the name of that?
18 A.  Insight .
19 Q.  And that's a company -- that's an Israeli company, is
20     it?
21 A.  That is an Israeli company, yes.
22 Q.  And what do they specialise in?
23 A.  Well, the founder of the company is the former head of
24     the Lebanese desk of Shin Bet and Shin Bet is the
25     Israeli equivalent of MI5.

101

1  Q.  Right.
2  A.  So they specialise in collating information,
3      particularly in the Middle East.  They obviously
4      specialise in collating information on Iran, on
5      Hezbollah, on Lebanon, and they were the -- the
6      expression I use, my Lord, is the "think tank".
7  Q.  So would it be fair to say, Mr Page, that in relation to
8      the matters covered by your project updates, you had in
9      fact subcontracted at least some of that work to this
10     Israeli company called Insight?
11 A.  That is correct.
12 Q.  And they were, amongst other things,
13     intelligence -gathering specialists ?
14 A.  They were specialists at obtaining information from
15     confidential sources and, my Lord, the important thing
16     was to analyse a significant amount of data being
17     recovered from multiple jurisdictions and
18     cross-referencing it , seeing really how it related to
19     Khater Massaad and his links .  So, in answer, my short
20     answer is, yes, they were the conduit to receive all the
21     information from my other subcontractors.
22 Q.  And they were really -- they were the people, were they,
23     who you enlisted to carry out some of this electronic
24     data-gathering?
25 A.  By which you mean electronic -- I don't understand.  By

102

1      " electronic ", you mean open source information on the
2      internet?
3  Q.  I mean of any source.
4  A.  Well, they were -- yes, they were using the dark web,
5      open source information on the internet .  That was the
6      limit to what they were doing.
7  Q.  And they could have been unlawfully accessing electronic
8      information for all you knew, Mr Page, couldn't they?
9  A.  Absolutely not.
10 Q.  How do you know what they did?
11 A.  Because my instructions from Mr Buchanan -- and not
12     simply his instructions -- it is my principle that no
13     information that is recovered must be obtained by
14     illegal means, and to hack is illegal .
15 Q.  You see, Mr Page, I suggest that we may be getting a bit
16     warmer here on how Mr Azima's data came to end up on the
17     internet.
18     Can you tell his Lordship a bit more about Insight?
19     I think you said people work for them who used to be the
20     equivalent of the Israeli MI5; is that right?
21 A.  Well, they have a number of people in their employment,
22     either who serve in the IDF -- you understand what the
23     IDF is , my Lord?  Israeli Defence Force.  The Israeli
24     Defence Force has a specialist unit that collates
25     intelligence , military intelligence .  So they are

103

1      specialists from the IDF, from Mossad, from Shin Bet.
2      There are lawyers, there are accountants, because we
3      were analysing a lot of information from public sources
4      which was financial information.
5  Q.  Insight would have the capability , wouldn't they, to
6      access Mr Azima's emails if they'd wanted to?
7  A.  No, I have no knowledge whether they do that type of
8      work.
9  Q.  But given the high-powered natured of the people at
10     Insight you've described, their expertise would extend,
11     wouldn't it , into that sort of covert operation?
12 A.  Not to my knowledge.
13 Q.  I suggest, Mr Page, that that's not a truthful answer.
14 A.  Well, my Lord, I can only express to you the mandate
15     they received from me on behalf of the Government of RAK
16     was to use their intelligence community contacts to
17     deliver information or provide information regarding
18     Dr Massaad and his associations as outlined in my
19     witness statement.
20 Q.  And that would include -- and it was thought, wasn't it ,
21     that Dr Massaad's associate included Mr Azima?
22 A.  Absolutely not.  My Lord, the report of 26 May --
23     Farhad Azima's name came out -- completely out of the
24     blue.  It was not part of our mandate to look at
25     Farhad Azima.  This information came from a confidential

104

1  source.  The confidential source was not even given --
2  because we weren't instructed to look at Farhad Azima.
3  He provided what he heard in the marketplace, if that's
4  the expression, my Lord.
5  Q.  Were there some written instructions or documents that
6  recorded your retainer of Insight in relation to these
7  matters?
8  A.  No.
9  Q.  Why not?
10  A.  Because that's not how -- my Lord, I work in a very
11  strange world, without sounding over-dramatic.
12  I neither trust telephones, nor I do trust the email, so
13  any briefings that they received from me would have been
14  face to face.
15  Q.  And how were they paid?
16  A.  By bank transfer.
17  Q.  From whom?
18  A.  From my company in the Middle East.
19  Q.  And how much did you pay them in 2015?
20  A.  Without access to my records, I have no recollection.
21  It's dealt with by my finance director.
22  Q.  Roughly how much?
23  A.  In the whole of 2015?
24  Q.  Yes.  Millions?
25  A.  In relation to Khater Massaad or in relation to other

105

1  matters instructed to me by His Highness?  There were
2  other matters which -- again I have the same problem.
3  Q.  Did His Highness -- did the Ruler know that you were
4  essentially acting as a bridgehead into Insight?  It
5  sounds like he probably did.
6  A.  I'm sorry, my Lord, I don't understand the question.
7  Q.  Did His Highness know that when he asked you to carry
8  out various tasks, you were actually retaining this
9  Israeli operation called Insight to carry them out?
10  A.  My Lord, there's no secret that I operate in the
11  State of Israel and it is no secret, my Lord --
12  Q.  What's the answer to the question?
13  A.  Well, I would not have told him, nor would he have asked
14  me the question.
15  Q.  But it sounds as if what you may have been doing,
16  Mr Page, is acting as something of a go-between, really
17  hooking up the Ruler's wishes with what sounds like
18  a very effective Israeli intelligence-gathering and
19  surveillance operation.
20  A.  Absolutely not.  They were just one of a number of
21  subcontractors that I used.
22  Q.  Presumably Insight would have copies of the project
23  updates that they prepared for you, wouldn't they?
24  A.  They have exactly the same protocol that I adopted when
25  we commenced this project.  In fact it is not

106

1  a protocol -- a new protocol.  It was a protocol that
2  I -- that commenced as far back as 2008/2010, when
3  I was working against Sheikh Khalid.
4  Q.  I suggest, Mr Page, that you didn't forget about these
5  30 or so written reports when you gave your witness
6  statement.  You would have known about those written
7  reports, I suggest to you.
8  A.  But, my Lord, I thought we dealt with the fact that
9  I don't actually recall how many reports there were.
10  I don't have any reports because, on the instructions of
11  His Highness -- if I may I step back.  As early
12  as January 2015 His Highness expressed to me his
13  concerns that his palace and other government
14  organisations had been compromised.  By "compromised",
15  my Lord, I mean information had been obtained illegally
16  from within his organisation.
17  In my report there's a reference to someone called
18  Joseph Abu.  That is not Joseph Aboud.  It is
19  Joseph Assad, who is a former CIA agent attached to the
20  US Embassy in Abu Dhabi who ran a company in Abu Dhabi.
21  So, you know, we had good reason to believe that Joseph
22  Assad was running a campaign.  We had no evidence, but
23  we believe he was.
24  So His Highness' concern about his information being
25  compromised were well founded and on that basis

107

1  I created a form of protocol.  And also, my Lord, it
2  should be remembered, we are talking about investigating
3  links to Iran.  This is a government agency that has
4  enormous capability to access information.  So, with
5  respect, my Lord, why it might seem a bit bizarre, it
6  may seem a bit fanciful, I live in the world populated
7  by former spooks -- I beg your pardon, former
8  intelligence agents and we take drastic measures to
9  protect not only the information, but the people engaged
10  in gathering the information.
11  Q.  And I suggest that you lied in your witness statement
12  about the way in which you report only orally.
13  A.  I don't think, my Lord, I was intending to lie.  It may
14  have been misleading, for which I apologise to the
15  court, but, as I told you, at the time I completed that
16  witness statement there were issues in my life which
17  were causing me considerable distress and to this day
18  that continues.
19  Q.  And you did that in order to avoid -- and you omitted to
20  make any mention of the project updates in your report,
21  didn't you, the written project updates?
22  A.  Because, my Lord, we're talking about something that
23  happened five years ago, and in the last five years
24  I have had my 19-year-old son committed to a mental
25  health hospital on numerous occasions, I have had my son

108

1     assault me, I have had my wife have a stroke, and, in
2     fairness, my mind was not focused on trying to remember
3     back to 2014, and to this day my son is in a mental
4     health hospital. So, with respect, my Lord, what
5     counsel is suggesting, that I sought to mislead your
6     court, is absolutely not true.
7  Q. And you did so in order to seek to avoid being
8     identified as the author or as the producer of the only
9     surviving version of your project update, dated
10    26 March 2015. That's why you told those lies --
11 A. Absolutely not, my Lord. My Lord, my name was disclosed
12    in the discovery proceedings prior to this trial. Why
13    would I seek to hide behind the fact that I would have
14    been the author of this report?
15 Q. And you did that, you lied, Mr Page, because the March
16    project update showed that you, Mr Page, were
17    investigating, amongst other people, Mr Farhad Azima?
18 A. Absolutely not.
19 Q. And because that one surviving project update showed
20    that you were investigating the human rights campaign on
21    behalf of the Ruler?
22 A. The human rights campaign?
23 Q. Sorry, the concern about a campaign being mounted of the
24    sort we see described in the March project update.
25 A. My Lord, the campaign that we foresaw or what we think

                            109

1     was going to happen is no different to the campaign that
2     was mounted by Sheikh Khalid to embarrass His Highness.
3     So our answer -- our emphasis was what is the nature of
4     the complaint and what they intended to do with it, and,
5     as I said in my evidence, earlier evidence, my brief
6     was: was Dr Khater Massaad working with a member of
7     His Highness' family? And this is a follow-on from that
8     investigation.
9  Q. And you lied because the March project update showed
10    that you had been investigating, amongst others,
11    Mr Azima from as early as March 2015?
12 A. My Lord, with respect, I've answered that question.
13    Absolutely not. I was never mandated to or instructed
14    to, then or now, investigate Farhad Azima.
15 Q. And in paragraphs 12 to 15 of your witness statement
16    {D/3/4-5} you gave an untruthful account of your
17    Farhad Azima-related work in 2015, didn't you?
18 A. Would you mind if I just read it?
19 Q. You may.
20 A. Paragraph 15?
21 Q. 12 to 15. You can read those paragraphs. I'm
22    suggesting to you that what it does not reveal --
23 A. No.
24 Q. -- is the full extent to which you were looking at
25    Mr Azima as shown by the project update, which we will

                            110

1     come to, Mr Page -- we are going to come to that -- and
2     don't -- remember that there are three and a half pages
3     concerning Mr Azima -- right? -- before you answer the
4     question I put to you. I think you said that you didn't
5     look at Mr Azima at all in 2015, so be very careful
6     because you're on oath now, Mr Page.
7  A. Yes, I appreciate I'm on oath and I've already mentioned
8     that, when I prepared my statement in June of 2019,
9     I could not recall the name of Farhad Azima because this
10    was a massively complex investigation involving many,
11    many people, and if Farhad Azima had been -- I think, my
12    Lord, I have a fairly retentive memory. If Farhad Azima
13    had been the focus of my investigation I would have
14    remembered. The answer is he was not and never was and
15    is this day is.
16 Q. Could we turn to what Mr Page you actually were doing in
17    2015 in relation to Mr Azima?
18 A. I'm sorry, you're talking about the paragraph 15 again?
19 Q. No, I'm going to ask you if you could try to call upon
20    your retentive memory to help with what you were
21    actually doing in 2015 as it may have concerned
22    Mr Azima; all right, Mr Page? That's what I'm looking
23    at now; all right? It doesn't matter whether you're
24    looking at Mr Azima by himself or as part of
25    Dr Massaad's team allegedly or as part of a campaigning

                            111

1     group or for some wider very, very confidential
2     sensitive reason. Just think about, Mr Page, the extent
3     to which Mr Azima was the subject -- double underline --
4     of your, Mr Page's, attention in 2015. Do you
5     understand that, Mr Page?
6  A. I understand the question, my Lord.
7  Q. Right. Well, let's try, shall we, to tell his Lordship
8     truthfully now on oath what you actually did in relation
9     to looking at Mr Azima in 2015?
10 A. My Lord, if I may -- my Lord, if I may -- I find this
11    slightly offensive. I am a former police officer.
12    I left the police with an exemplary conduct certificate.
13    I joined the police to uphold the rule on law and order.
14    And to propose that I'm lying on oath, I find, my Lord,
15    very offensive because I do not lie on oath.
16    I understand the oath and I continue to uphold the
17    values that I had when I was a police officer. So the
18    answer is to your question, my Lord -- is I did not
19    investigate Farhad Azima. The only reference to
20    Farhad Azima is in this report dated March 2016, and
21    this part of the project finished very quickly
22    thereafter.
23 Q. Can we have the project update up, please, {H7/299}?
24    You know, Mr Page, by now that it's dated 26 March 2015.
25    And his Lordship can take it, can he, that this was

                            112

1   prepared by Insight, this Israeli investigative outfit
2   that you've described today?
3 A. That is correct.
4 Q. Will we find details of Insight and their work on the
5   internet?
6 A. I would think not.
7 Q. Oh, why not?
8 A. Because in our -- in the nature of the business they
9   undertake, we do not -- we don't go on Yellow Pages. We
10   are a very -- as I am -- a very boutique, respectable
11   investigation and corporate intelligence agency. So we
12   don't need to put our name on the internet. My name is
13   on the internet because my group provides security in
14   hostile environments, and the reference to the
15   investigation division, which is in my witness
16   statement, is a minute part of the work that I do for
17   governments in hostile environments.
18 Q. So how would somebody get to know about Insight's work,
19   then?
20 A. Right. Okay. So 2005, my Lord, I am providing security
21   support to the European Commission aid mission to the
22   Palestinian people, which is in Jerusalem. I am the
23   only foreign company to be given a licence in Israel to
24   carry weapons, which is part of the requirement to
25   protect the diplomats of the European Commission.

113

1     I also have a licence in Palestine, which is very
2   rare, because I have to work both sides of the divide.
3   To perform the service that I need to provide to my
4   clients, I need to gather intelligence from the
5   Palestinian Authority and from the Israeli authorities,
6   and that puts me into contact, my Lord, with people from
7   the Israeli intelligence service.
8     So, as will be my evidence when it comes to
9   Mr Halabi, I have numerous connections within the --
10   both the Palestinian Authority intelligence service and
11   the Israeli intelligence service, and when I was seeking
12   a company to help me on this project, that's how I came
13   across this company.
14 Q. And why, in a case concerning Dr Khater Massaad and the
15   UAE, did you think to -- that actually an Israeli
16   investigative outfit would be the right people to help
17   you?
18 A. My Lord, the allegations against Khater Massaad were
19   links to Iran, links to Hezbollah, which is in Southern
20   Lebanon. Who better -- who has more knowledge of Iran
21   and Hezbollah and Lebanon than the Israelis? Certainly
22   not British intelligence.
23 Q. And is your evidence that you thought that none of
24   Insight's information-gathering would be through illicit
25   obtaining of electronic material, none of it at all?

114

1 A. No, it is from confidential sources, from what I would
2   call "covert operations", and by "covert", my Lord, I do
3   not mean electronic covert operations; I mean
4   cultivating a source by means of under-cover operation.
5   And I don't feel too comfortable giving away all the --
6   I'm happy to expand if you wish, but if you want an
7   example, I knew that Khater Massaad -- because I know
8   Khater Massaad personally. I have worked with him for
9   two years, I travelled with him, I socialised with
10   him -- so I knew he liked women, just an example -- and
11   I don't mean his wife, I mean other women.
12     Now, if I wanted to get information on
13   Khater Massaad, the English thing is to put someone
14   beside him to cultivate him in a way that I don't think
15   I need to explain, my Lord. And that's how it works.
16   And it's bizarre, I know, and, my Lord, I'm sure it's
17   bizarre to this court, but the world in which I live in
18   is populated by former intelligence services, officers,
19   and they're the skill sets to this day that are
20   converted into the commercial world.
21 Q. It would also include, wouldn't it -- your particular
22   knack of getting confidential information, that would
23   extend to paying people, wouldn't it, Mr Page?
24 A. The payment may be no more than a lunch.
25 Q. But it would include paying people for information,

115

1   wouldn't it, Mr Page?
2 A. Potentially, yes.
3 Q. Paying people to get confidential information; yes?
4 A. Absolutely not.
5 Q. Can you look at {H7/299/2}, please, which is the project
6   report.
7 A. Right, yes.
8 Q. "In the US, KM's team hired a team of advisers managing
9   Farhad Azima ... in order to spread allegations against
10   our client. The main allegations against the client are
11   on human rights issues ..."
12     Can you see that?
13 A. Yes.
14 Q. "FA, who might also be responsible for paying the
15   US team, handles all KM's activities in the US."
16     Can you see that?
17 A. Yes.
18 Q. Then a bit further on down it says:
19     "According to our source, FA also hired a private
20   investigator ..."
21     Now, who was your source?
22 A. It's not my source.
23 Q. Well, who is the source you're talking about there?
24 A. Well, I actually don't know who the source is.
25 Q. Oh, I see. So this is an Insight source and you don't

116

1       know who they're referring to?
2   A.  My Lord, how it works is that everybody within my
3       industry is over-protective with sources, for one of two
4       reasons: to disclose the source, they put the source at
5       risk and no one in our industry gives up the source
6       unless asked to do, and I did not ask my colleagues to
7       give up their source. I believe that this information
8       that they had obtained from the source and the
9       information I have asked them, the source, was over
10      a series of meetings over lunch.
11  Q.  And then the last paragraph:
12          "Our sources have reported that KM's team suspects
13      that they have an information leak since they noticed
14      some of RAK's actions in the last few months. They
15      believe that the client is having someone monitor their
16      activities either electronically or in other methods."
17          Now stopping there, Mr Page, do you know who the
18      "sources" -- plural -- are who are referred to there?
19  A.  I have absolutely no idea, my Lord.
20  Q.  And therefore -- well, in going on, they say:
21          "... have reported that KM's team suspects that they
22      have an information leak."
23  A.  I can't comment on why he says that. But, my Lord, if
24      this information been obtained in an illegal way, I am
25      lost as to know how we got Joseph Assad's name wrong in

117

1       the report because he's called "Joseph Aboud". His name
2       is not "Joseph Abouth".
3   Q.  Mr Page, you're in no position to say to his Lordship
4       whether Insight did or didn't use illegal means to
5       obtain information that fed into these project updates
6       of yours.
7   A.  I am, my Lord, in a position.
8   Q.  How?
9   A.  Because, my Lord, I said in evidence previously that
10      Insight were mandated by me and were told that we must
11      not break the law because the information that we may be
12      producing for the client may be the subject of legal
13      proceedings and, therefore, cannot be tainted by any
14      possibility of illegality.
15          Now, if you ask me, my Lord, if approaching someone
16      under pretext, cultivating them, talking to them, is
17      illegal, I think it's probably questionable, but it is
18      not illegal activity. If someone volunteers -- if the
19      former mistress of Khater Massaad volunteers information
20      to me about him, I'm not sure where the duty of
21      confidentiality lies. It's as simple as that. And in
22      this case the source knew various people named in this
23      report and heard through the grapevine that a campaign
24      was about to be launched against His Highness, and it's
25      the same source that actually was against His Highness

118

1       on the Sheikh Khalid case. That's how we got from this
2       quantum leap of finding someone who might be involved in
3       working with Khater Massaad against His Highness.
4   Q.  Mr Page, you didn't actually know, did you, the way in
5       which Insight were going about getting information or
6       intelligence for you and the Ruler, did you?
7   A.  Yes, I did.
8   Q.  You weren't involved in the actual
9       intelligence-gathering itself, were you?
10  A.  My Lord, I have 40 years in this industry. I know when
11      information that has been provided to me has come from
12      an illegal source. This was clearly and unequivocally
13      information obtained from covert sources.
14          Now, if they used a pretext, ie met someone
15      pretending to be a journalist, I have no idea, but what
16      I do know is that they were never authorised or mandated
17      or did anything illegal.
18  Q.  Well, I suggest, Mr Page, that you would have known that
19      Insight would potentially carry out hacking or illegal
20      accessing of electronic data.
21  A.  Absolutely not.
22  Q.  And when it says here, "Our sources have reported that
23      KM's team suspects ... an information leak ... They
24      believe that the client is having someone monitor their
25      activities either electronically or in other methods",

119

1       they were right, weren't they, to be suspicious in that
2       way?
3   A.  No, because the timeline does not work --
4   Q.  Then if we go to {H7/299/3} --
5   A.  My Lord, may I just finish that answer? Sorry. The
6       timeline does not work. I was not mandated until
7       January of 2015, okay? The report stated March 2015.
8       They were not mandated to go after -- sorry, to put it
9       in the timeline, what you're saying is that their team
10      are saying that they were subject to electronic
11      interception.
12          Now, the worrying part for my client in this report
13      is, if you look at Joseph Assad -- and I apologise, my
14      Lord, to go on -- it refers to Joseph Aboud, AKA
15      Joseph Assad, being an expert in SIGINT, and for the
16      benefit of my Lord, "SIGINT" is spook language for
17      "hacking".
18          So the concerns that my client had raised about
19      information being leaked from his palace was well
20      founded because Joseph Assad is a known specialist in
21      that field from his CIA days.
22  Q.  If we go to {H7/299/3}, please, heading, "KM efforts
23      against the client.
24          "FA and the US Advisory Team."
25          Can you see that?

120

1  A.  Yes.
2  Q.  "In [consideration] to our previous report, we were
3      informed by several new sources ..."
4          Can you see that?
5  A.  Yes.
6  Q.  What were those new sources?
7  A.  My Lord, I've no idea.
8  Q.  And it reads on:
9          "At the moment, KM's strategy in the US is to spread
10     human rights violations allegations against the client ."
11         Can you see that?
12 A.  Yes.
13 Q.  Then a bit further on down it says:
14         "According to our sources, KM's US lawyer,
15     Kirby Behre ... hired a consultant ..."
16         What are the sources that are being referred to
17     there, Mr Page, can you tell his Lordship?
18 A.  My Lord, I can't answer the question.  I have never
19     asked, nor would I ask, unless I had reason to ask, "Who
20     actually are you talking to?", because, as I explained
21     in my previous evidence, I don't -- no one gives up
22     a confidential source unless required to by law.
23     A source is a source, and you don't -- because you may
24     have a source that is in a very difficult position, and
25     if they are to disclose to a third party who that source

                              121

1      is, you may end up compromising your source.
2          So, for example, my Lord, during the investigation
3      of Khater Massaad I had a source within Lebanese
4      intelligence .  He was sharing information that he was
5      getting from Lebanese intelligence -- because it was
6      a quid pro quo.  I was giving him information, he was
7      giving me.
8          If I were to give up the source, bearing in mind we
9      are talking about links to Hezbollah, there is a good
10     possibility that my source may actually suffer physical
11     harm, so therefore I am -- as my colleagues are -- I am
12     overprotective of my sources.  And it's well founded and
13     it's something that has been drilled into me and
14     disciplined in me since I've been in this industry for
15     a number of years.
16 Q.  It's right, isn't it, Mr Page, that information
17     concerning Mr Azima's alleged management of Massaad's
18     team in the US, including as to the advisers that were
19     working for the team, was likely to be confidential
20     information?
21 A.  No.
22 Q.  And what's been described here, I suggest, Mr Page, is
23     the procurement on behalf of -- the procurement as part
24     of this project of confidential information --
25     information confidential to Dr Massaad or Mr Azima or

                              122

1      others.
2  A.  No.
3  Q.  And advisers are likely to be agents, aren't they, owing
4      a duty of confidence to their principal?
5  A.  To my knowledge, this information that's contained in
6      this report was provided by someone who had had a lunch,
7      a social gathering, with somebody else within this team,
8      and -- pardon my expression, my Lord -- had spilled the
9      beans.  We didn't -- we just wanted to ascertain what --
10     if there was any substance to what His Highness
11     believed, that Khater Massaad was working with
12     a relative of His Highness to create damage and harm to
13     his reputation.
14 Q.  It's likely, isn't it, that a plan or strategy of
15     Dr Massaad's in relation to, for example, to some human
16     rights concerns or campaign, that is likely to have been
17     confidential to Dr Massaad, isn't it -- likely to be?
18 A.  No, because I'm sure that on the internet there's
19     a thing called, I think -- well, Amnesty International
20     certainly , but Banged Up in Dubai talk about numerous
21     human rights abuses in the UAE.  So the fact that
22     Khater Massaad was privy to allegedly human rights
23     abuses is probably something that's reported in open
24     source, I would believe.
25 Q.  How do you think, Mr Page, that Dr Massaad's team came

                              123

1      to suspect that there was an information leak?  What did
2      you understand to be the reason that, if you like --
3  A.  My Lord, it's very simple.  As I said, His Highness had
4      good reason to believe that his information had been
5      compromised, so, therefore, it follows that they may
6      have -- somebody may have conducted a covert operation
7      into His Highness' palace, the RAK prosecutor's office ,
8      which was fed back to Khater Massaad.
9          Now, my Lord, I can tell you that to this day or --
10     sorry -- that there's certainly -- during the course of
11     my investigation into Khater Massaad, it is clear that
12     Khater Massaad maintains contacts within Ras Al Khaimah
13     that is feeding in information and we're getting that
14     from human intelligence sources.
15         So, my Lord, I'm trying to make the point is we were
16     well founded in our belief that there's -- something was
17     really amiss within the security of the Palace and the
18     RAK prosecutor's office and perhaps in RAKIA.  I'm just
19     repeating what I said previously.
20 Q.  Could you go to page 16 of this document, please
21     {H7/299/16}, which is the summary.  It's the summary:
22         "As we reported above ..."
23         Can you see that?
24 A.  Yes.
25 Q.  You're reporting here, aren't you, for the benefit of

                              124

1      the Ruler and for RAK, basically, aren't you?
2  A.  Yes.
3  Q.  And that would include RAKIA?
4  A.  Correct.
5  Q.  You say this:
6          "As we reported above, KM's US team has a certain
7      plan to smear RAK and its Ruler with human rights
8      allegations ."
9          That would be a serious concern, wouldn't it, at
10     that time, to the Ruler?  It would go beyond merely --
11     it would go on --  it would go beyond merely a concern
12     about what you've alleged to be some information leak in
13     the Palace, wouldn't it, Mr Page?
14 A.  No, that's not correct, my Lord.  Given that as far back
15     as 2008/2009 his step-brother -- sorry, his
16     half-brother, Sheikh Khalid, had produced a report
17     criticising His Highness and the way His Highness acted
18     as the Crown Prince.
19         It goes -- therefore follows that of course he would
20     be concerned if there was going to be a campaign against
21     him, but it would be following -- and again, my Lord,
22     it's on the internet if anyone wants -- it's called the
23     "Rogue Report", and if anybody wanted to follow it
24     through, this would make sense, that this is where they
25     tried to discredit His Highness.

125

1  Q.  Mr Page, have I understood your evidence correctly?  Is
2      it your evidence that the Ruler was concerned that his
3      half-brother was in cahoots with Dr Massaad to start
4      some campaign against the --
5  A.  That is not my evidence.
6  Q.  Don't interrupt, please.  Don't interrupt, please.
7          I understand your evidence to be that the Ruler was
8      concerned, as you understood it, that his half-brother
9      was in league with Dr Massaad and that together they
10     were mounting some campaign in order to destabilise
11     the Ruler and RAK.  I think that's a summary of what
12     you've said today.
13 A.  My evidence is that a member of his family, which is
14     what I raised with my Lordship before we broke for
15     lunch.
16 Q.  But the concern of the Ruler was that there was a plot
17     to destabilise him and RAK; in other words, to
18     destabilise his Rulership of RAK.  Is that right?
19 A.  Yes.
20 Q.  That would be something of enormous concern to
21     the Ruler, wouldn't it?
22 A.  Well, it would not only be of great concern to the
23     Ruler, it would be of great concern to the federal
24     government.  The Emirate of Ras Al Khaimah is a federal
25     emirate and anybody who tried to destabilise an emirate

126

1      would be guilty of a very serious criminal offence in
2      UAE.
3  Q.  What would happen to them?
4  A.  I have no idea.
5  Q.  There's an ominous tone there when you said that.  What
6      would happen to them?
7  A.  I have no idea.  I imagine trying to plot a coup d'état
8      would have serious consequences.  What that would mean,
9      I don't know.  I'm not familiar --
10 Q.  Capital consequences?
11 A.  Well, I'm not familiar with UAE law so I can't answer
12     you.
13 Q.  So his Lordship can take it -- if you wouldn't mind
14     answering the question as well -- that the Ruler would
15     have been very, very exercised by this alleged plot
16     against him?
17 A.  You mean concerned?
18 Q.  Yes.
19 A.  Well, I would imagine so, but he never voiced those
20     concerns to me.
21 Q.  I suggest that's not true, Mr Page.
22 A.  What is not true?
23 Q.  You spoke to the Ruler about various matters at this
24     time and you're saying that the Ruler didn't express to
25     you concerns about what we see you writing about on

127

1      these three or four pages in this report?
2  A.  No.
3  Q.  Is that what you're saying to his Lordship?
4  A.  His brief to me was that, "I believe that my family
5      member may be working with Khater Massaad". We didn't
6      stray into, "They're trying to plot my overthrow".  We
7      didn't -- what I can say on oath, my Lord, is it is
8      apparent that His Highness has great concerns about what
9      is going on within his emirate because, during the time
10     at which I served him, I have seen that he has enhanced
11     considerably the security at the Palace.  For what
12     reason, I cannot comment.  But I had seen it at my first
13     hand.  I go to the Palace.  When I first went to the
14     Palace in 2015, there were no armed security at the
15     Palace.  To this day there are armed UAE soldiers
16     guarding his palace.
17 Q.  Mr Page, can you answer the question rather than give
18     sort of lengthy speeches all the time?
19 A.  I'm sorry.  Please ask your question again.
20 Q.  I'm going to take longer, I'm afraid, because if you
21     look at the transcript, I ask you a question and then
22     you give a very long answer.
23 A.  I beg your pardon, my Lord.
24 Q.  Now, you can give a long answer, but do please try to
25     answer the question.

128

1  A.  I understand, my Lord.
2  Q.  I was asking you about the -- what we see in the project
3      update, the three and a half pages that refer to
4      Mr Azima, they do so, don't they, in terms that Mr Azima
5      is apparently managing Dr Massaad's US team? That's
6      right, isn't it?
7  A.  That's what the report says, yes.
8  Q.  And this report records that this team is in effect
9      working on Dr Massaad's side of things, doesn't it?
10 A.  That is correct.
11 Q.  And I think from your evidence the concern was -- there
12     was a concern with the Ruler that actually this was part
13     of some attempt to threaten the Ruler's stability and
14     position.
15 A.  No, I would not say that.
16 Q.  And I suggest that that was the case, Mr Page, and that,
17     since that was the case, the Ruler would have been very,
18     very focused on anybody whom the Ruler suspected of
19     being part of that alleged plot.
20 A.  That is not correct.
21 Q.  That's fair, isn't it, Mr Page?
22 A.  No, I think the Ruler's concern was that information
23     regarding the ongoing investigation into
24     Dr Khater Massaad and the case being prepared by the RAK
25     prosecutor was being shared outside the confines of his

                           129

1      organisation.
2  Q.  And, Mr Page, if we go to {H7/299/16} -- I think we can
3      go through this little paragraph:
4          "As we reported above, KM's US team ..."
5          That was viewed by the authors of this report to be
6      being managed by Mr Azima, wasn't it?
7  A.  Yes.
8  Q.  So we can read it as follows, if for "KM's US team" we
9      replace -- if we replace "KM's US team" in this
10     paragraph with "KM's US team managed by Mr Azima", we
11     can read as follows:
12         "As we reported above, KM's US team, managed by
13     Mr Azima, has a certain plan to smear RAK and its Ruler
14     with human rights allegations. As far as we know, at
15     this point, they do not have any evidence to back up
16     these allegations, but they started gathering
17     information for a campaign, based on hearsay and
18     testimonies, and started searching for a platform to
19     make it public. The campaign is not public yet, so we
20     will be able to gather intelligence on their progress in
21     order to monitor their activities and attempt to contain
22     or ruin their plans."
23         Now, Mr Page, the reference to "their progress" and
24     "their activities" and "their plans" is a reference to
25     KM's US team managed by Mr Azima, isn't it, Mr Page?

                           130

1  A.  It is.
2  Q.  Thank you, Mr Page. And it follows from that, doesn't
3      it, that what you put in train on behalf of RAK and
4      RAKIA or the Ruler at this time was some serious
5      intelligence-gathering on the US team and Mr Azima,
6      didn't you?
7  A.  Correct, using human intelligence sources.
8  Q.  And I suggest that you wouldn't have stopped at human
9      intelligence sources, Mr Page. You would have been
10     content to use illegal intelligence-gathering services
11     in order to achieve the information that you were
12     required to produce for the Ruler.
13 A.  With respect, no, because this operation actually --
14     this part of my mandate ended shortly after we produced
15     this report.
16 Q.  And there's no evidence, is there, Mr Page, that you
17     produce -- there's no project update that we've
18     seen in which there's any suggestion that the
19     intelligence-gathering and monitoring we see referred to
20     here have been brought to an end?
21 A.  Well, it was brought to an end because, my Lord, we
22     decided -- in and in discussions with His Highness -- that
23     the source that we was using for this -- to obtain this
24     information might be compromised. So for his own safety
25     we decided to withdraw continuing to obtain information

                           131

1      in respect of this campaign.
2  Q.  What did you understand the intelligence-gathering would
3      comprise, then? Just human sources; is that right?
4  A.  Yes, human sources. I mean, if you are to mount
5      a campaign of this -- of that described in my report,
6      Dr Massaad would have been talking to PR agencies,
7      corporate communications. We have a number of sources
8      which we had used in the Khater Massaad -- I beg your
9      pardon -- in the Sheikh Khalid investigation, who would
10     hear -- I mean a mandate -- I apologise if I'm teaching
11     you to suck eggs. Under US law, if you work for a --
12     against the interests of a foreign government, you are
13     required to register that with a certain organisation in
14     the United States. So therefore we were seeking to see
15     whether any of the main PR agencies had registered an
16     interest representing Khater Massaad or whoever to go
17     after His Highness.
18 Q.  Mr Buchanan gave evidence that you were being paid
19     directly by the Palace in 2015 and 2016. Is that right,
20     Mr Page?
21 A.  That is correct.
22 Q.  Mr Buchanan gave evidence that in 2017 to 2018 you were
23     being paid about US $300,000 per quarter. Would that be
24     right?
25 A.  That's -- well, from my knowledge. I can't -- without

                           132

1  referencing my invoices -- if he says that, he would
2  have been authorising my invoices, so perhaps he's got
3  the better handle on this than I have.
4  Q. How much were you being paid in 2015 for this work?
5  A. Again, my Lord, it would vary.  It would be 100,000
6  a month, it might be -- it depended on the scope of work
7  that we were undertaking.  I mean, bear in mind that we
8  were working, my Lord, in 14 or 15 jurisdictions.
9  That's a lot of resources to commit, and not only
10  consultancy fees or contractors' fees, there's travel
11  costs, etc, etc.  So I -- honestly, my Lord, I can't
12  give you a figure because I just don't know it without
13  referencing material which I don't have before me.
14  Q. Can you be shown [H7/268], please, Mr Page?  Bear in
15  mind that that project update is 26 March 2015.  Do you
16  think it likely that the Ruler -- sorry, go to [H7/268]
17  first.
18  Mr Buchanan gave evidence that one of the prompts
19  for the emails -- you'll see there's some emails in
20  early April 2015, [H7/268].
21  A. Do you wish me to read them?
22  Q. I just want you to -- now you've got the page, listen to
23  the context.  You know context is important.  If I could
24  set some context for once and then I'll ask you the
25  question.

133

1  Mr Buchanan gave evidence that the March project
2  update report that I have just taken you to was, he
3  thought, one of the prompts for what we see in these
4  emails referred to as "the Ruler's instruction in
5  relation to Mr Azima"; all right?
6  A. If you say so, my Lord.  I'm not familiar with this
7  correspondence.
8  Q. No, and you've got no basis to challenge that, have you?
9  A. I've never seen it, my Lord, so I don't know -- I'm
10  not -- the only person I reported to was His Highness
11  directly or Jamie Buchanan.  I had no idea what the
12  internal politics were within the Palace about what was
13  going to be decided or not decided.  It's not part of my
14  mandate.
15  Q. No.  So at the foot of the page Mr Buchanan says this to
16  Mr Handjani on 4 April 2015:
17  "Good afternoon.  HHSS had wanted us to target FA --
18  on what basis would we do this?"
19  Can you see that, "to target"?  And "FA" is
20  a reference to Farhad Azima; all right?
21  A. I see that, my Lord.
22  Q. If you go on, please, to [H7/273], you will see some
23  more emails on 4 April 2015, featuring Mr Bustami,
24  Mr Handjani and Mr Buchanan.  Can you read that,
25  Mr Page?  (Pause)

134

1  A. Yes, I've read it.
2  Q. And you can see that Mr Bustami says this:
3  "I have had few discussions with boss [that's
4  a reference to the Ruler, Mr Page] about FA and he is
5  adamant that we bring charges against him."
6  And then a bit later on it says:
7  "He wants me to get you on the case to file some
8  sort of charges against Farhad."
9  And then later on:
10  "When are you next in town so that me and you and Jamie
11  could hook up and coordinate our attack."
12  Do you see that, Mr Page?
13  A. I can, my Lord, yes.
14  Q. And you at this time -- you had meetings, didn't you,
15  with Mr Buchanan and the Ruler?
16  A. That is correct.
17  Q. And I put it to you, Mr Page, that you would have been
18  made aware at or around that time that the Ruler was
19  adamant that charges should be brought against Mr Azima.
20  That's right, isn't it?
21  A. Absolutely not, my Lord.
22  Q. And you would have been made aware that the Ruler wanted
23  to target Farhad Azima?
24  A. Absolutely not, my Lord.
25  Q. And you would have been made aware that one -- that you

135

1  were -- in effect, that you were being instructed to
2  obtain information on Mr Azima because the Ruler wanted
3  that to be done?
4  A. No, my Lord.  I already said I was never instructed by
5  His Highness or anybody else in Ras Al Khaimah to
6  conduct an operation or investigate Farhad Azima, and
7  that is my evidence.
8  Q. If you go to [H7/464], please, you'll see an email on
9  20 July 2015.  Have you got that, Mr Page?
10  A. Not yet.  (Pause)
11  Q. Have you got that?
12  A. Yes, I have, my Lord, yes.
13  Q. You can see that on 19 July 2015 -- it's the bottom
14  email -- Mr Buchanan sent this email, saying:
15  "NB [that's Mr Bustami] says the Boss wants criminal
16  stuff taken out of [the] letter and to go after FA ..."
17  Can you see that?
18  A. I can, my Lord, yes.
19  Q. And "FA" is a reference to Mr Azima; all right?
20  A. It must be, my Lord, yes.
21  Q. Yes, it must be.  So it looks, doesn't it, Mr Page, as
22  if, in July 2015, the Ruler was still letting it be
23  known that he wanted Mr Azima to be gone after?
24  A. My Lord, I can't possibly comment.  I had no
25  instructions from His Highness to go after Farhad Azima.

136

1    What His Highness was talking about I have no
2    comprehension.
3 Q. And I suggest, Mr Page, you were having -- you were
4    involved with the Ruler and Mr Buchanan at that time,
5    weren't you?
6 A. In 2015?
7 Q. Yes.
8 A. Yes, that is correct, my Lord.
9 Q. And you were working on the project for them,
10    weren't you?
11 A. I was working on the mandate as described in my witness
12    statement.
13 Q. And that project included, didn't it, concerning
14    yourself with the alleged campaign by Dr Massaad and his
15    associates?
16 A. I just said in evidence previously we shut down that
17    particular project as early as April because to continue
18    with the project would have compromised the source and
19    I have said we decided not to continue with it because
20    it was not necessary.
21 Q. And I suggest that you would have been told that your
22    remit to target Mr Azima by getting information for the
23    Ruler had become all the more important as at July 2015.
24 A. My Lord, I report what -- I said it once and I will say
25    it again. I was never instructed by His Highness or any

137

1    of his advisers to target, investigate -- and by
2    "target", I don't know what that means -- Farhad Azima.
3 Q. And I suggest that around about July, when it was made
4    plain to you that the Ruler still wanted Mr Azima gone
5    after, you would have redoubled your
6    intelligence -gathering efforts on Mr Azima.
7 A. Absolutely not, my Lord. I wasn't doing anything
8    against Farhad Azima. Why would I double something I'm
9    not doing?
10 Q. And I suggest that around about October and
11    November 2015 you caused or procured the hacking of
12    Mr Azima's emails through spear-phishing attacks on his
13    data.
14 A. Absolutely not, my Lord.
15 Q. And that you continued to procure illegal access to
16    Mr Azima's data through 2016?
17 A. Absolutely not, my Lord.
18 Q. And you made that illegally obtained information
19    available to those you were working for, namely
20    the Ruler, RAK and RAKIA?
21 A. I did not, my Lord.
22 Q. Can we go, please, to paragraph 16 of your witness
23    statement at page {D/3/5}? You refer there to
24    a conversation you allegedly had with Mr Buchanan.
25 A. Yes.

138

1 Q. And you placed this in 2016.
2 A. Yes.
3 Q. And you say in paragraph 15:
4    "During that conversation, Jamie asked me to keep my
5    ears and eyes open for anything I heard about a negative
6    publicity campaign that might be damaging for RAK."
7    Do you see that?
8 A. Yes, I do.
9 Q. We've seen, haven't we, Mr Page, that a negative
10    publicity campaign that might be damaging for RAK was
11    something that you were looking at back in March 2015,
12    as recorded in that project update?
13 A. No. The instructions from His Highness in January of
14    2015 were to establish whether Khater Massaad was
15    working in collaboration with a member of his family to
16    orchestrate obtaining information illegally from his
17    palace, understanding the strategy, understanding the
18    investigation. It was not about ascertaining if there
19    was a plan to launch a smear campaign. That came as
20    a result of our -- we think outside the box, and it just
21    happened, in trying to understand whether Khater Massaad
22    was working against His Highness' interest with a member
23    of his family, we developed a source who gave us this
24    information which is in the report. We were never
25    mandated to go after it. It's something that we used as

139

1    part of the ongoing investigation into the link between
2    Khater Massaad and a member of His Highness' Royal
3    Family.
4 Q. And in paragraph 16 you say this {D/3/5}:
5    "Following this conversation with Jamie, I spoke to
6    a few contacts I use occasionally in the investigations
7    business, journalism and PR industry and asked them to
8    keep their ear to the ground."
9    Now without giving a lengthy speech, please,
10    Mr Page, who were the contacts you're there talking
11    about?
12 A. I cannot remember.
13 Q. You can't remember?
14 A. I cannot remember.
15 Q. Including the contacts in the investigations business,
16    you can't remember?
17 A. My Lord, the --
18 Q. Can you remember or not?
19 A. I cannot remember.
20 Q. I suggest, Mr Page, that what you're talking about in
21    paragraphs 15 and 16 were simply a continuation of the
22    intelligence -gathering and monitoring project that we
23    saw evidenced in the March 2015 project update.
24 A. Absolutely not. Absolutely not, my Lord.
25 Q. I'm going to ask you about the alleged discovery of this

140

January 29, 2020          Ras Al Khaimah Investment Authority v Farhad Azima          Day 6

**141**

1  data in August 2016. You claim, Mr Page, don't you,
2  that you learnt of the hacked data on the internet
3  through Mr Halabi?
4  A. That is correct.
5  Q. And you give evidence there in paragraph 18 (D/3/5-6].
6  Can you see that?
7  A. Yes.
8  Q. You were in court today, weren't you, when Mr Halabi
9  gave his evidence --
10  A. I was, my Lord.
11  Q. -- and when he indicated the way in which he came by
12  this information?
13  A. I was, my Lord.
14  Q. And it's right, isn't it, that by the time Mr Halabi
15  came by this information, you had worked for many, many
16  months using the expert services of Insight,
17  a specialist Israeli outfit?
18  A. Absolutely not, my Lord.
19  Q. Had you stopped using Insight by August?
20  A. No, they were working on the mandate that we were given
21  by Mr Buchanan in March of 2015, which was to
22  investigate Khater Massaad's links to Iran, Hezbollah --
23  it's in my evidence -- but Iran, Hezbollah, we were
24  looking at -- we were looking in Kyrgyzstan, I was
25  looking in DRC, I was looking in -- all over the place,

**142**

1  at least six or seven jurisdictions, my Lord. But we
2  were not looking at Dr Farhad -- sorry, correction -- we
3  were not looking at Farhad Azima.
4  Q. So I suggest, Mr Page, that if you had Insight, with all
5  its expertise, information-gathering for you at that
6  time, if there was something interesting and new
7  concerning Mr Azima or the alleged campaign that he was
8  involved in for Khater Massaad, you'd have got wind of
9  it straightaway from someone like Insight, wouldn't you,
10  Mr Page?
11  A. No, my Lord, they had a limited mandate and it's in my
12  evidence. Jamie asked me to do this not as a mandate.
13  I was not mandated. I was not paid. Just, "If you're
14  out and about, keep your eyes to the -- ears to the
15  ground in case you hear anything". That was it and they
16  were never mandated by me to do that, because had
17  I mandated them, they would have been paid. I was not
18  being paid for this.
19  Q. I suggest, Mr Page, that the alleged involvement of
20  Mr Halabi in relation to discovering this hacked data is
21  entirely invented.
22  A. My Lord, no, it's not. That is -- Mr Halabi and I have
23  had a long-standing relationship. This mandate -- and,
24  my Lord, just to answer your question that you raised to
25  me, I do not -- I am not computer literate. I'm

**143**

1  embarrassed to say that I'm a dinosaur. I do not use
2  the computer. Because this was going to be searches in
3  the Arabic language, Mr Halabi was one of the people
4  that I reached out for.
5  Q. And I suggest that you have used Mr Halabi -- that you,
6  rather, asked Mr Halabi to sign a statement claiming he
7  found this hacked data in order that Mr Halabi could
8  serve as some source for that discovery --
9  A. That is not true, my Lord.
10  Q. -- in order to place the source of that discovery at
11  least one step further removed from you and/or the
12  people working for you.
13  A. My Lord, I'm repeating what I said. I was never
14  mandated by His Highness, by any of His Highness'
15  advisers, to go after Farhad Azima. So I can't answer
16  the question any farther. I'm telling you that I was
17  never mandated and that's on oath.
18  Q. And I put it to you, Mr Page, that you arranged for
19  Azima's confidential data, that by this stage had been
20  illegally obtained by or through your offices, to be
21  published online in August 2016.
22  A. Absolutely not, my Lord.
23  Q. And you were working for RAK and/or RAKIA and the Ruler
24  at that time, weren't you?
25  A. Well, I would say, my Lord, I was actually working for

**144**

1  His Highness, not RAK or RAKIA. I was working for the
2  Government of Iraq, of which His Highness is the Ruler.
3  Q. And the Government of Iraq ultimately --
4  A. I beg your pardon, "RAK", nor "Iraq".
5  Q. Yes, and RAKIA is the investment authority of the
6  RAK Government?
7  A. That is my understanding, my Lord.
8  Q. And you would have been aware that there was a plan
9  afoot there to ruin Mr Azima through some sort of
10  offensive which RAKIA had by then launched?
11  A. No, my Lord, I was not privy to any of those
12  conversations with His Highness' advisers.
13  Q. Who else did you tell about the hacking of Mr Azima's
14  data, please? Who did you tell about that?
15  A. As outlined in my statement.
16  Q. I'd suggest that you illegally obtained that data and --
17  did you discuss the illegal obtaining of it with
18  anybody?
19  A. I didn't obtain the information illegally so I'm not
20  sure who I would have discussed it with.
21  Q. Can I ask you, by August 2016 the negotiations between
22  RAK and RAKIA and Dr Massaad had broken down, hadn't
23  they?
24  A. I believe so, my Lord, but again I'm not party -- I'm
25  not privy to that sort of conversation.

1   Q.   And by the end of September litigation had been started,
2        hadn't it, by RAKIA against Mr Azima?
3   A.   Again, my Lord, I'm not privy to that type of -- I'm not
4        part of the litigation team.
5   Q.   Are you aware of what, if any, campaigning has been
6        carried out on behalf of RAK or RAKIA since
7        September 2016 against Mr Azima?
8   A.   Sorry, my Lord --
9   Q.   Since --
10  A.   No -- sorry -- by "campaigning" you mean what?
11  Q.   I mean online campaigning, I mean spreading stories,
12       trying to promulgate stories adverse to Mr Azima --
13       stories adverse to Mr Azima.
14  A.   I am aware that they hired media communications
15       consultants, but what their mandate was is not within my
16       knowledge, my Lord.
17  Q.   So you don't know what, if any, steps RAK or RAKIA took
18       to mount some sort of publicity campaign against
19       Mr Azima since that date; is that right?
20  A.   My Lord, I'm not privy to that type of information.
21  Q.   What have you done for RAK or RAKIA since August 2016?
22       What services have you performed since then?
23  A.   Continued to investigate Khater Massaad; I have
24       continued to look at issues involving their dispute in
25       Georgia; I have continued to look at issues in

145

1        Kyrgyzstan where money went missing; I have continued to
2        look at money that went missing in India; I have
3        continued to look at money that went missing in
4        I believe Bulgaria -- it may be Romania, my Lord,
5        I can't remember; and, more importantly, the Iranian
6        issue. But that is really of great concern to the
7        Government of Ras Al Khaimah.
8   Q.   It's right, isn't it -- if you want to go in your
9        witness statement, please, Mr Page, to {D/3/6} --
10  A.   Sorry, which?
11  Q.   If you go to paragraph 20, please.  Start at
12       paragraph 19, please, Mr Page.
13  A.   Yes.
14  Q.   Thank you.  You say in paragraph 19 -- this is your
15       account that Mr Halabi called you.  Do you remember
16       giving -- well, you've given evidence of that in
17       paragraph 19.  Can you see?
18  A.   Yes, I vaguely remember he called me, yes.
19  Q.   You say in paragraph 20:
20           "When I received this information from Majdi,
21       I would have picked up the phone to Jamie although I do
22       not specifically remember doing so."
23           Do you remember that?
24  A.   Yes, I do remember that.
25  Q.   And then a bit later on you say:

146

1            "I believe I spoke to Jamie first because he was my
2        client and that he asked me then to contact Neil Gerrard
3        at Dechert and let him know what I had heard but it may
4        have been the other way round.  I think I may have
5        spoken to them more than once in this period.  I do not
6        recall how I provided them the links that Majdi had
7        given to me."
8            Can you see that?
9   A.   That is my recollection, my Lord.
10  Q.   Then you go on to say:
11           "I do not know what Jamie and Neil did with the
12       information ..."
13           Can you see that?
14  A.   No, I passed on the information -- as I said, this was
15       not a mandate from Mr Buchanan. This was, "Please have
16       a look". I found it. I passed it on. That was my --
17       the end of my involvement in that particular exercise,
18       which again was not a mandate. It was just, "Can you do
19       this?"
20  Q.   So after you had passed on this information to
21       Mr Buchanan and Mr Gerrard for the first time -- after
22       you'd initially passed it on -- that was the end of your
23       contacting them in that regard?
24  A.   Other than that I am aware, because I am aware, that
25       they hired a specialist -- computer forensic specialist

147

1        to download the material. Other than that, I'm not
2        aware of -- and I am aware, my Lord, that Decherts have
3        reviewed, interrogated the information, but other than
4        that, I'm not aware of anything else.
5   Q.   But as far as you're concerned, Mr Halabi gave you the
6        information, the two links, you then passed it on the
7        phone to Messrs Buchanan and Gerrard or one or both of
8        them; is that right?
9   A.   Yes, that's correct, my Lord.
10  Q.   And you didn't pass on any further links to either of
11       those gentlemen subsequently?
12  A.   My Lord, I run at that time a company turning over --
13       I am the chairman of a company turning over £27 million
14       a year. I am running complex contracts in hostile
15       environments. This was a favour for Mr Buchanan. It
16       was not -- I didn't keep -- it was literally, "Can you
17       do it?", I passed the information on and that was it.
18       I don't recall, I could not possibly recall,
19       four years -- nearly four years down the road or
20       something, my Lord -- four years after the event, what
21       exactly was said and what I said and who I said because
22       I run a very big organisation. I'm the chairman of the
23       group.
24  Q.   Could you go, please, to {G/26.10}?
25  A.   Yes, I have it in front of me.

148

1  Q.  This is a copy of the judgment of Mr Justice Rix, as he
2      then was, in Dubai Aluminium v Sayed Reyadh Sayed
3      Abdulla --
4  A.  "Riyadh".
5  Q.  I defer to you, Mr Page.  3 December 1998.
6          You'll recollect this case, won't you, Mr Page?
7  A.  Yes, it was one of the first cases I did with the -- for
8      the Government of Dubai.
9  Q.  And if we go, please -- I don't think we need to bother
10     with the case except for the way it deals with your role
11     in it.  If you go to [G/26.10/4] please -- that's the
12     fourth page of this --
13 A.  Yes.
14 Q.  -- can you see what Mr Justice Rix records from lines 19
15     down to 31, please?
16 A.  Yes, I can read it, yes.
17 Q.  Have you read it?
18 A.  Yes, I'm familiar with it because --
19 Q.  You're familiar with it?
20 A.  Yes.
21 Q.  And that's a reference to you, Mr Page, isn't it, in
22     that page?
23 A.  It is, my Lord, yes.
24 Q.  And there was evidence, wasn't there, filed through an
25     affidavit before Mr Justice Rix, in relation to this

149

1      particular application, "... that information in
2      relation to certain of Mr Al Alawi's accounts had been
3      obtained by a sub-agent instructed by Page Associates
4      making what Mr Page of that firm called 'pretext calls'
5      to the banks concerned ..."
6          Do you see that?
7  A.  Yes, my Lord.
8  Q.  And from your evidence today, it sounds as if you don't
9      think making pretext calls to banks would be unlawful;
10     is that right?
11 A.  My Lord, my instructions to my agent at the time
12     I commissioned them to conduct the work into
13     Mr Al Alawi, who by, my Lord -- at that point was
14     subject to a criminal investigation both in Dubai and
15     Switzerland, was to undertake investigations.  I had no
16     knowledge until this case arose as to how they obtained
17     that information.
18 Q.  What's the answer to my question?
19 A.  That I -- sorry, was your question did I authorise
20     pretext calls?
21 Q.  I said that from your evidence today it sounds as if you
22     didn't think that making pretext calls to banks to
23     obtain information would be unlawful.
24 A.  Sorry, I said -- I did not say I did not think it was
25     unlawful.  I'm saying that my instructions to my agents,

150

1      both in the United Kingdom and in Switzerland, were to
2      obtain the information.  I at all times --
3  Q.  What's the answer?  You seem to have given the same
4      answer again not to my question.  What's the answer to
5      my question?
6  A.  You're asking me the question did I authorise or
7      sanction --
8  Q.  No, I didn't.  I didn't ask you that.  I asked you
9      whether you thought making pretext calls to the banks in
10     the way that Mr Justice Rix describes and with which you
11     must be familiar -- whether you think that's unlawful or
12     not.  You, Mr Page, here today, what do you think about
13     it?
14 A.  Yes, Mr Justice Rix said it was unlawful.  I cannot
15     argue with the decision of Mr Justice Rix.
16 Q.  So it's only because he made that finding that you think
17     it's unlawful, is it?  You didn't think independently --
18 A.  No, no, I'm sorry, my Lord.  I did not instruct my
19     agents to obtain information illegally by pretext
20     information.  I only became aware of it when this case
21     came before Mr Justice Rix.  My instructions to my
22     agents then and to this day is: you operate within the
23     law.
24 Q.  I'm sorry, Mr Page, I suggest that's not truthful and
25     that you would -- that you are perfectly happy to nod

151

1      and wink at sub-agents so that they get information by
2      whatever means necessary.
3  A.  My Lord, this was an enormously complex investigation
4      involving what I would only describe as an organised
5      crime gang working within Dubai Aluminium.  I did not
6      commission or authorise them to do it.  I accept
7      unreservedly that this is in breach of the law as
8      prescribed in Mr Justice Rix's decision, for which
9      I have apologised to the court, but I can say no more on
10     it.  It was not something I sanctioned; it came out
11     after the event.
12 Q.  If we go to [G/26.10/5], can you read lines 16 to 27,
13     please, Mr Page?
14 A.  Sorry?
15 Q.  It starts:
16         "This evidence is not answered on behalf of Dubai."
17         Can you see?
18 A.  Oh, sorry, you're talking -- all right.
19 Q.  Lines 16 down to 27.
20 A.  Yes, understood.
21 Q.  That's all right.  Just read that to yourself, please.
22     (Pause)
23 A.  Yes, I can see what it says, yes.
24 Q.  Mr Justice Rix found, didn't he, that there was a strong
25     prima facie case of criminal or fraudulent conduct in

152

January 29, 2020          Ras Al Khaimah Investment Authority v Farhad Azima          Day 6

1    the obtaining of such information concerning
2    Mr Al Alawi's accounts?
3  A.  I accept that, my Lord, yes.
4  Q.  And that was something which had arisen as a result of
5    your use of the sub-agent to get information for
6    a client?
7  A.  That is correct, my Lord, yes.
8  Q.  Can we go, please, to {G/26.15}? Have you got that,
9    Mr Page?
10  A.  Yes.
11  Q.  Do you see that?
12  A.  Yes.
13  Q.  This is a piece by the Hindustan Times on December 15,
14    2015. You can see what it says:
15      "BCCI wants all details of snooping from UK firm.
16    "With the previous cricket Board secretary
17    Sanjay Patel clarifying his position on the payment of
18    US$900,000 ... made in 2013-2014 for a controversial
19    surveillance that is being alleged was aimed at fellow
20    officials, the focus has shifted to the UK-based
21    security and investigations company, Page Protective
22    Services (PPS) that carried it out."
23      Can you see that, Mr Page?
24  A.  I can, my Lord, yes.
25  Q.  You can see that the article then runs on over the page.

153

1    If you go to the second page, please, {G/26.15/2}, you
2    can see -- if you just read it to yourself and then I'll
3    ask you some questions.
4  A.  I'm familiar with this publication, my Lord.
5  Q.  Yes. So what this piece suggests is that there was
6    going to be some enquiry into work which your company
7    had carried out in relation to a certain Indian cricket
8    board; is that right?
9  A.  That is correct, my Lord, yes, although the company is
10    actually -- the article is -- the name of the company
11    that undertook the work is not PPS UK.
12  Q.  And is it right that you carried out the surveillance
13    that's referenced here, you or your firm?
14  A.  My Lord, I'm in some difficulty again. This is -- the
15    instructions from the BCCI, the Board of Cricket Control
16    in India, is a confidential instruction between myself
17    and the then chairman of the board. I'm not sure --
18    I know the article refers -- I'm not sure, my Lord, I'm
19    at liberty to tell you what my instructions were or the
20    background to this instruction. It's -- my Lord, I'm
21    being asked to breach confidentiality again and I don't
22    feel very comfortable about it.
23  Q.  And one of the quotes here is {G/26.15/2}:
24      "'If this is the case, we are interested to find out
25    from where and how email exchanges between

154

1    Shashank Manohar (BCCI president) and Lalit Modi and the
2    secretary's (Anurag Thakur) pictures with an alleged
3    bookie were generated and circulated to a section of the
4    media', said the official ."
5      There was a concern, wasn't there, about the illegal
6    obtaining of emails and their disclosure to the press?
7    Is that right?
8  A.  No, because at that time, my Lord, Lalit Modi was under
9    investigation by what is called the "CBI", which is the
10    Central Bureau of Investigation, ie the Indian
11    equivalent of the FBI, in relation to criminal activity.
12    I have no idea whether they sought to get information
13    from Lalit Modi, but the reference to -- this is not
14    something I took part of.
15  Q.  Were you involved in any alleged illegal obtaining of
16    emails at this time?
17  A.  No, my Lord.
18  Q.  Can I ask you finally, please, to go to {H10/353},
19    please, where you'll see a copy of a judgment of
20    Sir Andrew Smith in the case called
21    JSCBTA Bank v Ablyazov and others. Can you see that,
22    Mr Page?
23  A.  I can, my Lord, yes.
24  Q.  I'm sure you're familiar with this litigation, aren't
25    you, enough --

155

1  A.  Relatively so, yes.
2  Q.  This records a judgment of Mr Justice Smith on
3    15 February 2018. You can see from paragraph 1 he
4    refers to the fact that this is a long-running dispute,
5    with allegations of conspiracy made by the bank against
6    the defendants, and freezing injunctions have been
7    obtained and receivership orders made against the
8    defendants in relation to this litigation; all right?
9    Then if you go to paragraph 7 at {H10/353/2}, you'll
10    see the matters before Sir Andrew Smith. Can you see
11    there?
12  A.  Yes, my Lord, yes.
13  Q.  One of the defendants had applied to challenge the
14    orders the bank had obtained on two grounds: one was
15    that there had been non-disclosure and the second was
16    that the bank did not have clean hands; all right?
17    Those were the two grounds of challenge. And the
18    learned judge dismissed those challenges, but he dealt
19    with the clean hands argument at page 21 of this
20    judgment, starting at paragraph 113 {H10/353/21}. Can
21    you see that?
22  A.  Yes.
23  Q.  And one of the defendants raised four complaints in
24    relation to the clean hands argument. You can see (i),
25    (ii), (iii), (iv). It's the fourth one. It was said by

156

```
 1   one of the defendants that the bank had:
 2        "... misled the court when applying for a disclosure
 3   order against Mr Eesh Aggarwal."
 4        Right?
 5  A. Yes.
 6  Q. It's that fourth aspect that concerns you.  If you go,
 7   please, to page 24 of this judgment, to the heading
 8   "Disclosure order against Mr Aggarwal" (H10/353/24) --
 9  A. Sorry.
10  Q. That's all right.  Take your time.
11  A. Which paragraph are you reading?
12  Q. It starts at paragraph 128.  Do you have that at the top
13   of page (H10/353/24)?
14  A. Yes.
15  Q. Paragraph 129 -- sorry, 128, this is where the judge is
16   dealing with the fourth bit of the clean hands; in
17   other words, that there's been -- the disclosure by the
18   bank has not been right.  Paragraph 129:
19        "The evidence in support of the application was
20   a statement made by Mr Tucker and dated 14 June 2016.
21   He said that the Bank had 'recently discovered that
22   Mr Ablyazov and Mr Khrapunov [had] been working [with]
23   Mr Aggarwal'.  He complained that the Bank was contacted
24   in early 2016 by a Mr Stuart Page, who had claimed to
25   act for unnamed Israeli 'hackers' who had extracted
```

157

```
 1   information from Mr Aggarwal's computer.  At a meeting
 2   with Mr Hardman and a Mr Nurlan Nurgabylov, a senior
 3   official of the Bank, on 17 February 2016 Mr Page showed
 4   documents indicating that Mr Aggarwal was involved with
 5   a number of named companies.  Mr Khrapunov's complaint
 6   is that the Bank was dishonest about when it learned
 7   about Mr Aggarwal administering Mr Ablyazov's assets and
 8   dealing with Mr Khrapunov: that it had information
 9   obtained by unlawful hacking and wanted to appear to
10   have come by the information legitimately .'"
11        Can you see that?
12  A. I can, my Lord, yes.
13  Q. And in paragraph 130 the judge goes on:
14        "It appears from Mr Jenkins' evidence ..."
15        Then that runs on.
16        Can you see the last sentence:
17        "It is said that the UAE would have responded to the
18   request and provided information about assets managed by
19   Mr Aggarwal. (According to Mr Jenkins, between
20   November 2011 and September 2013 the Republic of
21   Kazakhstan made other requests of other states for legal
22   assistance that referred to companies of which,
23   according to the Bank, it had later learned from
24   Mr Page  ...)."
25        Can you see that?  Then paragraph 134:
```

158

```
 1        "During the hearing, Mr Samek introduced an
 2   alternative version of this complaint: that the Bank
 3   knew of Mr Aggarwal's involvement with Mr Khrapunov and
 4   with Mr Ablyazov's assets through meetings that
 5   Mr Nurgabylov and Mr Rakishev had with Mr Page before
 6   the meeting in February 2016 to which Mr Tucker
 7   referred.  In support of this allegation Mr Khrapunov
 8   relied on a letter from Mr Page's solicitor ,
 9   Stewarts Law LLP ..."
10        Can you read on?  Can you read on, please, the rest
11   of paragraph 134, please, (H10/353/24-25) -- to the end
12   of 134?
13  A. Yes, my Lord.  I'm familiar with that.
14  Q. So there was evidence, wasn't there, Mr Page, in this
15   Ablyazov judgment of Sir Andrew Smith, that you had
16   Mr Page, had been saying, claiming, that you had bank
17   information derived from Israeli hackers.  That's right,
18   isn't it?
19  A. My Lord, the affidavit in support of Hogan Lovells was
20   written by Mr Tucker.  I did not meet with Mr Tucker.
21   I met with Mr Chris Hardman, who is a partner.  I did
22   not say -- and I do not know where this information has
23   come from -- that it was Israeli hackers.  I'm in some
24   difficulty because I -- that -- Mr Tucker was not
25   present at that meeting so I have no idea as to how
```

159

```
 1   Mr Tucker made that assumption.
 2  Q. It's right, isn't it, Mr Page, that you do have access
 3   to expert hackers, don't you?
 4  A. No, I do not have access -- and, my Lord, I was provided
 5   information from a source in Dubai that showed that
 6   Mr Eesh Aggarwal had knowingly assisted in the
 7   commission of a laundering of $700 million stolen from
 8   the BTA Bank.  My first approach -- and I go back to my
 9   Lord -- is that I saw that this is evidence of
10   a criminal conspiracy.  I presented the information to
11   the bank and to the legal -- to the Ministry of Justice
12   and told them that they should seek MLAT -- MLAT
13   assistance.  I'm sure you know what "MLAT" stands for.
14   I did not commission nor was I paid to access
15   Eesh Aggarwal's information.
16  Q. And I suggest, Mr Page, that you caused or procured the
17   hacking of Mr Azima's emails in this matter and made
18   that material available to RAK and RAKIA.
19  A. Absolutely not, my Lord.
20  MR LORD: Thank you, Mr Page.
21  MR TOMLINSON: My Lord, I've no re-examination, unless
22   your Lordship has any questions.
23  JUDGE LENON: No, I don't have any questions.  Thank you,
24   Mr Page.
25  A. Thank you, my Lord.
```

160

487