# Exhibit 2

**IN THE HIGH COURT OF JUSTICE**              **Claim no. QB-2020-002492**

**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

<b><u>Claimant</u></b>

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**

**(2) GRAYSON + CO LIMITED**

~~**(3) MR STUART ROBERT PAGE**~~

~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~

**(5) DECHERT LLP**

**(6) MR DAVID NEIL GERRARD**

<b><u>Defendants</u></b>

---

**THIRD WITNESS STATEMENT OF**

**STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE,** of 14 Montpelier Road, London, W5 2QP, **WILL SAY** as follows:

## A. INTRODUCTION

1. I am the same Stuart Page who has made two previous witness statements in these proceedings (dated 12 March 2021 and 14 May 2021 respectively). I was formerly the Third Defendant to these proceedings.

2. I make this statement in connection with the application of Stokoe Partnership Solicitors ("**Stokoe**"), the Claimant, to adjourn the trial in these proceedings, which I understand will be determined at a pre-trial review hearing on 11 February 2022. I have therefore prepared this statement in a limited time period with limited reference to documents, and so it is not as detailed as it could be.

3. Subject to this point, and except where I indicate otherwise below, the facts and matters set out in this witness statement are within my own knowledge and I believe them to be true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

4. In this witness statement I refer to documents which together comprise exhibit "**SRP-3**". References to page numbers in bold in squared brackets in this witness statement are references to that exhibit.

## B. ENGAGEMENT IN RAS AL KHAIMAH

5. In 2008, I was approached by Khater Massaad ("**Khater**"), the CEO of RAK Ceramics who was an adviser to His Highness Saud bin Saqr Al Qasimi ("**Sheikh Saud**", and later, "**the Ruler**"), then the Crown Prince of Ras Al Khaimah ("**RAK**"). I was instructed to assist Sheikh Saud in a dispute with his half-brother. This engagement came to an end in 2010 when Sheikh Saud's father passed away and Sheikh Saud succeeded him as the Ruler.

6. In 2014, I read a press report that there was an ongoing investigation into financial irregularities at RAK Airways. I contacted an associate and asked whether there was anything I could assist with. I had a meeting with the Ruler but at first nothing came of it. In around January 2015, a meeting was set up between me and Jamie Buchanan ("**Jamie**") who was then CEO of RAK Development LLC and adviser to the Ruler. Shortly afterwards, Jamie and I had another meeting in Dubai and he asked me to assist

with an investigation into Khater who it was believed had misappropriated a very significant amount of RAK government funds. At that stage, I was instructed to investigate Khater's assets, his connections with Iran, his alleged links to Hezbollah in Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking), and to look into whether Khater was working with other members of the Ruler's family to overthrow the Ruler.

7. Soon after I received these instructions from Jamie, I instructed Amit Forlit ("**Amit**") from Insight to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service) and his team had experience of working in military intelligence on behalf of the Israeli Defence Force. The project was given the codename "Project Beech" which was used between me, Amit and his team. The investigation work was undertaken using three main sources of intelligence - human intelligence, open-source research, and what is known as SIGINT. SIGINT is a term that originates from intercepting communications such as radio signals and tapping a target's phone. The term is still widely used in the intelligence community (including the commercial investigations industry) to describe the hacking of confidential emails and the unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

8. My main point of contact was Amit, but I know that he used several analysts, some of whom were located outside Israel.

9. In about June 2015, approximately five months after receiving Jamie's instructions, I received a telephone call from Neil Gerrard ("**Neil**"), a partner in the law firm Dechert LLP ("**Dechert**") in which he said that he was a lawyer instructed by a mutual client, and he suggested that we should meet. The following day we met in Dechert's London office. Over the course of the following five years, I met Jamie frequently both in RAK and London, and also Neil and Amit on multiple occasions, to discuss various aspects of the investigations that I was engaged in, some of which are detailed below. Some meetings took place in Dechert's London office. However, to the best of my knowledge and belief, there came a time when Neil was uncomfortable with this as he did not want a written record that he was meeting Amit or Amit's team. After this, the meetings took place in other locations, such as hotels. Whilst we all did meet together, I know that Neil and Amit had a direct line of communication that did not involve me.

10. I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

## C. METHOD OF REPORTING AND COMMUNICATIONS

11. Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. The reports usually included an executive summary, some raw data that had been obtained as a result of the investigation, some analysis of the data and recommendations and action points. I also recall that some of the reports contained extracts from confidential documents, with the document itself appended to or embedded in the report. Given the content of these extracts, it was obvious that they had been obtained as part of Amit and Insight's SIGINT work, in other words as a result of unauthorised access to computers and other devices.

12. Strict protocols for the handling and the sharing of the reports between myself, the Ruler and Jamie (and Neil on occasions where Jamie asked me to provide him a copy of selected reports) were introduced. The object of the protocols was to ensure that there was no paper trail left for others to find and that the reports themselves were destroyed.

13. As part of the effort to make sure that the reports were only seen by those who we wanted to see them, an email account was created that only Amit, specified members of his team and my personal assistant, Caroline Timberlake ("**Caroline**") could access. A draft email would be prepared with instructions and a copy of the report. The email would never be sent, but the report would be downloaded from the draft email account onto a laptop that was not connected to any server, printed from a printer which was not connected to a network, and the draft message was then overwritten. Amit (or one of his team) then sent a secure coded message informing me or Caroline that there was something to be reviewed. The coded message would then be deleted.

14. The printed copy of the report would be hand delivered to Jamie for his review, or would be left at his hotel when he stayed in London. The Ruler instructed me that I was not to send him anything electronically, which meant that I had personally to hand-deliver all the reports to him in RAK. I did this as part of our regular private meetings, which took place every three to four weeks.

15. As for Neil, when Jamie asked me to send the reports to him, I initially sent them via courier (or Caroline would hand-deliver them) to Neil or his secretary at Dechert's office in London. However, on one occasion, a report was opened by somebody other than Neil or his secretary in Dechert. Given the content of the report, Neil was very concerned and, after this, he asked me to send any future reports to his home address in East Sussex. Courier receipts and emails relating to the delivery of these reports to Dechert's office and Neil's home address are exhibited at [**SRP3/2-22**].

16. Every few months, Jamie returned the reports to me so that I could destroy them securely, which I did.

17. Any matters emanating from the reports or wider investigations that required Neil, Jamie and I to discuss them would either be discussed face to face or via Confide, and later Signal, a secure and encrypted network.

## D. AZIMA MATERIAL

18. During one of my regular meetings with Jamie in early 2015 he mentioned Farhad Azima ("**Azima**"). This was the first time I had heard that name. Some time after that, Jamie told me that Khater had threatened a negative publicity campaign against the government of RAK and the Ruler and asked me to keep my eyes and ears open for anything that could be considered damaging to RAK.

19. On 22 January 2020, a trial concerning a dispute between Ras Al Khaimah Investment Authority ("**RAKIA**") and Azima commenced before the High Court in London (the "**Azima Trial**"). On 29 January 2020 I gave evidence at the Azima Trial and exhibit a transcript of that evidence [**SRP3/23-50**]. In my witness statement and testimony at the Azima Trial, I stated things that were inaccurate. I have subsequently corrected these inaccuracies in an affidavit dated 7 January 2022 that was prepared for an application Azima is making before the Supreme Court [**SRP3/51-62**].

20. In summary, my evidence at the Azima Trial was that links to confidential material belonging to Azima, which had been obtained unlawfully and uploaded to the internet, had been drawn to my attention in 2016 by a journalist, Majdi Halabi ("**Majdi**"). That is inaccurate. It was in fact Amit who brought the links to the material to my attention.

21. However, between the discovery of the material in 2016 and the Azima Trial, once it became apparent that RAKIA wanted to rely on this material for its claims against Azima, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit had told me about the data, and Amit told me that he did not want his name disclosed in legal proceedings. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK because, at that time, there were no diplomatic relations between the State of Israel and the UAE. There followed a series of meetings between Neil, Jamie, Amit and me to discuss how to respond to the enquiries from Azima's legal team as to how the material had been discovered by RAKIA. During one of these meetings, Amit suggested that we simply introduce another person to the story and say that this person was the one who discovered the material. It was against that background that I met Majdi. I discussed the cover story with Neil and Jamie and we agreed to meet to work out a plan.

22. In October and November 2018, there were two meetings in Cyprus, which were attended by Amit, Neil, David Hughes ("**David**") (a former colleague of Neil's at Dechert, where both had been partners, but at the time working at Stewarts Law LLP), Majdi, and me, at which we agreed that we would proceed with the cover story that Majdi had discovered the material. As I recall, Jamie and I travelled together to the first of those meetings, but to the best of my recollection he was not present at the second meeting. I also recall that David voiced his scepticism as to whether the story was credible, and did not think it would work, but Neil made it clear that this was the best way forward and that David would have to go along with it.

23. As the Azima Trial approached, Amit called me and told me that Neil wanted to meet with me, Amit, Majdi and Jamie to go through the evidence that we were to give at the Azima Trial. We then settled on Switzerland as the location for the meeting because it was convenient for Neil given the time constraints arising from his other work commitments. The meeting took place between 1 and 4 December 2019 in a small hotel outside Bern in Switzerland. The attendees were Neil, Amit, Majdi and me, and Jamie

did not attend. During our stay at the hotel, we went through a mock trial, with Neil acting as both judge and cross-examining counsel. This was all done to perfect the cover story as to how the hacked material had been discovered. At one point during the time we spent together, Neil said to me something to the effect of "if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years."

24. Given the nature of what we were discussing at the hotel, a number of security protocols were put in place. I told Neil to leave his mobile phone at home or to switch it off, and I provided burner phones for me and him to use. To avoid detection, I did not fly to Switzerland but instead took a train via Paris, Strasbourg, Basel and then to Bern.

## E. RAC MEETING

25. Very shortly after I gave evidence in the Azima Trial, I was contacted by Amir Handjani ("**Amir**"), a very close adviser to the Ruler. I had first seen Amir in the court room during the Azima Trial and I had given him my mobile number. Amir suggested that we meet for a coffee that weekend. On 1 or 2 February 2020, we met in a coffee shop in London's West End for about thirty minutes. One of the topics of conversation during that meeting was the litigation that RAK and the Ruler were involved in. A short time after that meeting, he contacted me again and said that Neil thought it would be a good idea if the three of us met. Neil was a member of the RAC club, a private members' club on Pall Mall, and so we arranged to meet there for breakfast a few days later.

26. During that breakfast, one of the topics of conversation that came up was the funding of various proceedings involving RAK. We had recently been present at the Azima Trial, and the funding of the Azima proceedings had been a topic of conversation for a number of years by that point. A few days beforehand, on 28 January 2020, further proceedings had been issued by Karam Al Sadeq ("**Al Sadeq**") against various defendants, including Dechert and Neil, which related to RAK and which had been reported in the press. Neil then said words to the effect of "we need you to find out who is funding all of this". Neil and Amir then instructed me to do this. At this stage, I was still receiving my payment from RAK and so they paid for whatever investigations I carried out.

27. Shortly after the meeting, I instructed Amit to investigate who was funding these cases. Neil was aware that I used Amit to carry out these types of investigations and he was aware of the type of methods that Amit used, including SIGINT.

488

28. For completeness, I wish to record that at that stage I did not know about Stokoe's representation of Al Sadeq.

## F.   GATWICK SERVICE STATION MEETING

29. On my instructions, and based upon what Neil had asked me to do at the RAC meeting, Amit produced a report sometime in April or May 2020. I recall that he was sensitive about who saw this report.

30. I sent the report by Signal to Amir. Neil and I agreed to meet at a service station near Gatwick Airport to show him the report. We chose that location because Neil believed that he was under surveillance, and that this was somewhere where he could not be easily observed covertly.

31. I read the report at the time and whilst I cannot now recall the specific contents, I do remember that it dealt with how the RAK-related litigation was being funded.

32. When I met Neil, I gave him a copy of the report and he read it, but I did not let him take the document with him, and I took the report away with me and destroyed it. I do recall that Neil did not look surprised or concerned by the contents of the report, which I found strange at the time.

## G.   STOKOE PROCEEDINGS

33. Some time before I was served in these proceedings, I received a call from Amir who told me that, on the Ruler's instructions, I should work with the lawyers defending the Al Sadeq proceedings in relation to the allegations that formed part of Al Sadeq's case about surveillance on Stokoe in Dubai. Amir also sent me an extract of the document which contained these allegations Although I contacted Enyo Law and discussed the matter briefly with Edward Allen, a partner at the firm, nothing further came of it. From what I am aware, at that time Enyo Law represented neither the Ruler nor RAK but did represent Neil and Dechert in the Al Sadeq proceedings. For the avoidance of doubt, I had no involvement in the alleged surveillance of those acting on behalf of Al Sadeq as alleged in the Al Sadeq proceedings, and in particular I did not break into the hotel room of one of Al Sadeq's solicitors in Dubai.

34. Paul Robinson ("**Paul**") was served with proceedings in a claim by Stokoe on 1 July 2020. I have known Paul for a long time and we have a friendly professional relationship. Shortly after he was served, he sent me some of the documents from that claim via Signal, for the reason that I was named in those proceedings. I then sent them on to Neil to inform him of what was happening.

## STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed   …………………………………………

Stuart Robert Page

Dated   7 February 2022

**IN THE HIGH COURT OF JUSTICE**         Claim no. QB-2020-002492

**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

## STOKOE PARTNERSHIP SOLICITORS

**Claimant**

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**

**(2) GRAYSON + CO LIMITED**

~~**(3) MR STUART ROBERT PAGE**~~

~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~

**(5) DECHERT LLP**

**(6) MR DAVID NEIL GERRARD**

**Defendants**

---

## EXHIBIT SRP3

---

| ITEM | EXHIBIT | PAGE |
|:---:|:---|:---:|
| 1 | Courier receipts and emails relating to the delivery of these reports to Decherts and Neil's home address | 2 - 22 |
| 2 | Transcript of Stuart Page's evidence at trial in RAKIA v Azima | 23 – 50 |
| 3 | Affidavit of Stuart Page dated 7 January 2022 prepared for an application by Farhad Azima before the Supreme Court in RAKIA v Azima [2021] EWCA Civ 349 | 51 – 62 |

From:     Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:     21 April 2016 14:10
To:       Caroline Timberlake
Subject:  Re: Bike to Dechert LLP

Hi Caroline

That's all booked in for you.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.


On 21 April 2016 at 14:02 Caroline Timberlake wrote:

Howdo Jignesh, need another bike to Decherts this afternoon please:


Pick up:        Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX


Deliver to:     Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main


Cheers

C


**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 14 April 2016 11:56
**To:** Caroline Timberlake
**Subject:** RE: Bike to Dechert LLP


Hi Caroline

I am pleased to confirm this was delivered at 1127 and signed for by 'POST JUNIOR'

492

Great to have you on board.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 14 April 2016 at 11:02 Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:

Many thanks Jignesh, bike already been and picked up.


Cheers

C


**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 14 April 2016 10:51
**To:** Caroline Timberlake <CTimberlake@pagegroupltd.com>
**Subject:** Bike to Dechert LLP


Hi Caroline

I am pleased to confirm your bike is booked in and your document should be collected in the next 90 minutes.

This will be £15 all in.

Thank you for choosing Apex.

493

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin



# APEX

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       10 May 2016 11:04
To:         Caroline Timberlake
Subject:    Re: Bike to Dechert LLP

Hi Caroline

I am well. Hope you are too.

Bike should be with you in 30 next minutes.

Thank you for choosing Apex!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



**APEX**

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 10 May 2016 at 10:59 Caroline Timberlake wrote:

Howdo Jignesh, need another bike to Decherts today please:

Pick up:         Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX

Deliver to:     Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main

Many thanks.

Cheers

C

Hi Caroline

The bike is booked in for you. Email you the label for Belgium very shortly.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



**APEX**

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 05 July 2016 at 11:47 Caroline Timberlake wrote:

Howdo Jignesh, hope alls well. I have been away for a couple of weeks enjoying myself in the US of A (very glad I wasn't around for the EU referendum crap!!). Please see below, one for Brussels and one for Decherts for this afternoon please.

Many thanks.

Kind regards,

Caroline

A4 Envelope 1kg to:

European External Action Service,

Field Security Division – MDR B1 (EEAS CORT 02/515),

For the attention of Mr Peter Cavendish,

9A Rond Point Schuman,

1046 Brussels

496

Belgium

Ref: May June Inv

Tel +3225843203

And same day to the usual place please:

Pick up:      Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX

Deliver to:   Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main

Many thanks.

Cheers

C

497

From: Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent: 16 September 2016 11:51
To: Caroline Timberlake
Subject: Re: London pick up and delivery asap

---

Hi Caroline

No worries. Should be with you in the next hour.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin



**APEX**

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 16 September 2016 at 11:42 Caroline Timberlake wrote:

Howdo Jignesh,

Need pick up and delivery in London asap if possible

Pick up: 1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1: A4 envelope; 1kg

Neil Gerrard
Partner

Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Cheers

C

498

| From: | Jignesh Shah <jignesh.shah@apexcouriers.co.uk> |
|---|---|
| Sent: | 21 September 2016 13:31 |
| To: | Caroline Timberlake |
| Cc: | customer.services@apexcouriers.co.uk |
| Subject: | Re: London pick up and delivery asap |

---

Thanks, Caroline.

A rider should be with you in 60 mins.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



I am running this year's Royal Parks Half Marathon for World Child Cancer. My fundraising pledge could pay for a life-saving dose of chemotherapy for 7 children with cancer in Ghana. To donate, please visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 21 September 2016 at 13:22 Caroline Timberlake wrote:

Howdo Jignesh/Shane

Need pick up and delivery in London asap:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Many thanks.

Cheers

C

499

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      27 September 2016 15:10
To:        Caroline Timberlake
Subject:   Re: London pick up and delivery asap

Hi Caroline

This is booked in for you. Collection within 60 minutes.

Kind Regards

Jignesh Shah
0207 041 9427

On 27 Sep 2016, at 15:02, Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:

Howdo Jignesh/Shane

Need pick up and delivery in London before 5pm please

Pick up: 1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1: A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Many thanks.

Cheers

C

500

| From: | Jignesh Shah <jignesh.shah@apexcouriers.co.uk> |
|---|---|
| Sent: | 10 October 2016 13:41 |
| To: | Caroline Timberlake |
| Subject: | Re: London pick up and delivery x 2 |

Hi Caroline

All good with me. Hope you're well? These are booked in to be collected in the next hour for you.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



I am running this year's Royal Parks Half Marathon in support of World Child Cancer. Did you know for just £4 they could provide a child with life saving chemotherapy? To make a small contribution, feel free to visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 10 October 2016 at 13:26 Caroline Timberlake wrote:

Howdo Jignesh/Shane

Need pick up and delivery in London by end of today please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

AND

Delivery 2:  A4 envelope; .5kg

F.A.O.: JAMES SMITH
Strictly Private & Confidential

501

c/o Hyatt Regency London - The Churchill
30 Portman Square
London
England
W1H 7BH
Tel: +44 (0) 20 7486 5800

Many thanks.

Cheers

C

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      21 October 2016 11:07
To:      Caroline Timberlake
Subject:      Re: Urgent London pick up and delivery

Hey Caroline

This is booked in for you.  Delivery by Noon is going to be really tough but I will see what can be done.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



I am running this year's Royal Parks Half Marathon in support of World Child Cancer. Did you know for just £4 they could provide a child with life saving chemotherapy? To make a small contribution, feel free to visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 21 October 2016 at 10:51 Caroline Timberlake wrote:

Happy Friday Gents, could I get a bike asap pretty please, needs delivering before MIDDAY if at all possible.

a4 envelope; 0.5kg; docs

To:

**NEIL GERRARD**

**Dechert LLP**
160 Queen Victoria Street
London EC4V 4QQ

+44 20 7184 7672 Direct

+44 7506 910 526 Mobile
+44 20 7184 7000 Main

Many thanks.

Cheers

C

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      02 December 2016 09:54
To:      Caroline Timberlake
Subject:      Re: London pick up and delivery

---

Hi Caroline

Happy Friday!

Will have someone with you in the next hour.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



**APEX**

Please note our new address is Suite 4 Joanna House, 34 Central Road, Worcester Park, KT4 8XZ

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 02 December 2016 at 09:45 Caroline Timberlake wrote:

Howdo,

Need pick up and delivery in London by 2pm today please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Many thanks.

Cheers

C

504

Hey Caroline

That's all booked in for you.  Someone will be with you in the next 60-90 minutes.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



**APEX**

Please note our new address is Suite 4 Joanna House, 34 Central Road, Worcester Park, KT4 8XZ

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 12 December 2016 at 15:19 Caroline Timberlake wrote:

Howdo,

Need pick up and delivery in London this afternoon please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 0.2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Many thanks.

Cheers

C

505

From: Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent: 21 December 2016 14:12
To: Caroline Timberlake
Subject: Re: London pick up and delivery

Hi Caroline

That's booked in to be collected in the next hour for you!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 21 December 2016 at 14:08 Caroline Timberlake wrote:

Howdo,

Need pick up and delivery in London this afternoon please, before 4.30pm if poss please.

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery:  A4 sized box; 6cm wide approx. ; 2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct


Many thanks.

Cheers

C

506

From: Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent: 21 December 2016 16:11
To: Caroline Timberlake
Subject: Re: ANOTHER urgent London pick up and delivery

---

Its booked!  Can't guarentee timings but will do our best.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!



**APEX**

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this from your system and notify the sender immediately.  Thank you for your understanding.

On 21 December 2016 at 16:07 Caroline Timberlake wrote:

Thanks Jignesh, good to talk to you earlier.

Afraid need another pick up this afternoon to go to Dechert's again, is that possible please.

A4 Envelope; 0.3kg; Document

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Cheers

C

**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 21 December 2016 14:12
**To:** Caroline Timberlake
**Subject:** Re: London pick up and delivery

Hi Caroline

That's booked in to be collected in the next hour for you!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!



APEX

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 21 December 2016 at 14:08 Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:

Howdo,

Need pick up and delivery in London this afternoon please, before 4.30pm if poss please.

Pick up: 1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery: A4 sized box; 6cm wide approx. ; 2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Many thanks.

Cheers

From: Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent: 13 February 2017 16:00
To: Caroline Timberlake; Shane Hawke
Subject: Re: UK delivery
Attachments: Page group UK 130217.pdf

---

Hey Caroline

This is booked in for you. Page 1 on the package and page 2 to the driver please.

Have a nice evening!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427


On 13 February 2017 at 15:48 Caroline Timberlake wrote:


Howdo, need UK delivery please, needs to be there tomorrow morning if possible please


A4 envelope, docs; 0.5kg


NEIL GERRARD

HUNTERS FARM

NUTLEY

EAST SUSSEX

TN22 3LS


Tel: +44 7506 910 526


Cheers

C

509


From : PAGE GROUP LTD
CAROLINE TIMBERLAKE 02079309200
CATHERINE PLACE 1
2ND FLOOR
SW1E 6DX LONDON
GB United Kingdom

Origin:
**LON**

To : NEIL GERRARD
HUNTERS FARM

Contact:
NEIL GERRARD
07506910526

**TN22 3LS NUTLEY**
**GB United Kingdom**

# GB-LGW-LGW

| | Day | Time |
|---|---|---|
| | | **X12** |

**Account No 417414782**
**Ref code PAG007**
DOCUMENT

Pce/Shpt Weight
**0.50 kg**

Piece
**1 / 1**



WAYBILL 89 5510 3916

(2L)GBTN223LS*34002000

(J) JD01 3054 7887 8430 4875

510

Hey Caroline

This is booked in for collection today for you. The label is attached.

Have a nice weekend!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Mob: 07530 848242


On 17 February 2017 at 15:26 Caroline Timberlake wrote:

Howdo, another UK delivery please, needs to be there tomorrow morning if possible please

A4 envelope, docs; 0.5kg

NEIL GERRARD

HUNTERS FARM

NUTLEY

EAST SUSSEX

TN22 3LS

Tel: +44 7506 910 526

Cheers

C

511



https://my.tnt.com/myTNT/printDocumentation/printDocumenta...

512

1    nothing in Hebrew about this matter.
2    MR TOMLINSON: Thank you. May this witness be released?
3    JUDGE LENON: Yes. Thank you, Mr Halabi.
4    A.   Thank you, my Lord.
5    MR TOMLINSON: My Lord, before calling the next witness,
6        I want to make sure how we're doing in timetabling terms
7        because we've put Mr del Rosso off until tomorrow. The
8        position is that Mr King can only do tomorrow morning,
9        Mr Leach can't do tomorrow morning and --
10   MR LORD: Sorry, my Lord, I'm eight minutes ahead of time or
11       ten minutes which is unusual, so I've made a little bit
12       of time. I would anticipate that I won't need more
13       than -- I don't think I will need more than an hour with
14       Mr Leach and I would estimate roughly half a day -- it
15       might be longer -- with Mr Page. So I'm trying to
16       finish both Mr Leach and Mr Page today. I hope to be
17       able to do that. But if my learned friend wants to call
18       Mr Leach first to be sure that he can get away today,
19       because Mr Page could come back tomorrow if required,
20       then that would be fine as far as we're concerned. But
21       I'm in your Lordship's hands and those of my learned
22       friend, of course, whose evidence he is calling .
23   MR TOMLINSON: Unfortunately I don't have Mr Leach here at
24       the moment.
25           My Lord, the possibilities are I think that Mr Leach

                              49

1        is interposed in Mr Page's evidence at, say, 3.00, if my
2        friend thinks -- or 3.30 if my friend thinks he will be
3        an hour or that we put Mr Leach off till -- I think he
4        can do tomorrow afternoon.
5    MR LORD: My Lord, I was expecting to deal with -- I spoke
6        to my learned friend about this yesterday -- I was
7        expecting to deal with Mr Page and Mr Leach today, so
8        I would prefer to start with Mr Page, as planned, and
9        interpose Mr Leach if necessary, but if I finish Mr Page
10       in time, with an hour to go, then we can just go on in
11       the normal way and he will be away this afternoon.
12   JUDGE LENON: Let's carry on on that basis.
13   MR TOMLINSON: If we revisit at the break in the afternoon.
14       I'm certainly going to call Mr Page next. I just wanted
15       to ensure what we were going to do about Mr Leach.
16   JUDGE LENON: That's very helpful. Thank you.
17   MR TOMLINSON: So, my Lord, I call Mr Page.
18                MR STUART ROBERT PAGE (sworn)
19            Examination-in-chief by MR TOMLINSON
20   MR TOMLINSON: Could you give the court your address,
21       Mr Page?
22   A.   Number 14 -- sorry, my business address, your Honour, or
23       my home address?
24   Q.   I think your home address is on the witness statement.
25   A.   Right, number 14 --

                              50

1    Q.   No, perhaps that's your business address. I apologise.
2        The business address.
3    A.   It's The Sanctuary and it's -- shall I give the full
4        address? It's The Sanctuary, Westminster, SW1.
5    Q.   Could you look -- there should be a bundle there in
6        front of you labelled "D", and then if you go to tab 3.
7        {D/3/1} --
8    A.   Correct, yes, I have it, yes.
9    Q.   -- that should be a document that says "Witness
10       statement of Stuart Robert Page" on the first page.
11   A.   Yes.
12   Q.   Then if you turn to page {D/3/7}, is that your
13       signature?
14   A.   That is my signature, my Lord.
15   Q.   Are there any matters in that statement that you wish to
16       correct or clarify, Mr Page?
17   A.   Yes, there are.
18   Q.   Do you want to indicate what they are?
19   A.   In reference to my police service, which is on
20       "Background" at 3, the date I left the police was 1978,
21       not 1979 {D/3/2}.
22   Q.   Thank you.
23   A.   And there is a reference, my Lord, to the name of my
24       company in Dubai. It's actually called "Page Group
25       Middle East FZE". I think it's in the statement as

                              51

1        "SZE".
2            The other part of my statement, my Lord, is where
3        I talk about reference to reviewing documents, but then
4        I mention in my statement, my Lord, that I did not --
5        I'm not familiar with the name of Farhad Azima.
6    Q.   And what did you want to correct in relation to that,
7        Mr Page?
8    A.   Having been shown a report which was prepared by my
9        firm, I'm now aware that I was -- should have been
10       familiar with that name.
11   Q.   What report is that?
12   A.   It's a report which I was shown by the -- by
13       Stewarts Law.
14   Q.   I'm sorry, Mr Page?
15   A.   Sorry, my Lord, I was asked to look at a document by
16       Stewarts Law and asked to confirm whether that was my
17       report or not.
18   Q.   Can you be shown {H7/298} please? It is {H7/299}, the
19       next page. Sorry. Is that the document you are
20       referring to?
21   A.   That is the document, my Lord.
22   Q.   And sorry, Mr Page, what's your evidence about that
23       document?
24   A.   Well, I was not -- when I prepared my witness statement,
25       my Lord, I was not -- did not recall that we submitted

                              52

1     this report to the client in which Farhad Azima's name
2     is quite clearly given.
3  Q. Thank you. Is there anything else that you wish to
4     clarify or correct in your statement, Mr Page?
5  A. No, my Lord.
6  MR TOMLINSON: Thank you, Mr Page. If you wait there, there
7     will be some questions.
8  JUDGE LENON: Can I just be clear what part of the statement
9     you want to correct?
10 A. Sorry, my Lord, it was the reference to my police
11    service.
12 JUDGE LENON: You've done that. In relation to Mr Azima, is
13    it paragraph 13?
14 A. Yes, paragraph 13. Yes, my Lord. {D/3/4}.
15 JUDGE LENON: So what do you want to say instead of that?
16 A. Well actually what I'm saying, my Lord, is of course
17    I should have remembered the name, but at the time
18    I prepared my statement in June of 2019 I could not
19    recall Farhad Azima's name.
20 MR TOMLINSON: And that was the result of having been shown
21    that document, the RAK project update?
22 A. That is correct, my Lord, yes.
23 MR TOMLINSON: Thank you, Mr Page. If you wait there, there
24    will be some questions.
25 MR LORD: My Lord, I've raised this with my learned friend,

53

1     but in view of the matters I am going to be putting to
2     Mr Page, I thought I should raise with him whether it
3     may become appropriate for him to be given any sort of
4     warning about the privilege against self-incrimination.
5     I'm not saying that I advocate that, but I just wanted
6     to make sure that that was something that I had at least
7     broached in case your Lordship or my learned friend or
8     somebody thought that at some point in my questioning,
9     if at all, that was an appropriate warning that should
10    be given to this witness. I didn't want it to be said
11    that I had crashed on in my forensic eagerness and had
12    not allowed that to be considered. So I'm not
13    suggesting it or advocating it. I just thought I ought,
14    as a matter of sort of good order, really, to flag that,
15    my Lord.
16 JUDGE LENON: Thank you.
17            Cross-examination by MR LORD
18 MR LORD: Mr Page, I'm going to ask you first about the
19    nature of your relevant businesses, if I may.
20         Have you got your witness statement there, Mr Page?
21 A. Yes, I do, my Lord.
22 Q. In paragraph 1 and paragraph 5 you set out the
23    businesses which you say are relevant to the matters in
24    this dispute, don't you {D/3/1-2}?
25 A. Yes, my Lord.

54

1  Q. And it looks from paragraphs 1 and 5 as if the
2     businesses are Page Corporate Investigations Limited --
3     is that right?
4  A. That is correct, my Lord, yes.
5  Q. -- and Page Protective Services Limited?
6  A. That is correct, my Lord.
7  Q. And those are both English companies -- well, English
8     and Welsh companies, are they?
9  A. Well, there is a Page Protective Services in Cyprus and
10    there is a Page Protective Services in Hong Kong.
11 Q. So when you say "based in England", what do you mean by
12    that in paragraph 1?
13 A. Well, the company that was performing the contract for
14    the European Commission in -- well, sorry, the company
15    that was performing the contracts for the European Union
16    was Page Protective Services UK.
17 Q. What about the company which did the work in this case?
18 A. Page Group Middle East.
19 Q. That's a Dubai company, is it?
20 A. It's a Dubai -- what they call a "DMCC company".
21 Q. Apart from the matters that you refer to in your witness
22    statement, do you or any of your companies or firms --
23    do they do any other work for any RAK-related entity?
24 A. I'm sorry, my Lord, I don't understand the question.
25 Q. Well, apart from the work that you've explained in your

55

1     witness statement in paragraphs 1 and 5 {D/3/1-2} and
2     then the work that you've described starting at
3     paragraph 13 {D/3/4} -- 12 and 13 -- have you or any of
4     your businesses done any other work for RAK, the Ruler,
5     any RAK entity?
6  A. Yes, prior to this project, yes.
7  Q. Are any of the companies that you identify in this
8     statement of yours -- are any of those licensed or
9     regulated in any way?
10 A. Well, there is no regulation in the United Kingdom
11    regarding security companies providing security in
12    hostile environments. We are signatories to the code of
13    conduct, which is part of the UN Charter on how you
14    operate in conflict zones. There is no requirement to
15    be a licensed investigation company in this country. In
16    Israel, where I operate, I do have a security licence
17    issued by the Government of Israel, as I do in
18    Palestine.
19 Q. If we go to paragraph 5 of your witness statement
20    {D/3/2}, where you're explaining the Page Group, and you
21    set out some companies there. Can you see -- you say
22    "Page Protective Services Limited". It looks as if that
23    does security and Page Corporate Investigations Limited
24    does the investigation work; is that right?
25 A. That is partially correct, yes.

56

1 Q. Because you say there they focus respectively on (1)
2 providing security services and (2) undertaking
3 investigations and due diligence.
4 A. That would be correct, my Lord, yes.
5 Q. And would it be right to say that the investigative work
6 that you did in this case in 2015 and 2016 in relation
7 to RAK or RAKIA, that was carried out through
8 Page Corporate Investigations Limited?
9 A. No, that is not correct, my Lord.
10 Q. Through which Page entity did you carry that work out?
11 A. Page Group Middle East Limited, which is a wholly owned
12 subsidiary of Page Group Hong Kong.
13 Q. And you've said in paragraph 6 of your witness statement
14 at page {D/3/2} -- you're explaining the investigation
15 side of your business, aren't you?
16 A. That is correct, my Lord.
17 Q. And you say about six lines down:
18 "We do not generally work directly for law firms."
19 Can you see that?
20 A. Yes, that is correct, my Lord.
21 Q. Is that because, Mr Page, law firms would generally not
22 be comfortable with your methods of investigation?
23 A. That is not correct, my Lord.
24 Q. So why would it be that you don't generally work
25 directly for law firms?

57

1 A. Because I -- getting instructed, it is the norm that
2 I get instructed with a client that has a problem, an
3 issue, and he would ask me to work alongside his legal
4 team in gathering information for their -- in support of
5 their litigation.
6 Q. If you go, please, to paragraph 3 of your witness
7 statement, Mr Page, at {D/3/2}, you explain how you
8 began your career in the police force, 1970 to 1979,
9 first in Sussex and subsequently the
10 Metropolitan Police. Can you see that?
11 A. Correct, yes. That's correct.
12 Q. And you say:
13 "Towards the end of my time in the police I was
14 seconded to Scotland Yard's Anti-Terrorist Squad and
15 Special Branch during the period of the Troubles in
16 Northern Ireland."
17 To what rank did you rise, Mr Page, when you were in
18 the police?
19 A. Police constable.
20 Q. So you were police constable throughout your time in the
21 force, were you?
22 A. I was a police constable, yes.
23 Q. You were never in fact promoted, were you, then?
24 A. I never sought to be promoted.
25 Q. And you were in the force for nearly ten years; is that

58

1 right?
2 A. No, I was in the force for eight years, my Lord.
3 Q. Then you said in paragraph 4:
4 "I left the police in [1978] in order to take
5 a career break and went to work in Saudi Arabia as
6 a security and investigations adviser in the
7 construction and oil industry. I returned to the UK in
8 around 1983 ..."
9 Can you see that?
10 A. Yes.
11 Q. What prompted you to take a career break from the police
12 force in 1978?
13 A. My Lord, in 1978, as a young detective, I was working in
14 the region of 60 to 70 hours a week. The opportunity
15 came to go and work in the Middle East with a tax-free
16 salary which was twice that which I was earning in the
17 police service, and the rule at that time within the
18 police service is that you could take a career break, if
19 you rejoined the service within five years, you
20 maintained all your pension contributions and you could
21 rejoin without the need to be retrained. And it was
22 always my intention, my Lord, to rejoin the police
23 service when I finished working in Saudi Arabia.
24 Q. But in the event you did not rejoin the police force?
25 A. I did not.

59

1 Q. No. Could you please go to paragraph 8 of your witness
2 statement at {D/3/3}?
3 A. Yes, I have that.
4 Q. You can see in paragraphs 8 to 9 you give some evidence
5 about your initial engagement in Ras Al Khaimah. Can
6 you see that, Mr Page?
7 A. I can see that, my Lord.
8 Q. Have you read your statement recently, your witness
9 statement?
10 A. I have been reading it fairly consistently, my Lord,
11 yes.
12 Q. Since when have you been reading it consistently?
13 A. In preparation for this trial, my Lord.
14 Q. And when do you think you first started reading it by
15 way of preparation for the trial? How far ago, how long
16 ago?
17 A. Well, my Lord, I just recently returned from a trip to
18 the Far East and I took it with me to read so I could
19 refresh my memory on the testimony that I will be giving
20 for your court.
21 Q. So what's the answer to my question? Approximately
22 when -- how long ago did you first re-read this
23 statement of yours that you've given in the middle of
24 last year? Two weeks? Three weeks?
25 A. Well, I left for Hong Kong a week ago last Monday.

60

1    I took it with me then.  I would have been shown it by
2    the solicitors for the client because of the mistake
3    I made regarding the report on -- when -- Mr Azima's
4    name.  So it's not a very long statement, my Lord.
5    I would have refreshed my memory as and when.
6 Q.  And when did you first appreciate that there were
7    matters in the statement that you ought to correct?
8 A.  When -- well, first of all when I read that I got the
9    date of leaving the police service wrong; more recently
10   when I became aware that I got the name of my company or
11   the designation of the company in Dubai wrong; and of
12   course, when I was shown this report on the screen here,
13   where obviously I should have been aware of
14   Farhad Azima's name.
15 Q.  So the first time you thought you ought to revise this
16   statement was when Stewarts Law showed you a copy of the
17   project update that you've referred to this morning?
18 A.  That is correct, my Lord.
19 Q.  And had that not been shown to you, it's unlikely you
20   would have sought to revise your evidence in that
21   regard, isn't it, Mr Page?
22 A.  My Lord, I would like to, if I may, put into context
23   what was going on in my life in June of 2019 when
24   I prepared this report.
25      In August of 2019 I was diagnosed with clinical

61

1    depression, which takes me back to June of 2019, where
2    my psychiatrist is clear that I would have been
3    suffering from depression at that point.  Therefore, my
4    Lord, with respect, my recollection of events that
5    occurred some four years previously was slightly shaded.
6 Q.  Could you please look at paragraphs 8 to 9 of your
7    witness statement {D/3/3}?
8 A.  Yes.
9 Q.  You're referring there, aren't you, to some work that
10   you did from 2008 to 2010 for the current Ruler of
11   Ras Al Khaimah?
12 A.  It was on behalf of the current Ruler of Ras Al Khaimah,
13   yes.
14 Q.  Yes, when he was the Crown Prince?
15 A.  That is correct, my Lord.
16 Q.  And it's right, isn't it, that there was something of
17   a struggle for power within Ras Al Khaimah around that
18   time?
19 A.  I would not, my Lord, describe it as a "struggle for
20   power".
21 Q.  So what was the work that you did at that time in terms
22   of investigation services?
23 A.  So, my Lord, His Highness Sheikh Saud had been appointed
24   Crown Prince after his half-brother had been removed
25   from that position on instructions of the late

62

1    Sheikh Zayed of Abu Dhabi.
2       So my instructions were that the information that
3    I -- or the brief that I received was to ascertain
4    whether Sheikh Khalid was intending to try and -- not
5    de-throne, but to reappoint himself as a Crown Prince.
6 Q.  So there was potentially going to be a challenge to the
7    current Ruler and you helped him in that regard?
8 A.  Well, there was a challenge to the current Ruler.
9 Q.  And you were retained by or on behalf of the then
10   current Ruler?
11 A.  No, I was retained by Khater Massaad in his position as
12   chairman of RAK Ceramics, who in turn was reporting to
13   His Highness Sheikh Saud.
14 Q.  Could you be shown, please, {Day2/85:1}?  Mr Page,
15   you'll see starting at paragraph 9 -- on Day 2,
16   page 85 --
17 A.  Yes, I can see it, my Lord.
18 Q.  -- Mr Buchanan was asked about certain matters
19   pertaining to you.  And he said at line 9:
20      "Answer: Mr Page had worked for the RAK Government
21   previously."
22      And I asked him.
23      "Question:  Doing what?"
24      And he said:
25      "Answer: I believe it was during the time of --

63

1    there was certain dissent taking place over the
2    leadership at RAK, and I believe it was at that time
3    that Mr Page worked for His Highness who was then
4    Crown Prince."
5       And I said.
6       "Question:    ...  So Mr Page worked for the
7    Crown Prince before he took over as Ruler of RAK?"
8       And Mr Buchanan said:
9       "Answer: That is speculation on my part because
10   I was not involved at the time."
11      Was Mr Buchanan right to be giving evidence that you
12   were involved in relation to certain dissent within
13   Ras Al Khaimah at around that time?
14 A.  I'm sorry, my Lord, I didn't quite understand the
15   question.  Again?
16 Q.  What were you doing, Mr Page?  What were doing at that
17   time?  What was the remit?  What were you doing?
18 A.  Okay, so the remit was to try and ascertain what plans
19   Sheikh Khalid was to try and destabilise His Highness'
20   position as the Crown Prince of Ras Al Khaimah.
21 Q.  And what did you do in terms of investigating or
22   ascertaining what those plans were or might be?
23 A.  We conducted surveillance in London.  My Lord, I'm not
24   quite sure that it's appropriate to talk about what is
25   a confidential matter between myself and His Highness

64

1    unrelated to Khater Massaad, but if you instruct me to
2    do so, I will do so.
3    JUDGE LENON: Will you answer the question, please?
4    A.   Okay. So we were undertaking intelligence-gathering,
5         trying to understand what his plans were, who he was
6         meeting with, how he was being supported, what his PR
7         campaign was, and things along those lines.
8    MR LORD: You did that for how long? Over what period?
9    A.   To the best of my knowledge and my belief, my Lord --
10        well, it was at least two -- I presume two years prior
11        to the death of the Ruler.
12   Q.   And what form did the surveillance and monitoring that
13        you're describing -- what form did that take? How did
14        you actually carry it out?
15   A.   Well, at that time, Sheikh Khalid was living -- or still
16        does, I believe -- living in Kensington, so we were
17        physically putting him under surveillance.
18   Q.   You had people following him?
19   A.   That is correct, my Lord.
20   Q.   And were there any other forms of intelligence-gathering
21        that you used?
22   A.   No, the purpose was -- is to understand who his advisers
23        were. So the purpose of physical surveillance was to
24        see who he met, where he went and nothing else, my Lord.
25   Q.   Mr Page, just seeing where the Sheikh went and who he

                              65

1         spoke to, who he met, that wouldn't tell you, would it,
2         what he was talking about, what his plans were? That
3         would just tell you his physical movements, wouldn't it,
4         Mr Page?
5    A.   My Lord, with respect, if you conduct surveillance in
6         a proper manner, you are able to determine what someone
7         is meeting with because the whole purpose of
8         surveillance -- and it was a very large surveillance
9         operation -- is you would have multiple teams, and the
10        architect of a multiple team is if Sheikh Khalid met
11        Mr A and we didn't know who Mr A was, we would then
12        follow off -- a part of the team would follow off Mr A
13        to ascertain who he was.
14            So from memory -- and it's a long time ago, my
15        Lord -- he had a lawyer representing him, so we needed
16        to find out -- we identified who that lawyer was. He
17        had a PR company representing him. We found out who
18        that was. And we at one point -- I think, my Lord, from
19        memory, we followed him to the Israeli Embassy.
20   Q.   So, so far you've got the Sheikh, you've got the PR
21        company, the lawyer and the Israeli Embassy. That's
22        four bits of information. That doesn't allow you,
23        Mr Page, does it, to ascertain what the plans are? How
24        do you know what the plans are? They may be just having
25        a lunch at the Israeli Embassy.

                              66

1    A.   My Lord, His Highness Sheikh Saud has his own sources of
2         information. I was just one of those sources of
3         information, carrying out the instructions given to me
4         by Khater Massaad to try and understand -- for example,
5         my Lord, we followed Sheikh Saud [sic] to Geneva because
6         we believed that he was going to attend an important
7         meeting in Geneva. That is a very complicated and very
8         expensive operation and it was successful.
9             We followed him to the United States for the
10        inauguration -- where he went to the inauguration of
11        President Obama. He also met Hillary Clinton, so we
12        were understanding how he was trying to elicit support
13        from the United States for his potential attempt to
14        regain power or -- correct -- to regain his position in
15        Ras Al Khaimah as the Crown Prince.
16   Q.   Sorry, Mr Page, when you said that the Sheikh had his
17        own sources of information, what were you there
18        referring to?
19   A.   I presume, my Lord, coming from sources within --
20        sources within Ras Al Khaimah.
21   Q.   Mr Page --
22   A.   But, my Lord, I never met His Highness during the whole
23        engagement on this issue. In fact, the first time I met
24        His Highness is when he instructed me in relation to the
25        issue before the court now -- correction, the matter of

                              67

1         Khater Massaad.
2    Q.   Mr Page, you would have wanted, wouldn't you, to obtain
3         what was likely confidential information at that time in
4         order to be able to tell -- to inform the Sheikh --
5         sorry, the Ruler -- about the Sheikh's plans?
6    A.   By "confidential information", what are you referring
7         to?
8    Q.   You'd want information from people who were on the
9         inside, as you would see it, of the Sheikh's gang,
10        wouldn't you? That's what you'd want, isn't it,
11        Mr Page?
12   A.   That is correct.
13   Q.   You'd want some inside information, wouldn't you,
14        Mr Page?
15   A.   That is correct, my Lord.
16   Q.   And are you telling his Lordship that over the period of
17        two years, all you did was physically tail these people
18        and you didn't actually obtain any inside information at
19        all?
20   A.   Not at all, my Lord. In fact we developed intelligence
21        that Sheikh Saud [sic] and/or his wife were involved in
22        a number of industrial tribunal cases before the courts
23        in England, involving members of his entourage who had
24        sued him for unfair dismissal. We then cultivated those
25        people as what we call a "confidential source" to know

                              68

517

1   what they knew about his plans in respect of
2   Ras Al Khaimah. So they were former employees of
3   Sheikh Khalid who may or may not have been privy to
4   information concerning his plans to regain his position
5   as the Crown Prince.
6 Q. You're talking about Sheikh Khalid there, aren't you?
7   The Ruler was Sheikh Saud and Sheikh Khalid was the
8   person --
9 A. Yes, I beg your pardon.
10 Q. That's all right. I think it's clear.
11      So you were getting information from ex-employees at
12   that time?
13 A. We were seeking to get information from ex-employees,
14   yes.
15 Q. I suggest that you succeeded, didn't you, Mr Page, in
16   all likelihood?
17 A. I cannot recall whether we -- we have a number of ways,
18   my Lord, of cultivating sources, and I can't, after all
19   these years, remember whether we succeeded or didn't
20   succeed. I seem to recall that his former security
21   adviser was one of those people that we managed to talk
22   to and he provided information because he was a very
23   aggrieved ex-employee of His Highness -- sorry, of --
24   well, he's still His Highness -- Sheikh Khalid and he
25   wished to vent his anger by sharing information. That's

1   how we operate in this business.
2 Q. In other words, this aggrieved employee would have told
3   you confidential things that he'd learnt when he was
4   working as a security officer for Sheikh Khalid?
5 A. Yes, and it's not for me to question whether he was in
6   breach of any of his employment obligations.
7 Q. Or for you to question whether he was breaching any duty
8   of confidentiality presumably, Mr Page?
9 A. It's -- that was not for me to consider.
10      My Lord, he was what we call in this industry --
11   it's called "HUMIT", which stands for "human
12   intelligence ", but in everyday speak, it's
13   a confidential source. And that confidential source may
14   well be, my Lord, a journalist that Sheikh Khalid is
15   seeking to get him to write some positive PR spin.
16   I have a number of -- then and to this day -- a number
17   of journalist sources who would let me know if
18   they're -- in fact, my Lord, it was all out there on the
19   internet that Sheikh Khalid -- what his plans were. He
20   was spinning his story on the internet as to how he
21   should be the Ruler of -- sorry, he should be the
22   Crown Prince of Ras Al Khaimah, not Sheikh Saud, which
23   included a disinformation programme, including
24   publishing a report which is known as the "Rogue
25   Report", claiming that Sheikh Saud and the Emirate of

1   Ras Al Khaimah had illegal, unsavoury relationships with
2   Iran.
3      So it was out there on the internet, my Lord.
4   I didn't have to find it -- sorry, I did not have to get
5   it from a source. Sheikh Khalid was employing a company
6   called Californian Strategies to lead his PR campaign
7   against His Highness Sheikh Saud.
8 Q. I think from that answer you've just given, Mr Page, it
9   wouldn't concern you when gathering intelligence if the
10   source disclosed confidential information to you
11   because, as far as you were concerned, that was their
12   responsibility, whether it was confidential or not;
13   would that be fair?
14 A. That would be fair, my Lord, yes.
15 Q. Who did you deal with -- when you were working around
16   about 2008 to 2010 for the current Ruler, as you've
17   described, I think you said that you were engaged
18   through Dr Massaad; is that right?
19 A. That is correct, my Lord.
20 Q. And who else did you come across at RAK or the Palace or
21   part of the Ruler's group in the widest sense during
22   that engagement of yours over that two-year period?
23 A. Okay, my Lord, so how this came about is I was in
24   Brussels meeting the European Union in relation to one
25   of my contracts. I received a phone call from someone

1   called Wahid Attalla, an Egyptian gentleman, who I'd
2   known since my engagement with the Government of Dubai
3   in relation to other matters which were before the --
4   other matters.
5      Wahid Attalla said basically, my Lord, "Where are
6   you? Can you make it to Geneva?", and I said, "If it's
7   important, I can make it to Geneva". So I flew to
8   Geneva, I then met Dr Massaad and I was then taken on
9   his private jet and I was flown to Lebanon to be briefed
10   on this issue of Sheikh Khalid.
11 Q. Do you want to answer the question, please, Mr Page?
12 A. Only Dr Massaad and Wahid Attalla and no one else.
13 Q. And so when you reported back on the fruits of your
14   information-gathering and monitoring at that time, to
15   whom did you report?
16 A. Dr Massaad.
17 Q. Did you ever report directly to the Ruler?
18 A. Absolutely not.
19 Q. And why was that?
20 A. Because this is the way that Dr Massaad wanted the case
21   to be run. I didn't question his instructions.
22 Q. And how often did you report back in that engagement?
23 A. We used to have regular updates, but I would say six,
24   eight, ten weeks; for example, if Dr Massaad was
25   travelling in Europe, I would meet him. Such meetings

1    I had in Nice with him, I met him in Germany, I met him
2    in Switzerland, occasionally I met him in Ras Al Khaimah
3    or in Dubai, because I've been a frequent traveller, my
4    Lord, to Dubai since -- as long as I can remember, but
5    certainly since 1995.
6  Q.  It's right, isn't it, that that was really how you
7    became a trusted adviser as far as the current Ruler of
8    Ras Al Khaimah is concerned?  That's how you gained his
9    trust, through this engagement, wasn't it, Mr Page?
10 A.  I would not say that, my Lord, no.
11 Q.  How else do you think that you managed to gain the trust
12   of the Ras Al Khaimah Ruler or government bodies?
13 A.  My Lord, without sounding big-headed, I'm a known entity
14   in the UAE.  I have worked for the Government of Dubai
15   since 1995.  I continue to work for the Government of
16   Dubai until this date.  My reputation in the UAE -- they
17   respect my knowledge, they respect my ability and
18   His Highness' wife is married to someone called
19   Abdul Aziz Al Ghurair.  Abdul Aziz Al Ghurair is the
20   sister -- I beg your pardon, Abdul Aziz Al Ghurair is
21   the chairman of Mashreq Bank.  I was worked for
22   Mashreq Bank, so therefore in looking for an adviser --
23   or -- correction -- looking for someone to service his
24   needs, it would be not too difficult for His Highness to
25   check into my bona fides.

73

1  Q.  Did you do any work for the Ruler or for RAK, any
2    RAK-based entity, after 2010 but before the end of 2014?
3  A.  I did not.
4  Q.  Can we come on to your work in 2015 in RAK, please,
5    Mr Page?  Would you go to paragraph 12 of your witness
6    statement at {D/3/4}?  You see you say this:
7       "About a couple of months later ..."
8       So I think we should probably look at paragraph 11,
9    where you say that you went to see Mr Buchanan in
10   January 2015 -- can you see that?
11 A.  Yes, I do, yes.
12 Q.  -- and you say you cannot recall who arranged the
13   meeting.
14 A.  Well, it's more than likely it was His Highness'
15   personal secretary.
16 Q.  But who instigated it?  Was it you or Mr Buchanan who
17   initiated it?  Who called who first?
18 A.  So from recollection I received a call from
19   His Highness' secretary saying she wished me to meet
20   someone -- sorry, on instructions of His Highness, I was
21   to meet one of his advisers, and then it's possible, but
22   I cannot recall exactly, my Lord, that Mr Buchanan
23   phoned me and said, "When can we meet?"  I don't think
24   Mr Buchanan even knew I was in the UAE at that point.
25 Q.  In paragraph 12 you say this:

74

1    "About a couple of months later Jamie and I had
2    another meeting in Dubai and at that point we discussed
3    a specific mandate."
4       That's around about March 2015, isn't it, Mr Page?
5  A.  Yes, but Mr Buchanan's evidence is wrong.
6  Q.  In what respect?
7  A.  So in the chronology of the events, my Lord, which is
8    referred to in my statement, I saw information in the
9    local media regarding an investigation or issues to do
10   with RAK Airways.  I am very knowledgeable about how
11   they report things in the Gulf papers, and when they say
12   "issues", there is an underlying issue.  So I reached
13   out for Wahid Attalla, the gentleman I referred to who
14   introduced me to Khater Massaad, and asked him if he
15   would effect me an introduction to His Highness, who I'd
16   never met before.
17      So I went to the Palace with Wahid Italia, I met
18   His Highness, we had a get-to-know-you conversation.  It
19   was then, some months later, that His Highness summoned
20   me back to the Palace, after I had met Jamie Buchanan.
21      My Lord, it's important to understand that
22   His Highness has a habit of compartmentalising things.
23   He would ask me to do certain things, but not involve
24   Jamie Buchanan.  So, therefore, I had this Chinese wall
25   between what His Highness wishes me to undertake and

75

1    what he wishes Mr Buchanan to understand.
2  Q.  In your witness statement, Mr Page, at paragraph 10
3    {D/3/3}, you set out I think some evidence about what
4    you've just said.  Is that what you're talking about?
5    You had one meeting with Sheikh Saud?
6  A.  Sorry, paragraph which are we looking --
7  Q.  10 of your witness statement at {D/3/3}.
8  A.  Paragraph 10 of my witness statement?  That talks about
9    RAK Airways.  Is that what you're referring to?  I'm
10   sorry, my Lord, I --
11 Q.  You've just explained how you basically contacted --
12   well, read paragraph 10.  I assumed that paragraph 10
13   was a summary form of what you have just said, Mr Page.
14 A.  Yes, I'm sorry, my Lord.  That is correct, yes.
15 Q.  Well, it's your statement.  You must know what you meant
16   by it, Mr Page.
17 A.  I think, my Lord, I have actually reported how it
18   actually -- sorry, presented to you how it occurred.
19 Q.  It wasn't a trick there.  I was just trying to help you.
20 A.  Oh, I'm sorry.  Thank you.
21 Q.  So then we can pick the story up in paragraph 11
22   {D/3/3}.  You've now helpfully explained that you did
23   have a meeting with Sheikh Saud in 2014 and the next
24   involvement you had with RAK in January 2015 was
25   likely -- it sounds as if it was initiated by the Sheikh

76

1  who, through his personal assistant, invited you to come
2  to meet Mr Buchanan.
3  A. Well, no, I think -- yes, he asked me to meet
4  Mr Buchanan, but there was a subsequent meeting at
5  the Palace with His Highness.
6  Q. And when was that?
7  A. Some time -- right, so, if I put it into context --
8  Q. No, sorry, Mr Page --
9  A. No, this is important. In December 2014 through to
10  early -- to the middle of January 2015, I was in the
11  UAE -- I was in the UAE on an assignment for another
12  member of a royal family.
13      So, yes, there was the initial meeting with
14  Jamie Buchanan, but that was a get-together meeting and
15  nothing else at the Park Hyatt Hotel in Dubai.
16  Q. Mr Page, I was just asking you when did you have this
17  meeting with His Highness.
18  A. It could have been three days later, it could have been
19  four days later. I honestly can't remember. Certainly
20  before I left the UAE, somewhere around mid-January.
21  Q. So some time in the first half of January --
22  A. Correct.
23  Q. -- 2015?
24  A. No, not the first half of January because I left Dubai
25  on or around 10 January.

1  Q. So some time in the first half of January 2015?
2  A. Well, I wouldn't -- okay, semantics, my Lord, but
3  I would agree with you, yes.
4  Q. And what did you discuss with the Ruler on that
5  occasion?
6  A. My Lord, I am in some difficulty here because it was
7  a confidential discussion and instructions from
8  His Highness in relation to a personal matter which
9  I don't believe relates to the matter before the court
10  today. I am happy to disclose it to you, my Lord, but
11  I don't think it's appropriate, when we have members of
12  the press in the back of the court, for me to disclose
13  what is a confidential discussion between myself and
14  His Highness because, my Lord, to do so would destroy my
15  reputation as someone who deals in confidential matters.
16  JUDGE LENON: At the moment I don't see why it's necessary
17  to go into any detail as to the nature of the personal
18  matter, if that's the evidence.
19  MR LORD: No, I'm happy with that, my Lord, but
20  your Lordship will see I am anxious to get to the
21  bottom --
22  A. My Lord, I am prepared to share a piece of information
23  if you feel, but it's very limited as to what I'm
24  prepared to say in open court.
25  Q. It may become relevant, my Lord, this point, but we'll

1  move on because all I want to establish, as
2  your Lordship will appreciate, is the relevant remit for
3  this gentleman. So it looks like this is part of the
4  run-in. That's all. That's why I ask the question.
5      Can I ask a different question, then?
6      Mr Page, in paragraph 12 of your witness statement
7  {D/3/4}, you say this:
8      "About a couple of months later, Jamie and I had
9  another meeting in Dubai and at that point we discussed
10  a specific mandate."
11      You're not here talking about this confidential
12  personal matter, are you?
13  A. No, I'm not.
14  Q. You're talking about something different, aren't you,
15  Mr Page?
16  A. I am, my Lord, yes.
17  Q. So is your evidence right there that around about
18  March 2015 you had this meeting with Mr Buchanan when
19  you discussed a specific mandate?
20  A. Yes, my Lord, because the reason this is now -- when
21  I've corrected my witness statement is the report that
22  is before -- that has now been disclosed and I have
23  shown is dated March 2015 and it refers in this report
24  to a previous report, so it is inconceivable that
25  in March 2015 I was receiving an instruction from

1  Jamie Buchanan in relation to -- well, I received
2  a mandate, but I was obviously mandated before this
3  report, and that's the matter that I said is before
4  His Highness which I don't think I can disclose any more
5  at this point.
6  Q. Sorry, so are you saying that the report we --
7  A. My Lord, the timeline doesn't work because you're
8  talking of a report dated 26 March 2015 and in
9  Mr Buchanan's evidence he talks about briefing me in --
10  sorry, in -- at the same period. It doesn't work.
11  There was a previous engagement, which is the one I'm
12  referring to, with His Highness, who I don't think I can
13  disclose in open court.
14  Q. Well, I'm sorry about that -- I'm sorry, my Lord, I'm
15  troubled by that answer. If you go to {H7/299/3} -- get
16  that page up first, Mr Page.
17  A. Yes.
18  Q. This is an extract from the report that you or your firm
19  did -- and we'll come back to it in more detail today --
20  A. Correct.
21  Q. -- on 26 March 2015. It's your firm's report, isn't it?
22  A. Yes, it is my firm's report, yes.
23  Q. Can you see at the top it says:
24      "KM efforts against the client."
25  A. Yes.

1　Q.　"FA and the US Advisory Team."
2　A.　That is correct, my Lord.
3　Q.　"FA" refers to Mr Azima, doesn't it, Mr Page?
4　A.　It does, my Lord.
5　Q.　And it says -- this is the words of your firm's report:
6　　　"In continuation to our previous report, we were
7　　　informed by several new sources that FA is managing KM's
8　　　efforts in the US and perhaps even paying their bills ."
9　　　Now, Mr Page, it looks, doesn't it, on the face of
10　　this report of yours in March, that there is a link
11　　between this report, in this part of it anyway, and
12　　a previous report.　Is that right?
13　A.　That is correct, my Lord.
14　Q.　So what is the link between what we see here and what
15　　you covered in your previous report?
16　A.　My Lord, this is where I'm in some difficulty because,
17　　as I tried to explain, the meeting with His Highness
18　　in January of 2015 gave me a specific mandate of which
19　　this is just part of that mandate. But again, my Lord,
20　　I'm happy to disclose it, but I don't think I would be
21　　happy to disclose it in the presence of the media.
22　Q.　But it says:
23　　　"In continuation to our ..."
24　　　It's under the heading "FA and the US Advisory
25　　Team".

81

1　A.　My Lord, it's impossible to put this report into context
2　　if you don't understand the mandate that I received from
3　　His Highness based on the information that he had
4　　received.
5　　　My Lord, I really am in some difficulty here because
6　　you're asking me to breach a confidence and I don't feel
7　　comfortable.
8　MR TOMLINSON: My Lord, it's not something that I know
9　　anything about, but obviously this witness is concerned
10　　about it and, my Lord, there are two ways of dealing
11　　with it.
12　　　The first is that Mr Page can write something down
13　　on a note to be shown to your Lordship and my friend,
14　　indicating the general nature of the matter, or the
15　　second is that the court can go into private for this
16　　evidence to be explored.
17　　　It's probably sensible that the first option be
18　　explored first because then we may get some clearer idea
19　　of what the ambit of it is.　But obviously it's
20　　appropriate for -- if this is a -- your Lordship will
21　　appreciate the Ruler isn't my client and I don't know
22　　anything about this matter that's been talked about, but
23　　obviously this witness is in some discomfort about
24　　disclosing what he regards as confidential professional
25　　matters and it wouldn't be right, if it's not relevant

82

1　　to any issue in this case, for confidential professional
2　　matters to be disclosed in open court of an irrelevant
3　　nature.
4　MR LORD: My Lord, the difficulty with that is that this
5　　problem has arisen because of the way in which the
6　　claimant has gone about explaining Mr Page's role
7　　because it's clear from these answers that there is
8　　potentially a relevant connection between the previous
9　　report and mandate and matters that I am allowed to ask
10　　him about because clearly they relate to Mr Azima and
11　　this case.
12　　　So if there is some overarching concern or some
13　　ability to pass the earlier report and the earlier
14　　mandate, that's something that should have been dealt
15　　with before if in fact -- through RAKIA factoring in
16　　that this report was that of Mr Page and not adducing
17　　evidence, as it has done, of a sort that your Lordship
18　　has seen that disguises Mr Page's role because -- I am
19　　anxious that we go into private and we don't have the
20　　rigour of open court when I'm asking this witness
21　　questions because it would be my submission that he has
22　　told lies on oath, and I'll tell your Lordship that
23　　Mr Page has lied on oath in relation to the written
24　　reports and in relation to his coming across Mr Azima,
25　　and in those circumstances, in my submission,

83

1　　your Lordship should think very long and hard before we
2　　abandon the usual approach of staying in open court.
3　　　I can ask questions -- I'll try and ask my questions
4　　more slowly to establish the link to Mr Azima. I'm
5　　happy to do that.　But I am anxious that we should keep
6　　the public forum here to make sure that we get
7　　a truthful answer, if your Lordship understands what I'm
8　　saying.
9　JUDGE LENON: I'm certainly at this stage not going to go
10　　into any sort of closed session.　What do you say to the
11　　proposal that Mr Page should write down on a piece of
12　　paper the nature of the issue that he's uncomfortable
13　　about?
14　A.　My Lord, it is quite -- I beg your pardon.
15　MR LORD: Well, we can try that, my Lord.　I'm very happy to
16　　try that, but I am going to have to ask about the
17　　connection with the -- this witness has said that there
18　　is a connection so I am going to have to ask him about
19　　that.
20　JUDGE LENON: I see that and I see that's on the face of it
21　　plainly relevant.
22　A.　My Lord, it is quite -- with respect to everybody, it's
23　　quite difficult for me to put this in succinct format in
24　　two or three lines.　I will repeat.　I am happy to
25　　breach the confidence.　There are representatives of

84

1    His Highness here who would have no knowledge of the
2    mandate I was given because this is a personal
3    conversation between a sovereign ruler and myself, but
4    I am happy to disclose it to the court, but not in the
5    presence of the media.
6  MR LORD: My Lord, this is likely to be relevant because
7    a private conversation between Mr Page and the Ruler
8    that establishes some direct line of communication
9    between those two gentlemen is obviously relevant to
10   this case. It's relevant. The subject matter may not
11   be relevant, but the fact of the communication is
12   relevant, and I repeat that the problem has arisen
13   because of the way in which -- the evidence that RAKIA
14   has disclosed about Mr Page and his previous work in and
15   about relevant matters.
16 MR TOMLINSON: With great respect to my friend, these are
17   wholly bad points. The position is that this RAK
18   project update which he talks about a lot, doesn't
19   feature in his pleaded case and it's a matter that
20   hasn't been dealt with in evidence because it didn't
21   appear to be part of the issues before the court at all.
22   He can't criticise me now for not addressing a case
23   which only first appears in his note of opening and not
24   addressed in my evidence. But, my Lord --
25 MR LORD: Sorry, no, I'm going to correct that because that

85

1    is flatly wrong because Mr Azima referred to the project
2    update in his evidence. My learned friend successfully
3    had those bits, I think, maybe struck out. I can't
4    remember now. But the Ruler of Ras Al Khaimah deals
5    with this document in his evidence, and your Lordship
6    should go to that because my learned friend's case is
7    that this is really the first time that it's really
8    arising in this case and that's --
9  MR TOMLINSON: No, it's not my case it's the first time it
10   arises, but you can't criticise me for not dealing with
11   something in evidence when it's not part of the pleaded
12   case. The fact that it's referred to in witness
13   statements subsequently -- my friend actually amended
14   his pleadings to deal with certain matters that were
15   dealt with in disclosure, and if he wanted to deal with
16   this, he could have amended his pleadings to deal with
17   it. He choses not to.
18 JUDGE LENON: Yes, but presumably that's partly because he
19   wrote who wrote it.
20 MR TOMLINSON: Well, my Lord, if this was relied on as
21   a document, he doesn't actually have a pleaded case
22   about Mr Page's role either. The position is if this
23   is -- this is a document which we know refers to
24   Mr Azima. He could have had a pleaded case that this
25   was -- some inferences could therefore be drawn from

86

1    this as to the role of Mr Azima in the thinking of
2    RAKIA. He didn't plead that case. So I'm not objecting
3    to him now putting all these points to my witness in
4    cross-examination, but I am objecting to him complaining
5    that somehow I've suppressed reference to these in
6    evidence when they're not part of the case.
7        But, my Lord, what we've got to deal with here is --
8    my friend says, "Well, it's relevant that Mr Page was in
9    communication with the Ruler". That may be relevant,
10   but that's not in dispute. That's clear on the face of
11   the evidence. It's been -- it's mentioned in Mr Page's
12   witness statement. He's mentioned it again in evidence
13   today.
14       If he wants to go further into private, confidential
15   conversations between the Ruler and Mr Page, then that
16   is not an appropriate matter to be dealt with in open
17   court because one simply doesn't know where that goes
18   and how that relates to the Ruler's private affairs. It
19   doesn't matter whether it's the Ruler. It would be the
20   same if it was anybody whose private affairs were
21   discussed with a confidential agent. The idea that then
22   they could be explored in open court to see whether
23   something relevant comes out, my Lord, can't possibly be
24   right. The court has -- as your Lordship knows, the
25   court has a duty to protect people's rights to privacy

87

1    under Article 8. The court is a public authority and
2    it's important that those rights are protected.
3        One simply doesn't know exactly what's being
4    adverted to here. I'm perfectly happy for it to be
5    explored and if it turns out to be relevant to some
6    issue in the case, of course it must be dealt with. But
7    as a general piece of exploration, it's not right just
8    to go into it on the off-chance it might be.
9  JUDGE LENON: No, but you would presumably accept that the
10   nature of any mandate that the Ruler gave to Mr Page is
11   of relevance?
12 MR TOMLINSON: The nature of any mandate, my Lord, yes, but
13   what concerns me is that the question then goes into the
14   details of the mandate and what the Ruler said and,
15   you know, what information he provided and so on.
16   Certainly the general nature of the mandate I think must
17   be -- I accept that, and I think Mr Page was actually
18   about to volunteer it at one point.
19 A. My Lord --
20 MR LORD: I'm in your Lordship's hands. I am going to want
21   to pursue the dealings that Mr Page had with the Ruler
22   and obviously matters that relate to this project report
23   that we've had which appear to refer back to earlier
24   work and engagements concerning Mr Azima, which is what
25   this case is about.

88

522

1　A.　My Lord, I am prepared to answer certain questions, but
2　　　they will be vague and I think that's the best I can
3　　　help the learned counsel here -- and I'm happy to answer
4　　　a question, but without going into too many specifics.
5　MR LORD: My Lord, my concern is I'm not going to be held to
6　　　be giving Mr Page any licence to give anything other
7　　　than exactly truthful answers, so I'm not going to agree
8　　　to that. If in fact there's a staging post here which
9　　　we can go through in writing or otherwise that's
10　　　sufficient, then I'm more than happy for that approach
11　　　to happen. I'm not happy with Mr Page having, if you
12　　　like, licence, editorial licence, as to how he puts
13　　　things under the guise of this alleged confidentiality
14　　　that can't be looked behind.
15　JUDGE LENON: I am going to invite you, Mr Page, to write
16　　　down on a piece of paper what it is that you are
17　　　concerned about and to do it in as succinct a way as you
18　　　can.
19　A.　My Lord, may I request I do that in the break for lunch
20　　　because first of all I need to write it and it would be
21　　　much better, if you accepted, my Lord, for me to sit
22　　　with the lawyers for the Government and I will write it.
23　MR LORD: I'm sorry, my Lord, but obviously --
24　JUDGE LENON: That's not going to be possible.
25　A.　My Lord, then I'm prepared to say certain things which

89

1　　　I think will be helpful to counsel here. If he wishes
2　　　to expand on them, then I may have to revert to that.
3　　　　　I think what I will tell him, my Lord, will be
4　　　useful to him and I think it answers the concerns he may
5　　　have.
6　MR LORD: My Lord, would it be better to go into private for
7　　　this initial exploration and then to see whether
8　　　your Lordship feels, in the light of that, we should
9　　　continue in private, go into public or desist with that
10　　　line of questioning at all? I wonder if that would be
11　　　a safer way of doing it. It's just an offer.
12　JUDGE LENON: Yes, if that's going to be a way through this.
13　MR TOMLINSON: My Lord, I'm happy to deal with it in that
14　　　way if everybody thinks that's appropriate. It may be
15　　　that there's an earlier stage that Mr Page is offering
16　　　a general explanation, if he gives that general
17　　　explanation and it becomes clear that there's no need to
18　　　go any further, then we don't need to go into private.
19　　　If he gives that general explanation and my friend wants
20　　　to explore further, then we may need to.
21　JUDGE LENON: Let's try that. I'm anxious not to delay
22　　　matters too much with this. Let's see if we can get by
23　　　without --
24　MR LORD: Very well, my Lord. Very well.
25　　　　　Mr Page, you were going to explain the sensitivity.

90

1　A.　Yes, my Lord. His Highness' instructions were --
2　　　His Highness' information was that a member of his
3　　　family was working with Khater Massaad in gathering
4　　　information from the Palace and my instructions were to
5　　　ascertain whether that was in fact correct, that they
6　　　were working in collusion. But, my Lord, before I'm
7　　　asked a question, I can say on oath I was never asked --
8　　　I never heard the name of Farhad Azima.
9　Q.　So, Mr Page, you were asked by the Ruler to carry out
10　　　some sort of surveillance or investigation into what
11　　　the Ruler thought was some leak within the Palace?
12　A.　No, that's not correct. The request was could
13　　　I establish, because he'd heard a rumour, that
14　　　Khater Massaad was working with a member of his family
15　　　to the detriment of His Highness and the Government of
16　　　Ras Al Khaimah.
17　Q.　And so -- we'll come back to what you did in that
18　　　regard, please, but is that something that -- that was
19　　　an engagement that was set up simply between you and
20　　　the Ruler; is that right?
21　A.　That is correct, my Lord.
22　Q.　And is your evidence that nobody else knew about that?
23　A.　No one else was present at the meeting and no one else
24　　　knew my mandate.
25　Q.　And how long did that mandate last for?

91

1　A.　It's --
2　Q.　Still going on?
3　A.　No -- correction -- it's not still going on. It was
4　　　dealt with in the first report, which is obviously
5　　　not -- we do not have -- and it was dealt with partly in
6　　　the second report, the one -- the redacted report we
7　　　have here. Again I'm happy to share, my Lord, that
8　　　there was no information to suggest that His Highness'
9　　　belief was correct --
10　Q.　Right.
11　A.　-- ie that he was working with a member of his family.
12　Q.　And what sort of investigation work did you do in order
13　　　to establish the true position?
14　A.　Well, it was to review the previous investigation into
15　　　Sheikh -- His Highness, both his family members --
16　　　I nearly gave it away then. I beg your pardon -- and to
17　　　see what was going on and to try to ascertain whether
18　　　there was a connection, and this report is partly
19　　　prepared in relation to that. And I can take you
20　　　through chapter and verse, my Lord, if you want, but it
21　　　is the fact that we knew from previous intelligence
22　　　people who had worked for Sheikh Khalid in relation to
23　　　the bad -- the negative PR campaign that he launched
24　　　against His Highness when he was the Crown Prince and
25　　　therefore we explored that evidence as a possibility of

92

1        the -- where we might find a link through
2        His Highness -- sorry, that Khater Massaad was working
3        with parties against the Ruler.
4   Q.  Sorry, was the concern of the Ruler that somebody in
5        the -- somebody within his family was working with
6        Dr Massaad or was it the fact of Dr Massaad's alleged
7        campaign? I'm not sure what the concern was.
8   A.  It was that they were working, my Lord, together for
9        whatever reason -- I have no reason why -- that they
10       were working together for the purposes of destabilising
11       or causing harm to His Highness.
12   Q.  And as part of that engagement you looked at Mr Azima?
13   A.  That is not correct.
14   Q.  So at {H7/299} of your report, you say:
15       "FA and the US Advisory Team.
16       "In continuation to our previous report, we were
17       informed by several new sources that FA is managing KM's
18       efforts in the US and perhaps even paying their bills ."
19   A.  That is correct, but I was never mandated by
20       His Highness to investigate then, subsequently,
21       Farhad Azima.
22   Q.  Can I ask you, please, about the scope of the retainer?
23       Go back to paragraph 12 of your witness statement,
24       please. {D/3/4}.
25   A.  Yes.

93

1   Q.  Can you see what you say in paragraph 12 about the scope
2       of your retainer pursuant to this specific mandate?
3   A.  I do, my Lord.
4   Q.  "Jamie said that he was involved in investigating
5       wrongdoing by Khater Massaad and the misappropriation of
6       assets. He wanted my assistance in tracing assets,
7       investigating Khater Massaad's involvement with Iran,
8       his links to Hezbollah and Lebanon and his relationship
9       with Viktor Bout ... I understood my engagement to be
10       for the government generally but I did not know which
11       specific government entity. There was no letter of
12       engagement ..."
13       Can you see that?
14   A.  Yes, I can, my Lord.
15   Q.  Then, "Knowledge of Farhad Azima", paragraph 13:
16       "During this period in 2015 when I was undertaking
17       the investigations described above in relation to
18       Khater Massaad, I did not come across the name
19       Farhad Azima. The first time I recall hearing his name
20       was in early 2016 at one of my regular catch ups with
21       Jamie."
22       Now, Mr Page, you knew when you gave this witness
23       statement that it was in relation to a dispute between
24       RAKIA and Mr Azima about whether -- amongst other
25       things, about whether RAKIA had been involved in the

94

1       illegal access of Mr Azima's data, didn't you?
2   A.  I do.
3   Q.  And you're here giving evidence in a written statement
4       about the extent of your engagement by RAK or RAKIA,
5       aren't you?
6   A.  I am, yes.
7   Q.  And if you put together paragraph 12 and paragraph 13,
8       you are claiming, aren't you, that you did not come
9       across the name Farhad Azima until early 2016?
10   A.  That is correct, my Lord.
11   Q.  If we go to the one surviving project update at
12       {H7/299}, you can see at pages {H7/299/2-4} that there
13       are three pages of this report -- it looks like it's
14       17 pages. So three of the 17 pages concern matters
15       involving Mr Azima, don't they?
16   A.  That is correct.
17   Q.  So, Mr Page, can you explain to his Lordship why you put
18       in a witness statement and signed it and verified it to
19       be true back in June 2019 where you said this:
20       "During this period in 2015 when I was undertaking
21       the investigations described above in relation to
22       Khater Massaad, I did not come across the name
23       Farhad Azima. The first time I recall hearing his name
24       was in early 2016 at one of my regular catch ups with
25       Jamie."

95

1   A.  That is correct, my Lord.
2   Q.  Can you tell his Lordship why, when we've seen that in
3       March 2015 you have prepared a report which discusses
4       Mr Azima's alleged management of Dr Massaad's US team in
5       the context of a concern about Dr Massaad's strategy
6       that leads on to discussion of intelligence -gathering
7       and monitoring activities and containing and ruining
8       plans -- how could you possibly put in evidence what you
9       said in paragraph 13? What's the explanation for it,
10       Mr Page?
11   A.  It's very simple, my Lord. Farhad Azima was just -- was
12       a side issue in this report. There were matters I was
13       investigating across the globe, including, as I have
14       said, Lebanon, Iran, Hezbollah, arms trafficking, people
15       trafficking, and his name at the time I wrote that
16       statement no more than perhaps some of the other 20, 30,
17       40 names that we came across in the course of this
18       investigation rang a bell to me, and, my Lord, that is
19       my evidence. Plus, my Lord, as I explained, in June of
20       2019 there were certain things going on in my personal
21       life which affected my ability to remember events that
22       occurred as far back as -- sorry -- as 2015, four years,
23       and if my Lord wishes me to expand on what those issues
24       were, I'm more than happy to do so.
25   Q.  No, thank you, Mr Page. Could you go, please, to

96

1     paragraph 7 at {D/3/3}?

2 A. Are you talking about my statement or --

3 Q. Yes, please, Mr Page. I want to just finish this

4     matter, if you don't mind. I'm aware of the time.

5     Thank you.

6     In paragraph 7 of your witness statement you say

7     this in the last sentence:

8     "I don't keep contemporaneous documents and my

9     briefings to clients are invariably oral, especially in

10     the Middle East where this is very normal."

11     Now, Mr Page, I wasn't sure this morning whether you

12     were clarifying this bit of your witness statement as

13     well. What's the answer?

14 A. I'm sorry, my Lord, I still don't understand that

15     question.

16 Q. Where you say in this paragraph 7 that your briefings to

17     clients are invariably oral, that means that your client

18     briefings are always oral, doesn't it?

19 A. No, not always oral, my Lord. My Lord, the one thing

20     I learnt, having worked in Saudi Arabia for three years,

21     was a knowledge of the Middle Eastern culture and, with

22     the greatest of respect to counsel, it is a quite unique

23     learning experience. Even to this day, my Lord, I will

24     go before a client from the Middle East who will read

25     more -- less than one page. So, therefore -- you're

97

1     saying "Verbal briefings?" My Lord, the answer to that

2     question is "Yes, verbal briefings".

3 Q. Mr Page, you're not answering the question. What you

4     were telling the court in this witness statement at

5     paragraph 7 was that you always briefed clients

6     especially in the Middle East.

7 A. Well --

8 Q. Sorry, Mr Page. Sorry, Mr Page. The word "invariably"

9     means "without exception".

10 A. Well --

11 Q. You shrug. Sorry, Mr Page --

12 A. No, I beg your pardon. Sorry.

13 Q. Did you know what "invariably" means?

14 A. Well, I think I do, but perhaps that was a misleading

15     line in my statement.

16 Q. So what do you think it means? It means always, except

17     for the 27 written reports in this case that you made?

18     Is that what you meant to say?

19 A. My Lord, I would go before His Highness and I would have

20     an audience of perhaps 30 minutes. The first 15 minutes

21     of that audience, because His Highness is extremely

22     knowledgeable about world affairs, will be discussing

23     with me -- who thinks I'm also quite knowledgeable

24     about issues in the Middle East -- affairs of the

25     Middle East.

98

1     I would then present him with a verbal briefing and

2     he would not even look sometimes at the reports, but

3     sometimes he would read an executive summary, and I mean

4     an executive summary, because it is the custom, my Lord,

5     that in the Middle East you are very lucky, no matter

6     what it relates to, if they will read more than one

7     page.

8     What His Highness did subsequently with the verbal

9     briefings and if I'd given him a written report I cannot

10     comment on, but I know until this day that the culture

11     is a verbal briefing. They prefer it because they like

12     to hear what you're saying. And I'm sorry, my Lord, if

13     it goes against protocol that people understand, but

14     that is an experience I have learned since 1995. So I'm

15     a -- long standing practitioner in the Middle East.

16 MR LORD: Would that be a convenient point, my Lord?

17 MR TOMLINSON: Mr Page, you're in the middle of your

18     evidence so you know you mustn't talk to anybody about

19     your evidence until you have concluded?

20 A. I understand.

21 (1.04 pm)

22     (The luncheon adjournment)

23 (2.00 pm)

24 MR LORD: May it please your Lordship, Mr Page, I was asking

25     you about your witness statement in which you said that

99

1     you invariably briefed clients orally. Do you remember?

2 A. That is correct.

3 Q. And I was putting to you that that was untruthful

4     because we know at least in this case that you provided

5     many written project updates, didn't you?

6 A. Yes, that is correct, in addition to verbal updates.

7 Q. In addition to your oral updates, yes. And Mr Buchanan

8     gave evidence that you updated about every month; would

9     that be right?

10 A. Every month, six weeks, depending on when His Highness

11     wanted to see me.

12 Q. Yes. And Mr Buchanan estimated that probably roughly at

13     least half of the time there would be a written update

14     from you.

15 A. That is correct, my Lord.

16 Q. It's right, isn't it, that you still work for RAK or

17     RAKIA?

18 A. That is correct, my Lord.

19 Q. And so, since the beginning of 2015, you'd have provided

20     probably something in the region of 30 written project

21     updates, wouldn't you?

22 A. I think that the number has diminished over the last

23     12 months, but you may be right, my Lord. It may be 30.

24     I cannot recall exactly.

25 Q. By it's going to be in the order of around 25 to

100

1    30 reports in writing?
2  A. That is possible. I can't -- you know, I can't remember
3     exactly how many I did.
4  Q. Mr Buchanan gave evidence that all the reports were in
5     the same format; that's right, isn't it?
6  A. Yes.
7  Q. And how were the reports prepared? Did you type them
8     all up yourself or were others involved?
9  A. No, others involved.
10 Q. Who was involved?
11 A. The agent that I employed to assist me in this complex
12    investigation.
13 Q. And who's that?
14 A. It's a company in the State of Israel.
15 Q. Pardon?
16 A. A company in the state of Israel.
17 Q. What's the name of that?
18 A. Insight.
19 Q. And that's a company -- that's an Israeli company, is
20    it?
21 A. That is an Israeli company, yes.
22 Q. And what do they specialise in?
23 A. Well, the founder of the company is the former head of
24    the Lebanese desk of Shin Bet and Shin Bet is the
25    Israeli equivalent of MI5.

101

1  Q. Right.
2  A. So they specialise in collating information,
3     particularly in the Middle East. They obviously
4     specialise in collating information on Iran, on
5     Hezbollah, on Lebanon, and they were the -- the
6     expression I use, my Lord, is the "think tank".
7  Q. So would it be fair to say, Mr Page, that in relation to
8     the matters covered by your project updates, you had in
9     fact subcontracted at least some of that work to this
10    Israeli company called Insight?
11 A. That is correct.
12 Q. And they were, amongst other things,
13    intelligence-gathering specialists?
14 A. They were specialists at obtaining information from
15    confidential sources and, my Lord, the important thing
16    was to analyse a significant amount of data being
17    recovered from multiple jurisdictions and
18    cross-referencing it, seeing really how it related to
19    Khater Massaad and his links. So, in answer, my short
20    answer is, yes, they were the conduit to receive all the
21    information from my other subcontractors.
22 Q. And they were really -- they were the people, were they,
23    who you enlisted to carry out some of this electronic
24    data-gathering?
25 A. By which you mean electronic -- I don't understand. By

102

1     "electronic", you mean open source information on the
2     internet?
3  Q. I mean of any source.
4  A. Well, they were -- yes, they were using the dark web,
5     open source information on the internet. That was the
6     limit to what they were doing.
7  Q. And they could have been unlawfully accessing electronic
8     information for all you knew, Mr Page, couldn't they?
9  A. Absolutely not.
10 Q. How do you know what they did?
11 A. Because my instructions from Mr Buchanan -- and not
12    simply his instructions -- it is my principle that no
13    information that is recovered must be obtained by
14    illegal means, and to hack is illegal.
15 Q. You see, Mr Page, I suggest that we may be getting a bit
16    warmer here on how Mr Azima's data came to end up on the
17    internet.
18       Can you tell his Lordship a bit more about Insight?
19    I think you said people work for them who used to be the
20    equivalent of the Israeli MI5; is that right?
21 A. Well, they have a number of people in their employment,
22    either who work in the IDF -- you understand what the
23    IDF is, my Lord? Israeli Defence Force. The Israeli
24    Defence Force has a specialist unit that collates
25    intelligence, military intelligence. So they are

103

1     specialists from the IDF, from Mossad, from Shin Bet.
2     There are lawyers, there are accountants, because we
3     were analysing a lot of information from public sources
4     which was financial information.
5  Q. Insight would have the capability, wouldn't they, to
6     access Mr Azima's emails if they'd wanted to?
7  A. No, I have no knowledge whether they do that type of
8     work.
9  Q. But given the high-powered natured of the people at
10    Insight you've described, their expertise would extend,
11    wouldn't it, into that sort of covert operation?
12 A. Not to my knowledge.
13 Q. I suggest, Mr Page, that that's not a truthful answer.
14 A. Well, my Lord, I can only express to you the mandate
15    they received from me on behalf of the Government of RAK
16    was to use their intelligence community contacts to
17    deliver information or provide information regarding
18    Dr Massaad and his associations as outlined in my
19    witness statement.
20 Q. And that would include -- and it was thought, wasn't it,
21    that Dr Massaad's associate included Mr Azima?
22 A. Absolutely not. My Lord, the report of 26 May --
23    Farhad Azima's name came out -- completely out of the
24    blue. It was not part of our mandate to look at
25    Farhad Azima. This information came from a confidential

104

1    source.  The confidential source was not even given --
2    because we weren't instructed to look at Farhad Azima.
3    He provided what he heard in the marketplace, if that's
4    the expression, my Lord.
5 Q. Were there some written instructions or documents that
6    recorded your retainer of Insight in relation to these
7    matters?
8 A. No.
9 Q. Why not?
10 A. Because that's not how -- my Lord, I work in a very
11    strange world, without sounding over-dramatic.
12    I neither trust telephones, nor I do trust the email, so
13    any briefings that they received from me would have been
14    face to face.
15 Q. And how were they paid?
16 A. By bank transfer.
17 Q. From whom?
18 A. From my company in the Middle East.
19 Q. And how much did you pay them in 2015?
20 A. Without access to my records, I have no recollection.
21    It's dealt with by my finance director.
22 Q. Roughly how much?
23 A. In the whole of 2015?
24 Q. Yes.  Millions?
25 A. In relation to Khater Massaad or in relation to other

105

1    matters instructed to me by His Highness?  There were
2    other matters which -- again I have the same problem.
3 Q. Did His Highness -- did the Ruler know that you were
4    essentially acting as a bridgehead into Insight?  It
5    sounds like he probably did.
6 A. I'm sorry, my Lord, I don't understand the question.
7 Q. Did His Highness know that when he asked you to carry
8    out various tasks, you were actually retaining this
9    Israeli operation called Insight to carry them out?
10 A. My Lord, there's no secret that I operate in the
11    State of Israel and it is no secret, my Lord --
12 Q. What's the answer to the question.
13 A. Well, I would not have told him, nor would he have asked
14    me the question.
15 Q. But it sounds as if what you may have been doing,
16    Mr Page, is acting as something of a go-between, really
17    hooking up the Ruler's wishes with what sounds like
18    a very effective Israeli intelligence-gathering and
19    surveillance operation.
20 A. Absolutely not.  They were just one of a number of
21    subcontractors that I used.
22 Q. Presumably Insight would have copies of the project
23    updates that they prepared for you, wouldn't they?
24 A. They have exactly the same protocol that I adopted when
25    we commenced this project.  In fact it is not

106

1    a protocol -- a new protocol.  It was a protocol that
2    I -- that was commenced as far back as 2008/2010, when
3    I was working against Sheikh Khalid.
4 Q. I suggest, Mr Page, that you didn't forget about these
5    30 or so written reports when you gave your witness
6    statement.  You would have known about those written
7    reports, I suggest to you.
8 A. But, my Lord, I thought we dealt with the fact that
9    I don't actually recall how many reports there were.
10    I don't have any reports because, on the instructions of
11    His Highness -- if I may I step back.  As early
12    as January 2015 His Highness expressed to me his
13    concerns that his palace and other government
14    organisations had been compromised. By "compromised",
15    my Lord, I mean information had been obtained illegally
16    from within his organisation.
17      In my report there's a reference to someone called
18    Joseph Abu.  That is not Joseph Aboud.  It is
19    Joseph Assad, who is a former CIA agent attached to the
20    US Embassy in Abu Dhabi who ran a company in Abu Dhabi.
21    So, you know, we had good reason to believe that Joseph
22    Assad was running a campaign.  We had no evidence, but
23    we believe he was.
24      So His Highness' concern about his information being
25    compromised were well founded and on that basis

107

1    I created a form of protocol.  And also, my Lord, it
2    should be remembered, we are talking about investigating
3    links to Iran.  This is a government agency that has
4    enormous capability to access information.  So, with
5    respect, my Lord, why it might seem a bit bizarre, it
6    may seem a bit fanciful, I live in the world populated
7    by former spooks -- I beg your pardon, former
8    intelligence agents and we take drastic measures to
9    protect not only the information, but the people engaged
10    in gathering the information.
11 Q. And I suggest that you lied in your witness statement
12    about the way in which you report only orally.
13 A. I don't think, my Lord, I was intending to lie.  It may
14    have been misleading, for which I apologise to the
15    court, but, as I told you, at the time I prepared that
16    witness statement there were issues in my life which
17    were causing me considerable distress and to this day
18    that continues.
19 Q. And you did that in order to avoid -- and you omitted to
20    make any mention of the project updates in your report,
21    didn't you, the written project updates?
22 A. Because, my Lord, we're talking about something that
23    happened five years ago, and in the last five years
24    I have had my 19-year-old son committed to a mental
25    health hospital on numerous occasions, I have had my son

108

527

1      assault me, I have had my wife have a stroke, and, in
2      fairness, my mind was not focused on trying to remember
3      back to 2014, and to this day my son is in a mental
4      health hospital. So, with respect, my Lord, what
5      counsel is suggesting, that I sought to mislead your
6      court, is absolutely not true.
7  Q.  And you did so in order to seek to avoid being
8      identified as the author or as the producer of the only
9      surviving version of your project update, dated
10     26 March 2015. That's why you told those lies --
11  A.  Absolutely not, my Lord. My name was disclosed
12     in the discovery proceedings prior to this trial. Why
13     would I seek to hide behind the fact that I would have
14     been the author of this report?
15  Q.  And you did that, you lied, Mr Page, because the March
16     project update showed that you, Mr Page, were
17     investigating, amongst other people, Mr Farhad Azima?
18  A.  Absolutely not.
19  Q.  And because that one surviving project update showed
20     that you were investigating the human rights campaign on
21     behalf of the Ruler?
22  A.  The human rights campaign?
23  Q.  Sorry, the concern about a campaign being mounted of the
24     sort we see described in the March project update.
25  A.  My Lord, the campaign that we foresaw or what we think

1      was going to happen is no different to the campaign that
2      was mounted by Sheikh Khalid to embarrass His Highness.
3      So our answer -- our emphasis was what is the nature of
4      the complaint and what they intended to do with it, and,
5      as I said in my evidence, earlier evidence, my brief
6      was: was Dr Khater Massaad working with a member of
7      His Highness' family? And this is a follow-on from that
8      investigation.
9  Q.  And you lied because the March project update showed
10     that you had been investigating, amongst others,
11     Mr Azima from as early as March 2015?
12  A.  My Lord, with respect, I've answered that question.
13     Absolutely not. I was never mandated to or instructed
14     to, then or now, investigate Farhad Azima.
15  Q.  And in paragraphs 12 to 15 of your witness statement
16     {D/3/4-5} you gave an untruthful account of your
17     Farhad Azima-related work in 2015, didn't you?
18  A.  Would you mind if I just read it?
19  Q.  You may.
20  A.  Paragraph 15?
21  Q.  12 to 15. You can read those paragraphs. I'm
22     suggesting to you that what it does not reveal --
23  A.  No.
24  Q.  -- is the full extent to which you were looking at
25     Mr Azima as shown by the project update, which we will

1      come to, Mr Page -- we are going to come to that -- and
2      don't -- remember that there are three and a half pages
3      concerning Mr Azima -- right? -- before you answer the
4      question I put to you. I think you said that you didn't
5      look at Mr Azima at all in 2015, so be very careful
6      because you're on oath now, Mr Page.
7  A.  Yes, I appreciate I'm on oath and I've already mentioned
8     that, when I prepared my statement in June of 2019,
9     I could not recall the name of Farhad Azima because this
10     was a massively complex investigation involving many,
11     many people, and if Farhad Azima had been -- I think, my
12     Lord, I have a fairly retentive memory. If Farhad Azima
13     had been the focus of my investigation I would have
14     remembered. The answer is he was not and never was and
15     is this day is.
16  Q.  Could we turn to what Mr Page you actually were doing in
17     2015 in relation to Mr Azima?
18  A.  I'm sorry, you're talking about the paragraph 15 again?
19  Q.  No, I'm going to ask you if you could try to call upon
20     your retentive memory to help with what you were
21     actually doing in 2015 as it may have concerned
22     Mr Azima; all right, Mr Page? That's what I'm looking
23     at now; all right? It doesn't matter whether you're
24     looking at Mr Azima by himself or as part of
25     Dr Massaad's team allegedly or as part of a campaigning

1      group or for some wider very, very confidential
2      sensitive reason. Just think about, Mr Page, the extent
3      to which Mr Azima was the subject -- double underline --
4      of your, Mr Page's, attention in 2015. Do you
5      understand that, Mr Page?
6  A.  I understand the question, my Lord.
7  Q.  Right. Well, let's try, shall we, to tell his Lordship
8     truthfully now on oath what you actually did in relation
9     to looking at Mr Azima in 2015?
10  A.  My Lord, if I may -- my Lord, if I may -- I find this
11     slightly offensive. I am a former police officer.
12     I left the police with an exemplary conduct certificate.
13     I joined the police to uphold the rule on law and order.
14     And to propose that I'm lying on oath, I find, my Lord,
15     very offensive because I do not lie on oath.
16     I understand the oath and I continue to uphold the
17     values that I had when I was a police officer. So the
18     answer is to your question, my Lord -- is I did not
19     investigate Farhad Azima. The only reference to
20     Farhad Azima is in this report dated March 2016, and
21     this part of the project finished very quickly
22     thereafter.
23  Q.  Can we have the project update up, please, {H7/299}?
24     You know, Mr Page, by now that it's dated 26 March 2015.
25     And his Lordship can take it, can he, that this was

1       prepared by Insight, this Israeli investigative outfit
2       that you've described today?
3  A.  That is correct.
4  Q.  Will we find details of Insight and their work on the
5       internet?
6  A.  I would think not.
7  Q.  Oh, why not?
8  A.  Because in our -- in the nature of the business they
9       undertake, we do not -- we don't go on Yellow Pages. We
10      are a very -- as I am -- a very boutique, respectable
11      investigation and corporate intelligence agency. So we
12      don't need to put our name on the internet. My name is
13      on the internet because my group provides security in
14      hostile environments, and the reference to the
15      investigation division, which is in my witness
16      statement, is a minute part of the work that I do for
17      governments in hostile environments.
18  Q.  So how would somebody get to know about Insight's work,
19      then?
20  A.  Right. Okay. So 2005, my Lord, I am providing security
21      support to the European Commission aid mission to the
22      Palestinian people, which is in Jerusalem. I am the
23      only foreign company to be given a licence in Israel to
24      carry weapons, which is part of the requirement to
25      protect the diplomats of the European Commission.

113

1       I also have a licence in Palestine, which is very
2       rare, because I have to work both sides of the divide.
3       To perform the service that I need to provide to my
4       clients, I need to gather intelligence from the
5       Palestinian Authority and from the Israeli authorities,
6       and that puts me into contact, my Lord, with people from
7       the Israeli intelligence service.
8       So, as will be my evidence when it comes to
9       Mr Halabi, I have numerous connections within the --
10      both the Palestinian Authority intelligence service and
11      the Israeli intelligence service, and when I was seeking
12      a company to help me on this project, that's how I came
13      across this company.
14  Q.  And why, in a case concerning Dr Khater Massaad and the
15      UAE, did you think to -- that actually an Israeli
16      investigative outfit would be the right people to help
17      you?
18  A.  My Lord, the allegations against Khater Massaad were
19      links to Iran, links to Hezbollah, which is in Southern
20      Lebanon. Who better -- who has more knowledge of Iran
21      and Hezbollah and Lebanon than the Israelis? Certainly
22      not British intelligence.
23  Q.  And is your evidence that you thought that none of
24      Insight's information-gathering would be through illicit
25      obtaining of electronic material, none of it at all?

114

1  A.  No, it is from confidential sources, from what I would
2       call "covert operations", and by "covert", my Lord, I do
3       not mean electronic covert operations; I mean
4       cultivating a source by means of under-cover operation.
5       And I don't feel too comfortable giving away all the --
6       I'm happy to expand if you wish, but if you want an
7       example, I knew that Khater Massaad -- because I know
8       Khater Massaad personally. I have worked with him for
9       two years, I travelled with him, I socialised with
10      him -- so I knew he liked women, just an example -- and
11      I don't mean his wife, I mean other women.
12      Now, if I wanted to get information on
13      Khater Massaad, the English thing is to put someone
14      beside him to cultivate him in a way that I don't think
15      I need to explain, my Lord. And that's how it works.
16      And it's bizarre, I know, and, my Lord, I'm sure it's
17      bizarre to this court, but the world in which I live in
18      is populated by former intelligence services, officers,
19      and they're the skill sets to this day that are
20      converted into the commercial world.
21  Q.  It would also include, wouldn't it -- your particular
22      knack of getting confidential information, that would
23      extend to paying people, wouldn't it, Mr Page?
24  A.  The payment may be no more than a lunch.
25  Q.  But it would include paying people for information,

115

1       wouldn't it, Mr Page?
2  A.  Potentially, yes.
3  Q.  Paying people to get confidential information; yes?
4  A.  Absolutely not.
5  Q.  Can you look at {H7/299/2}, please, which is the project
6       report.
7  A.  Right, yes.
8  Q.  "In the US, KM's team hired a team of advisers managing
9       Farhad Azima ... in order to spread allegations against
10      our client. The main allegations against the client are
11      on human rights issues ..."
12      Can you see that?
13  A.  Yes.
14  Q.  "FA, who might also be responsible for paying the
15      US team, handles all KM's activities in the US."
16      Can you see that?
17  A.  Yes.
18  Q.  Then a bit further on down it says:
19      "According to our source, FA also hired a private
20      investigator ..."
21      Now, who was your source?
22  A.  It's not my source.
23  Q.  Well, who is the source you're talking about there?
24  A.  Well, I actually don't know who the source is.
25  Q.  Oh, I see. So this is an Insight source and you don't

116

1    know who they're referring to?

2  A.  My Lord, how it works is that everybody within my

3    industry is over-protective with sources, for one of two

4    reasons: to disclose the source, they put the source at

5    risk and no one in our industry gives up the source

6    unless asked to do, and I did not ask my colleagues to

7    give up their source. I believe that this information

8    that they had obtained from the source and the

9    information I have asked them, the source, was over

10    a series of meetings over lunch.

11  Q.  And then the last paragraph:

12        "Our sources have reported that KM's team suspects

13    that they have an information leak since they noticed

14    some of RAK's actions in the last few months. They

15    believe that the client is having someone monitor their

16    activities either electronically or in other methods."

17        Now stopping there, Mr Page, do you know who the

18    "sources" -- plural -- are who are referred to there?

19  A.  I have absolutely no idea, my Lord.

20  Q.  And therefore -- well, in going on, they say:

21        "... have reported that KM's team suspects that they

22    have an information leak ."

23  A.  I can't comment on why he says that. But, my Lord, if

24    this information been obtained in an illegal way, I am

25    lost as to know how we got Joseph Assad's name wrong in

117

1    the report because he's called "Joseph Aboud". His name

2    is not "Joseph Aboud".

3  Q.  Mr Page, you're in no position to say to his Lordship

4    whether Insight did or didn't use illegal means to

5    obtain information that fed into these project updates

6    of yours.

7  A.  I am, my Lord, in a position .

8  Q.  How?

9  A.  Because, my Lord, I said in evidence previously that

10    Insight were mandated by me and were told that we must

11    not break the law because the information that we may be

12    producing for the client may be the subject of legal

13    proceedings and, therefore, cannot be tainted by any

14    possibility of illegality .

15        Now, if you ask me, my Lord, if approaching someone

16    under pretext, cultivating them, talking to them, is

17    illegal , I think it 's probably questionable, but it is

18    not illegal activity . If someone volunteers -- if the

19    former mistress of Khater Massaad volunteers information

20    to me about him, I 'm not sure where the duty of

21    confidentiality lies . It 's as simple as that. And in

22    this case the source knew various people named in this

23    report and heard through the grapevine that a campaign

24    was about to be launched against His Highness, and it 's

25    the same source that actually was against His Highness

118

1    on the Sheikh Khalid case. That's how we got from this

2    quantum leap of finding someone who might be involved in

3    working with Khater Massaad against His Highness.

4  Q.  Mr Page, you didn't actually know, did you, the way in

5    which Insight were going about getting information or

6    intelligence for you and the Ruler, did you?

7  A.  Yes, I did.

8  Q.  You weren't involved in the actual

9    intelligence -gathering itself , were you?

10  A.  My Lord, I have 40 years in this industry. I know when

11    information that has been provided to me has come from

12    an illegal source. This was clearly and unequivocally

13    information obtained from covert sources.

14        Now, if they used a pretext, ie met someone

15    pretending to be a journalist , I have no idea, but what

16    I do know is that they were never authorised or mandated

17    or did anything illegal .

18  Q.  Well, I suggest, Mr Page, that you would have known that

19    Insight would potentially carry out hacking or illegal

20    accessing of electronic data.

21  A.  Absolutely not.

22  Q.  And when it says here, "Our sources have reported that

23    KM's team suspects ... an information leak ... They

24    believe that the client is having someone monitor their

25    activities either electronically or in other methods",

119

1    they were right, weren't they, to be suspicious in that

2    way?

3  A.  No, because the timeline does not work --

4  Q.  Then if we go to {H7/299/3} --

5  A.  My Lord, may I just finish that answer? Sorry. The

6    timeline does not work. I was not mandated until

7    January of 2015, okay? The report stated March 2015.

8    They were not mandated to go after -- sorry, to put it

9    in the timeline, what you're saying is that their team

10    are saying that they were subject to electronic

11    interception .

12        Now, the worrying part for my client in this report

13    is , if you look at Joseph Assad -- and I apologise, my

14    Lord, to go on -- it refers to Joseph Aboud, AKA

15    Joseph Assad, being an expert in SIGINT, and for the

16    benefit of my Lord, "SIGINT" is spook language for

17    "hacking".

18        So the concerns that my client had raised about

19    information being leaked from his palace was well

20    founded because Joseph Assad is a known specialist in

21    that field from his CIA days.

22  Q.  If we go to {H7/299/3}, please, heading, "KM efforts

23    against the client .

24        "FA and the US Advisory Team."

25        Can you see that?

120

1   A.   Yes.

2   Q.   "In [consideration] to our previous report, we were

3        informed by several new sources ..."

4            Can you see that?

5   A.   Yes.

6   Q.   What were those new sources?

7   A.   My Lord, I've no idea.

8   Q.   And it reads on:

9            "At the moment, KM's strategy in the US is to spread

10       human rights violations allegations against the client."

11           Can you see that?

12  A.   Yes.

13  Q.   Then a bit further on down it says:

14           "According to our sources, KM's US lawyer,

15       Kirby Behre ... hired a consultant ..."

16           What are the sources that are being referred to

17       there, Mr Page, can you tell his Lordship?

18  A.   My Lord, I can't answer the question.  I have never

19       asked, nor would I ask, unless I had reason to ask, "Who

20       actually are you talking to?", because, as I explained

21       in my previous evidence, I don't -- no one gives up

22       a confidential source unless required to by law.

23       A source is a source, and you don't -- because you may

24       have a source that is in a very difficult position, and

25       if they are to disclose to a third party who that source

                                    121

1        is, you may end up compromising your source.

2            So, for example, my Lord, during the investigation

3        of Khater Massaad I had a source within Lebanese

4        intelligence.  He was sharing information that he was

5        getting from Lebanese intelligence -- because it was

6        a quid pro quo.  I was giving him information, he was

7        giving me.

8            If I were to give up the source, bearing in mind we

9        are talking about links to Hezbollah, there is a good

10       possibility that my source may actually suffer physical

11       harm, so therefore I am -- as my colleagues are -- I am

12       overprotective of my sources.  And it's well founded and

13       it's something that has been drilled into me and

14       disciplined in me since I've been in this industry for

15       a number of years.

16  Q.   It's right, isn't it, Mr Page, that information

17       concerning Mr Azima's alleged management of Massaad's

18       team in the US, including as to the advisers that were

19       working for the team, was likely to be confidential

20       information?

21  A.   No.

22  Q.   And what's been described here, I suggest, Mr Page, is

23       the procurement on behalf of -- the procurement as part

24       of this project of confidential information --

25       information confidential to Dr Massaad or Mr Azima or

                                    122

1        others.

2   A.   No.

3   Q.   And advisers are likely to be agents, aren't they, owing

4        a duty of confidence to their principal?

5   A.   To my knowledge, this information that's contained in

6        this report was provided by someone who had had a lunch,

7        a social gathering, with somebody else within this team,

8        and -- pardon my expression, my Lord -- had spilled the

9        beans.  We didn't -- we just wanted to ascertain what --

10       if there was any substance to what His Highness

11       believed, that Khater Massaad was working with

12       a relative of His Highness to create damage and harm to

13       his reputation.

14  Q.   It's likely, isn't it, that a plan or strategy of

15       Dr Massaad's in relation to, for example, to some human

16       rights concerns or campaign, that is likely to have been

17       confidential to Dr Massaad, isn't it -- likely to be?

18  A.   No, because I'm sure that on the internet there's

19       a thing called, I think -- well, Amnesty International

20       certainly, but Banged Up in Dubai talk about numerous

21       human rights abuses in the UAE.  So the fact that

22       Khater Massaad was privy to allegedly human rights

23       abuses is probably something that's reported in open

24       source, I would believe.

25  Q.   How do you think, Mr Page, that Dr Massaad's team came

                                    123

1        to suspect that there was an information leak?  What did

2        you understand to be the reason that, if you like --

3   A.   My Lord, it's very simple.  As I said, His Highness had

4        good reason to believe that his information had been

5        compromised, so, therefore, it follows that they may

6        have -- somebody may have conducted a covert operation

7        into His Highness' palace, the RAK prosecutor's office,

8        which was fed back to Khater Massaad.

9            Now, my Lord, I can tell you that to this day or --

10       sorry -- that there's certainly -- during the course of

11       my investigation into Khater Massaad, it is clear that

12       Khater Massaad maintains contacts within Ras Al Khaimah

13       that is feeding in information and we're getting that

14       from human intelligence sources.

15           So, my Lord, I'm trying to make the point is we were

16       well founded in our belief that there's -- something was

17       really amiss within the security of the Palace and the

18       RAK prosecutor's office and perhaps in RAKIA.  I'm just

19       repeating what I said previously.

20  Q.   Could you go to page 16 of this document, please

21       {H7/299/16}, which is the summary.  It's the summary:

22           "As we reported above ..."

23           Can you see that?

24  A.   Yes.

25  Q.   You're reporting here, aren't you, for the benefit of

                                    124

1     the Ruler and for RAK, basically , aren't you?
2   A.  Yes.
3   Q.  And that would include RAKIA?
4   A.  Correct.
5   Q.  You say this :
6     "As we reported above, KM's US team has a certain
7     plan to smear RAK and its Ruler with human rights
8     allegations ."
9     That would be a serious concern, wouldn't it , at
10    that time, to the Ruler?  It would go beyond merely --
11    it would go on -- it would go beyond merely a concern
12    about what you've alleged to be some information leak in
13    the Palace, wouldn't it , Mr Page?
14   A.  No, that's not correct, my Lord.  Given that as far back
15    as 2008/2009 his step-brother -- sorry, his
16    half-brother, Sheikh Khalid, had produced a report
17    criticising His Highness and the way His Highness acted
18    as the Crown Prince.
19    It goes -- therefore follows that of course he would
20    be concerned if there was going to be a campaign against
21    him, but it would be following -- and again, my Lord,
22    it's on the internet if anyone wants-- it's called the
23    "Rogue Report", and if anybody wanted to follow it
24    through, this would make sense, that this is where they
25    tried to discredit His Highness.

1   Q.  Mr Page, have I understood your evidence correctly?  Is
2    it your evidence that the Ruler was concerned that his
3    half-brother was in cahoots with Dr Massaad to start
4    some campaign against the --
5   A.  That is not my evidence.
6   Q.  Don't interrupt , please.  Don't interrupt , please.
7    I understand your evidence to be that the Ruler was
8    concerned, as you understood it, that his half-brother
9    was in league with Dr Massaad and that together they
10    were mounting some campaign in order to destabilise
11    the Ruler and RAK. I think that's a summary of what
12    you've said today.
13   A.  My evidence is that a member of his family, which is
14    what I raised with my Lordship before we broke for
15    lunch.
16   Q.  But the concern of the Ruler was that there was a plot
17    to destabilise him and RAK; in other words, to
18    destabilise his Rulership of RAK. Is that right?
19   A.  Yes.
20   Q.  That would be something of enormous concern to
21    the Ruler, wouldn't it ?
22   A.  Well, it would not only be of great concern to the
23    Ruler, it would be of great concern to the federal
24    government. The Emirate of Ras Al Khaimah is a federal
25    emirate and anybody who tried to destabilise an emirate

1     would be guilty of a very serious criminal offence in
2     UAE.
3   Q.  What would happen to them?
4   A.  I have no idea.
5   Q.  There's an ominous tone there when you said that.   What
6    would happen to them?
7   A.  I have no idea.  I imagine trying to plot a coup d'état
8    would have serious consequences.  What that would mean,
9    I don't know. I'm not familiar --
10   Q.  Capital consequences?
11   A.  Well, I'm not familiar with UAE law so I can't answer
12    you.
13   Q.  So his Lordship can take it -- if you wouldn't mind
14    answering the question as well -- that the Ruler would
15    have been very, very exercised by this alleged plot
16    against him?
17   A.  You mean concerned?
18   Q.  Yes.
19   A.  Well, I would imagine so, but he never voiced those
20    concerns to me.
21   Q.  I suggest that's not true, Mr Page.
22   A.  What is not true?
23   Q.  You spoke to the Ruler about various matters at this
24    time and you're saying that the Ruler didn't express to
25    you concerns about what we see you writing about on

1     these three or four pages in this report?
2   A.  No.
3   Q.  Is that what you're saying to his Lordship?
4   A.  His brief to me was that, "I believe that my family
5    member may be working with Khater Massaad". We didn't
6    stray into, "They're trying to plot my overthrow". We
7    didn't -- what I can say on oath, my Lord, is it is
8    apparent that His Highness has great concerns about what
9    is going on within his emirate because, during the time
10    at which I served him, I have seen that he has enhanced
11    considerably the security at the Palace.  For what
12    reason, I cannot comment. But I had seen it at my first
13    hand.  I go to the Palace.  When I first went to the
14    Palace in 2015, there were no armed security at the
15    Palace.  To this day there are armed UAE soldiers
16    guarding his palace.
17   Q.  Mr Page, can you answer the question rather than give
18    sort of lengthy speeches all the time?
19   A.  I'm sorry.  Please ask your question again.
20   Q.  I'm going to take longer, I'm afraid, because if you
21    look at the transcript , I ask you a question and then
22    you give a very long answer.
23   A.  I beg your pardon, my Lord.
24   Q.  Now, you can give a long answer, but do please try to
25    answer the question.

1  A.  I understand, my Lord.
2  Q.  I was asking you about the -- what we see in the project
3      update, the three and a half pages that refer to
4      Mr Azima, they do so, don't they, in terms that Mr Azima
5      is apparently managing Dr Massaad's US team? That's
6      right, isn't it?
7  A.  That's what the report says, yes.
8  Q.  And this report records that this team is in effect
9      working on Dr Massaad's side of things, doesn't it?
10 A.  That is correct.
11 Q.  And I think from your evidence the concern was -- there
12     was a concern with the Ruler that actually this was part
13     of some attempt to threaten the Ruler's stability and
14     position.
15 A.  No, I would not say that.
16 Q.  And I suggest that that was the case, Mr Page, and that,
17     since that was the case, the Ruler would have been very,
18     very focused on anybody whom the Ruler suspected of
19     being part of that alleged plot.
20 A.  That is not correct.
21 Q.  That's fair, isn't it, Mr Page?
22 A.  No, I think the Ruler's concern was that information
23     regarding the ongoing investigation into
24     Dr Khater Massaad and the case being prepared by the RAK
25     prosecutor was being shared outside the confines of his

129

1      organisation.
2  Q.  And, Mr Page, if we go to {H7/299/16} -- I think we can
3      go through this little paragraph:
4          "As we reported above, KM's US team ..."
5          That was viewed by the authors of this report to be
6      being managed by Mr Azima, wasn't it?
7  A.  Yes.
8  Q.  So we can read it as follows, if for "KM's US team" we
9      replace -- if we replace "KM's US team" in this
10     paragraph with "KM's US team managed by Mr Azima", we
11     can read as follows:
12         "As we reported above, KM's US team, managed by
13     Mr Azima, has a certain plan to smear RAK and its Ruler
14     with human rights allegations. As far as we know, at
15     this point, they do not have any evidence to back up
16     these allegations, but they started gathering
17     information for a campaign, based on hearsay and
18     testimonies, and started searching for a platform to
19     make it public. The campaign is not public yet, so we
20     will be able to gather intelligence on their progress in
21     order to monitor their activities and attempt to contain
22     or ruin their plans."
23         Now, Mr Page, the reference to "their progress" and
24     "their activities" and "their plans" is a reference to
25     KM's US team managed by Mr Azima, isn't it, Mr Page?

130

1  A.  It is.
2  Q.  Thank you, Mr Page. And it follows from that, doesn't
3      it, that what you put in train on behalf of RAK and
4      RAKIA or the Ruler at this time was some serious
5      intelligence-gathering on the US team and Mr Azima,
6      didn't you?
7  A.  Correct, using human intelligence sources.
8  Q.  And I suggest that you wouldn't have stopped at human
9      intelligence sources, Mr Page. You would have been
10     content to use illegal intelligence-gathering services
11     in order to achieve the information that you were
12     required to produce for the Ruler.
13 A.  With respect, no, because this operation actually --
14     this part of my mandate ended shortly after we produced
15     this report.
16 Q.  And there's no evidence, is there, Mr Page, that you
17     produce -- there's no project update that we've
18     seen in which there's any suggestion that the
19     intelligence-gathering and monitoring we see referred to
20     here have been brought to an end?
21 A.  Well, it was brought to an end because, my Lord, we
22     decided -- and in discussions with His Highness -- that
23     the source that we was using for this -- to obtain this
24     information might be compromised. So for his own safety
25     we decided to withdraw continuing to obtain information

131

1      in respect of this campaign.
2  Q.  What did you understand the intelligence-gathering would
3      comprise, then? Just human sources; is that right?
4  A.  Yes, human sources. I mean, if you are to mount
5      a campaign of this -- of that described in my report,
6      Dr Massaad would have been talking to PR agencies,
7      corporate communications. We have a number of sources
8      which we had used in the Khater Massaad -- I beg your
9      pardon -- in the Sheikh Khalid investigation, who would
10     hear -- I mean a mandate -- I apologise if I'm teaching
11     you to suck eggs. Under US law, if you work for a --
12     against the interests of a foreign government, you are
13     required to register that with a certain organisation in
14     the United States. So therefore we were seeking to see
15     whether any of the main PR agencies had registered an
16     interest representing Khater Massaad or whoever to go
17     after His Highness.
18 Q.  Mr Buchanan gave evidence that you were being paid
19     directly by the Palace in 2015 and 2016. Is that right,
20     Mr Page?
21 A.  That is correct.
22 Q.  Mr Buchanan gave evidence that in 2017 to 2018 you were
23     being paid about US $300,000 per quarter. Would that be
24     right?
25 A.  That's -- well, from my knowledge. I can't -- without

132

1    referencing my invoices -- if he says that, he would
2    have been authorising my invoices, so perhaps he's got
3    the better handle on this than I have.
4  Q. How much were you being paid in 2015 for this work?
5  A. Again, my Lord, it would vary. It would be 100,000
6    a month, it might be -- it depended on the scope of work
7    that we were undertaking. I mean, bear in mind that we
8    were working, my Lord, in 14 or 15 jurisdictions .
9    That's a lot of resources to commit, and not only
10   consultancy fees or contractors' fees, there's travel
11   costs, etc, etc. So I -- honestly, my Lord, I can't
12   give you a figure because I just don't know it without
13   referencing material which I don't have before me.
14 Q. Can you be shown {H7/268}, please, Mr Page? Bear in
15   mind that that project update is 26 March 2015. Do you
16   think it likely that the Ruler -- sorry, go to {H7/268}
17   first .
18     Mr Buchanan gave evidence that one of the prompts
19   for the emails -- you'll see there's some emails in
20   early April 2015, {H7/268}.
21 A. Do you wish me to read them?
22 Q. I just want you to -- now you've got the page, listen to
23   the context. You know context is important. If I could
24   set some context for once and then I'll ask you the
25   question.

133

1      Mr Buchanan gave evidence that the March project
2    update report that I have just taken you to was, he
3    thought, one of the prompts for what we see in these
4    emails referred to as "the Ruler's instruction in
5    relation to Mr Azima"; all right?
6  A. If you say so, my Lord. I'm not familiar with this
7    correspondence.
8  Q. No, and you've got no basis to challenge that, have you?
9  A. I've never seen it , my Lord, so I don't know -- I'm
10   not -- the only person I reported to was His Highness
11   directly or Jamie Buchanan. I had no idea what the
12   internal politics were within the Palace about what was
13   going to be decided or not decided. It's not part of my
14   mandate.
15 Q. No. So at the foot of the page Mr Buchanan says this to
16   Mr Handjani on 4 April 2015:
17     "Good afternoon. HHSS had wanted us to target FA --
18   on what basis would we do this?"
19     Can you see that, "to target"? And "FA" is
20   a reference to Farhad Azima; all right?
21 A. I see that, my Lord.
22 Q. If you go on, please, to {H7/273}, you will see some
23   more emails on 4 April 2015, featuring Mr Bustami,
24   Mr Handjani and Mr Buchanan. Can you read that,
25   Mr Page? (Pause)

134

1  A. Yes, I've read it .
2  Q. And you can see that Mr Bustami says this :
3      "I have had few discussions with boss [that's
4    a reference to the Ruler, Mr Page] about FA and he is
5    adamant that we bring charges against him."
6      And then a bit later on it says:
7      "He wants me to get you on the case to file some
8    sort of charges against Farhad."
9      And then later on:
10     "When are you next in town so that me you and Jamie
11   could hook up and coordinate our attack ."
12     Do you see that, Mr Page?
13 A. I can, my Lord, yes.
14 Q. And you at this time -- you had meetings, didn't you,
15   with Mr Buchanan and the Ruler?
16 A. That is correct.
17 Q. And I put it to you, Mr Page, that you would have been
18   made aware at or around that time that the Ruler was
19   adamant that charges should be brought against Mr Azima.
20   That's right, isn't it?
21 A. Absolutely not, my Lord.
22 Q. And you would have been made aware that the Ruler wanted
23   to target Farhad Azima?
24 A. Absolutely not, my Lord.
25 Q. And you would have been made aware that one -- that you

135

1    were -- in effect , that you were being instructed to
2    obtain information on Mr Azima because the Ruler wanted
3    that to be done?
4  A. No, my Lord. I already said I was never instructed by
5    His Highness or anybody else in Ras Al Khaimah to
6    conduct an operation or investigate Farhad Azima, and
7    that is my evidence.
8  Q. If you go to {H7/464}, please, you'll see an email on
9    20 July 2015. Have you got that, Mr Page?
10 A. Not yet. (Pause)
11 Q. Have you got that?
12 A. Yes, I have, my Lord, yes.
13 Q. You can see that on 19 July 2015 -- it 's the bottom
14   email -- Mr Buchanan sent this email, saying:
15     "NB [that's Mr Bustami] says the Boss wants criminal
16   stuff taken out of [the] letter and to go after FA ..."
17     Can you see that?
18 A. I can, my Lord, yes.
19 Q. And "FA" is a reference to Mr Azima; all right?
20 A. It must be, my Lord, yes.
21 Q. Yes, it must be. So it looks, doesn't it , Mr Page, as
22   if , in July 2015, the Ruler was still letting it be
23   known that he wanted Mr Azima to be gone after?
24 A. My Lord, I can't possibly comment. I had no
25   instructions from His Highness to go after Farhad Azima.

136

1    What His Highness was talking about I have no
2    comprehension.
3  Q.  And I suggest, Mr Page, you were having -- you were
4    involved with the Ruler and Mr Buchanan at that time,
5    weren't you?
6  A.  In 2015?
7  Q.  Yes.
8  A.  Yes, that is correct, my Lord.
9  Q.  And you were working on the project for them,
10    weren't you?
11  A.  I was working on the mandate as described in my witness
12    statement.
13  Q.  And that project included, didn't it, concerning
14    yourself with the alleged campaign by Dr Massaad and his
15    associates?
16  A.  I just said in evidence previously we shut down that
17    particular project as early as April because to continue
18    with the project would have compromised the source and
19    I have said we decided not to continue with it because
20    it was not necessary.
21  Q.  And I suggest that you would have been told that your
22    remit to target Mr Azima by getting information for the
23    Ruler had become all the more important as at July 2015.
24  A.  My Lord, I report what -- I said it once and I will say
25    it again.  I was never instructed by His Highness or any

137

1    of his advisers to target, investigate -- and by
2    "target", I don't know what that means -- Farhad Azima.
3  Q.  And I suggest that around about July, when it was made
4    plain to you that the Ruler still wanted Mr Azima gone
5    after, you would have redoubled your
6    intelligence-gathering efforts on Mr Azima.
7  A.  Absolutely not, my Lord.  I wasn't doing anything
8    against Farhad Azima.  Why would I double something I'm
9    not doing?
10  Q.  And I suggest that around about October and
11    November 2015 you caused or procured the hacking of
12    Mr Azima's emails through spear-phishing attacks on his
13    data.
14  A.  Absolutely not, my Lord.
15  Q.  And that you continued to procure illegal access to
16    Mr Azima's data through 2016?
17  A.  Absolutely not, my Lord.
18  Q.  And you made that illegally obtained information
19    available to those you were working for, namely
20    the Ruler, RAK and RAKIA?
21  A.  I did not, my Lord.
22  Q.  Can we go, please, to paragraph 16 of your witness
23    statement at page {D/3/5}?  You refer there to
24    a conversation you allegedly had with Mr Buchanan.
25  A.  Yes.

138

1  Q.  And you placed this in 2016.
2  A.  Yes.
3  Q.  And you say in paragraph 15:
4      "During that conversation, Jamie asked me to keep my
5    ears and eyes open for anything I heard about a negative
6    publicity campaign that might be damaging for RAK."
7      Do you see that?
8  A.  Yes, I do.
9  Q.  We've seen, haven't we, Mr Page, that a negative
10    publicity campaign that might be damaging for RAK was
11    something that you were looking at back in March 2015,
12    as recorded in that project update?
13  A.  No.  The instructions from His Highness in January of
14    2015 were to establish whether Khater Massaad was
15    working in collaboration with a member of his family to
16    orchestrate obtaining information illegally from his
17    palace, understanding the strategy, understanding the
18    investigation.  It was not about ascertaining if there
19    was a plan to launch a smear campaign.  That came as
20    a result of our -- we think outside the box, and it just
21    happened, in trying to understand whether Khater Massaad
22    was working against His Highness' interest with a member
23    of his family, we developed a source who gave us this
24    information which is in the report.  We were never
25    mandated to go after it.  It's something that we used as

139

1    part of the ongoing investigation into the link between
2    Khater Massaad and a member of His Highness' Royal
3    Family.
4  Q.  And in paragraph 16 you say this {D/3/5}:
5      "Following this conversation with Jamie, I spoke to
6    a few contacts I use occasionally in the investigations
7    business, journalism and PR industry and asked them to
8    keep their ear to the ground."
9      Now without giving a lengthy speech, please,
10    Mr Page, who were the contacts you're there talking
11    about?
12  A.  I cannot remember.
13  Q.  You can't remember?
14  A.  I cannot remember.
15  Q.  Including the contacts in the investigations business,
16    you can't remember?
17  A.  My Lord, the --
18  Q.  Can you remember or not?
19  A.  I cannot remember.
20  Q.  I suggest, Mr Page, that what you're talking about in
21    paragraphs 15 and 16 were simply a continuation of the
22    intelligence-gathering and monitoring project that we
23    saw evidenced in the March 2015 project update.
24  A.  Absolutely not.  Absolutely not, my Lord.
25  Q.  I'm going to ask you about the alleged discovery of this

140

1    data in August 2016.  You claim, Mr Page, don't you,
2    that you learnt of the hacked data on the internet
3    through Mr Halabi?
4  A. That is correct.
5  Q. And you give evidence there in paragraph 18 {D/3/5-6}.
6    Can you see that?
7  A. Yes.
8  Q. You were in court today, weren't you, when Mr Halabi
9    gave his evidence --
10  A. I was, my Lord.
11  Q. -- and when he indicated the way in which he came by
12    this information?
13  A. I was, my Lord.
14  Q. And it's right, isn't it, that by the time Mr Halabi
15    came by this information, you had worked for many, many
16    months using the expert services of Insight,
17    a specialist Israeli outfit?
18  A. Absolutely not, my Lord.
19  Q. Had you stopped using Insight by August?
20  A. No, they were working on the mandate that we were given
21    by Mr Buchanan in March of 2015, which was to
22    investigate Khater Massaad's links to Iran, Hezbollah --
23    it's in my evidence -- but Iran, Hezbollah, we were
24    looking at -- we were looking in Kyrgyzstan, I was
25    looking in DRC, I was looking in -- all over the place,

141

1    at least six or seven jurisdictions, my Lord.  But we
2    were not looking at Dr Farhad -- sorry, correction -- we
3    were not looking at Farhad Azima.
4  Q. So I suggest, Mr Page, that if you had Insight, with all
5    its expertise, information-gathering for you at that
6    time, if there was something interesting and new
7    concerning Mr Azima or the alleged campaign that he was
8    involved in for Khater Massaad, you'd have got wind of
9    it straightaway from someone like Insight, wouldn't you,
10    Mr Page?
11  A. No, my Lord, they had a limited mandate and it's in my
12    evidence.  Jamie asked me to do this not as a mandate.
13    I was not mandated.  I was not paid.  Just, "If you're
14    out and about, keep your eyes to the -- ears to the
15    ground in case you hear anything".  That was it and they
16    were never mandated by me to do that, because had
17    I mandated them, they would have been paid.  I was not
18    being paid for this.
19  Q. I suggest, Mr Page, that the alleged involvement of
20    Mr Halabi in relation to discovering this hacked data is
21    entirely invented.
22  A. My Lord, no, it's not.  That is -- Mr Halabi and I have
23    had a long-standing relationship.  This mandate -- and,
24    my Lord, just to answer your question that you raised to
25    me, I do not -- I am not computer literate.  I'm

142

1    embarrassed to say that I'm a dinosaur.  I do not use
2    the computer.  Because this was going to be searches in
3    the Arabic language, Mr Halabi was one of the people
4    that I reached out for.
5  Q. And I suggest that you have used Mr Halabi -- that you,
6    rather, asked Mr Halabi to sign a statement claiming he
7    found this hacked data in order that Mr Halabi could
8    serve as some source for that discovery --
9  A. That is not true, my Lord.
10  Q. -- in order to place the source of that discovery at
11    least one step further removed from you and/or the
12    people working for you.
13  A. My Lord, I'm repeating what I said.  I was never
14    mandated by His Highness, by any of His Highness'
15    advisers, to go after Farhad Azima.  So I can't answer
16    the question any farther.  I'm telling you that I was
17    never mandated and that's on oath.
18  Q. And I put it to you, Mr Page, that you arranged for
19    Azima's confidential data, that by this stage had been
20    illegally obtained by or through your offices, to be
21    published online in August 2016.
22  A. Absolutely not, my Lord.
23  Q. And you were working for RAK and/or RAKIA and the Ruler
24    at that time, weren't you?
25  A. Well, I would say, my Lord, I was actually working for

143

1    His Highness, not RAK or RAKIA.  I was working for the
2    Government of Iraq, of which His Highness is the Ruler.
3  Q. And the Government of Iraq ultimately --
4  A. I beg your pardon, "RAK", nor "Iraq".
5  Q. Yes, and RAKIA is the investment authority of the
6    RAK Government?
7  A. That is my understanding, my Lord.
8  Q. And you would have been aware that there was a plan
9    afoot there to ruin Mr Azima through some sort of
10    offensive which RAKIA had by then launched?
11  A. No, my Lord, I was not privy to any of those
12    conversations with His Highness' advisers.
13  Q. Who else did you tell about the hacking of Mr Azima's
14    data, please?  Who did you tell about that?
15  A. As outlined in my statement.
16  Q. I'd suggest that you illegally obtained that data and --
17    did you discuss the illegal obtaining of it with
18    anybody?
19  A. I didn't obtain the information illegally so I'm not
20    sure who I would have discussed it with.
21  Q. Can I ask you, by August 2016 the negotiations between
22    RAK and RAKIA and Dr Massaad had broken down, hadn't
23    they?
24  A. I believe so, my Lord, but again I'm not party -- I'm
25    not privy to that sort of conversation.

144

1  Q. And by the end of September litigation had been started,
2     hadn't it, by RAKIA against Mr Azima?
3  A. Again, my Lord, I'm not privy to that type of -- I'm not
4     part of the litigation team.
5  Q. Are you aware of what, if any, campaigning has been
6     carried out on behalf of RAK or RAKIA since
7     September 2016 against Mr Azima?
8  A. Sorry, my Lord --
9  Q. Since --
10 A. No -- sorry -- by "campaigning" you mean what?
11 Q. I mean online campaigning, I mean spreading stories,
12    trying to promulgate stories adverse to Mr Azima --
13    stories adverse to Mr Azima.
14 A. I am aware that they hired media communications
15    consultants, but what their mandate was is not within my
16    knowledge, my Lord.
17 Q. So you don't know what, if any, steps RAK or RAKIA took
18    to mount some sort of publicity campaign against
19    Mr Azima since that date; is that right?
20 A. My Lord, I'm not privy to that type of information.
21 Q. What have you done for RAK or RAKIA since August 2016?
22    What services have you performed since then?
23 A. Continued to investigate Khater Massaad; I have
24    continued to look at issues involving their dispute in
25    Georgia; I have continued to look at issues in

145

1     Kyrgyzstan where money went missing; I have continued to
2     look at money that went missing in India; I have
3     continued to look at money that went missing in
4     I believe Bulgaria -- it may be Romania, my Lord,
5     I can't remember; and, more importantly, the Iranian
6     issue. But that is really of great concern to the
7     Government of Ras Al Khaimah.
8  Q. It's right, isn't it -- if you want to go in your
9     witness statement, please, Mr Page, to {D/3/6} --
10 A. Sorry, which?
11 Q. If you go to paragraph 20, please. Start at
12    paragraph 19, please, Mr Page.
13 A. Yes.
14 Q. Thank you. You say in paragraph 19 -- this is your
15    account that Mr Halabi called you. Do you remember
16    giving -- well, you've given evidence of that in
17    paragraph 19. Can you see?
18 A. Yes, I vaguely remember he called me, yes.
19 Q. You say in paragraph 20:
20       "When I received this information from Majdi,
21    I would have picked up the phone to Jamie although I do
22    not specifically remember doing so."
23       Do you remember that?
24 A. Yes, I do remember that.
25 Q. And then a bit later on you say:

146

1        "I believe I spoke to Jamie first because he was my
2     client and that he asked me then to contact Neil Gerrard
3     at Dechert and let him know what I had heard but it may
4     have been the other way round. I think I may have
5     spoken to them more than once in this period. I do not
6     recall how I provided them the links that Majdi had
7     given to me."
8        Can you see that?
9  A. That is my recollection, my Lord.
10 Q. Then you go on to say:
11       "I do not know what Jamie and Neil did with the
12    information ..."
13       Can you see that?
14 A. No, I passed on the information -- as I said, this was
15    not a mandate from Mr Buchanan. This was, "Please have
16    a look". I found it. I passed it on. That was my --
17    the end of my involvement in that particular exercise,
18    which again was not a mandate. It was just, "Can you do
19    this?"
20 Q. So after you had passed on this information to
21    Mr Buchanan and Mr Gerrard for the first time -- after
22    you'd initially passed it on -- that was the end of your
23    contacting them in that regard?
24 A. Other than that I am aware, because I am aware, that
25    they hired a specialist -- computer forensic specialist

147

1     to download the material. Other than that, I'm not
2     aware of -- and I am aware, my Lord, that Decherts have
3     reviewed, interrogated the information, but other than
4     that, I'm not aware of anything else.
5  Q. But as far as you're concerned, Mr Halabi gave you the
6     information, the two links, you then passed it on the
7     phone to Messrs Buchanan and Gerrard or one or both of
8     them; is that right?
9  A. Yes, that's correct, my Lord.
10 Q. And you didn't pass on any further links to either of
11    those gentlemen subsequently?
12 A. My Lord, I run at that time a company turning over --
13    I am the chairman of a company turning over £27 million
14    a year. I am running complex contracts in hostile
15    environments. This was a favour for Mr Buchanan. It
16    was not -- I didn't keep -- it was literally, "Can you
17    do it?", I passed the information on and that was it.
18    I don't recall, I could not possibly recall,
19    four years -- nearly four years down the road or
20    something, my Lord -- four years after the event, what
21    exactly was said and what I said and who I said because
22    I run a very big organisation. I'm the chairman of the
23    group.
24 Q. Could you go, please, to {G/26.10}?
25 A. Yes, I have it in front of me.

148

1  Q. This is a copy of the judgment of Mr Justice Rix, as he
2     then was, in Dubai Aluminium v Sayed Reyadh Sayed
3     Abdulla --
4  A. "Riyadh".
5  Q. I defer to you, Mr Page. 3 December 1998.
6        You'll recollect this case, won't you, Mr Page?
7  A. Yes, it was one of the first cases I did with the -- for
8     the Government of Dubai.
9  Q. And if we go, please -- I don't think we need to bother
10    with the case except for the way it deals with your role
11    in it. If you go to {G/26.10/4} please -- that's the
12    fourth page of this --
13 A. Yes.
14 Q. -- can you see what Mr Justice Rix records from lines 19
15    down to 31, please?
16 A. Yes, I can read it, yes.
17 Q. Have you read it?
18 A. Yes, I'm familiar with it because --
19 Q. You're familiar with it?
20 A. Yes.
21 Q. And that's a reference to you, Mr Page, isn't it, in
22    that page?
23 A. It is, my Lord, yes.
24 Q. And there was evidence, wasn't there, filed through an
25    affidavit before Mr Justice Rix, in relation to this

149

1     particular application, "... that information in
2     relation to certain of Mr Al Alawi's accounts had been
3     obtained by a sub-agent instructed by Page Associates
4     making what Mr Page of that firm called 'pretext calls'
5     to the banks concerned ..."
6        Do you see that?
7  A. Yes, my Lord.
8  Q. And from your evidence today, it sounds as if you don't
9     think making pretext calls to banks would be unlawful;
10    is that right?
11 A. My Lord, my instructions to my agent at the time
12    I commissioned them to conduct the work into
13    Mr Al Alawi, who by, my Lord -- at that point was
14    subject to a criminal investigation both in Dubai and
15    Switzerland, was to undertake investigations. I had no
16    knowledge until this case arose as to how they obtained
17    that information.
18 Q. What's the answer to my question?
19 A. That I -- sorry, was your question did I authorise
20    pretext calls?
21 Q. I said that from your evidence today it sounds as if you
22    didn't think that making pretext calls to banks to
23    obtain information would be unlawful.
24 A. Sorry, I said -- I did not say I did not think it was
25    unlawful. I'm saying that my instructions to my agents,

150

1     both in the United Kingdom and in Switzerland, were to
2     obtain the information. I at all times --
3  Q. What's the answer? You seem to have given the same
4     answer again not to my question. What's the answer to
5     my question?
6  A. You're asking me the question did I authorise or
7     sanction --
8  Q. No, I didn't. I didn't ask you that. I asked you
9     whether you thought making pretext calls to the banks in
10    the way that Mr Justice Rix describes and with which you
11    must be familiar -- whether you think that's unlawful or
12    not. You, Mr Page, here today, what do you think about
13    it?
14 A. Yes, Mr Justice Rix said it was unlawful. I cannot
15    argue with the decision of Mr Justice Rix.
16 Q. So it's only because he made that finding that you think
17    it's unlawful, is it? You didn't think independently --
18 A. No, no, I'm sorry, my Lord. I did not instruct my
19    agents to obtain information illegally by pretext
20    information. I only became aware of it when this case
21    came before Mr Justice Rix. My instructions to my
22    agents then and to this day is: you operate within the
23    law.
24 Q. I'm sorry, Mr Page, I suggest that's not truthful and
25    that you would -- that you are perfectly happy to nod

151

1     and wink at sub-agents so that they get information by
2     whatever means necessary.
3  A. My Lord, this was an enormously complex investigation
4     involving what I would only describe as an organised
5     crime gang working within Dubai Aluminium. I did not
6     commission or authorise them to do it. I accept
7     unreservedly that this is in breach of the law as
8     prescribed in Mr Justice Rix's decision, for which
9     I have apologised to the court, but I can say no more on
10    it. It was not something I sanctioned; it came out
11    after the event.
12 Q. If we go to {G/26.10/5}, can you read lines 16 to 27,
13    please, Mr Page?
14 A. Sorry?
15 Q. It starts:
16       "This evidence is not answered on behalf of Dubai."
17       Can you see?
18 A. Oh, sorry, you're talking -- all right.
19 Q. Lines 16 down to 27.
20 A. Yes, understood.
21 Q. That's all right. Just read that to yourself, please.
22    (Pause)
23 A. Yes, I can see what it says, yes.
24 Q. Mr Justice Rix found, didn't he, that there was a strong
25    prima facie case of criminal or fraudulent conduct in

152

1    the obtaining of such information concerning
2    Mr Al Alawi's accounts?
3 A. I accept that, my Lord, yes.
4 Q. And that was something which had arisen as a result of
5    your use of the sub-agent to get information for
6    a client?
7 A. That is correct, my Lord, yes.
8 Q. Can we go, please, to {G/26.15}? Have you got that,
9    Mr Page?
10 A. Yes.
11 Q. Do you see that?
12 A. Yes.
13 Q. This is a piece by the Hindustan Times on December 15,
14    2015. You can see what it says:
15       "BCCI wants all details of snooping from UK firm.
16       "With the previous cricket Board secretary
17    Sanjay Patel clarifying his position on the payment of
18    US$900,000 ... made in 2013-2014 for a controversial
19    surveillance that is being alleged was aimed at fellow
20    officials, the focus has shifted to the UK-based
21    security and investigations company, Page Protective
22    Services (PPS) that carried it out."
23       Can you see that, Mr Page?
24 A. I can, my Lord, yes.
25 Q. You can see that the article then runs on over the page.

153

1       If you go to the second page, please, {G/26.15/2}, you
2    can see -- if you just read it to yourself and then I'll
3    ask you some questions.
4 A. I'm familiar with this publication, my Lord.
5 Q. Yes. So what this piece suggests is that there was
6    going to be some enquiry into work which your company
7    had carried out in relation to a certain Indian cricket
8    board; is that right?
9 A. That is correct, my Lord, yes, although the company is
10    actually -- the article is -- the name of the company
11    that undertook the work is not PPS UK.
12 Q. And is it right that you carried out the surveillance
13    that's referenced here, you or your firm?
14 A. My Lord, I'm in some difficulty again. This is -- the
15    instructions from the BCCI, the Board of Cricket Control
16    in India, is a confidential instruction between myself
17    and the then chairman of the board. I'm not sure --
18    I know the article refers -- I'm not sure, my Lord, I'm
19    at liberty to tell you what my instructions were or the
20    background to this instruction. It's -- my Lord, I'm
21    being asked to breach confidentiality again and I don't
22    feel very comfortable about it.
23 Q. And one of the quotes here is {G/26.15/2}:
24       "'If this is the case, we are interested to find out
25    from where and how email exchanges between

154

1    Shashank Manohar (BCCI president) and Lalit Modi and the
2    secretary's (Anurag Thakur) pictures with an alleged
3    bookie were generated and circulated to a section of the
4    media', said the official ."
5       There was a concern, wasn't there, about the illegal
6    obtaining of emails and their disclosure to the press?
7    Is that right?
8 A. No, because at that time, my Lord, Lalit Modi was under
9    investigation by what is called the "CBI", which is the
10    Central Bureau of Investigation, ie the Indian
11    equivalent of the FBI, in relation to criminal activity.
12    I have no idea whether they sought to get information
13    from Lalit Modi, but the reference to -- this is not
14    something I took part of.
15 Q. Were you involved in any alleged illegal obtaining of
16    emails at this time?
17 A. No, my Lord.
18 Q. Can I ask you finally, please, to go to {H10/353},
19    please, where you'll see a copy of a judgment of
20    Sir Andrew Smith in the case called
21    JSCBTA Bank v Ablyazov and others. Can you see that,
22    Mr Page?
23 A. I can, my Lord, yes.
24 Q. I'm sure you're familiar with this litigation, aren't
25    you, enough --

155

1 A. Relatively so, yes.
2 Q. This records a judgment of Mr Justice Smith on
3    15 February 2018. You can see from paragraph 1 he
4    refers to the fact that this is a long-running dispute,
5    with allegations of conspiracy made by the bank against
6    the defendants, and freezing injunctions have been
7    obtained and receivership orders made against the
8    defendants in relation to this litigation; all right?
9       Then if you go to paragraph 7 at {H10/353/2}, you'll
10    see the matters before Sir Andrew Smith. Can you see
11    there?
12 A. Yes, my Lord, yes.
13 Q. One of the defendants had applied to challenge the
14    orders the bank had obtained on two grounds: one was
15    that there had been non-disclosure and the second was
16    that the bank did not have clean hands; all right?
17    Those were the two grounds of challenge. And the
18    learned judge dismissed those challenges, but he dealt
19    with the clean hands argument at page 21 of this
20    judgment, starting at paragraph 113 {H10/353/21}. Can
21    you see that?
22 A. Yes.
23 Q. And one of the defendants raised four complaints in
24    relation to the clean hands argument. You can see (i),
25    (ii), (iii), (iv). It's the fourth one. It was said by

156

1    one of the defendants that the bank had:
2         "... misled the court when applying for a disclosure
3    order against Mr Eesh Aggarwal."
4         Right?
5  A.  Yes.
6  Q.  It's that fourth aspect that concerns you.  If you go,
7    please, to page 24 of this judgment, to the heading
8    "Disclosure order against Mr Aggarwal" {H10/353/24} --
9  A.  Sorry.
10 Q.  That's all right.  Take your time.
11 A.  Which paragraph are you reading?
12 Q.  It starts at paragraph 128.  Do you have that at the top
13   of page {H10/353/24}?
14 A.  Yes.
15 Q.  Paragraph 129 -- sorry, 128, this is where the judge is
16   dealing with the fourth bit of the clean hands thing; in
17   other words, that there's been -- the disclosure by the
18   bank has not been right.  Paragraph 129:
19        "The evidence in support of the application was
20   a statement made by Mr Tucker and dated 14 June 2016.
21   He said that the Bank had 'recently discovered that
22   Mr Ablyazov and Mr Khrapunov [had] been working [with]
23   Mr Aggarwal'.  He complained that the Bank was contacted
24   in early 2016 by a Mr Stuart Page, who had claimed to
25   act for unnamed Israeli 'hackers' who had extracted

157

1    information from Mr Aggarwal's computer.  At a meeting
2    with Mr Hardman and a Mr Nurlan Nurgabylov, a senior
3    official of the Bank, on 17 February 2016 Mr Page showed
4    documents indicating that Mr Aggarwal was involved with
5    a number of named companies.  Mr Khrapunov's complaint
6    is that the Bank was dishonest about when it learned
7    about Mr Aggarwal administering Mr Ablyazov's assets and
8    dealing with Mr Khrapunov: that it had information
9    obtained by unlawful hacking and wanted to appear to
10   have come by the information legitimately ."
11        Can you see that?
12 A.  I can, my Lord, yes.
13 Q.  And in paragraph 130 the judge goes on:
14        "It appears from Mr Jenkins' evidence ..."
15        Then that runs on.
16        Can you see the last sentence:
17        "It is said that the UAE would have responded to the
18   request and provided information about assets managed by
19   Mr Aggarwal.  (According to Mr Jenkins, between
20   November 2011 and September 2013 the Republic of
21   Kazakhstan made other requests of other states for legal
22   assistance that referred to companies of which,
23   according to the Bank, it had later learned from
24   Mr Page ...)."
25        Can you see that?  Then paragraph 134:

158

1         "During the hearing, Mr Samek introduced an
2    alternative version of this complaint: that the Bank
3    knew of Mr Aggarwal's involvement with Mr Khrapunov and
4    with Mr Ablyazov's assets through meetings that
5    Mr Nurgabylov and Mr Rakishev had with Mr Page before
6    the meeting in February 2016 to which Mr Tucker
7    referred.  In support of this allegation Mr Khrapunov
8    relied on a letter from Mr Page's solicitor ,
9    Stewarts Law LLP ..."
10        Can you read on?  Can you read on, please, the rest
11   of paragraph 134, please, {H10/353/24-25} -- to the end
12   of 134?
13 A.  Yes, my Lord.  I'm familiar with that.
14 Q.  So there was evidence, wasn't there, Mr Page, in this
15   Ablyazov judgment of Sir Andrew Smith, that you,
16   Mr Page, had been saying, claiming, that you had bank
17   information derived from Israeli hackers.  That's right,
18   isn't it?
19 A.  My Lord, the affidavit in support of Hogan Lovells was
20   written by Mr Tucker.  I did not meet with Mr Tucker.
21   I met with Mr Chris Hardman, who is a partner.  I did
22   not say -- and I do not know where this information has
23   come from -- that it was Israeli hackers.  I'm in some
24   difficulty because I -- that -- Mr Tucker was not
25   present at that meeting so I have no idea as to how

159

1    Mr Tucker made that assumption.
2  Q.  It's right, isn't it, Mr Page, that you do have access
3    to expert hackers, don't you?
4  A.  No, I do not have access -- and, my Lord, I was provided
5    information from a source in Dubai that showed that
6    Mr Eesh Aggarwal had knowingly assisted in the
7    commission of a laundering of $700 million stolen from
8    the BTA Bank.  My first approach -- and I go back to my
9    Lord -- is that I saw that this is evidence of
10   a criminal conspiracy.  I presented the information to
11   the bank and to the legal -- to the Ministry of Justice
12   and told them that they should seek MLAT -- MLAT
13   assistance.  I'm sure you know what "MLAT" stands for.
14   I did not commission nor was I paid to access
15   Eesh Aggarwal's information.
16 Q.  And I suggest, Mr Page, that you caused or procured the
17   hacking of Mr Azima's emails in this matter and made
18   that material available to RAK and RAKIA.
19 A.  Absolutely not, my Lord.
20 MR LORD:  Thank you, Mr Page.
21 MR TOMLINSON:  My Lord, I've no re-examination, unless
22   your Lordship has any questions.
23 JUDGE LENON:  No, I don't have any questions.  Thank you,
24   Mr Page.
25 A.  Thank you, my Lord.

160

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL**
**(ENGLAND)**

**BETWEEN**

### RAS AL KHAIMAH INVESTMENT AUTHORITY

**Respondent**

**and**

### FARHAD AZIMA

**Appellant**

---

## AFFIDAVIT OF STUART ROBERT PAGE

---

I, **STUART ROBERT PAGE**, of 14 Montpellier Road, London, W5 2QP, **STATE ON OATH** as follows:

1    I make this affidavit at the request of Farhad Azima ("**Mr Azima**"), the Appellant, who I understand has a pending application for permission to appeal to the Supreme Court, and that the evidence I give in this affidavit may be relevant to that application.

2    I have prepared this affidavit in a fairly limited time period as I understand that Mr Azima's application may be decided imminently, and so I have not had the opportunity to review the full range of potentially relevant documents that are available to me. I am therefore preparing this affidavit largely from memory and with limited assistance from documents. Subject to this point, and except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

3        In this affidavit I refer to documents which together comprise exhibit **"SRP-1"**. References to page numbers in bold in squared brackets in this affidavit are references to that exhibit.

4        As a result of previous work I carried out on behalf of the Ruler of Ras Al Khaimah (**"RAK"**) (the **"Ruler"**), I gave evidence for the Ras Al Khaimah Investment Authority (**"RAKIA"**), the Respondent, in these proceedings during the trial which took place in January and February 2020 before Deputy Judge Lenon QC (the **"First Trial"**). As such, I provided a witness statement dated 20 June 2019 [**SRP-1/1-7**] (my **"Witness Statement"**) and gave evidence at the First Trial on 29 January 2020. A transcript of my oral evidence is at [**SRP-1/8-35**].

5        I make this affidavit to supplement the evidence which I gave at the First Trial in the present proceedings. I also want take this opportunity to correct part of that evidence, as set out below.

**My role in the investigation of Khater Massaad**

6        I was engaged by the Ruler to investigate Khater Massaad (**"Khater"**) in January 2015, in relation to the misappropriation of a large amount of government funds. Khater had previously been the main advisor to the Ruler and a close confidante and friend, and he sat on the board of a number of RAK entities.

7        The Ruler initially asked me to meet with Mr Jamie Buchanan (**"Jamie"**), to whom I reported during the course of my mandate, until Jamie left RAK in the summer of 2019. In the course of my mandate, I also worked alongside Mr Neil Gerrard (**"Neil"**) of Dechert LLP (**"Dechert"**), although I was never instructed by him in relation to the investigation into Khater.

8        In addition to the general mandate described above, Jamie provided more detailed instructions and requested that my investigation looked into:

8.1      Khater's alleged connection with Hezbollah, a prescribed terrorist organisation, in Lebanon, and alleged assistance in relation to their funding;

8.2      Khater's assets and business interests, particularly in Saudi Arabia;

8.3      A concern that Khater was allegedly working with other members of the Ruler's family to overthrow the Ruler;

8.4      Khater's connections with Iran, and in particular an alleged connection to Iran's Islamic Revolutionary Guard Corps (the **"IRGC"**); and

8.5      Khater's business associates, in particular his association with Viktor Bout (to whom I refer in my Witness Statement).

9    Soon after meeting with Jamie in 2015, I instructed Amit (of Insight – the company which I identified during my oral testimony at the First Trial as having assisted me with the preparation of the reports I presented to the Ruler, Jamie and Neil) to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defence Force. Consequently, Amit and his team had extensive knowledge of the methods used by Iran and the IRGC to move money in support of terrorist organisations. They also had multiple language skills (in particular Arabic and Farsi), and so were a natural choice for this project.

10   This project was given the codename "Project Beech" which was used between me, Amit and his team.

11   The investigation work was undertaken using three main sources of intelligence, namely:

11.1   HUMINT – human intelligence, which constituted cultivating individuals to provide information;

11.2   Open Source – research into corporate and other publicly available records; and

11.3   SIGINT – signal intelligence, which is intelligence-gathering by the interception of communications.

12   SIGINT is a term that originates from intercepting radio signals and tapping a target's phone, and continues to be used in the intelligence world (including the commercial investigations industry) to include the hacking of confidential emails and unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

13   My main point of contact was Amit, but I know that Amit used a number of analysts to assist with the project by analysing the raw data. I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose.

14   In addition to undertaking some of the investigative work for the project, my role also included ensuring that the reports Amit and Insight prepared were shared with the Ruler, Jamie and, later on, Neil as securely as possible (given the sensitivity of the reports and what they contained).

15      Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. One of the reports entitled "Project Update" (dated 26 March 2015) which I have seen (in redacted form) in the context of the First Trial [**SRP-1/36-52**] was the second of these reports. The reports would generally include an executive summary, some raw data that had been obtained as a result of the investigation (usually contained within an appendix to the report), some analysis of this data, and recommendations and action points.

16      I recall that some of these reports also featured extracts from confidential documents (with the document itself then appended to or embedded in the report) which I concluded must have been obtained as part of Amit's and Insight's SIGINT work. It was obvious to me (and it would have been obvious to anyone else reading the reports) that such documents were obtained as a result of unauthorised access to computers.

17      I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

18      Given the nature of the people and organisations we were investigating (including those set out above), we adopted secure communications protocols for handling Amit's reports and sharing them with Jamie, Neil and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

19      An email account was created that only Amit and I (and my personal assistant, Caroline Timberlake ("**Caroline**")) could access, and to which we knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to my company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

20      Amit (or one of his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to me (or occasionally Caroline) to indicate that there was something to be reviewed. These messages would then be deleted.

21   To discuss matters relating to Project Beech, other members of the team, including Jamie and Neil also used Confide (originally) and then moved to Signal later on. I also recall that Andrew Frank (who was part of RAKIA's strategy team – see below) routinely used Whatsapp.

22   Once the reports had been downloaded and printed in hard copy, Caroline was instructed to delete the electronic copy. The reports were hand-delivered to Jamie for his review, or would be left for him at his hotel in London with the concierge. I would also deliver the report in person to the Ruler in RAK as part of our regular private audiences.

23   At Jamie's request, I would also arrange for a copy of some of the reports (but not all of the reports) to be sent to Neil, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Caroline) to Neil (or Neil's secretary) at Dechert's office in London. However, on one occasion, a report was opened by someone other than Neil or his secretary at Dechert. Given the obvious make-up of the report (as set out above), this caused Neil real concern, as he asked me to send future reports to his home in Nutley, East Sussex. Courier receipts and emails relating to the delivery of reports to Neil at Decherts and at his home are exhibited at [**SRP-1/53-73**].

24   The Ruler instructed me that I was not to send anything to him via electronic means or by courier: if I had something to give to him or something to report, I was to meet with him in person in RAK. Accordingly, for the duration of Project Beech, I met with the Ruler approximately every three to four weeks to provide an update on our investigation. I would usually meet Jamie beforehand and discuss the report in detail, and he would indicate any part of the report that he thought I needed to highlight to the Ruler. Normally Jamie would then also be present at those meetings with the Ruler, and very occasionally Neil would be in attendance as well.

25   A typical meeting with the Ruler would last about 45 minutes, of which the first fifteen minutes would be spent discussing world affairs, of which the Ruler is very knowledgeable. In my experience in the Arab world, Middle Eastern clients are unlikely to read lengthy documents, so frequently the Ruler asked me to give him an overview of where we were in the investigation, and occasionally would read the executive summary at the front of the report, but not the whole document. I would leave the copy of the report with the Ruler before I left.

26   At this point I wish to correct and clarify my evidence given at the First Trial, as I realise that I was unintentionally misleading when I said that my reports to clients, including the Ruler, were "invariably oral". What I meant was that my reports to the Ruler were invariably face to face, in the manner described above.

27    Every few months, Jamie returned to me the hard copies of the reports he held, on the understanding that I would then arrange for the reports to be destroyed (which I then did).

28    I also arranged meetings with Amit, Jamie, Neil and me between 2015 and 2019 in order to obtain guidance from Jamie and Neil as to the direction of the investigation. They were specifically interested in my investigation into the role played by Khater in RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of my investigation were on the US sanctions list). I recall that Jamie told me that Mr Azima had introduced the three buyers to the transaction and asked me to look into the sale of the hotel as part of my investigation. To the best of my recollection, the reports produced by Amit and his team in connection with this part of the investigation contained information derived from SIGINT material.

29    Starting in 2016, multiple meetings took place at Dechert's office in London. Dechert required visitors to sign in and show some form of identification. To the best of my knowledge and belief, towards the end of 2016 or the beginning of 2017, Neil became increasingly concerned about meeting at Dechert's office as he did not want a written record indicating that Amit (or any other member of Amit's team) had visited him. It was after this that when we met in London, we gathered at Jamie's suite in the Churchill Hotel or in Amit's suite at the Metropolitan Hotel.

30 .   Jamie told me that he also attended strategy meetings in New York every four to six weeks with Andrew Frank (of Karv Communications) Amir Handjani ("**Amir**") (a close advisor to the Ruler) and Neil to discuss the investigation and RAK's litigation.

**Discovery of the hacked data**

31    As set out paragraphs 14 to 15 of my Witness Statement, Jamie told me that he understood that a negative publicity campaign had been threatened by Khater against the government of RAK and the Ruler, and asked me to keep my eye and ears open for anything about such a campaign that might be damaging for RAK.

32    I wish to correct the evidence I gave both in my Witness Statement and during my oral testimony at the First Trial as to the circumstances in which Mr Azima's confidential information came to be discovered.

33    The fact of the matter is that Majdi Halabi ("**Majdi**") had no role in the discovery of Mr Azima's confidential information. I provided incorrect testimony, claiming that (i) I had approached in him in relation to the threatened negative publicity campaign, and (ii) he had discovered the data. In fact, I approached Amit (and not Majdi) and asked him

to monitor the internet and dark web for such information, and it was Amit who told me about the data.

34    In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima.

35    During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In November 2018, my name was disclosed by RAKIA to Mr Azima in the context of these proceedings as being the person who informed them of the existence of the tranches of data. However, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit was in turn the person who had told me about the data, and Amit told me that he did not want his name disclosed in proceedings, for fear that, by inference, Insight would be accused of being responsible for hacking. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK. At this time there were no diplomatic relations between the State of Israel and the UAE.

**Meeting in Cyprus**

36    Consequently, there were a series of meetings between (variously) Amit, Jamie, Neil and me to discuss how to respond to Mr Azima's enquiries in these proceedings regarding how his data had been discovered by RAKIA.

37    Amit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Majdi, who I knew as one of Amit's subcontractors. I subsequently met with Majdi and Amit and we discussed the idea of Majdi being used as a cover for Amit's discovery of Mr Azima's data. I then discussed the idea of Majdi being used as a cover story with Jamie and Neil, and it was subsequently agreed that we would all meet to work out the plan. Initially Jamie, Neil and I discussed seeing the 'Israeli boys' (i.e. Amit and his team) in Israel as the safest option, but we later agreed to meet in Cyprus to sign off on the use of Majdi as a cover story.

547

38      We met in Cyprus on or around 21 November 2018. The meeting was attended by David Hughes (a partner, formerly with Neil at Dechert but, by this time, at Stewarts Law ("**David**")), Neil, Jamie, Majdi, Amit and me. It was agreed at this meeting that we would proceed with the cover story that Majdi (and not Amit) had discovered and passed the link to Mr Azima's confidential data to me, and that, if necessary, Majdi and I would be willing to provide witness testimony to this effect.

39      During this meeting, David raised his objection to the cover story, saying it was "*not credible*" and that it would not work, but Neil made it clear that this was going to be the best way forward, and that David needed to fall in line.

40      I subsequently met with Caroline Black and Dorothy Cory-Wright of Dechert and Lucy Ward of Stewarts Law to prepare my Witness Statement, which I signed on 20 June 2019.

41      I apologise unreservedly for the part I played in misleading the Court during the First Trial, and wish to state that the remainder of my evidence was true.

**Meeting with the FBI**

42      In mid-February 2019, Jamie advised me that the Ruler wished for me to attend a meeting with the FBI. On or around 21 February 2019, I therefore attended a meeting in New York at Dechert's office in order to meet with an FBI agent. My understanding was that the purpose of the meeting was to try to persuade the US authorities to open an investigation into Mr Azima. This is based on my understanding that for some while, RAK had been attempting to persuade the Department of Justice and the FBI to open up such an investigation.

43      When I arrived, I met with Jamie, Neil and a Mr Chris Swecker ("**Chris**") who I understand is a lawyer and an ex-FBI agent. However, after we waited for a considerable time in the meeting for the FBI agent to arrive, I was told that the meeting needed to be cancelled due to a scheduling miscommunication. I returned to the UK and awaited further instructions.

44      In early to mid-March 2019, Jamie then advised me that the Ruler wished for me to return to the US for a further meeting, this time to Houston. I had not been briefed on what the meeting related to, but I was told that my expenses would be covered and that I should just make sure that I made myself available. On or around 17 March 2019, I met with Jamie, Neil, Chris and an FBI agent called Paul Zukas ("**Paul**") at the Hyatt Centric The Woodlands hotel in Houston.

45      In the course of my career, I have had numerous interactions with federal law enforcement agencies and the district attorney's office in New York. Those meetings always took place at the offices of the relevant organisation. I therefore found it

strange that the meeting with the FBI in Houston was held at a hotel and not at the field office. At that meeting, Chris told me that I was being considered as a potential witness for a grand jury and that the purpose of the meeting was to assess my credibility. Following the meeting, Jamie, Neil, Chris and I went for dinner with the assistant special agent in charge ("**ASAC**") of the Houston field office, whose name I do not now recall. In the course of that dinner it became apparent that Chris and the ASAC were friends.

**Meeting in Switzerland**

46      As the trial of the proceedings (i.e. the First Trial) approached (due to commence in January 2020), I was asked by Amit (who had in turn been instructed by Neil) to organise and attend a meeting with him, Jamie, Neil, and Majdi to rehearse our testimony for the First Trial. We settled on Switzerland as the location for the meeting.

47      This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Having reviewed my travel records [**SRP-1/74-90**], I arrived at the hotel on the evening of 1 December 2019 and I left on 4 December 2019.

48      Shortly before the meeting, I was told by Neil that the Ruler had instructed him to tell Jamie that the meeting was no longer going ahead. As far as I am aware, the Ruler had terminated Jamie's employment in the summer of 2019. I was told by Neil that the Ruler therefore had concerns about whether he could be trusted to attend a meeting which required total secrecy.

49      Amit and some of his team also attended the meeting and provided extensive security for the meeting.

50      I had arranged for a special protocol to be in place to ensure maximum security and secrecy. I told Neil to leave his mobile phone at home or to switch it off so that his location could not be tracked. Neil, Caroline and I used burner phones for communication purposes, and I left my mobile phone at home.

51      To avoid detection, I did not fly direct to Switzerland. On 1 December, I took a series of trains from London to Paris Gare du Nord, then I transferred to Gare de l'Est. From Paris, I then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, I was collected by a member of Amit's security team and driven to the hotel.

52      At the hotel, we went through a mock trial, with Neil acting as both the judge and the cross-examining counsel. An effort was made to perfect the narrative that we were to tell the English court about how I had discovered the hacked data through Majdi.

53    We made use of the hotel's private chef and their wine from the hotel's cellar. The day was a mixture of eating, drinking and sections of cross-examination by Neil to drill into our story. During one of the sessions, Neil said something to the effect of "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*".

## Termination of my engagement

54    Following the First Trial, my work for RAK continued until 1 June 2020 when my engagement was terminated. I believe that the last report I prepared was for May 2020. I set out below the circumstances leading up to the termination of my engagement.

55    In March 2020, I received a call from Amir who told me that I should have no further contact with Neil. By this time, Amir had become one of my points of contact for the investigation after Jamie's role had been terminated.

56    I assumed at this point that it was Neil who was being pushed out of the picture by the Ruler. I agreed to have no further contact with Neil.

57    It seemed that I was wrong in my assumption when, on 28 May 2020, I received a letter from the Investment & Development Office of the Government of RAK saying that my engagement had been terminated. The language seemed odd to me given that I had never had a formal written agreement with any particular RAK entity that could be terminated.

58    This came as a shock to me as I had frequently been told by Jamie that the Ruler was grateful for the work I had done for him.

59    I therefore telephoned Amir shortly after receiving the letter to ask what was going on. He told me that he knew nothing about this but that he would check the position with the Ruler. He then called me back along the lines that I should not worry, that it was all connected to internal politics and that I should be re-instated in a few months. However, that never happened, and I received a subsequent letter from the Investment & Development Office on 14 June 2020 confirming payment of my final

invoice.

**SWORN** by Stuart Robert Page

Signed: _____

Date: 7 January 2022

Before me: _____

Name: _C KRAMPTON___

Occupation: _SOLICITOR___

Address:    Ashfords LLP
            1 New Fetter Lane
            London
            EC4A 1AN

IN THE SUPREME COURT OF THE UNITED
KINGDOM
ON APPEAL FROM THE COURT OF APPEAL
(ENGLAND)

BETWEEN

**RAS AL KHAIMAH INVESTMENT
AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

## AFFIDAVIT OF STUART ROBERT PAGE

---

**Burlingtons Legal LLP
5 Stratford Place
London
W1C 1AX**

**DX 82986 MAYFAIR**

**DH/AZI0003.2**

**Tel:     0207 529 5420**

**Solicitors for the Appellant**

552