UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FARHAD AZIMA, | |
| Petitioner, | **ORDER** |
| -against- | 21 Misc. 501 (PGG) |
| AMIR ALI HANDJANI, | |
| Respondent. | |

PAUL G. GARDEPHE, U.S.D.J.:

      Petitioner Farhad Azima seeks discovery from Respondent Amir Ali Handjani for use in a foreign proceeding in the United Kingdom, pursuant to 28 U.S.C. § 1782.  (Dkt. No. 2) Handjani has opposed Azima's application, arguing, inter alia, that Azima's requests are overly broad and inconsistent with English procedure.  (Dkt. No. 11)

      For the reasons stated below, Azima's application will be granted.

## BACKGROUND

### I.  FOREIGN PROCEEDINGS

      Farhad Azima is a United States businessman based in Kansas City, Missouri. Between 2007 and 2016, Azima and RAKIA – an investment authority of Ras Al Khaimah ("RAK")[1] -- were involved in several joint ventures.  (Holden Decl. (Dkt. No. 5) ¶ 6; UK Judgment (Dkt. No. 12-1) ¶¶ 1, 3)

---

[1] RAK is one of the seven Emirates of the United Arab Emirates.  (Barger Decl., Ex. 1 ("UK Judgment") (Dkt. No. 12-1) ¶ 1)

On September 30, 2016, RAKIA filed a lawsuit against Azima in the United Kingdom, alleging that Azima had engaged in fraud and conspiracy.  (See Holden Decl. (Dkt. No. 5) ¶ 7; UK Judgment (Dkt. No. 12-1) ¶¶ 5-9)

Azima claims that RAKIA's suit is based on information RAKIA illegally obtained by hacking Azima's computers and email accounts.  Azima brought a counterclaim against RAKIA alleging that RAKIA and its agents were responsible for this hacking, and that they had relied on information obtained through this hacking in bringing claims against Azima. In his counterclaim, Azima alleges that RAKIA's suit against him is politically motivated. According to Azima, the lawsuit is "the culmination of a targeted attack on him[] . . . because of his refusal to take RAKIA's side in a bitter fight" with a former senior government official – Dr. Khater Massaad – "who RAKIA alleges was guilty of large scale embezzlement."  (Holden Decl. (Dkt. No. 5) ¶¶ 4, 7; UK Judgment (Dkt. No. 12-1) ¶¶ 10-11, 255-57)

While RAKIA does not dispute that Azima was hacked, RAKIA denies any responsibility for the hacking.  According to RAKIA, it innocently obtained the hacked information from publicly accessible websites.  (UK Judgment (Dkt. No. 12-1) ¶¶ 12, 258; see also Holden Decl. (Dkt. No. 5) ¶¶ 7-9, 14-16)

In January and February 2020, RAKIA and Azima's claims were tried before a court in the United Kingdom.  Respondent Amir Ali Handjani – a U.S. lawyer who lives in New York, and who is a close advisor to Sheikh Saud bin Saqr Al Qasimi, the ruler of RAK – testified on behalf of RAKIA.[2]  Handjani denied that RAKIA was involved in the hacking.  (Holden Decl.

---

[2] Handjani has also served as an executive at RAK Petroleum and as a "senior advisor" to Karv Communications, a public relations firm.  (See Holden Decl. (Dkt. No. 5) ¶¶ 13, 21-22, 32)

(Dkt. No. 5) ¶¶ 8, 13; see id., Ex. B ("Sept. 5, 2019 Handjani Witness Statement") (Dkt. No. 5-2)

¶ 23; UK Trial Transcripts (Dkt. Nos. 12-4 and 12-5))

On May 22, 2020, the UK trial court entered judgment for RAKIA and dismissed

Azima's counterclaim, finding that Azima had not proven that RAKIA was responsible for the

hacking.  While noting that RAKIA had not credibly explained how it found Azima's data on the

internet, the court found that Azima had not demonstrated that RAKIA was responsible for the

hacking.  (UK Judgment (Dkt. No. 12-1) ¶¶ 377.6, 381-85)

Azima appealed the trial court's decision, citing new evidence supporting his

claim that RAKIA is responsible for the hacking.  (Holden Decl. (Dkt. No. 5) ¶ 10)  In a March

12, 2021 decision, the England and Wales Court of Appeal held that Azima's counterclaim was

wrongly dismissed, and that he should be permitted to retry his claim with new evidence.  (See

Barger Decl., Ex. 7 ("UK Appeal") (Dkt. No. 12-7) ¶¶ 129-49)

On July 16, 2021, the UK court granted Azima leave to amend his counterclaim

and to add the following new parties as counterclaim defendants:  RAKIA's outside counsel,

Dechert LLP; Dechert partner Neil Gerrard; RAKIA executive Jamie Buchanan; and private

investigator Stuart Page (the "Counterclaim Defendants").[3]  (Holden Decl. (Dkt. No. 14) ¶ 4)

Azima's counterclaim has since been re-amended and is currently pending.  (See Holden Decl.

(Dkt. No. 21-1) ¶ 4; id., Ex. 1 ("Am. Counterclaim") (Dkt. No. 21-2) (March 11, 2022 Am.

Counterclaim))

In the Amended Counterclaim, Azima alleges that the Counterclaim Defendants

conspired to hack Azima's computers and email accounts and to conceal that crime.  According

---

[3] Page was later dropped as a counterclaim defendant in the UK action.  (See Holden Decl., Ex.
2 ("Feb. 7, 2022 Page Witness Statement") (Dkt. No. 21-3) ¶ 1)

to Azima, in August and September 2016, "links to around 30 GB of Mr. Azima's personal private data spanning more than 10 years, including a substantial number of privileged communications, appeared . . . . on websites that disparaged Mr. Azima." (Holden Decl. (Dkt. No. 5) ¶ 15; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 6, 72-77)

In a September 23, 2016 letter to Azima, RAKIA made claims against him that are premised on the hacked materials. The UK lawsuit was filed a short time later. According to Azima, "[n]o other party has sought to rely on the hacked material in any proceeding in any jurisdiction." (Holden Decl. (Dkt. No. 5) ¶ 15; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 6, 72-77)

Azima claims that RAKIA launched a campaign against him in February 2015, when it learned that Azima was working with RAKIA's former CEO – Dr. Massaad – to draw attention to human rights abuses in RAK. (Holden Decl. (Dkt. No. 5) ¶¶ 16-17; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 15, 42-48D)

Stuart Page prepared a document for RAKIA entitled "RAK Project Update Report." In his report, Page recommends that RAKIA and its agents "gather intelligence on [Azima and his team] in order to monitor their activities and attempt to contain or ruin their plans." (Holden Decl. (Dkt. No. 5) ¶¶ 17-18; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 15, 42-48D; Holden Decl., Ex. C "Project Update Report") (Dkt. No. 5-3) at 17[4])

Azima further claims that, after Page's report was distributed, RAK's ruler directed Handjani, Buchanan, and Nasser Bustami to "target" or "go after" Azima. In April and May 2015, Handjani discussed these instructions with Buchanan and Bustami over Handjani's

---

[4] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

personal Gmail account. (Holden Decl. (Dkt. No. 5) ¶ 19; id., Ex. D ("April and July 2015 Emails") (Dkt. No. 5-4); Am. Counterclaim (Dkt. No. 21-2) ¶¶ 49-52)

According to Azima, between March 2015 and August 2016, he and his associates received more than 150 "spear-phishing" emails. (Holden Decl. (Dkt. No. 5) ¶ 20; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 18, 53-56) During this period, Azima's email accounts were accessed on multiple occasions through IP addresses unfamiliar to Azima, including IP addresses associated with India and Bulgaria. (Am. Counterclaim (Dkt. No. 21-2) ¶ 57)

In December 2015, Karv Communications – a U.S. public relations firm for which Handjani is a senior advisor – sent Gerrard a document entitled "View from the Window." That document reports that "a series of investigations" has "exposed as fact" that Azima "orchestrated [or] fully participated in numerous fraudulent activities." (Holden Decl. (Dkt. No. 5) ¶¶ 21-22, 32; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 58-61; Holden Decl., Ex. E ("View from the Window") (Dkt. No. 5-5); id., Ex. F (Dkt. No. 5-6) (Karv Communications Registration Statement))

On July 16, 2016, Azima met with Gerrard, Buchanan, and a Dechert associate. During that meeting, "Gerrard pressured . . . Azima to assist RAKIA in its dispute with Dr. Massaad," and threatened that "if Dr. Massaad did not agree to a settlement of his dispute, Mr. Azima would be 'collateral damage' in the ensuing conflict." (Holden Decl. (Dkt. No. 5) ¶ 23 (emphasis omitted); Am. Counterclaim (Dkt. No. 21-2) ¶¶ 66-67)

The dispute between Massaad and RAKIA was not resolved, and within weeks of the July 2016 meeting, blog sites containing portions of Azima's stolen data were created online. Additional links containing Azima's stolen data were published in 2018 and 2019. (Holden Decl. (Dkt. No. 5) ¶¶ 24-25; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 72-73)

On August 15 and 16, 2016, Buchanan and Gerrard sent emails to Handjani and others claiming to "break the news" of the discovery of these websites containing Azima's stolen data. While RAKIA maintains that its consultants innocently discovered Azima's stolen data on the internet, Azima claims that Gerrard and Buchanan had arranged for Azima's stolen data to be downloaded "several days prior to that point." (Holden Decl. (Dkt. No. 5) ¶ 26; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 68-71; Holden Decl., Ex. G ("Aug. 2016 Emails") (Dkt. No. 5-7))

According to Azima, Vital Management Services – working on behalf of RAKIA – arranged for the hacking of Azima's data. Bank statements show that in 2015 and 2017, Vital Management paid more than $1 million to Indian hacking firm CyberRoot Risk Advisory Pte. Ltd. and Gravitas International LLC. Vital Management is an investigative firm controlled by Nicholas Del Rosso, and Gravitas is an entity owned and controlled by Buchanan. During the UK trial, Del Rosso testified that – on RAKIA's behalf – he had arranged for Azima's stolen data to be collected in August and September 2016 by Northern Technology Inc. And a former CyberRoot employee "confirmed that CyberRoot is a 'hack for hire' firm[;] that CyberRoot uses the infrastructure of another Indian hack for hire firm [–] BellTroX Info Tech Services[;] and that other hacking firms had been approached to target Mr[.] Azima as early as October 2014." (See Holden Decl. (Dkt. No. 5) ¶¶ 27-30; Am. Counterclaim (Dkt. No. 21-2) ¶¶ 20-26F, 40, 78-81B)

## II.    **PROCEDURAL HISTORY**

On June 29, 2021, Azima initiated the instant proceeding to obtain evidence for use in a foreign proceeding, pursuant to 28 U.S.C. § 1782. Azima seeks the following documents from Handjani, along with a deposition:

1.  All documents and communications from September 2014 to present related to Farhad Azima or his associates, including but not limited to (1) documents related to the Project Update and similar reports prepared about Mr. Azima and his associates; (2) documents related to the instructions to "target" and "go after" Mr. Azima; (3) documents related to the "View from the Window" document provided by Karv Communications to Mr. Gerrard, (4) documents related to the purported discovery of Mr. Azima's stolen data in August 2016; (5) documents related to the websites published about Mr. Azima and links published on those websites between August 2016 and June 2019; and (6) documents describing communications between Mr. Handjani and Mr. Azima.

2.  All documents and communications from September 2014 to present related to the following persons and entities that are alleged to be involved in the attack on Mr. Azima:  CyberRoot, BellTroX, RAK Ruler Sheikh Saud bin Saqr Al Qasimi, James Buchanan, Stuart Page and any companies controlled by Mr. Page including Stuart Page MEFZ, Vital Management Services, Inc., Nicholas Del Rosso, Northern Technology Inc., and Gravitas International LLC.

(Pet. Br. (Dkt. No. 3) at 11; see also Proposed Order (Dkt. No. 2-2))

Azima claims that there is reason to believe that Handjani has these documents, given his "close involvement" with the events described above, as shown by emails he received and responded to regarding the decision to "target" Azima, as well as emails purporting to "break the news" regarding the alleged discovery of Azima's stolen data.  (Holden Decl. (Dkt. No. 5) ¶ 36)  And while Handjani testified at the UK trial that he had no involvement with or knowledge of the hacking, he was not required to produce relevant documents in connection with that proceeding.  (Id. ¶¶ 31-32; see Barger Decl., Exs. 4-5 ("UK Trial Transcripts") (Dkt. Nos. 12-4 and 12-5))

Handjani opposes Azima's Section 1782 application, claiming, inter alia, that (1) pre-trial testimony is inconsistent with English procedure, and should not be permitted; and (2) Azima's requests are "overbroad" and "untethered to his claims." (Resp. Opp. (Dkt. No. 11) at 15-25)

## DISCUSSION

### I.   LEGAL STANDARD

Section 1782(a) provides that

> [t]he district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal. . . .  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. . . .  The order may prescribe the practice and procedure, which may be in whole or part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure.

28 U.S.C. § 1782(a).

Section 1782 authorizes district courts to grant such relief only where (1) "the person from whom discovery is sought reside[s] (or is found) in the district of the district court to which the application is made"; (2) "the discovery [is] for use in a proceeding before a foreign tribunal"; and (3) "the application is made by a foreign or international tribunal or 'any interested person.'"  Schmitz v. Bernstein Liebhard & Lifshitz, LLP, 376 F.3d 79, 83 (2d Cir. 2004) (quotation marks and citations omitted).

"'[O]nce the statutory requirements are met, a district court is free to grant discovery in its discretion.'"  Id. at 83-84 (quoting In re Metallgesellschaft AG, 121 F.3d 77, 78 (2d Cir. 1997)) (alteration in Schmitz); see In re Edelman, 295 F.3d 171, 181 (2d Cir. 2002) ("Congress planned for district courts to exercise broad discretion over the issuance of discovery orders pursuant to § 1782(a) – both over whether to grant a discovery order and, if so, what limits to place on that discovery." (citing S. Rep. No. 88-1580, § 9, reprinted in 1964

U.S.C.C.A.N. at 3788)).  "This discretion, however, is not boundless.  Rather, . . . 'district courts must exercise their discretion under § 1782 in light of the twin aims of the statute:  providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'" Schmitz, 376 F.3d at 84 (quoting In re Metallgesellschaft, 121 F.3d at 79) (quotation marks omitted).

> In exercising their discretion, district courts should consider
>
> (1)    whether the documents or testimony sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid;
>
> (2)    the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;
>
> (3)    whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and
>
> (4)    whether the subpoena contains unduly intrusive or burdensome requests.

In re Warren, No. 20 MISC. 208 (PGG), 2020 WL 6162214, at *5 (S.D.N.Y. Oct. 21, 2020) (quotation marks and alterations omitted) (citing In re Microsoft Corp., 428 F. Supp. 2d 188, 192-93 (S.D.N.Y. 2006) and Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264-66 (2004)).

"A court considering a request for discovery under § 1782 must also be mindful of U.S. federal discovery procedures under Rules 26 and 45 of the Federal Rules of Civil Procedure."  In re Auto-Guadeloupe Investissement S.A., No. 12 MC 221 (RPP), 2012 WL 4841945, at *4 (S.D.N.Y. Oct. 10, 2012); see In re Gushlak, No. 11 MC 218 (NGG), 2011 WL 3651268, at *6 (E.D.N.Y. Aug. 17, 2011) ("Section 1782(a) mandates that discovery under the statute be produced 'in accordance with the Federal Rules of Civil Procedure.'  Accordingly, the

court is guided by Rules 26 and 45, which govern third-party discovery."), aff'd sub nom.

Gushlak v. Gushlak, 486 F. App'x 215 (2d Cir. 2012).

## II.   ANALYSIS

As Respondent concedes (see Resp. Opp. (Dkt. No. 11) at 14 n.5), the three

statutory factors are satisfied here. Azima has shown that (1) Handjani resides in and is found in

this District; (2) discovery is sought for use in proceedings before a foreign tribunal; and (3)

Azima – as a party in ongoing litigation – is an interested party in those proceedings.

As noted above, however, in exercising its discretion under Section 1782, this

Court must also consider the four factors set forth in Intel Corp. v. Advanced Micro Devices,

Inc., 542 U.S. 241 (2004), along with the federal rules that govern discovery.

Here, Handjani argues that – under the Intel factors – Azima's application should

be denied, because (1) granting the requested discovery would circumvent English procedural

rules, which do not generally permit live pre-trial testimony; and (2) the requested discovery is

"overbroad" and "untethered" to Azima's claims. Handjani also argues that the requested

deposition is duplicative of his earlier trial testimony, and thus should not be permitted under

Fed. R. Civ. P. 30(a)(2)(A)(ii). (Resp. Opp. (Dkt. No. 11) at 15-25)

### A.   Whether the Evidence Sought Is Within the Jurisdictional Reach of the English Court

Under the first Intel factor, courts consider "[w]hether the documents or testimony

sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782

aid." In re Warren, 2020 WL 6162214, at *4 (quotation marks, alterations, and citations

omitted); see also Intel, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a

participant in the foreign proceeding . . . , the need for § 1782(a) aid generally is not as apparent

as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad. A

foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence.  In contrast, nonparticipants in the foreign proceedings may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." (citations omitted)).

Here, Handjani does not contend that the evidence Azima seeks is within the jurisdictional reach of the English court.  (See Resp. Opp. (Dkt. No. 11) at 15-25)  Indeed, while Handjani testified on behalf of RAKIA during the UK proceedings, he was not a party to those proceedings and did not produce document discovery in advance of his testimony.  (Holden Decl. (Dkt. No. 5) ¶¶ 13, 31-32)  Because Handjani has not shown that the discovery Azima seeks is within the jurisdictional reach of the English court, analysis of the first Intel factor favors granting Azima's application.

### B.      Whether the English Court Would Be Receptive to Judicial Assistance from this Court

Under the second Intel factor, courts consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." Intel, 542 U.S. at 264.

Here, Handjani has not provided any basis for this Court to find that the English court would not be receptive to this Court's assistance.  Accordingly, the second Intel factor favors granting Azima's application.

### C.      Whether the Application Constitutes an Attempt to Circumvent Discovery Restrictions in England

Under the third Intel factor, courts "consider whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." Id. at 265.

Handjani contends that Azima's application is an effort to circumvent English discovery rules, because English courts typically do not permit pre-trial depositions. (Resp. Opp. (Dkt. No. 11) at 20-21 (citing, inter alia, In re WildBrain Family Int'l Ltd., No. 19 Misc. 527 (JPO), 2020 WL 6135765, at *2 (S.D.N.Y. Oct. 19, 2020)))[5] According to Handjani, Azima filed his Section 1782 application before post-remand discovery commences in the UK action, and the timing of Azima's application suggests that he is attempting "'to obtain a greater scope of discovery here than would be permitted by the UK Court.'" (Id. at 21 (quoting Saint-Gobain Adfors S.A.S. v. 3M Co., No. 020MC00052MJDKMM, 2020 WL 6111632, at *6 (D. Minn. Oct. 16, 2020)))

Federal courts are not bound by the discovery rules of foreign courts in exercising discretion under Section 1782, however. See Intel, 542 U.S. at 262 (rejecting foreign discoverability rule as "senseless" because it would "thwart § 1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws"); Mees v. Buiter, 793 F.3d 291, 303 & n.20 (2d Cir. 2015) (noting that "proof-gathering restrictions" under the third Intel factor "are best understood as rules akin to privileges that prohibit the acquisition or use of certain materials," and that "the [un]availability of the discovery in the foreign proceeding should not be afforded undue weight" (emphasis in Mees)). The Second Circuit has also rejected an "exhaustion" or "quasi-exhaustion" requirement for

---

[5] Instead of pre-trial depositions, UK courts typically authorize discovery through written witness statements. See WildBrain, 2020 WL 6135765, at *2-3; see also In re Emergency Ex Parte Application of Godfrey, No. 17-21631-CV, 2018 WL 1863749, at *2 (S.D. Fla. Feb. 22, 2018) (describing English discovery procedures), report and recommendation adopted sub nom. In re Godfrey, No. 17-21631-CIV, 2018 WL 1859344, at *2 (S.D. Fla. Mar. 15, 2018).

granting Section 1782 relief, instructing that a district court may not condition discovery on an applicant first attempting to obtain discovery in the foreign court. Id. at 303.

Here, Handjani has not shown that pre-trial depositions are prohibited under English law in the circumstances of this case. Nor has Handjani shown that the UK court would not be receptive to such evidence if obtained through Section 1782. See In re Godfrey, 2018 WL 1863749, at *9 (granting Section 1782 application for document and deposition discovery for use in English proceeding because the respondent "provided no authoritative proof that the English court would reject this discovery" and, instead, "simply point[ed] to the English court's peculiar limits on discovery, which is not enough").

As to Handjani's timing argument, it is not persuasive, because Azima is not required to first seek discovery from the English court. Moreover, Handjani has not shown that the evidence Azima seeks from him is within the jurisdictional reach of the UK court, or that Azima seeks discovery here in bad faith.[6] Id. at *10 (finding that third Intel factor favored granting Section 1782 application because, despite limits to discovery in English court, "there is no evidence that Petitioners seek discovery in bad faith").

Accordingly, analysis of the third Intel factor favors granting Azima's application.[7]

_____

[6] Handjani's request that this Court "defer decision on the application until the English Court has the opportunity to take up issues related to the scope of discovery" (Resp. Opp. (Dkt. No. 11) at 25) is rejected for the same reasons.

[7] Handjani cites to In re WildBrain Family International Limited, No. 19 Misc. 527 (JPO), 2020 WL 6135765 (S.D.N.Y. Oct. 19, 2020). In that case, the court granted a motion to quash a Section 1782 deposition subpoena. In applying the third Intel factor, the court concluded "that ordering live testimony would be in tension with the proof-gathering procedures that govern the UK tribunal overseeing this dispute." Id. at *2. The court did not elaborate further on this point. The court went to find that the testimony sought "is not proportional to the needs of the case and is unwarranted." Id. at *3; see also id. at *2 ("The Court concludes in its discretion that live

### D.    Whether the Subpoena Requests
### Are Unduly Intrusive or Burdensome

The final <u>Intel</u> factor requires a court to consider "whether the subpoena contains

unduly intrusive or burdensome requests." <u>In re Warren</u>, 2020 WL 6162214, at *5 (quotation

marks and alterations omitted) (citing <u>In re Microsoft Corp.</u>, 428 F. Supp. 2d at 193 and <u>Intel</u>,

542 U.S. at 264-65).

Handjani argues that Azima's discovery requests are "hugely overbroad and

untethered to the facts of his claim, not connected to Respondent, [and] speculative." (Resp.

Opp. (Dkt. No. 11) at 21)  In this regard, Handjani complains that (1) Azima has requested "'all

documents and communications'" between Handjani and "at least ten different individuals or

entities over a seven-year period from 2014 to the present"; (2) Azima's claims are based on

alleged hacking activity that took place in March 2015 and August 2016; and (3) there is no

reason to believe that Handjani has the requested documents, given his prior trial testimony in

which he denied any involvement with or knowledge of the hacking.  (<u>Id.</u> at 22-25)  Handjani

also argues that the requested deposition would be duplicative of his trial testimony, and thus

should not be permitted under Fed. R. Civ. P. 30(a)(2)(A)(ii).[8]  (<u>Id.</u> at 15-17)

Azima responds that RAKIA called Handjani at trial, thus "implicitly conceding

that Mr. Handjani is in possession of relevant discovery."  (Pet. Reply (Dkt. No. 13) at 6)  Azima

also argues that he seeks only documents and communications relating to (1) Azima and "a short

list of five associates targeted by the hackers"; and (2) "persons and entities allegedly involved in

[the] hacking."  (<u>Id.</u>)  As to the timeframe of his requests, Azima asserts that it "tracks the years

---

testimony by Raine, a nonparty to the UK litigation, is not warranted.").  Here, by contrast this
Court concludes that the requested deposition is not disproportional to Azima's discovery needs.
[8] Fed. R. Civ. P. 30(a)(2)(A)(ii) provides that "[a] party must obtain leave of court" prior to
deposing a witness who "has already been deposed in the case."

of continuing misconduct by RAKIA and its agents." In this regard, Azima notes that his

counterclaim asserts a hacking conspiracy that began in 2014, as well as efforts to conceal the

hack that continued until at least 2020. (See id. at 7-8) With respect to Fed. R. Civ. P.

30(a)(2)(A)(ii), Azima argues that a deposition of Handjani should be permitted – despite his

trial testimony – because (1) the UK appeals court determined that all aspects of Azima's

hacking claim would be open for re-examination in the new trial; (2) new information –

including information regarding the involvement of CyberRoot and BellTroX in the hack – has

been obtained since Handjani testified, and Handjani was not questioned about this evidence at

trial; and (3) Handjani was not required to produce any documents in the UK action, and thus

was not confronted with the documents now requested. (Id. at 8-9)

        In considering the fourth Intel factor, courts "'assess whether the discovery is

overbroad or unduly burdensome by applying the familiar standards of Rule 26 of the Federal

Rules of Civil Procedure.'" Union Fenosa Gas, S.A. v. Depository Tr. Co., 20 Misc. 188 (PAE),

2020 WL 2793055, at *7 (S.D.N.Y. May 29, 2020) (quoting Mees, 793 F.3d at 302). "Under

Rule 26(b)(1), parties are entitled to discovery 'regarding any nonprivileged matter that is

relevant to any party's claim or defense,' to the extent the request is 'reasonably calculated to

lead to the discovery of admissible evidence.'" In re Gushlak, 2011 WL 3651268, at *6. "This

standard 'has been construed broadly to encompass any matter that bears on, or that reasonably

could lead to other matter that could bear on, any issue that is or may be in the case.'" Id.

(quoting Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351 (1978)).

        Fed. R. Civ. P. 45 requires that a party "responsible for issuing and serving a

subpoena . . . take reasonable steps to avoid imposing undue burden or expense on a person

subject to the subpoena." Fed. R. Civ. P. 45(d)(1). "'Whether a subpoena imposes an "undue

burden" depends on factors including relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described, and the burden imposed. The party seeking discovery bears the initial burden of showing relevance.'" In re Auto-Guadeloupe Investissement S.A., 2012 WL 4841945, at *4 (quoting Noel v. Bank of New York Mellon, No. 11 Mc. 216 (PKC), 2011 WL 3279076, at *2 (S.D.N.Y. July 27, 2011)).

Here, Azima has adequately shown that the requested discovery is relevant and is reasonably calculated to lead to the discovery of admissible evidence. He has shown that Handjani has an ongoing relationship with the ruler of RAK and that he is a senior advisor at KARV Communications – the public relations firm that disseminated the "View from the Window" document that is the subject of Azima's application. (See Holden Decl. (Dkt. No. 5) ¶¶ 13, 21-22, 32; UK Trial Transcript (Dkt. No. 12-4) at 3-5) It is also undisputed that Handjani received emails in (1) April and July 2015 that instructed him and others to "target" and "go after" Azima; and (2) in August 2016 that purported to "break the news" regarding the discovery of Azima's hacked data. (See April and July 2015 Emails (Dkt. No. 5-4); Aug. 2016 Emails (Dkt. No. 5-7); UK Trial Transcript (Dkt. No. 12-4) at 11-13; UK Trial Transcript (Dkt. No. 12-5) at 13)[9] Although Handjani has denied any involvement with or knowledge of the plot to hack Azima, this Court concludes that Azima has alleged sufficient facts to demonstrate that Handjani may have evidence regarding the hacking.

---

[9] Azima has also submitted an affidavit from Stuart Page, who was hired by RAKIA to investigate Azima and Massaad. Page states that Handjani attended regular meetings in New York to discuss RAKIA's investigation of Azima and Massaad. (See Holden Decl., Ex. 2 ("Jan. 7, 2022 Page Aff.") (Dkt. No. 18-3) at 3-7)

Handjani has also not shown that the requested discovery would pose an undue burden on him.  The timeframe for the requested discovery is a seven-year time period between September 2014 and the present, during which RAKIA allegedly hacked Azima and his associates and covered-up the hacking conspiracy.  (See Am. Counterclaim (Dkt. No. 21-2) ¶¶ 81B-C, 130-31 (alleging that RAKIA arranged to hack Massaad in December 2014 and has concealed the evidence of the hacking conspiracy))  The requested discovery also directly addresses the allegations set forth in the Amended Counterclaim, including (1) "Project Update and similar reports prepared about Mr. Azima and his associates"; (2) instructions to "target" and "go after" Azima; (3) the "'View from the Window' document provided by Karv Communications to Mr. Gerrard"; (4) "the purported discovery of Mr. Azima's stolen data in August 2016"; (5) websites published about Azima in August 2016 and June 2019; (6) communications between Handjani and Azima[10]; and (7) the various entities alleged to have participated in the alleged hacking.  (See Proposed Order (Dkt. No. 2-2) at 2; Am. Counterclaim (Dkt. No. 21-2))

Handjani has also not shown that Azima should be precluded from deposing Handjani under Fed. R. Civ. P. 30.  Given (1) the new evidence that emerged after Handjani's trial testimony – evidence that led the England and Wales Court of Appeal to remand the case for a new trial; (2) the new facts alleged in Azima's Amended Counterclaim; and (3) the fact that Handjani was not required to produce document discovery prior to his trial testimony, there is reason to believe that Handjani's deposition testimony will not be duplicative of his trial testimony.

---

[10]  In 2015 and 2016, Handjani provided a "channel of communication" between Azima and RAKIA in relation to the ongoing dispute between RAK and Massaad, with which Azima had become involved.  (See Sept. 5, 2019 Handjani Witness Statement (Dkt. No. 5-2) ¶¶ 13-20)

Analysis of the fourth <u>Intel</u> factor indicates that Azima's application should be granted.

*          *          *          *

Having considered all four <u>Intel</u> factors and the applicable federal rules governing discovery, the Court concludes that Azima's application should be granted.

## **CONCLUSION**

For the reasons stated above, Azima's Section 1782 application is granted.  By July 21, 2022, Azima will file proposed subpoenas for the Court's approval.

Handjani's request for oral argument (Dkt. No. 11), and motion to strike Azima's supplemental submissions (Dkt. Nos. 19, 24), are denied as moot.  The Clerk of Court is directed to terminate the motions (Dkt. Nos. 2, 18, 21).

Dated: New York, New York
      July 15, 2022

SO ORDERED.

Paul G. Gardephe
United States District Judge